# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## DEL RIO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | CIVIL ACTION NO. 2:23-CV-00055 |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF HOMELAND | § | |
| SECURITY, *et al.*, | § | |
| | § | |
| *Defendants.* | § | |

---

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION OR
## STAY OF AGENCY ACTION

---

## TABLE OF CONTENTS

Table of Contents ........................................................................................................ ii

Table of Authorities................................................................................................... iii

Introduction ................................................................................................................ 1

Factual Background .................................................................................................... 3

    A.    Texas has a crisis at its Southern border. ................................................. 3

    B.    Texas launches Operation Lone Star and installs concertina wire................................. 8

    C.    In September, aliens surge in Eagle Pass........................................................ 12

    D.    Federal Defendants destroy Texas's concertina wire.......................................... 14

Argument ................................................................................................................. 22

    A.    Texas can show a likelihood of success on the merits. .................................... 23

        1.    Texas is likely to succeed on its conversion and trespass to chattels claims. ............. 24

        2.    Texas is likely to succeed on its claim that Defendants violated the APA by acting in excess of their statutory authority. ............................ 26

        3.    Texas is likely to succeed on its claim that Defendants failed to follow prescribed procedures. .......................... 28

        4.    Texas is likely to succeed on its claim that Defendants' actions were arbitrary and capricious in violation of the APA.............................. 31

        5.    In the alternative, Texas is likely to succeed on its claim that Defendants acted *ultra vires*. .......................... 33

    B.    Texas has demonstrated a substantial threat of irreparable harm................................. 36

    C.    Texas has demonstrated that the balancing of interests weighs in its favor and that the injunctive relief will serve the public interest. ...................... 37

Conclusion ............................................................................................................... 39

Certificate of Conference........................................................................................... 41

Certificate of Service................................................................................................. 41

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affinity Healthcare Servs., Inc. v. Sebelius*,
   720 F. Supp. 2d 12 (D.D.C. 2010) ...................................................................23

*All. for Hippocratic Med. v. U.S. Food & Drug Admin.*,
   78 F.4th 210 (5th Cir. 2023)............................................................................ 22

*Apter v. HHS*,
   80 F.4th 579 (5th Cir. 2023) .............................................................. 34, 35, 36

*Connasauga River Lumber Co. v. Shippen*,
   293 F.3d 579 (5th Cir. 1923) ...........................................................................26

*Cummer-Graham Co. v. Maddox*,
   285 S.W.2d 932 (Tex. 1956)............................................................................25

*Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*,
   600 F.2d 1184 (5th Cir. 1979)..........................................................................23

*E.V. v. Robinson*,
   906 F.3d. 1082 (9th Cir. 2018) ........................................................................36

*Frost v. Mischer*,
   463 S.W.2d 166 (Tex. 1971) ............................................................................26

*Gen. Elec. Co. v. EPA*,
   290 F.3d 377 (D.C. Cir. 2002) ...................................................................29, 30

*Geyen v. Marsh*,
   775 F.2d 1303 (5th Cir. 1985) .........................................................................34

*Glasgow v. Owen*,
   6 S.W. 527 (Tex. 1887)....................................................................................26

*Hazel v. Lonesome Ranch Property Owners Ass'n*,
   656 S.W.3d 468 (Tex. App.—El Paso 2022) ...................................................26

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*,
   804 F.2d 1390 (5th Cir. 1986) .........................................................................36

*La. Pub. Serv. Comm'n v. FCC*,
   476 U.S. 335 (1986) .........................................................................................26

*Larson v. Domestic & Foreign Commerce Corp.*,
     337 U.S. 682 (1949) ............................................................................................... 36

*Louisiana v. Biden*,
     55 F.4th 1017 (5th Cir. 2022) ............................................................................... 39

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
     463 U.S. 29 (1983) ............................................................................................ 31, 32, 33

*Mountain States Tel. & Tel. Co. v. Vowell Constr. Co.*,
     341 S.W.2d 148 (Tex. 1960) ............................................................................... 24, 25

*Nken v. Holder*,
     556 U.S. 418 (2009) .............................................................................................. 22

*Office of Commc'n of the United Church of Christ v. FCC*,
     707 F.2d 1413 (D.C. Cir. 1983) ........................................................................... 33

*Pan Am. Petroleum Corp. v. Long*,
     340 F.2d 211 (5th Cir. 1964) ............................................................................... 24

*Portland Cement Ass'n v. EPA*,
     665 F.3d 177 (D.C. Cir. 2011) ............................................................................. 33

*Prof'ls & Patients for Customized Care v. Shalala*,
     56 F.3d 592 (5th Cir. 1995) ................................................................................. 29

*SEC v. Chenery Corp.*,
     318 U.S. 80 (1943) ............................................................................................... 32

*Sepulvado v. Jindal*,
     729 F.3d 413 (5th Cir. 2013) ............................................................................... 39

*State v. Cemex Constr. Materials South, LLC*,
     350 S.W.3d 396 (Tex. App.—El Paso 2011) ...................................................... 24

*Texas v. U.S. EPA*,
     829 F.3d 405 (5th Cir. 2016) ............................................................................... 23

*Texas v. United States*,
     40 F.4th 205 (5th Cir. 2022) ............................................................................... 39

*Texas v. United States (DACA)*,
     50 F.4th 498 (5th Cir. 2022) ............................................................................ 35, 36, 37

*Texas v. United States (DAPA)*,
     809 F.3d 134 (5th Cir. 2015) .......................................................... 28, 29, 30, 31

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016)..................................................................................................29

*U.S. Dep't of Labor v. Kast Metals Corp.*,
    744 F.2d 1145 (5th Cir. 1984) ...........................................................................29, 30

*United States v. Garner*,
    767 F.2d 104 (5th Cir. 1985)...............................................................................32

*United States v. Williams*,
    441 F.2d 637 (5th Cir. 1971) ...............................................................................26

*In re Village Mobile Homes, Inc.*,
    947 F.2d 1282 (5th Cir. 1991)..............................................................................25

*Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*,
    16 F.4th 1130 (5th Cir. 2021) ..............................................................................23

*Winter v. NRDC*,
    555 U.S. 7 (2008) .........................................................................................22, 36

*Zapata v. Ford Motor Credit Co.*,
    615 S.W.2d 198 (Tex. 1981) ...............................................................................24

**Statutes**

5 U.S.C. § 551(10)(D) ...............................................................................................23

5 U.S.C. § 551(13) ...................................................................................................23

5 U.S.C. § 551(13), (10)(D) .......................................................................................26

5 U.S.C. § 553 ..................................................................................................28, 29

5 U.S.C. § 553(a)(2) ................................................................................................31

5 U.S.C. § 553(b)(A) ......................................................................................28, 29, 30

5 U.S.C. § 558(b) .....................................................................................................26

5 U.S.C. § 702 ...................................................................................................34, 36

5 U.S.C. § 705 ...............................................................................................3, 22, 23

5 U.S.C. § 706(2)(A) ................................................................................................31

5 U.S.C. § 706(2)(D) ................................................................................................28

6 U.S.C. §§ 202(1)-(3), 251, 255 .......................................................................................14

6 U.S.C. § 202(5) ...............................................................................................................27

6 U.S.C. § 211(c)(2), (5), (6), (8) ................................................................................ 14, 27

6 U.S.C. § 256 ....................................................................................................................15

8 U.S.C. § 1103(a)(5) ........................................................................................................27

8 U.S.C. § 1324 (a)(1)(A)(ii) .............................................................................................27

8 U.S.C. § 1324(a)(1)(A)(iv) ............................................................................................. 28

8 U.S.C. §1357(a)(3) ................................................................................................... 25, 27

Pub. L. 110–161, div. E, title V, §564(a), Dec. 26, 2007, 121 Stat. 2090 ................................. 15, 33

Pub. L. No. 109-367, §§ 2(a)(2), 3, 120 Stat. 2638, 2638-2639 (2006) ........................... 15

Tex. Gov't Code § 418.014 ..................................................................................................8

Tex. Penal Code §§ 12.50, 30.05 .........................................................................................8

**Other Authorities**

85 Fed. Reg. 14,953 ...........................................................................................................12

88 Fed. Reg. 69214 .............................................................................................................32

Exec. Order No. 14059, 86 Fed. Reg. 71549, 71549 (Dec. 15, 2021) .............................38

RESTATEMENT (SECOND) OF TORTS §263 (1965) ..........................................................25

U.S. Const. art. I, § 10, cl. 3 .................................................................................................9

### INTRODUCTION

In the midst of an unprecedented immigration crisis at the southern border, federal government officials are, once again, undermining Texas's efforts to stem the flow of illegal immigration.

The crisis at the southern border is well known. The Biden Administration's abdication of its duty to secure the border has allowed millions of aliens to illegally cross into Texas and the United States in record numbers. According to data maintained by the federal government, U.S. Customs and Border Protection ("CBP") encountered approximately 458,000 aliens at the border in FY2020. That number swelled to over 1.7 million encounters in FY2021 and nearly 2.4 million in FY2022. And the number of "gotaways"—aliens who are detected as making an illegal entry but neither found nor apprehended—increased by 303 percent between FY2019 and FY2022, reaching more than 600,000 in FY2022.

But the border crisis is not just limited to harms of this unprecedented influx of unlawful immigration. It also includes deadly drug smuggling, human trafficking, infiltration by suspected terrorists, and other criminal drug cartel activities. To date, in FY2023, CBP has seized over 22,000 pounds of fentanyl—compared with 8,300 pounds over the same period in FY2022. Fentanyl is potentially lethal at a two-milligram dose and is involved in more deaths of Americans under 50 than any other cause of death, including heart disease, cancer, homicide, or suicide. Fentanyl and other drugs are often illegally smuggled into the United States by cartels that operate as transnational criminal organizations—and that have been designated by the Governor of Texas as foreign terrorist organizations. And the organized crime and drug cartels shuttling these drugs

daily prey on alien communities and children through human trafficking, violence, extortion, and exploitation.

In response, Texas has acted to fill the breach created by the federal government's indolence. The Governor of Texas declared a border security disaster in 2021 and launched Operation Lone Star, which utilizes multiple state agencies, including the Texas Military Department ("TMD"), to fill dangerous gaps left by the Biden Administration's failure to secure the U.S.-Mexico border.

Among other Operation Lone Star initiatives, TMD has purchased and deployed concertina wire fencing, always with the permission of the landowners, to deter and slow illegal crossings at hot spots along the southern border—including in Eagle Pass, Texas, located in the U.S. Border Patrol's Del Rio Sector.

Recently, Eagle Pass has become the epicenter of this unprecedented alien surge. According to Eagle Pass Mayor Rolando Salinas, Jr., this recent surge is like "nothing that we've seen ever, really, to have so many people crossing in without consequence."[1] After roughly 14,000 people—about half of Eagle Pass's population—entered the city in less than two weeks, Mayor Salinas declared a state of disaster, which the City Council endorsed the next week.

On previous occasions, agents of CBP have cut Texas's concertina wire barriers placed at strategic border crossing locations. But just as Eagle Pass was being overwhelmed by this alien surge in September and October of 2023, agents of CBP, without any justification, increased this

---

[1] Gaige Davis, *High Migration Through Texas Border Town of Eagle Pass Strains Resources*, NPR (Sept. 22, 2023), https://www.npr.org/2023/09/22/1201215460/high-migration-through-texas-border-town-of-eagle-pass-strains-resources.

federal practice of cutting, destroying, or otherwise damaging Texas's concertina wire that had been strategically positioned for the purpose of securing the border and stemming the flow of illegal migration.

Since September 20, 2023, federal agents have developed and implemented a policy, pattern, or practice of destroying Texas's concertina wire to encourage and assist thousands of aliens to illegally cross the Rio Grande and enter Texas. Federal agents not only cut Texas's concertina wire, but also attach ropes or cables from the back of pickup trucks to ease aliens' ability to illegally climb up the riverbank into Texas. And they regularly cut new openings in the wire fence, sometimes immediately after Texas officers have placed new wire to plug up gaps in fencing barriers.

By cutting Texas's concertina wire, the federal government has not only illegally destroyed property owned by the State of Texas; it has also disrupted the State's border security efforts, leaving gaps in Texas's border barriers and damaging Texas's ability to effectively deter illegal entry into its territory. Texas is entitled to a preliminary injunction against this ongoing, unlawful practice which undermines its border security efforts. This Court can and should enjoin the Defendants from continuing to destroy and damage private property that is not theirs—without statutory authority and in violation of both state and federal law. In the alternative, the Court should issue a stay of agency action under 5 U.S.C. § 705.

## FACTUAL BACKGROUND

### A.  Texas has a crisis at its Southern border.

A crisis of human trafficking, drug smuggling, and terrorist infiltration exists along Texas's 1,200-mile border with Mexico. For three years, the number of aliens illegally crossing the southern border has ballooned. CBP encountered about 458,000 aliens at the border in FY2020, 1.7 million

3

in FY2021, and 2.4 million in FY2022.[2] So far in FY2023, CBP has already encountered more than 2.2 million.[3] Those numbers omit individuals detected as making an illegal entry but neither found nor apprehended (there were more than 600,000 in FY2022) and the "unknown number of aliens who evade detection" entirely.[4]

This unprecedented influx of criminal activity along our southern border has had predictable and harmful effects in Texas and across the country. Both Texas citizens and aliens themselves—many of them unaccompanied minors—are often at the mercy of transnational criminal cartels that see illicit activity along the border as good business.[5] These transnational criminal organizations that ferry violent crime across the Rio Grande daily "have become potent paramilitary forces, with heavily armed mobile units able to stand their ground against the Mexican military."[6] One former U.S. Attorney General has stated that the cartels pose security threats that look "more like ISIS than like the American mafia."[7] In one recent incident, these non-state actors were able to overwhelm Mexico's military with "700 cartel paramilitary fighters with armored cars, rocket launchers and heavy machine guns."[8] The federal government has chosen to "accept

---

[2] Office of Inspector General, Dep't of Homeland Security, OIG-23-24: Intensifying Conditions at Southwest Border Are Negatively Impacting CBP and ICE Employees' Health and Morale 6 (May 3, 2023), https://www.oig.dhs.gov/sites/default/files/assets/2023-05/OIG-23-24-May23.pdf.

[3] *Southwest Land Border Encounters*, U.S. Customs & Border Protection, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

[4] OIG-23-24, *supra* n.2, at 10.

[5] Todd Bensman, Overrun: How Joe Biden Unleashed the Greatest Border Crisis in U.S. History 29-32, 193 (2023).

[6] William Barr, Opinion, *The U.S. Must Defeat Mexico's Drug Cartels*, WALL ST. J. (Mar. 2, 2023), https://www.wsj.com/articles/the-us-must-defeat-mexicos-drug-cartels-narco-terrorism-amlo-el-chapo-crenshaw-military-law-enforcement-b8fac731.

[7] Id.

[8] Id.

a failed narco-state on our border, providing sanctuary to narco-terrorist groups preying on the American people."[9]

These criminal organizations—"the largest, most violent, and most prolific fentanyl trafficking operation in the world"—shuttle illegal narcotics like fentanyl from Mexico into every corner of this country.[10] Although federal officials continue to claim that "Mexico is not a producer of fentanyl," that country is home to thousands of "illegal laboratories" that in fact manufacture the synthetic drug.[11] This year alone, CBP has seized over 22,000 pounds of fentanyl—a synthetic opioid that is lethal at two milligram doses and is now the leading cause of death for Americans under 50.[12] The fentanyl epidemic is now a nationwide problem that reaches far beyond Texas.[13] Just last month, an infant died after accidentally coming into contact with fentanyl residue at a daycare in New York City.[14]

---

[9] Id.

[10] Press Release, U.S. Department of Justice, Justice Department Announces Charges Against Sinaloa Cartel's Global Operation (Apr. 14, 2023), https://www.justice.gov/opa/pr/justice-department-announces-charges-against-sinaloa-cartel-s-global-operation.

[11] Press Release, U.S. Department of State, Remarks at Joint Press Availability in Palacio Nacional (Oct. 5, 2023), https://www.state.gov/secretary-antony-j-blinken-secretary-of-homeland-security-alejandro-mayorkas-attorney-general-merrick-garland-white-house-homeland-security-advisor-dr-liz-sherwood-randall-mexican-secretary-of-p/; *see* DRUG ENFORCEMENT AGENCY, DEA-DCT-DIR-008-20: FENTANYL FLOW TO THE UNITED STATES (Jan. 2020), https://www.dea.gov/sites/default/files/2020-03/DEA_GOV_DIR-008-20%20Fentanyl%20Flow%20in%20the%20United%20States_0.pdf.

[12] Press Release, Chuck Grassley, Feinstein-Grassley Resolution for National Fentanyl Awareness Day Passes Senate (May 18, 2023), https://www.grassley.senate.gov/news/news-releases/feinstein-grassley-resolution-for-national-fentanyl-awareness-day-passes-senate.

[13] Id.

[14] Susie Coen, *Baby Boy Dies After Ingesting Fentanyl at New York Nursery*, DAILY TELEGRAPH (Sept. 17, 2023), https://www.telegraph.co.uk/world-news/2023/09/16/baby-boy-dead-ingesting-fentanyl-new-york-nursery-bronx/.

In addition to trafficking drugs, Mexican cartels also traffic human beings. "For the first time in history, the cartel proceeds from human smuggling [may] have surpassed those from drug smuggling."[15] Trafficking across the southern border has changed "from a scattered network of freelance 'coyotes' to a multi-billion-dollar international business controlled by organized crime, some of Mexico's most violent drug cartels."[16] Cartels demand thousands of dollars from aliens to facilitate their illegal entry, commodifying them as human "inventory" with "numbered, colored wrist band[s]."[17] Women and children are raped and abused while journeying to the border, only to be trafficked for further sexual violence upon arriving in the United States.[18] Many newly arrived aliens live in constant fear of visits by cartel members shaking them down for the thousands of dollars they still owe.[19]

Besides submitting themselves to violence and exploitation at the hands of criminal cartels, geographic perils exist for aliens attempting to illegally cross the border. A record high of 853 aliens died crossing it between October 2021 and October 2022.[20] Much of the border passes through the

---

[15] Bensman, *supra* n.5, at 41.

[16] Miriam Jordan, *Smuggling Migrants at the Border Now a Billion-Dollar Business*, N.Y. Times (July 25, 2022), https://www.nytimes.com/2022/07/25/us/migrant-smuggling-evolution.html.

[17] Bensman, *supra* n.5, at 32.

[18] *See* Laura Gottesdeiner et al., *Migrants Are Being Raped at the Mexico Border as they Await Entry to US*, Reuters (Sept. 29, 2023), https://www.reuters.com/world/migrants-are-being-raped-mexico-border-they-await-entry-us-2023-09-29/; Virginia Allen, *'America's New Slave Trade' Is Here at Hands of Mexican Cartels, Border Expert Tells Lawmakers*, Daily Signal (July 19, 2023), https://www.dailysignal.com/2023/07/19/new-slave-trade-arrived-america-hands-mexican-cartels-border-expert-tells-congress/.

[19] Tim Hains, *Sen. Katie Britt: What I Saw at the Border Was Not the American Dream, It Was a Nightmare*, RealClearPolitics (Sept. 27, 2023), https://www.realclearpolitics.com/video/2023/09/27/sen_katie_boyd_britt_what_i_saw_at_the_border_was_not_the_american_dream_it_was_a_nightmare.html.

[20] Camilo Montoya-Galvez, *At Least 853 Migrants Died Crossing the U.S.-Mexico Border in Past 12*

arid Chihuahuan Desert—the largest desert in North America—where aliens risk dying from excessive heat and lack of water.[21] Other portions of the border pass through the Rio Grande, where aliens risk drowning in some stretches with a powerful current.[22] A United Nations agency has declared the U.S.-Mexico border the deadliest land crossing in the world.[23]

Cartel members who cross the border bring violence and crime with them. Law enforcement along the Texas border now regularly engage in high-speed chases with traffickers[24] while "'robberies and violence' skyrocket in [previously] quiet town[s]."[25] Cartels seizing upon an open border have also facilitated the infiltration of terrorists from across the globe. In 2022, the number of border apprehensions of individuals on the FBI's terrorist watchlist was "500 percent more than in *the prior five years combined*."[26] Put another way, CBP encountered just 6 individuals

---

*Months—a Record High*, CBS NEWS (Oct. 28, 2022), https://www.cbsnews.com/news/migrant-deaths-crossing-us-mexico-border-2022-record-high/.

[21] *See* Frances Vinall, *More than 100 Migrants Died from Heat Near U.S.-Mexico Border this Year*, WASH. POST (July 7, 2023), https://www.washingtonpost.com/weather/2023/07/07/migrant-deaths-heat-mexico-border/.

[22] *See* Santiago Perez & Alicia Caldwell, *'It's Like a Graveyard': Record Numbers of Migrants Are Dying at the U.S. Border*, WALL ST. J. (Mar. 17, 2023), https://www.wsj.com/articles/illegal-immigration-mexico-us-border-deaths-c35cf892.

[23] Peter Aitken, *UN Migration Study Deems US-Mexico Border 'Deadliest' Land Route in the World Based on 2021 Numbers*, FOX NEWS (July 4, 2022), https://www.foxnews.com/us/un-migration-study-deems-us-mexico-border-deadliest-land-route-world-based-2021-numbers.

[24] Ali Bradley, *Chases Rampant at Southern Border, Plaguing Communities*, NEWS NATION (Mar. 17, 2023), https://www.newsnationnow.com/us-news/immigration/border-coverage/cartels/southern-border-pursuits/.

[25] Harriet Alexander, *Venezuelan Migrants Are Repelled By Re-installed Razor Wire at Eagle Pass*, DAILY MAIL (Sept. 22, 2023), https://www.dailymail.co.uk/news/article-12547831/eagle-pass-migrants-razor-wire-venezuelans.html.

[26] BENSMAN, supra n.5, at 255-56 (emphasis added); see also id. at 258-64; Adam Shaw et al., Thousands of 'Special Interest Aliens' from Middle East Countries Stopped at Southern Border Since 2021: Data, FOX NEWS (Oct. 10, 2023), https://www.foxnews.com/politics/thousands-special-interest-aliens-middle-east-countries-stopped-southern-border-2021-data.

on the terrorist watchlist in 2018; it encountered 146 of them in 2023.[27] Given the hundreds of thousands of "gotaways" who have evaded apprehension, it is impossible to know how many terrorists have already succeeded in passing through the porous southern border and formed terror cells in America.[28]

**B.    Texas launches Operation Lone Star and installs concertina wire.**

In 2021, Governor Greg Abbott declared a border security disaster and launched Operation Lone Star to mitigate the effects of this unprecedented crisis. As part of that initiative, the Governor has:

    a.   detailed law enforcement officers to plug border staffing gaps;

    b.   heightened vehicle inspections by the Department of Public Safety ("DPS");

    c.   bused aliens who wished to relocate to sanctuary cities in other States, which now recognize the southern border poses a national problem;

    d.   constructed miles of border wall after the U.S. ceased construction;

    e.   invoked the Texas Disaster Act to enhance penalties for criminal trespass on private land, *see* Tex. Gov't Code § 418.014; Tex. Penal Code §§ 12.50, 30.05;

    f.   designated transnational criminal cartels smuggling drugs, people, and weapons into Texas as foreign terrorist organizations;

---

[27] MaryAnn Martinez, *Feds Prevented Over 160 People on Terror Watchlist From Crossing US Borders Illegally—Highest Ever Total Recorded: DHS*, N.Y. Post (Sept. 15, 2023), https://nypost.com/2023/09/15/160-people-on-terror-watch-list-stopped-at-us-border-in-2023/.

[28] Andrew Miller, *Hamas Attacks Reminder That Sleeper Cells Are Crossing Southern Border, Expert Warns: 'They're Already Here,'* Fox News (Oct. 11, 2023), https://www.foxnews.com/politics/hamas-attack-reminder-sleeper-cells-crossing-southern-border-expert-warns-theyre-already-here.

g.   deployed floating marine barriers to deter illegal crossings in hotspots along the Rio Grande; and

h.   invoked the Invasion Clauses of the U.S. Constitution, *see* U.S. Const. art. I, § 10, cl. 3; *id.* art. IV, § 4.

These efforts have so far "led to over 477,800 illegal alien apprehensions," "more than 34,200 criminal arrests, with more than 31,200 felony charges reported," and "over 428 million lethal doses of fentanyl" seized.[29] "Every individual who is apprehended or arrested and every ounce of drugs seized would have otherwise made their way into communities across Texas and the nation."[30]

In addition to those historic initiatives, Governor Abbott also instructed TMD to deploy concertina wire to deter aliens from making the illegal and dangerous journey across the border into Texas.[31] Concertina wire is a type of barbed wire that is formed in large coils that can be expanded like a concertina, a musical instrument that resembles an accordion. A single roll can span more than 50 feet of distance and connect with other rolls, posts, hinges, and other components to form a continuous fence.

Accordingly, concertina wire has long been used to form a secure perimeter around airports, prisons, military bases, government buildings, and other high security locations. The

---

[29] Press Release, Office of the Texas Governor, Operation Lone Star Builds More Border Wall To Protect Texans (Sept. 15, 2023), https://gov.texas.gov/news/post/operation-lone-star-builds-more-border-wall-to-protect-texans.

[30] Id.

[31] Press Release, Office of the Texas Governor, Operation Lone Star Deploys New Border Security Deterrence Strategies (June 9, 2023), https://gov.texas.gov/news/post/operation-lone-star-deploys-new-border-security-deterrence-strategies.

federal government, for example, deployed concertina wire to create a secure perimeter around the U.S. Capitol and the Supreme Court of the United States in early 2021.[32] Even retail stores have begun employing concertina wire "[i]n an effort to combat a wave of retail thefts and smash-and-grab robberies."[33]

International borders across the globe are likewise secured with concertina wire.[34] India, the world's largest democracy, has used concertina wire to fence off almost 2,000 miles of its border with Bangladesh.[35] The Obama Administration likewise used razor wire along portions of the U.S.-Mexico border.[36]

Coiled razor wire can be quickly deployed to cover a large span of geographical space. As DHS itself acknowledges, once deployed, it effectively "serves as a deterrent" to prevent

---

[32] Zachary Cohen, *US Capitol Police Tells Lawmakers that Razor Wire Fencing Should Remain Until September*, CNN (Feb. 19, 2021), https://www.cnn.com/2021/02/19/politics/us-capitol-police-fencing-extension-request/index.html; Marisa J. Lang, *An Increasingly Fortified Federal City*, WASH. POST (Apr. 13, 2021), https://www.washingtonpost.com/dc-md-va/interactive/2021/us-capitol-fencing/.

[33] Nancy Loo & Katie Smith, *Retailers Using Metal Coils to Deter Robberies, Nab Thieves*, NEWS NATION (Dec. 15, 2021), https://www.newsnationnow.com/holidays-on-alert/retailers-using-metal-coils-to-deter-robberies-nab-thieves/; *see also* Lisa Fickenscher et al., *Saks Fifth Avenue is Wrapped in Razor Wire to Prevent Looting*, N.Y. POST (June 3, 2020), https://nypost.com/2020/06/02/saks-fifth-avenue-is-wrapped-in-razor-wire-to-prevent-looting/.

[34] Lorena Iñiguez Elebee, *What Border Walls Look Like Around the World*, L.A. Times (Jan. 31, 2017), https://web.archive.org/web/20170514093140/https://www.latimes.com/world/mexico-americas/la-fg-g-border-bariers-20170130-story.html.

[35] Shahidul Islam Chowdhury, *India Completes Fencing Three-Fourths of Border*, New Age Bangladesh (Sept. 23, 2020), https://www.newagebd.net/article/117038/india-completes-fencing-three-fourths-of-border.

[36] Office of Inspector General, Dep't of Homeland Security, OIG-17-39: CBP's Border Security Efforts – An Analysis of Southwest Border Security Between the Ports of Entry 4 (Feb. 27, 2017), https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-39-Feb17.pdf.

unauthorized crossings and entry onto restricted property.[37] Snags on wire coils slow illegal entries and ease law enforcement apprehension. But the challenge of safely navigating the wire itself often deters trespassers from attempting to cross at all.

TMD regularly purchases concertina wire from a variety of vendors to help secure the border, including in the vicinity of Eagle Pass, Texas. Over the past three years, TMD has spent $32 million to procure components for its concertina wire fence, Perez Decl. ¶3—including roughly $11 million for more than 70,000 rolls of concertina wire—equivalent to roughly 330 miles of barrier, Perez Decl. ¶5. Texas's need for concertina wire has increased in recent months. In the second half of 2023 alone, as the Defendants accelerated their practice of destroying Texas's property, TMD has purchased almost 30,000 rolls of wire. Perez Decl. ¶3. Much of this wire is stored in facilities near Eagle Pass, Texas. Perez Decl. ¶4.

TMD servicemembers regularly deploy concertina wire along Texas's border with Mexico, including in the vicinity of Eagle Pass, Texas. After initial conversations with landowners, they obtain written consent in a Border Barrier License Agreement authorizing construction, maintenance, and repair of concertina wire fencing. Garcia Decl. ¶10. To construct the concertina fence, TMD servicemembers place stakes in the ground, spaced out every five to six feet, and stretch concertina wire along the line of fencing stakes. Garcia Decl. ¶8. Successive rolls of wire are attached to each other by clamps and the rolls are attached to the fence stakes with tying wires. Garcia Decl. ¶8. Ground anchors placed at intervals keep the wire coils flush with the ground.

---

[37] Office of Inspector General, Dep't of Homeland Security, OIG-17-115: Management Alert – Security and Safety Concerns at Border Patrol Stations in the Tucson Sector 6 (Sept. 29, 2017), https://www.oig.dhs.gov/sites/default/files/assets/2017/OIG-17-115-MA-092917.pdf.

Garcia Decl. ¶8. TMD servicemembers almost always construct the fence with a minimum of three rolls of wire: Two rolls of wire are situated on the ground on either side of the stake line, while a third roll is installed above and between them in line with the fencing stakes. Garcia Decl. ¶9. TMD servicemembers are capable of laying "a quarter mile of [this] triple-strand razor wire each day."[38]

## C.   In September, aliens surge in Eagle Pass.

Maverick County—which includes Eagle Pass, Texas—has been particularly affected by the ongoing border crisis.[39] In June 2023, Eagle Pass represented nearly 25% of all CBP border encounters.[40] Seizures there of cocaine, methamphetamine, heroin, fentanyl, and marijuana increased by 7% in June 2023 and 9% in July 2023.[41]

But those routine and ongoing challenges in Eagle Pass pale in comparison to the massive influx the city saw this fall. Over the second and third weeks of September, almost 14,000 aliens—roughly half the entire population of Eagle Pass—entered the city illegally. On September 20, 2023, more than 4,000 aliens illegally crossed into Eagle Pass in a single day.[42] That two-week surge in

---

[38] Press Release, Texas Military Department, Texas Gets Help With Border, Florida-Tennessee National Guard  (June 7, 2023), https://tmd.texas.gov/ols-weekly-joint-press-release-injects-6-7-2023.

[39] Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 85 Fed. Reg. 14,953, 14,953-14,955 (Mar. 16, 2020).

[40] *Southwest Land Border Encounters (By Component)*, U.S. CUSTOMS & BORDER PROTECTION, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters-by-component.

[41] Press Release, U.S. Customs & Border Patrol, CBP Releases July 2023 Monthly Update (Aug. 18, 2023), https://www.cbp.gov/newsroom/national-media-release/cbp-releases-july-2023-monthly-update.

[42] MaryAnn Martinez & Jorge Fitz-Gibbon, *Overwhelmed Texas City Declares State of Emergency As over 11K Migrants—Close to Half Its Population—Surge Across Border*, N.Y. POST (Sept. 20, 2023), https://nypost.com/2023/09/20/eagle-pass-texas-declares-state-of-emergency-over-migrants/.

Eagle Pass is roughly the same as the total number of alien apprehensions for the entire Del Rio Sector for the entire year in each of 2009, 2010, 2011, 2017, and 2018.[43]

This sudden and overwhelming influx of aliens has resulted in what one observer called "complete madness," straining local resources.[44] The city's law enforcement officers have been "overwhelmed" by a spate of crime[45] and Eagle Pass is home to only a single shelter capable of housing aliens.[46]

In response to this massive influx, the mayor of Eagle Pass issued an emergency declaration under the Texas Disaster Act. On September 19, 2023, Mayor Rolando Salinas, Jr., declared a state of disaster "due to the severe undocumented immigrant surge into the City of Eagle Pass."[47] On September 26, 2023, the City Council ratified the mayor's disaster declaration because the alien surge continued to plague the city, stating that it would remain in effect until terminated by the City Council.[48] The Eagle Pass City Council has not terminated the disaster declaration.

---

[43] *Total Illegal Alien Apprehensions By Month*, U.S. BORDER PATROL (Jan. 2020), https://www.cbp.gov/sites/default/files/assets/documents/2020-Jan/U.S.%20Border%20Patrol%20Monthly%20Apprehensions%20%28FY%202000%20-%20FY%202019%29_1.pdf.

[44] *See* Anna Giaritelli, *Elon Musk Goes to the Border and Leaves Stunned: 'Complete Madness*,*'* WASH. EXAMINER (Sept. 29, 2023), https://www.washingtonexaminer.com/policy/immigration/elon-musk-goes-to-the-border-and-leaves-stunned; *see also* Alicia Caldwell & Michelle Hackman, *Migrants Overwhelm Texas City of Eagle Pass*, WALL ST. J. (Sept. 21, 2023), https://www.wsj.com/politics/policy/migrants-overwhelm-texas-city-of-eagle-pass-531879cf.

[45] Alexander, *supra* n.25.

[46] *See* Uriel J. Garcia, *Texas Border Cities Scramble to Shelter Thousands of Newly-Arrived Migrants*, TEX. TRIB. (Sept. 21, 2023), https://www.texastribune.org/2023/09/21/texas-migrants-border-eagle-pass/.

[47] City of Eagle Pass (@CityEaglePassTx), X (Sept. 20, 2023, 9:13 AM), https://twitter.com/CityEaglePassTx/status/1704498968154009806.

[48] City of Eagle Pass, *The City of Eagle Pass City Council Ratifies Emergency Declaration*, FACEBOOK (Sept. 27, 2023), https://www.facebook.com/photo.php?fbid=710818617741865&set=a.632768342213560&type=3 .

Texas had previously "installed razor wire in Eagle Pass to stop illegal crossings." During the September surge, however, the Governor of Texas "deployed more Texas National Guard to repel illegal crossings & install more razor wire."[49] TMD "reinforced the razor wire barrier, adding new spools to deter entry at the illegal crossing point."[50]

### D.   Federal Defendants destroy Texas's concertina wire.

Federal law tasks DHS and Secretary Mayorkas with, among other things, "[p]reventing the entry of terrorists and the instruments of terrorism into the United States"; "[s]ecuring the borders … of the United States, including managing and coordinating those functions transferred to [DHS] at ports of entry"; "[c]arrying out the immigration enforcement functions vested by statute," like U.S. Border Patrol (USBP) operations, detention and removal, and inspections at ports of entry; and consulting with "the heads of State and local law enforcement agencies to determine how to most effectively conduct [immigration] enforcement operations." 6 U.S.C. §§ 202(1)-(3), 251, 255; *see also id.* § 111(b)(1)(A), (B), (D), (H).

Federal law tasks CBP and Acting Commissioner Miller with, among other things, "ensur[ing] the interdiction of persons and goods illegally entering the United States"; "detect[ing], respond[ing] to, and interdict[ing] terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States;" "safeguard[ing] the borders of the United States"; and "enforc[ing] and administer[ing] all immigration laws." *Id.* § 211(c)(2), (5), (6), (8).

---

[49] Greg Abbott (@GregAbbott_TX), X (Sept. 20, 2023, 4:54 PM), https://twitter.com/Greg Abbott_TX/status/1704614936218149361.

[50] Keith Griffith, *Eagle Pass Border Standoff*, DAILY MAIL (Sept. 26, 2023), https://www.daily mail.co.uk/news/article-12563581/Eagle-Pass-border-crisis-Texas-National-Guard.html.

Federal law tasks USBP and Chief Owens with, among other things, "serv[ing] as the law enforcement office of [CBP] with primary responsibility for interdicting persons attempting to illegally enter or exit the United States or goods being illegally imported into or exported from the United States at a place other than a designated port of entry"; "deter[ring] and prevent[ing] the illegal entry of terrorists, terrorist weapons, persons, and contraband"; and "carry[ing] out other duties and powers prescribed by the Commissioner" of CBP. *Id.* § 211(e)(3)(A)-(B).

When it comes to fencing along the border, federal law instructs that DHS "shall construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective." Pub. L. 110–161, div. E, title V, §564(a), Dec. 26, 2007, 121 Stat. 2090.[51] And when it first assigned immigration and border functions to DHS, Congress instructed that it "should be a priority for the Secretary" to complete a "14-mile border fence project" near San Diego, California. 6 U.S.C. § 256.

The federal Defendants, however, have taken deliberate steps not to police the Nation's southern border. They have taken additional steps to undercut any State that tries to secure its own border, which the federal government has itself abandoned. Here, Defendants have done just that by adopting a policy, pattern, or practice of destroying Texas's concertina wire fence.

TMD servicemembers routinely record and report noteworthy or suspicious incidents to TMD's chain of command, including incidents of anyone damaging state property or tampering with border infrastructure. *See* Garcia Decl. ¶11. In the first half of this year, TMD documented at least 20 incidents when CBP officials seized and damaged Texas's wire fencing by cutting it. On

---

[51] *See also* Pub. L. No. 109-367, §§ 2(a)(2), 3, 120 Stat. 2638, 2638-2639 (2006).

various occasions from January 2023 through August 2023, CBP officials cut Texas's concertina wire to admit aliens illegally entering Texas through the fence hole created by CBP's destruction of state property.

In response to reporting in June that showed footage of "Border Patrol cutting through razor wire placed by the state of TX to allow aliens to enter & be processed,"[52] "a CBP spokesperson" stated that federal officials were entitled to destroy state property to admit illegal aliens anytime they had already effectuated an illegal crossing of the international border.[53] CBP's damage to Texas's concertina wire accelerated in September and October, just as the sudden influx of aliens was surging into Eagle Pass.

On September 20, 2023, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 8:51 AM, admitting more than 1,200 aliens through the hole. That same day, the Governor of Texas publicly explained in a statement on X (formerly known as Twitter) that Texas had "installed [the] razor wire in Eagle Pass to stop illegal crossings." Federal officers, however, "CUT that wire" to "open[] the floodgates to illegal immigrants." In response, the Governor announced that he "immediately deployed more Texas National Guard to repel illegal crossings & install more razor wire."[54]

This post—which has since been viewed more than 10 million times—included an embedded video from earlier that same day showing CBP officials tearing Texas's fence apart:

---

[52] Bill Melugin (@BillMelugin_), X (June 30, 2023, 1:35 PM), https://twitter.com/BillMelugin_/status/1674849236448313372.

[53] Bill Melugin (@BillMelugin_), X (June 30, 2023, 6:23 PM), https://twitter.com/BillMelugin_/status/1674921617661591553.

[54] Abbott, *supra* n.49.



The video also shows CBP officials waving aliens up the riverbank:



Defendants did not cease their destruction of state property. Instead, they doubled down on their policy, pattern, or practice of destroying Texas's wire fence. TMD has documented CBP officials seizing and damaging Texas's wire fence by cutting openings more times since September 20 than in the prior eight months combined. Garcia Decl. ¶12.

    a.   On September 21, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 4:52 AM, admitting an unknown number of aliens through the hole.

    b.   On September 23, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 5:53 PM, admitting 30 aliens through the hole.

c.  On September 24, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 1:05 PM, admitting 186 aliens through the hole.

d.  On September 26, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 1:40 PM, admitting an unknown number of aliens through the hole.

e.  On September 27, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 2:47 PM, admitting 94 aliens through the hole.

f.  On September 27, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 3:25 PM, admitting an unknown number of aliens through the hole.

g.  On September 28, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 7:23 AM, admitting 72 aliens through the hole.

h.  On September 28, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 10:04 AM, admitting 32 aliens through the hole.

i.  On September 28, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 11:20 AM, admitting more than 30 aliens through the hole.

j.  On September 28, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 1:55 PM, admitting an unknown number of aliens through the hole.

k.  On September 29, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 6:00 AM, admitting an unknown number of aliens through the hole.

l.  On September 29, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 4:12 PM, admitting 35 aliens through the hole.

m.  On September 30, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 9:14 AM, admitting 232 aliens through the hole.

n. On September 30, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 1:30 PM, admitting an unknown number of aliens through the hole.

o. On September 30, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 2:35 PM, admitting an unknown number of aliens through the hole.

p. On September 30, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 4:37 PM, admitting an unknown number of aliens through the hole.

q. On October 1, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 11:00 AM, admitting an unknown number of aliens through the hole.

r. On October 2, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 11:11 AM, admitting an unknown number of aliens through the hole.

s. On October 2, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 2:55 PM, admitting an unknown number of aliens through the hole.

t. On October 6, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 12:45 PM, admitting an unknown number of aliens through the hole.

u. On October 6, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 5:25 PM, admitting an unknown number of aliens through the hole.

v. On October 10, CBP officials cut Texas's concertina wire near Eagle Pass, Texas, at 11:40 AM, admitting an unknown number of aliens through the hole.

Since September 20, then, CBP has seized and damaged Texas's concertina wire—cutting through usually a minimum of three rows of concertina wire—to escort aliens into Texas more than 20 times. Garcia Decl. ¶¶12-13. On each of these occasions, CBP has entered onto state,

municipal, or private land to destroy state property. (Plaintiff has not placed concertina wire on any federal land near Eagle Pass.)

Defendants thus have a policy, practice, or pattern of seizing, damaging, and destroying Texas's personal property by cutting, severing, and tearing its concertina wire fence to introduce breaches, gaps, or holes in the barrier. Banks Decl. ¶14. They have authorized their officials or agents to engage in this conduct anytime an alien has managed to illegally cross the international border in the Rio Grande to process that alien in the United States—even where migrants are in no apparent distress or when any legitimate exigency has dissipated. Garcia Decl. ¶13; Banks Decl. ¶¶16-17, 19. Defendants' wire-cutting policies are pervasive and widespread. And they are largely implemented by higher-level CBP leadership, rather than lower-level officers, who regularly refuse to destroy or damage Texas's border infrastructure. Banks Decl. ¶¶24-25.

CBP's routine act of seizing and cutting Texas's concertina wire destroys its utility as a barrier fence, as evidenced by CBP's ability to usher large numbers of aliens through breaches made in the fence. TMD servicemembers are constantly tasked with closing gaps CBP agents have cut in the fence, deploying new rolls each time, Garcia Decl. ¶14, often for CBP officials to come behind them immediately to cut the fence once again, Banks Decl. ¶¶14, 18, 21. As a result of Defendants' destruction of concertina wire, Plaintiff has suffered and continues to suffer harm and a real and immediate threat of repeated injury in the future. Plaintiff owns the concertina wire that has been placed in border locations and Defendants' repeated destruction of Plaintiff's property has diminished Texas's efforts to secure the border.

Defendants have no statutory authority or other privilege to seize and damage Texas's wire fence by cutting breaches. Defendants routinely damage Texas's fence with no apparent need to

21

administer emergency response to an alien in distress. The concertina wire does not prevent officials from providing water or other nourishment to aliens on the other side of the fence, and law enforcement continue to operate boats in the river. Banks Decl. ¶23. Defendants also have no statutory authority or other privilege to hold open the breaches in Texas's wire fence after seizing and damaging it. Even if Defendants have cut Texas's wire fence on some occasions to aid an individual migrant in urgent distress, Defendants routinely refuse to repair the damages to Texas's wire fence promptly after any exigency has dissipated, instead broadening breaches or leaving them open for hundreds of other aliens to enter illegally. Banks Decl. ¶¶15, 17-18.

## ARGUMENT

Texas is entitled to a preliminary injunction against Defendants' destruction of its concertina wire along the border because it can show "that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). The final two elements merge when the opposing party is the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The Court should also issue a stay under 5 U.S.C. § 705. The standard for staying an agency action is the same as the standard for a preliminary injunction. "In the same way that a preliminary injunction is the temporary form of a permanent injunction, a stay [under section 705] is the temporary form of vacatur." *All. for Hippocratic Med. v. U.S. Food & Drug Admin.*, 78 F.4th 210, 254 (5th Cir. 2023). "Under 5 U.S.C. § 705, [courts] may, under certain "conditions[,] ... and to the extent necessary to prevent irreparable injury, ... issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion

of the review proceedings." *Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1143 (5th Cir. 2021) (quoting 5 U.S.C. § 705).

This provision "authorizes reviewing courts to stay agency action pending judicial review." *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010) (citing 5 U.S.C. § 705). "Motions to stay agency action pursuant to these provisions are reviewed under the same standards used to evaluate requests for interim injunctive relief." *Id.* (citing *Cuomo v. U.S. Nuclear Regulatory Comm'n,* 772 F.2d 972, 974 (D.C. Cir. 1985)); *see also Texas v. U.S. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (granting stay of agency action under 5 U.S.C. § 705 and applying preliminary injunction factors).

Further, under the Administrative Procedure Act (APA), "'agency action' includes the whole or a part of an agency … sanction." 5 U.S.C. § 551(13). A "'sanction' includes the whole or a part of an agency destruction, taking, seizure, or withholding of property." 5 U.S.C. § 551(10)(D). The destruction of the concertina wire is a sanction, which qualifies as a final agency action.

## A.   Texas can show a likelihood of success on the merits.

"A preliminary injunction may issue … despite the existence of a plausible defense, as long as the movant demonstrates a substantial likelihood of success." *Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1188 (5th Cir. 1979).

Texas has a substantial likelihood of success in demonstrating that Defendants committed conversion and trespass, exceeded their statutory duty, and violated the APA. In the alternative, Texas has a substantial likelihood of success in demonstrating that Defendants' agents acted *ultra vires*.

1.    **Texas is likely to succeed on its conversion and trespass to chattels claims.**

Texas common law furnishes a cause of action for conversion for "the unlawful and wrongful exercise of dominion, ownership, or control by one person over the property of another, to the exclusion of the same rights by the owner." *Pan Am. Petroleum Corp. v. Long*, 340 F.2d 211, 219-220 (5th Cir. 1964) (applying Texas law). It also furnishes a cause of action for trespass to chattels for wrongfully exercising dominion over the private property of another in a way that causes "actual damage" or "deprives the owner of its use for a substantial period of time." *Zapata v. Ford Motor Credit Co.*, 615 S.W.2d 198, 201 (Tex. 1981). The difference between the two torts is the degree of interference with the property interest: Any interference with another's property causing actual damage constitutes a trespass; but "serious[] interfere[nce]" amounts to conversion when it would justify requiring the tortfeasor to pay the full value of the property. *Id.*

Under either tort, the subjective intent or ill will of the tortfeasor is irrelevant to the question of liability. "[A] wrongful or fraudulent intent or purpose is not required, and the presence of any good faith in the [tortfeasor] is relevant only to the issue of [money] damages." *Pan Am.*, 340 F.2d at 220 & n.24. "The important thing is that a property right was violated." *Mountain States Tel. & Tel. Co. v. Vowell Constr. Co.*, 341 S.W.2d 148, 150 (Tex. 1960).

These principles have a straightforward application here. The State of Texas may—and does—hold a proprietary interest in property, like its concertina wire fence. *See, e.g.*, *State v. Cemex Constr. Materials South, LLC*, 350 S.W.3d 396, 398, 409 (Tex. App.—El Paso 2011) (permitting state conversion claim for construction materials to proceed). Here Defendants "deliberately and intentionally used [wire cutters] in making a cut to the [fence]." *Mountain States Tel.*, 341 S.W.2d at 150. "The [fence] was lawfully in place" on state, municipal, or private land. *Id.* So, "[t]he molesting or severing of the [fence] was a violation of a property right which gave rise to a cause of

action regardless of negligence." *Id.* By cutting Texas's concertina wire fence, Defendants have destroyed its utility as a barrier and deprived Texas of its use for a substantial time. Texas will likely succeed on its conversion and trespass claims. *See Cummer-Graham Co. v. Maddox*, 285 S.W.2d 932, 935 (Tex. 1956) (finding liability for trespass to chattels based on "the destruction of some fences"); *In re Village Mobile Homes, Inc.*, 947 F.2d 1282, 1283 (5th Cir. 1991) (applying Texas law finding liability for conversion based on removal of "a fence from the lot").

No authority justifies Defendants' ongoing practice of destroying Texas's concertina wire. The common law may furnish certain narrow privileges to invade the property interests of others. *See* RESTATEMENT (SECOND) OF TORTS §263 (1965) (private necessity). Federal officials may also have a privilege embodied in statute—namely, 8 U.S.C. §1357(a)(3), which authorizes them "to have access to private lands … for the purpose of patrolling the border to prevent the illegal entry of aliens" within 25 miles of the border. But Texas's concertina wire fence in no way impedes federal officers from patrolling the border or apprehending aliens—much less conducting water rescues or administering aid to migrants on the banks of the Rio Grande. Banks Decl. ¶¶15-16, 20. Defendants here have a practice of willfully destroying property that is not their own when there is no exigency at all, and of persisting in that abuse even after any exigency has dissipated. Garcia Decl. ¶13; Banks Decl. ¶¶14, 16-17, 19. And it should be obvious that destroying a wire fence serving as a barrier to illegal entry is *not* "patrolling the border to prevent the illegal entry of aliens."[55]

---

[55] Even if Defendants' subjective intent was somehow relevant (it is not), there can be no question that the conduct here is willful. Even after Governor Abbott tweeted that CBP officials were destroying *state property*, Defendants have persisted in their policy of destroying Texas's fencing.

Because Defendants' unlawful and destructive exercises of dominion and control over state property are ongoing, this court can and should preliminarily and permanently enjoin them. *See, e.g.*, *Hazel v. Lonesome Ranch Property Owners Ass'n*, 656 S.W.3d 468, 581, 500 (Tex. App.—El Paso 2022); *Glasgow*, 5 S.W. at 529. Money damages may be an adequate legal remedy for past conversion or trespass, but only an injunction can prevent ongoing invasions of property interests—as both the Supreme Court of Texas and the Fifth Circuit have recognized. *See Frost v. Mischer*, 463 S.W.2d 166, 168 (Tex. 1971); *Connasauga River Lumber Co. v. Shippen*, 293 F.3d 579, 580 (5th Cir. 1923). The federal government has sought injunctive relief for ongoing invasions of its own property interests before. *See, e.g.*, *United States v. Williams*, 441 F.2d 637, 642 (5th Cir. 1971) ("[T]he United States filed a complaint characterizing these intrusions as continuing trespasses and praying for a permanent injunction."). It should not be heard to object when Texas seeks an injunction against Defendants' ongoing destruction of state property here.

### 2. Texas is likely to succeed on its claim that Defendants violated the APA by acting in excess of their statutory authority.

An agency sanction in excess of statutory authority violates the APA. "A sanction may not be imposed or a substantive rule or order issued except within jurisdiction delegated to the agency and as authorized by law." 5 U.S.C. § 558(b). Defendants have no statutory authority to destroy Texas's concertina wire. "[A]n agency literally has no power to act … unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 335, 374 (1986). Defendants' destruction of concertina wire is a final agency action. 5 U.S.C. § 551(13), (10)(D).

---

And when confronted by state officials, CBP agents have ordered them to "back the fuck off" and threatened to "tie a fucking tow strap to this shit and rip it all out." Banks Decl. ¶¶18, 22. This willful conduct is itself evidence of exceeding the lawful scope of any common-law or statutory authority to trespass. *See Glasgow v. Owen*, 6 S.W. 527, 530 (Tex. 1887).

Defendants do have the authority and duty to set "national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), and to "ensure the interdiction of persons and goods illegally entering the United States"; "detect[ing], respond[ing] to, and interdict[ing] terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States;" "safeguard[ing] the borders of the United States"; and "enforc[ing] and administer[ing] all immigration laws." 6 U.S.C. § 211(c)(2), (5), (6), (8); *see also id.* § 211(e)(3). But no statute authorizes Defendants to destroy and seize border infrastructure belonging to another sovereign in order to facilitate unlawful entry of aliens into the United States. On the contrary, facilitating unlawful entry runs directly counter to Defendants' "power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5). This power does not include destroying and seizing concertina wire that controls and guards the boundary and border against the illegal entry of aliens.

As discussed earlier, Defendants also have the power, "within a distance of twenty-five miles from any such external boundary" of the United States, "to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States[.]" 8 U.S.C. § 1357(a)(3). This power also does not include the power to cut concertina wire that prevents the illegal entry of aliens into the United States.

A person who "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of the law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law" commits a crime. 8 U.S.C. § 1324 (a)(1)(A)(ii). Defendants' destruction and seizure of TMD's concertina wire would therefore be a *crime* if

27

committed by a private actor because it permits and allows the movement and transportation of illegal aliens within the United States.

Additionally, a person who "encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law" commits a crime. 8 U.S.C. § 1324(a)(1)(A)(iv). If a private actor cut Plaintiff's concertina wire in the same way that Defendants did—perhaps even lowering ropes from the beds of pickup trucks with a view to waving aliens across the Rio Grande— that person would have committed a crime because cutting the wire "encourages or induces" aliens to enter the United States in violation of the law.

Texas has shown a likelihood of success in demonstrating that Defendants' actions in removing and destroying concertina wire are in direct conflict with their statutory duties under federal law in violation of the APA. This court should enjoin any further destruction.

### 3. Texas is likely to succeed on its claim that Defendants failed to follow prescribed procedures.

The APA directs federal courts to set aside agency action that is taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). Defendants' policy, pattern, or practice of seizing and destroying Plaintiff's concertina wire is a sanction equivalent to a substantive rule. As such, it should have been subject to notice and comment.

The APA requires that agencies engaging in rulemaking provide notice to affected parties in advance of the rulemaking and an opportunity to participate in the process. 5 U.S.C. § 553. When the rulemaking involves "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice," the notice and comment requirement of formal rulemaking does not apply. 5 U.S.C. § 553(b)(A). But these exceptions "must be narrowly construed." *Texas*

*v. United States (DAPA)*, 809 F.3d 134, 171 (5th Cir. 2015). "Section 553 was enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those who are regulated." *U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 n.17 (5th Cir. 1984) (quotations omitted).

The destruction of the concertina wire was a final and reviewable agency action subject to notice and comment. First, it "mark[s] the consummation of the agency's decisionmaking process—it [is] not [] of a merely tentative or interlocutory nature. Second, the action [is] one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (citation omitted).

Defendants' sanction was also substantive. If an agency action is an interpretive rule, general statement of policy, or rule of agency procedure or practice, it is exempt from the notice-and-comment requirement, but if it is a substantive rule, it is subject to notice and comment. *See Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995); 5 U.S.C. § 553(b)(A). To evaluate whether a rule is substantive, courts will examine "whether the rule (1) imposes any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion. … If a statement denies the decisionmaker discretion in the area of its coverage … then the statement is binding and creates rights or obligations." *DAPA*, 809 F.3d. at 171 (internal citations and quotation marks omitted).

"While mindful but suspicious of the agency's own characterization, [courts] … focus[] primarily on whether the rule has binding effect on agency discretion or severely restricts it." *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002) (quoting *McLouth Steel Prods. Corp. v. Thomas*,

838 F.2d 1317, 1320 (D.C. Cir. 1988)). "[A]n agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." *Id.* at 383 (citation omitted). The practical effect of a sanction destroying concertina wire is that of a binding rule. A policy of cutting wire—routinely and when exigent circumstances that might otherwise justify a trespass have dissipated or are entirely non-existent—"is applied by the agency in a way that indicates it is binding." *Id.* A binding rule issued or exercised without notice and comment violates the APA.

Alternatively, the sanction is subject to notice and comment because it has a substantive impact. A binding rule may be exempt from notice and comment rulemaking if it is one of "agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). But, if an arguably procedural rule has a substantial impact, the exemption will not apply. "[T]he substantial impact test is the primary means by which [we] look beyond the label 'procedural' to determine whether a rule of the type Congress thought appropriate for public participation." *Kast Metals Corp.*, 744 F.2d at 1153. Similarly, "rules are generally considered procedural so long as they do not 'change the substantive standards by which the [agency] evaluates' applications that seek a benefit that the agency has the power to provide." *DAPA*, 809 F.3d at 176-77 (quoting *Nat'l Sec. Counselors v. CIA*, 931 F. Supp. 2d 77, 107 (D.D.C. 2013)). Here, the destruction of concertina wire changes the substantive standards by which aliens are permitted to enter the United States, so the sanction is substantive.

The Fifth Circuit also examines the "effect on those interests ultimately at stake in the agency proceeding," and "agency rules that impose 'derivative,' 'incidental,' or 'mechanical' burdens on regulated individuals are considered procedural, rather than substantive." *DAPA*, 809 F.3d at 176 (quotation omitted). The interests at stake here are substantive. Texas's interest in the

security of the border, the security of Texas residents, and the interests of Texas taxpayers in not being commandeered to provide education and social services to immigrants who have not properly been admitted into the United States are sufficiently significant that they should not have been affected without proper notice-and-comment rulemaking. [56]

Defendants' failure to follow proper rulemaking procedures before declaring open season on Texas's property violates the APA. This court should enjoin any further destruction of Texas's concertina wire fence.

### 4. Texas is likely to succeed on its claim that Defendants' actions were arbitrary and capricious in violation of the APA.

Defendants' actions in ordering the cutting and destroying of concertina wire were also arbitrary and capricious. A "reviewing court shall ... hold unlawful and set aside agency action ... found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ... [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A).

An agency decision is considered arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

---

[56] Plaintiff recognizes that there is an additional exception to the notice and comment requirement for the provision of a public benefit. 5 U.S.C. § 553(a)(2). But that exception is narrowly construed to refer to monetary payments from federal agencies to beneficiaries and does not apply here. *See, e.g.*, *DAPA.*, 809 F.3d at 177 (quoting *Baylor Univ. Med. Ctr. v. Heckler*, 758 F.2d 1052, 1061 (5th Cir. 1985)).

29, 43 (1983). Although agencies are entitled to some deference, "the arbitrary and capricious standard of review … is by no means a rubber stamp." *United States v. Garner*, 767 F.2d 104, 116 (5th Cir. 1985).

An agency must articulate a sufficient rationale to justify its action. "Because the central focus of the arbitrary and capricious standard is on the rationality of the agency's 'decisionmaking,' rather than its actual decision, '[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'" *Garner*, 767 F.2d at 116 (quoting *State Farm*, 463 U.S. at 50). As such, "the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

Arguably, all the Defendants have ever pointed to as a basis for their conduct here is a vague humanitarian concern—not enough to justify acting in direct contravention of their statutory responsibilities as well as their own stated priorities. *But see* Compl. ¶¶52–53. Defendants have, at a minimum, behaved in a manner that "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. For one thing, Defendants have (finally) recognized the urgent need to construct border infrastructure: Just a few weeks ago, Secretary Mayorkas announced there "is presently an acute and immediate need to construct physical barriers … in the vicinity of the border of the United States in order to prevent unlawful entries."[57] Yet Defendants have, at the same time, destroyed Texas's border infrastructure designed to prevent

---

[57] Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 88 Fed. Reg. 69214, 69215 (filed Oct. 4, 2023), available at https://public-inspection.federalregister.gov/2023-22176.pdf.

unlawful entries—all in violation of the federal laws that task Defendants with securing the southern border. *Cf. Portland Cement Ass'n v. EPA*, 665 F.3d 177, 187 (D.C. Cir. 2011) ("an agency must have a similar obligation to acknowledge and account for a changed regulatory posture the agency creates—especially when the change impacts a contemporaneous and closely related rulemaking"); *Office of Commc'n of the United Church of Christ v. FCC,* 707 F.2d 1413, 1441–42 (D.C. Cir. 1983) (finding it "seriously disturbing" and "almost beyond belief" that an agency would take rulemaking action undercutting another "concurrent" rulemaking process).

Defendants have, at a maximum, behaved in a manner "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. When it comes to fencing along the border, federal law instructs that DHS "shall construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective." Pub. L. 110–161, div. E, title V, §564(a), Dec. 26, 2007, 121 Stat. 2090. Defendants have instead actively destroyed reinforced fencing along the border where fencing was practical and effective—in direct conflict with their statutory duties.  This is the very definition of "implausible."

Texas has a likelihood of success on the merits in demonstrating that Defendants have acted arbitrarily and capriciously in violation of the APA, and this court should enjoin any further destruction of the border wire.

**5.  In the alternative, Texas is likely to succeed on its claim that Defendants acted *ultra vires.***

In the alternative, if Defendants' destruction and seizure of Plaintiff's concertina wire is not final agency action, it is *ultra vires* action. Defendants are destroying and seizing Texas's concertina wire without legal authority and contrary to legal authority.  *See infra*, Part A.2.

"Section 702 of '[t]he APA generally waives the Federal Government's immunity from a suit "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority.'" *Apter v. HHS*, 80 F.4th 579, 589 (5th Cir. 2023) (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012), in turn quoting 5 U.S.C. § 702). "[A] non-statutory cause of action under the APA (that is, an *ultra vires* claim that uses the APA as a vehicle to sue an agency)" is a "distinct type[] of claim[]" from "a cause of action under the APA's general provisions." *Id.* at 592 (citing *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 489 (5th Cir. 2014)).  Defendants have waived sovereign immunity for *ultra vires* claims under the APA via the 1976 amendment to 5 U.S.C. § 702, which "waived sovereign immunity for suits seeking nonmonetary relief through nonstatutory judicial review of agency action." *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985).

"When a plaintiff uses the APA to assert a 'non-statutory cause of action'—such as an *ultra vires* claim—section 702 contains two separate requirements for establishing a waiver of sovereign immunity. First, the plaintiff must identify some 'agency action' affecting him in a specific way. The action need not be final. Second, the plaintiff must show that he has been adversely affected or aggrieved by that action. To satisfy this second requirement, the plaintiff must establish that the injury he complains of falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint. *Apter*, 80 F.4th at 589-90 (cleaned up, citations omitted).

First, Plaintiff here asserts that the agency action—the destruction of concertina wire— aggrieves Texas specifically.  The *ultra vires* agency action harms Plaintiff because Plaintiff incurs

costs in repairing the wire fencing the federal government persists in destroying, Garcia Decl. ¶14—all in addition to obvious "expenditures in providing emergency medical services, social services and public education for illegal aliens." *Texas v. United States (DACA)*, 50 F.4th 498, 518 (5th Cir. 2022).

Second, Plaintiff's injuries are in the zone of interests sought to be protected by the APA. The zone-of-interests test is not especially demanding and is applied in keeping with Congress's evident intent when enacting the APA to make agency action presumptively reviewable. *Apter*, 80 F.4th at 592. The test is satisfied if the claims are "*arguably* within the zone of interests to be protected or regulated by the statute." *DACA*, 50 F.4th at 521 (citing *Patchak*, 567 U.S. at 224). The only time that review is foreclosed under this test is "when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (internal quotations omitted) (quoting *Patchak*, 567 U.S. at 225). "The Supreme Court has always conspicuously included the word *arguably* in the test to indicate that the benefit of *any doubt goes to the plaintiff.*" *Apter*, 80 F.4th at 592 (quoting *DACA*, 50 F.4th at 520).

In this case, the interests or purposes of the INA and related immigration statutes are to set forth "a comprehensive federal statutory scheme for regulation of immigration and naturalization" and to "set the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *DACA*, 50 F.4th at 521 (internal quotations omitted) (quoting *Chamber of Commerce v. Whiting*, 563 U.S. 582, 587 (2011)). Thus, Plaintiffs have an interest in seeing the INA and other statutes enforced and upheld. *See id.* at 521 (citing *Arizona*, 567 U.S. at

35

397, and *DAPA*, 809 F.3d at 163). Plaintiffs also have an interest in reducing the financial burdens of illegal immigration, as shown by the injuries that demonstrate their standing. *Id.*

Moreover, destruction and seizure of property is explicitly covered by the APA, so the destruction and seizure of TMD's concertina wire is explicitly within the APA's zone of interests, as are injuries resulting from that destruction and seizure of property—namely, the fiscal harms to Texas resulting from additional aliens present in Texas.[58] Gipson Decl. (driver's licenses); Meyer Decl. (public education), Bricker Decl. (healthcare); Waltz Decl. (incarceration).

**B.      Texas has demonstrated a substantial threat of irreparable harm.**

The State of Texas has established a substantial likelihood of irreparable harm. "To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that the harm is inevitable and irreparable." *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986). Instead, "[t]he plaintiff need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Id.* (footnote omitted). Texas meets this showing because it is "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20.

---

[58] Before 1976, courts viewed such claims under judge-made, common-law legal fictions and principles set out in *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949). The *Apter* court noted that "under our precedent, Congress apparently 'd[id] away with the *ultra vires* doctrine and other fictions surrounding sovereign immunity' when it amended the APA in 1976," *Apter*, 80 F.4th at 593 (citing *Geyen*, 775 F.3d at 1307), but "decline[d] to consider whether [litigants] might also be able to assert their *ultra vires* claims using only the common law version of that doctrine." *Id.* The court also noted that the Second, Fourth, Ninth, Eleventh, and District of Columbia circuits still recognize common-law *ultra vires* claims in some cases. *Id. See, e.g., E.V. v. Robinson*, 906 F.3d. 1082, 1093 (9th Cir. 2018) ("[N]either the text nor the structure of the 1976 amendment to the APA indicates that Congress intended to abrogate the *Larson* exceptions in cases not covered by the section 702 waiver."). Plaintiff's claims in the present case are covered by the section 702 waiver, so there is no need to consider whether the claims could also be brought under the *Larson* principles.

Defendants' repeated destruction of Texas's concertina wire irreparably harms Texas because it facilitates increased illegal entry into the State. As a result, Texas will incur uncompensated "expenditures in providing emergency medical services, social services and public education for illegal aliens." *DACA*, 50 F.4th at 518; Gipson Decl. (driver's licenses); Meyer Decl. (public education), Bricker Decl. (healthcare); Waltz Decl. (incarceration). In addition, Defendants' ongoing pattern of cutting Texas's concertina wire will frustrate the State's ability to protect its residents from deadly fentanyl and other serious dangers posed by cartel activity at the border, as described in the Factual Background section of this motion. To prevent Texas's irreparable harm, this Court should enjoin further destruction of the concertina wire.

**C.    Texas has demonstrated that the balancing of interests weighs in its favor and that the injunctive relief will serve the public interest.**

As set forth above, Plaintiff has established a likelihood of success on the merits and irreparable harm. The balance of hardships and public interest also favor a preliminary injunction.

Millions of migrants and hundreds of millions of fatal doses of illegal drugs have crossed into Texas from Mexico in the last three years due to the failure of the federal government to secure the border. Texas's placement of concertina wire along the border limits those illegal crossings. It is squarely within the public interest to prohibit the federal government from unlawfully destroying wire barriers owned and positioned by Texas as part of its efforts to obstruct the unchecked flow of migrants and deadly fentanyl. In December 2021, the Biden Administration itself declared "a national emergency to deal with the threat" of fentanyl and found that "the trafficking into the United States of illicit drugs, including fentanyl and other synthetic opioids, is causing the deaths

of tens of thousands of Americans annually."[59] Texas's border security efforts are directly aimed at combatting the illicit importation of deadly fentanyl and the disastrous effects of unchecked migration. The State has a strong interest in protecting its citizens from such irreparable harms through the placement of concertina wire at busy international border crossings.

Further, the placement of concertina wire along the border deters migrants intending to undertake dangerous border crossings in an active drug smuggling and human trafficking hotspots. Deaths and disappearances along the U.S.-Mexico border have become commonplace in recent years, and such tragedies are increasing.[60] Indeed, in 2021 there were 78 water-related deaths along the Southwest Border, up from 41 in 2020.[61] Since President Biden took office, a United Nations agency has declared that the U.S.-Mexico border is the deadliest land crossing in the world.[62] Aliens who enter the United States and Texas at ports of entry—rather than attempting an illegal and dangerous water crossing—may enter lawfully if allowed to do so and in any event the placement of concertina wire acts as a deterrent to water crossings. Texas's placement of concertina wire protects Texas residents and minimizes the risks to migrants of drowning while journeying to and through illegal entry points of entry.

---

[59] Exec. Order No. 14059, 86 Fed. Reg. 71549, 71549 (Dec. 15, 2021).

[60]     *See* Annual Regional Overview—Executive Summary, International Organization for Migration's ("IOM") Missing Migrants Project ("MMP") (2021), available at https://missingmigrants.iom.int/sites/g/files/tmzbdl601/files/publication/file/MMP%20annual %20regional%20overview%202021%20LAC_Executive%20Summary-ENG_0.pdf; *see also* Border Rescues and Mortality Data, U.S. Customs and Border Protection, available at https://www.cbp.gov/newsroom/stats/border-rescues-and-mortality-data.

[61]     *See* Border Rescues and Mortality Data, U.S. Customs and Border Protection, available at https://www.cbp.gov/newsroom/stats/border-rescues-and-mortality-data.

[62]     UN Migration Study Deems US-Mexico Border 'Deadliest' Land Route in the World Based on 2021 Numbers, (July 4, 2022), https://www.foxnews.com/us/un-migration-study-deems-us-mexico-border-deadliest-land-route-world-based-2021-numbers.

On the other side of the scale, there can be no public interest in unlawful agency action. *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Texas v. United States*, 40 F.4th 205, 229 (5th Cir. 2022) (quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)) (internal quotations omitted). It will not "disserve the public interest" for this Court to grant an injunction. *Sepulvado v. Jindal*, 729 F.3d 413, 417 (5th Cir. 2013).

## CONCLUSION

Plaintiff respectfully requests the Court to preliminarily enjoin Defendants from cutting or otherwise destroying Texas's concertina wire. Alternatively, Plaintiff requests a stay of agency action pending judicial review.

Dated: October 24, 2023.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

*/s/ Ryan D. Walters*
RYAN D. WALTERS
Chief, Special Litigation Division
Texas Bar No. 24105085

BRENT WEBSTER
First Assistant Attorney General

SUSANNA DOKUPIL
Special Counsel
Texas Bar No. 24034419

GRANT DORFMAN
Deputy First Assistant Attorney General

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

RALPH MOLINA
Deputy Attorney General for Legal Strategy

AMY S. HILTON
Special Counsel
Texas Bar No. 24097834

ROBERT HENNEKE
Texas Bar No. 24046058
Texas Public Policy Foundation
901 Congress Ave.
Austin, Texas 78701
(512) 472-2700
rhenneke@texaspolicy.com

HEATHER L. DYER
Special Counsel
Texas Bar No. 24123044

Office of the Attorney General
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1706
Ryan.Walters@oag.texas.gov
Munera.Al-Fuhaid@oag.texas.gov
Susanna.Dokupil@oag.texas.gov
Amy.Hilton@oag.texas.gov
Heather.Dyer@oag.texas.gov

COUNSEL FOR PLAINTIFF

**CERTIFICATE OF CONFERENCE**

I certify that I conferred via email with counsel for Defendants, Jean Lin of the U.S. Department of Justice, Civil Division, Federal Programs Branch, regarding the relief requested in this motion.  Counsel for Defendants stated that they oppose the motion.

*/s/Ryan D. Walters*
RYAN D. WALTERS

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on October 24, 2023, which automatically serves all counsel of record who are registered to receive notices in this case. I also served a copy of this document via email to counsel for Defendants, Jean Lin, at Jean.Lin@usdoj.gov.

*/s/Ryan D. Walters*
RYAN D. WALTERS