# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### DEL RIO DIVISION

| | |
|---|---|
| THE STATE OF TEXAS, | § |
| | § |
| *Plaintiff*, | § |
| | § |
| | § CIVIL ACTION NO. <u>2:23-cv-00055</u> |
| v. | § |
| | § |
| U.S. DEPARTMENT OF HOMELAND | § |
| SECURITY, *et al.*, | § |
| | § |
| *Defendants.* | § |

---

## APPENDIX TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

---

| 1 | Declaration of Manuel Perez | Appx. 001 – 003 |
|---|---|---|
| 2 | Declaration of Carlos R. Garcia | Appx. 004 - 011 |
| 3 | Declaration of Michael Banks | Appx. 012 – 027 |
| 3.1 | Exhibit A - Video of incident described in ¶¶ 15-20 of Declaration of Michael Banks | Appx. 028 |
| 3.2 | Exhibit B - Video of incident described in ¶ 16 of Declaration of Michael Banks | Appx. 029 |
| 3.3 | Exhibit C - Video of incident described in ¶ 20 of Declaration of Michael Banks | Appx. 030 |
| 4 | Declaration of Rebecca Waltz | Appx. 031 – 033 |
| 5 | Declaration of Susan Bricker | Appx. 034 – 038 |
| 5.1 | Declaration of Susan Bricker Exhibit 1 – Population-based Method for Estimating the percentage of Undocumented Clients in Texas | Appx. 040 – 042 |
| 5.2 | Declaration of Susan Bricker Exhibit 2 – Health and Human Services Commission Services and Benefits Provided to Undocumented Immigrants, Medicaid and CHIP-Perinate Programs, CY 2019-2022 | Appx. 044 – 046 |

| 6 | Declaration of Sheri Gipson | Appx. 047 – 050 |
|---|---|---|
| 6.1 | Declaration of Sheri Gipson Exhibit A – Verifying Lawful Presence | Appx. 051 - 058 |
| 7 | Declaration of Michael Meyer | Appx. 059 - 062 |

Dated: October 24, 2023.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

*/s/ Ryan D. Walters*
**RYAN D. WALTERS**
Chief, Special Litigation Division
Texas Bar No. 24105085

**BRENT WEBSTER**
First Assistant Attorney General

**SUSANNA DOKUPIL**
Special Counsel
Texas Bar No. 24034419

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**MUNERA AL-FUHAID**
Special Counsel
Texas Bar No. 24094501

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

**AMY S. HILTON**
Special Counsel
Texas Bar No. 24097834

**ROBERT HENNEKE**
Texas Bar No. 24026058
Texas Public Policy Foundation
901 Congress Ave.
Austin, Texas 78701
(512) 472-2700
rhenneke@texaspolicy.com

**HEATHER L. DYER**
Special Counsel
Texas Bar No. 24123044

Office of the Attorney General
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1706
Ryan.Walters@oag.texas.gov
Munera.Al-Fuhaid@oag.texas.gov
Susanna.Dokupil@oag.texas.gov
Amy.Hilton@oag.texas.gov
Heather.Dyer@oag.texas.gov

**COUNSEL FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on October 24, 2023, which automatically serves all counsel of record who are registered to receive notices in this case.

*/s/Ryan D. Walters*
RYAN D. WALTERS

## DECLARATION OF MANUEL PEREZ

1.      My name is Manuel Perez. I am the Director of Procurement and Contract Services for the Office of State Administration within the Texas Military Department. In that role, I am responsible for reviewing all purchasing contracts made by the department. My current primary focus is working on Operation Lone Star.

2.      I served for twenty-three years in the United States Army, primarily working on logistics. I retired in 2004 with the rank of first sergeant. After retiring from the army, I spent ten years working as procurement team lead at the Comptroller's office and four years as a branch manager in the procurement division of the Department of Public Safety. I am a certified Texas Procurement Manager. In total, I have over thirty years of experience in logistics.

3.      Since the beginning of Operation Lone Star, I have created approximately 52 purchase orders for concertina wire, c-wire, and fencing material connected to c-wire placement. The first order c-wire order was ordered on October 19, 2021. The latest purchase was on October 9, 2023. The total combined cost of these orders is approximately $32,572,637.99. The two largest c-wire purchases in support of Operation Lonestar have taken place during 2023. The largest was on July 10, 2023 totaling $2,413,216.80 for 20,040 rolls. The second largest purchase was on October 9, 2023 totaling $874,800.00 for 7,200

rolls. The Texas Military Department is currently in the process of receiving all of the c-wire ordered on October 9. I anticipate that the department will continue to order c-wire as the need arises.

4.        The majority of the c-wire procured by the Texas Military Department is stored at a bill of materials yard in Eagle Pass, Texas to support Operation Lone Star activities in the area.

5.        Concertina wire is similar to barbed wire concertina. C-wire is purchased in rolls that can vary from 25 feet long to 50 feet long. These rolls clamped together and attached to metal rods to keep them in place, thereby forming a fence. Per industry practice, 211 rolls of 30" x 25' c-wire can cover 1 mile, although this may vary depending on terrain and how much the wire is stretched.

6.        C-wire can be cut using bolt cutters or other tools that can be purchased at a hardware store. When cut, c-wire is difficult to repair and is often replaced instead.

Signed this _ 19 _ day of October 2023.

_Manuel Perez_
_____
Manuel Perez

Director of Procurement and
Contract Services

Office of State Administration
Texas Military Department.

## DECLARATION OF CARLOS R. GARCIA

1.      My name is Captain Carlos R. Garcia. I currently serve as the Officer in Charge of engineering operations for Operation Lone Star including construction, maintenance, and repair of concertina wire, or c-wire, fencing.

2.      I have worked in both federal and state military engineering operations for almost a decade. From 2013 to 2019, I worked as a logistics officer for the Texas Military Department ("TMD") in the Combat Engineer Company, training engineers to support Operation Enduring Freedom, Guantanamo Bay. From 2019 to 2021, I worked as an operations officer in the United States Military Entrance Processing Command. I began serving in my current role as Captain in the 156th Brigade Engineer Battalion in 2021.

3.      My current responsibilities include working closely with the Battalion Executive Officer. I write operational directives, plans, and tactical orders, overseeing field training exercises and training schedules, and preparing recommended courses of action for the regiment commander. As the officer in charge of engineering operations, I also oversee a staff of 77 people assigned to operational control and four different Special Response Teams ("SRTs") of about forty engineers each.

4.      Engineering SRTs are divided across four strategic locations along Texas's southern border: SRT 1 is based in the Rio Grande Valley; SRT 2 is assigned

to the region surrounding the City of Zapata; SRT 3 is assigned to the region surrounding the City of Eagle Pass; and SRT 4 is assigned to the western corridor near the City of El Paso.

5.      Part of my responsibilities include overseeing Operation Lone Star engineer deployment, installation, maintenance, and repair of border infrastructure, like Texas's c-wire fencing, and the strategic allocation of our engineers to carry out those tasks as the mission demands.

6.      For much of this year, members of SRT 2 deployed to assist SRT 3 with engineering operations near Eagle Pass, Texas. As part of that mission, engineers cleared land to increase visibility and constructed miles of c-wire fencing. Engineers are continuously deployed in the vicinity of Eagle Pass to construct, maintain, and repair Texas's c-wire fence.

7.      C-wire is a type of barbed wire that is formed in large coils and can expand like a concertina, a musical instrument that resembles an accordion. A single roll is usually 36 inches in diameter and can be stretched to span more than 50 feet of distance and connect with other rolls and other components to form a continuous fence. To enhance effectiveness, however, engineers usually do not stretch a single coil of wire to its maximum possible length, instead stretching each roll to around almost 40 feet.

8.      Texas's c-wire fence consists of more than just c-wire. To make a continuous fence, fencing stakes are placed in the ground and spaced out every five to six feet. C-wire is then stretched along the line of fencing stakes, attaching successive rolls of wire to each other by clamps and attaching rolls to the fence stakes with tying wires. Additionally, ground anchors are placed at intervals to keep the c-wire coils flush with the ground.

9.      To the best of my knowledge, engineers employ this fencing structure using a minimum of three rows of c-wire. Two rolls of wire are situated on the ground on either side of the stake line, while a third roll is installed above and between them in line with the fencing stakes. On some occasions, engineers construct the c-wire fence using four, five, or even six rows of coil depth. Engineers almost never deploy just one or two coils, which would highly reduce the fence's efficacy as a barrier.

10.     C-wire fencing is installed on municipal or private land only with the agreement of the landowner. The Texas Department of Public Safety ("DPS") initiates conversations with landowners about permission to place c-wire fencing. On some occasions landowners themselves request c-wire fencing. Operation Lone Star then executes a written Border Barrier License Agreement with the landowner authorizing construction, maintenance, and repair of c-wire fencing.

11.     When the c-wire fence is destroyed, damaged, or breached, it is our practice to have local officers send a report to the Lone Star Battle Desk, which also forwards those incident reports to the engineering team. Accordingly, my group is regularly made aware of incidents of damage to Texas's c-wire fence in order deploy SRTs to promptly make repairs.

12.     I am aware that officials of the U.S. Customs and Border Protection ("CBP") have seized, cut, and otherwise damaged Texas's c-wire fence near Eagle Pass, Texas, on numerous occasions since September 20, 2023. Incident reports I have reviewed show that CBP officials have cut breaches into Texas's c-wire fence more than twenty times just between September 20 and October 10 of this year. Those include the following reported incidents:

    a.  On September 21, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 4:45 AM.

    b.  On September 24, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 1:05 PM.

    c.  On September 24, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 5:53 PM.

    d.  On September 26, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 1:40 PM.

e.  On September 27, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 2:47 PM.

f.  On September 27, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 3:20 PM.

g.  On September 27, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 3:30 PM.

h.  On September 28, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 3:37 AM.

i.  On September 28, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 7:50 AM.

j.  On September 28, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 10:20 AM.

k.  On September 28, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 11:20 AM.

l.  On September 28, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 2:02 PM.

m. On September 29, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 6:00 AM.

n.  On September 29, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 4:12 PM.

o.  On September 30, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 1:30 PM.

p.  On September 30, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 2:43 PM.

q.  On September 30, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 4:37 PM.

r.  On October 1, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 11:26 AM.

s.  On October 2, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 11:23 AM.

t.  On October 2, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 2:55 PM.

u.  On October 4, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 110:04 AM.

v.  On October 4, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 3:00 PM.

w.  On October 6, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 1:14 PM.

x.  On October 6, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 5:30 PM.

y. On October 10, 2023, CBP officials cut Texas's c-wire near Eagle Pass, Texas, at 11:40 AM.

13.     These reports document that CBP officials themselves routinely cut the c-wire with bolt cutters, pull the fence apart, flatten it, place clothes atop it, and engage in other destructive measures, usually cutting through all rows of wire fencing present at the breach location. On some occasions, reports show, CBP officers have engaged in this practice even where there is no apparent distress or medical emergency.

14.     I am aware of the repair process engineers undertake to address breaches like these. Texas's c-wire fence cannot be easily patched together at the breach points. The tying or tangling up of c-wire as an immediate, short-term measure, is ineffective and can only be a short-term solution. Effective reinforcement of c-wire requires deploying a new roll of c-wire wherever CBP officials have breached the fence. Accordingly, at places where CBP officials have damaged Texas's c-wire fence, Texas must deploy a minimum of three new rolls of concertina wire for every breach.

I hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and information.

Signed this __20__ day of October 2023.

GARCIA.CARLOS.R
AMIREZ.1216746933

Digitally signed by
GARCIA.CARLOS.RAMIREZ.121
6746933
Date: 2023.10.20 10:51:24 -05'00'

Carlos R. Garcia

Captain, 156th Brigade Engineer Battalion of the Texas Military Department

## DECLARATION OF MICHAEL BANKS

1.      My name is Michael Banks. I am the Special Advisor on Border Matters to the Governor of Texas, often referred to as the "Texas Border Czar." In that role, I am responsible for coordinating and implementing border security strategies under Operation Lone Star.

2.      For almost three decades, I have worked in security and law-enforcement operations along the U.S.-Mexico border. For 10 years, I served in the United States Navy, where I worked in border law enforcement as a member of the Navy Military Police. I then spent 23 years working as an agent in the U.S. Customs and Border Protection ("CBP"), U.S. Border Patrol ("USBP"), an agency housed within the U.S. Department of Homeland Security ("DHS"), serving under five different presidential administrations—from President Clinton to President Biden.

3.      Among other responsibilities, CBP is tasked with "ensur[ing] the interdiction of persons and goods illegally entering the United States"; "detect[ing], respond[ing] to, and interdict[ing] terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States;" "safeguard[ing] the borders of the

United States"; and "enforc[ing] and administer[ing] all immigration laws." 6 U.S.C. § 211(c)(2), (5), (6), (8); *see also id.* § 211(e)(3) (specifying duties of the U.S. Border Patrol within CBP).

4.      I have carried out those duties in leadership roles for CBP with responsibilities across California, Arizona, and Texas. From 2019 to 2021, I served as Patrol Agent in Charge for the McAllen, Texas Border Patrol Station, with responsibility for the command of a large station with over 600 agents, 80 supervisors, and 7 support staff, and for the management of budget and a payroll. During my time at the, station manpower grew to 1,100 with the addition of 210 Office of Field Operations ("OFO") officers and 198 National Guard and Activity Duty soldiers. I managed and oversaw the following: various enforcement, detention, and processing operations; seizure of property; fleet maintenance and supplies; facility construction and alteration; budgeting and procurement; technology projects; community relations; and partnerships with other agencies. I managed these operations for a dynamic operating environment that spans 53 river miles and a total of 7,254 square miles, including 10 cities, 3 ports of entry, National Parks, and several wildlife refuges. I led and managed the following: labor and employment issues; air coordination; disruption initiatives; intelligence; Processing Investigations Team; Common Intelligence Picture; administrative reports; pay cap issues; trend analysis; agent deployments; technology

deployments; specialty units; employee recognition; budget; Continuity of Operations; training requirements; health and safety; Integrated Mission Analysis; joint operations; media relations; International Liaison Unit; facilities; station enforcement targets; vehicle fleet; and critical incidents. On a regular basis, I coordinated operations with all three ports of entry, the Weslaco and Rio Grande City Border Patrol stations, the Rio Grande Valley Sector Intel, Air Support, CBP's Special Operations Group, Joint Field Command, National Park Service, Fish and Wildlife, Cameron and Hidalgo County Sherriff Departments, 10 different city police departments as well as their mayors, High Intensity Drug Trafficking Areas, and public land managers.

5.      From 2022 to 2023, I served as Patrol Agent in Charge for Weslaco, Texas, with responsibility for the command of a large station with over 400 agents, 60 supervisors, and 5 support staff, and for the management of an annual budget and payroll. I managed and oversaw the following: various enforcement, detention, and processing operations; seizure of property; fleet maintenance and supplies; facility construction and alteration; budgeting and procurement; technology projects; community relations; and partnerships with other agencies. I managed these operations for a dynamic operating environment that spans 48 river miles and a total of 5,144 square miles, including 8 cities, 2 ports of entry, National Parks, and several wildlife refuges. I led and managed the following:

labor and employment issues; air coordination; disruption initiatives; intelligence; Processing Investigations Team; Common Intelligence Picture; administrative reports; pay cap issues; trend analysis; agent deployments; technology deployments; specialty units; employee recognition; budget; Continuity of Operations; training requirements; health and safety; Integrated Mission Analysis; joint operations; media relations; International Liaison Unit; facilities; station enforcement targets; vehicle fleet; and critical incidents. On a regular basis, I coordinated operations with all three ports of entry, the Weslaco and Rio Grande City Border Patrol stations, the Rio Grande Valley Sector Intel, Air Support, CBP's Special Operations Group, Joint Field Command, National Park Service, Fish and Wildlife, Cameron and Hidalgo County Sheriff Departments, 10 different city police departments as well as their mayors, High Intensity Drug Trafficking Areas, and public land managers.

6.      I have also held leadership positions in CBP with responsibility for outside of Texas. From 2021 to 2022, I served as Deputy Chief for Law Enforcement Operational Programs at the U.S. Border Patrol Headquarters in Washington, D.C. This position is the number five official in charge of the U.S. Border Patrol and had direct supervision over the immigration, prosecution, custody, and detention division which oversees and implements U.S. Border

Patrol Policy for the entire U.S. border with respect to immigration, prosecution, custody, and detention.

7.     I have been recognized for my decades of federal service in CBP and the U.S. Navy with numerous awards. In 1994, I received the Navy and Marine Corps Achievement Medal for superior performance. In 1997, I received the Navy and Marine Corps Achievement Medal gold star in lieu of second award for superior performance, among other Navy awards and accommodations. In 2022, I received the U.S. Border Patrol Meritorious Achievement Award for my leadership in handling the 2021 migrant surge. In the years 2006 through 2022, I received Outstanding Performance awards for my leadership in CBP and was rated the top performer in each of these years when rated against my peers. In each of those years I also received case awards for Outstanding Performance in leadership.

8.     On January 30, 2023, Governor Abbott named me the first ever Border Czar for the State of Texas. In that role, I work closely with the Texas Military Department ("TMD"), the Texas Department of Public Safety ("DPS"), the Texas National Guard (the "Guard"), the Texas Facilities Commission ("TFC"), local and municipal governments, and private landowners along the border. My responsibilities include facilitating the construction of Texas's border wall, strategic advising on the deployment of other border infrastructure like

concertina wire and buoy systems, and regular consultation with federal, state, and local law-enforcement partners to respond to the surge of illegal migration.

9.      Specifically, I have worked with other state agencies participating in Operation Lone Star to coordinate strategic placement of border infrastructure based on identifying historical hotspots for illicit traffic and shifting illegal migration patterns across the Rio Grande. I have worked with private landowners along the border to secure agreements to permit state construction of steel-bollard fencing. Under Operation Lone Star, Texas has already constructed 12 miles of this border wall and is on pace to complete one mile of new construction every two weeks. I have also advised on the safety, effectiveness, and costs for the deployment of buoy systems in the Rio Grande and placement of concertina wire to deter illegal and dangerous crossings.

10.     To facilitate regular supervision of these efforts along the southern border, my office is based in Hidalgo County, Texas. To that end, I also regularly travel along Texas's border with Mexico to observe the construction of the border wall and deployment of concertina wire, to meet with state and federal law-enforcement officials, and to monitor the mass illegal entry of migrants into this country. Although my work regularly takes me across all fourteen Texas counties touching the U.S.-Mexico border, in recent weeks, I have spent additional time in Maverick County because of a surge in illegal crossings near Eagle Pass, Texas in

September of this year. Over a one-week period, almost 14,000 migrants—half the entire population of Eagle Pass—entered the City illegally. The following week, more than 4,000 migrants illegally crossed into Eagle Pass in a single day. I personally observed much of this surge in Eagle Pass from September 18 to September 22.

11.     In response to this massive influx of migrants, the Mayor of Eagle Pass issued an emergency declaration under the Texas Disaster Act of 1975. On September 19, 2023, Mayor Rolando Salinas, Jr., declared a state of disaster "due to the severe undocumented immigrant surge into the City of Eagle Pass." On September 26, 2023, the City Council ratified the mayor's disaster declaration, stating that it would remain in effect until terminated by the City Council. As far as I am aware, the Eagle Pass City Council has not terminated the disaster declaration.

12.     TMD has taken steps to address and deter this sudden influx by deploying concertina wire along the border near Eagle Pass. I am in regular communication with TMD, which purchases, deploys, and maintains concertina wire on state, municipal, and private land. In every instance where TMD has deployed wire on municipal or private land, the landowner has agreed to allow Texas to place its wire fence to deter illegal crossings. I have personally observed TMD officers placing the concertina wire along the border near Eagle Pass. On

many of these occasions, CBP officials have also been physically present and observed Texas officials placing wire fencing.

13.     I have also personally observed federal officials damage this wire fence to facilitate the surge of migrants into Eagle Pass by cutting gaps into the wire and pulling the fence apart to destroy its ability to serve as a fence against illegal entries. On the days I have been present near Eagle Pass, federal officials have cut, destroyed, or otherwise damaged Texas's wire fencing there on almost a daily basis. I have documented many of these incidents by capturing video recordings on my cellular phone. Based on conversations with TMD officers and other state employees stationed in Eagle Pass, I understand that my observations are typical of ongoing federal efforts to damage and destroy Texas's border infrastructure.

14.     On repeat occasions I have observed federal agents—not migrants, cartel members, or state officials—cut Texas's concertina wire and then attach ropes or cables from the back of pickup trucks to assist migrants illegally climbing up the bank into Texas. Instead of merely cleaning up mangled wire, I have regularly observed federal officers cut new openings into the fence, sometimes immediately after Texas officers have placed new wire to plug up gaps in the fencing barrier. On some occasions, I have witnessed federal officers cut a new gap in the wire fence roughly 10 feet from an existing opening, seemingly for no

purpose other than to destroy state property. And I have regularly observed federal agents cut wire for migrants who are in no apparent distress, whether immediately upon migrants reaching the Texas bank or even as they begin to assemble on the opposite riverbank.

15.    For example, on September 20, 2023, I observed federal officials destroy state property by cutting Texas's wire on municipal land owned by the City of Eagle Pass. On this occasion, I approached several members of CBP leadership standing at a large hole that had been cut into the Texas wire. I also noticed that a green and white marked Border Patrol service truck was backed up to the hole, one end of a rope was tied to the bumper of this truck, and the other end of this rope was in the river. Migrants were using the rope to ease their climb

up the riverbank. Below is a still shot taken from one of the videos that truly and accurately depicts the scene on September 20, 2023.



The video footage is attached to this declaration as **Exhibit A**.

16.     While at the scene, I asked the senior federal agent why they had cut Texas's wire fencing, to which he responded that they had acted to prevent a possible drowning sometime earlier. Surveying the scene, I observed no migrants in distress. Instead, I saw a line of more than 2,000 migrants stretching across the Rio Grande, calmly and steadily approaching the Texas riverbank to make use of

openings in the wire fence. Below is a still shot taken from one of the videos that also truly and accurately depicts the scene at the border that day.



The video footage is attached to this declaration as **Exhibit B**.

17.     During the conversation, I advised the federal agent that I was aware that a boat unit had assisted an illegal immigrant in the river about half an hour earlier, but I asked him what that had to do with cutting the wire in the first place and allowing it to stay open thereafter. As I observed the scene, it was clear that the wire fence was not impeding law enforcement boats from operating along river. I then pointed to the long line of migrants illegally streaming from Mexico across the river and through the fence gap. I advised the federal agent that the hole CBP had cut in Texas's wire was attracting and inviting migrants to cross and that,

if he was concerned about drowning, it was critical to close the hole and cut off the open invitation. The federal agent responded, "I'm not in charge."

18.     I then asked him who was in charge, to which he stated let me get him and walked away. The federal agent returned with his supervisor, Deputy Patrol Agent in Charge, whom I asked what's the plan here. He responded in a raised and angry voice, "You were in the patrol not that long ago. You know the plan." I responded that I had been in CBP leadership not that long ago, but that I had never, and would not ever, facilitate illegal entry. I also advised him I did not know "the plan," which is why I was asking for an explanation. He did not respond to my question. I then asked him how long he planned to keep the hole open. He replied, "until they are all in," looking out at the long line of migrants. I responded that Texas would have its engineers close all the holes, to which he responded, "I will just cut it again." After I responded, "and we will patch it up again," The lead agent  became angry and shouted, "If that's the case, I will tie a fucking tow strap to this shit and rip it all out." Refusing to escalate the argument, I walked away. I got back to my vehicle and was in the process of reaching out to TMD to have them respond to the area to close the hole, when I heard Mr. Trevino yell out to another agent "get me the fucking cutters."

19.     At this point, I ordered a sergeant with TMD to film the episode. We then witnessed this supervisor move approximately 10 to 15 feet down river from

the current hole and start cutting a new hole. Below is a still shot from the video attached as **Exhibit A**.



There was no need to make additional cuts in the wire fence as CBP had already had an existing breach in the wire fence just a few feet away that they were using to shuttle migrants illegally into the United States.

20.     During this entire episode, migrants continued using the rope that CBP had placed off the back of a pickup truck to climb up the riverbank, and law-enforcement boats continued moving along the Rio Grande unimpeded. Below is a still shot taken from one of the videos that truly and accurately depicts the scene on September 20, 2023.



Footage of this episode is included in the video attached to this declaration as **Exhibit C**.

21.    Likewise, on September 26, 2023, I observed CBP leadership cut Texas's wire on private property owned by a local farmer. On this occasion, Texas National Guard had just completed breach repairs to the Texas wire and moved on to another area to conduct more repairs. Within minutes, CBP leadership, specifically the Deputy Patrol Agent in Charge, came behind the soldiers and cut the wire.

22.    Based on my own observations and conversations, it was my opinion that CBP officials were aware they were damaging state property. As my interaction with Mr. Trevino shows, CBP officials routinely cut wire immediately after it has been placed by TMD officers. TMD has told me that on September 20, 2023, a Sergeant from the Texas National Guard observed two members of CBP

leadership cutting Texas wire. When the Sergeant approached the CBP agents and asked about them cutting the wire, the Supervisor from the two previous incidents told the Sergeant to "back the fuck off, and you better not record us." This incident was reported to the TMD chain of command.

23.     Based on my observations, it is my opinion that Texas's wire fence in no way prevents federal officials from providing drinking water and food, emergency medical response, or other safety measures to migrants crossing the Rio Grande. While federal officials cut Texas's wire fence, law-enforcement airboats regularly move along the Rio Grande freely to perform water rescues or other river operations. And CBP has regular access points and station houses along the riverbank, both at lawful ports of entry and elsewhere.

24.     I have personally spoken with many Border Patrol Agents who are opposed to the federal government's policy and practice of cutting Texas's concertina wire. Many officers have told me they believe that routine efforts by the federal government to destroy or damage Texas's border infrastructure undercuts CBP's mission to secure our nation's border, enforce federal immigration laws, and deter and interdict illegal entries facilitating an epidemic of drug, weapons, and human smuggling. Brandon Judd, President of the National Border Patrol Council, which is the Border Patrol's labor union, has similarly

denounced the wire-cutting policy being implemented by CBP under the Biden Administration.

25.      Because of discomfort with the federal government's deliberate efforts to make the southern border less secure, many Border Patrol Agents have told me they refuse to cut Texas's wire fencing after being instructed to do so by Border Patrol leadership. The federal government has thus been forced to enlist higher-level Border Patrol leadership to perpetrate the damage and destruction of Texas's wire fence. On multiple occasions, I have personally observed leadership and management-level officials, like the Deputy Patrol Agent in Charge I describe herein, damage state property by cutting and destroying Texas's concertina wire.

I hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and information.

Signed this 23rd day of October 2023.

Michael Banks

Special Advisor on Border Matters
to the Governor of Texas

**Exhibit A:**
**Video of incident described in ¶¶ 15-20 of Declaration of Michael Banks**

**Exhibit B:**
**Video of incident described in ¶ 16 of Declaration of Michael Banks**

**Exhibit C:**
**Video of incident described in ¶ 20 of Declaration of Michael Banks**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | CIVIL ACTION NO. _____ |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF HOMELAND | § | |
| SECURITY, *et al.,* | § | |
| | § | |
| *Defendants.* | § | |

## DECLARATION OF REBECCA WALTZ

My name is Rebecca Waltz, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.      I am the Budget Director for the Texas Department of Criminal Justice. The Texas Department of Criminal Justice (TDCJ) is the state agency responsible for the care, custody, and rehabilitation of persons convicted of a criminal offense in the state of Texas.

2.      I have been employed with TDCJ since June 2004, and I have served in my current position since January 2020. Prior to that, I served as TDCJ's Deputy Budget Director from December 2017 to December 2019, a Senior Budget Analyst from October 2007 to November 2017, and a Junior Budget Analyst from September 2004 to September 2007.

3.      The Bureau of Justice Assistance (BJA) administers the State Criminal Alien Assistance Program (SCAAP) in conjunction with the U.S. Immigration and Customs Enforcement (ICE), Department of Homeland Security (OHS). SCAAP provides federal payments to states and localities that incurred correctional officer salary costs for incarcerating undocumented criminal aliens with at least one felony or two misdemeanor convictions for

violations of state or local law, and incarcerated for at least 4 consecutive days during the reporting period.

4.      As a part of my employment with TDCJ, I am responsible for compiling the data to be included in TDCJ's application for federal reimbursement to the State Criminal Alien Assistance Program. These data sets include the number of correctional officers and their salary expenditures (correctional officer is defined as a person whose primary employment responsibility is to maintain custody of individuals held in custody in a correctional facility) for the reporting period, information regarding maximum bed counts and inmate days, and information about the eligible inmates – (1) whom the agency incarcerated for at least four consecutive days during the reporting period; and (2) who the agency knows were undocumented criminal aliens, or reasonably and in good faith believes were undocumented criminal aliens.

5.      TDCJ has sought reimbursement from the federal government through SCAAP since 1998.

6.      For the most recently completed SCAAP application (reporting period of July 1, 2021, through June 30, 2022), TDCJ reported data for 6,914 eligible inmates and total of 2,019,635 days. An estimate of the cost of incarceration for these inmates can be calculated by multiplying the systemwide cost per day per inmate for Fiscal Year 2022 ($77.49) as reported by the Texas Legislative Budget Board by the number of days.   For example ($77.49 x 2,019,635 days = $156,501,516).

7.      A SCAAP award for this application period has not been received.

8.      TDCJ also submitted a SCAAP application for the reporting period of July 1, 2020, through June 30, 2021.  TDCJ reported data for 7,058 eligible inmates and a total of 1,984,597 days.  An estimate of the cost of incarceration for these inmates can be calculated by multiplying

the systemwide cost per day per inmate for Fiscal Year 2022 ($77.49) as reported by the Texas Legislative Budget Board by the number of days.  For example ($77.49 x 1,984,597 days = $153,786,422).

9.      Of this estimated amount, TDCJ was reimbursed $14,883,040.

10.     It is my belief that to the extent the number of aliens in TDCJ custody increases, TDCJ's unreimbursed expenses will increase as well.

11.     Whether incarcerating criminal aliens or having them on parole or mandatory supervision, TDCJ incurs costs. Keeping detainees in TDCJ custody, or adding them to parole or mandatory supervision, imposes costs on TDCJ for housing, supervising, and providing health care. An estimate of the cost of parole or mandatory supervision for these inmates can be calculated by multiplying the average cost per inmate for active parole supervision for Fiscal Year 2022 ($4.69) as reported by the Texas Legislative Budget Board by the number of days.  For example ($4.69 x 2,019,635 days = $9,472,088; or $4.69 x 1,984,597 = $9,307,760).

10.     All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 24th day of October 2023.

Rebecca Waltz
TDCJ Budget Director

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

DEL RIO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION No. _____ |
| | § | |
| U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

### DECLARATION OF SUSAN BRICKER

1.      My name is Susan Bricker. I am an adult and competent to testify. The information and opinions contained in this declaration are based upon my personal knowledge, my review of the relevant documents, and my knowledge, skills, training, and experience.

2.      I am currently the manager (Manager V) of the Health Program Outcomes and Epidemiology Team ("HPOE") within the Office of Data, Analytics and Performance ("DAP") (the office formerly known as the Center for Analytics and Decision Support--CADS) at the Texas Health and Human Services Commission ("HHSC").

3.      Except for a brief eight-month period in 2014 when I worked in the private sector, I've been employed at HHSC since 2007. In that time, I have worked as an Epidemiologist II (2007-2012), Research Specialist V (2012-Jan. 2014), a Research Specialist V (Sept. 2014-Apr. 2018), a Program Specialist VII (May 2018-May 2021), and Manager V (June 2021-current). The HPOE

**Appx. 034**

Team conducts and/or coordinates legislative and HHS-directed research on health care utilization, demographic trends, and enrollment patterns for the state's health care and human service programs.

4.     In 2007, as part of the 2008-2009 General Appropriations Act, the Texas Legislature required HHSC to report the cost of services and benefits provided by HHSC to undocumented immigrants in the State of Texas. This report, also known as the Rider 59 Report, was first completed by HHSC in 2008. Due to numerous requests for more recent information following the issuance of the 2008 report, the Rider 59 Report was updated in 2010, 2013, 2014, 2017, and 2021. The Rider 59 Report completed in 2021 covered state fiscal year (SFY) 2019.

5.     HHSC provided three principal categories of services and benefits to undocumented immigrants in Texas: (i) Texas Emergency Medicaid; (ii) the Texas Family Violence Program (FVP); and (iii) Texas Children's Health Insurance Program (CHIP) Perinatal Coverage (a/k/a "CHIP Perinate") for Rider 59 and subsequent versions. Undocumented immigrants also receive uncompensated medical care from public hospitals in the State. In the 2008 and 2010 versions of the Rider 59 Report, HHSC provided estimates of the amount of uncompensated medical care provided by state public hospital district facilities to undocumented immigrants. HHSC has not provided any estimates of uncompensated care for undocumented immigrants in more recent versions of the Rider 59 Report.

6.     In September 2022, HHSC updated the methodology for calculating the fraction of the Texas' Medicaid Type Program 30 (Emergency Medicaid) clients and CHIP Perinate clients that are likely to be undocumented immigrants. The newer methodology is described in paragraphs 8 and 10. These estimates are calculated for calendar years (CY) 2019 through 2022.

Due to the change in methodology and the shift from state fiscal year to calendar year, the current estimates do not match the estimates provided in previous testimony.

7.     Emergency Medicaid is a federally required program jointly funded by the federal government and the states. The program provides Medicaid coverage, limited to emergency medical conditions including childbirth and labor, to undocumented immigrants living in the United States. To produce Rider 59 cost estimates for the portion of Emergency Medicaid payments attributable to undocumented immigrants in Texas, HHSC relied on population estimates from the U.S. Census Bureau to estimate the percentage of non-U.S. citizen reproductive-age females in Texas who have not attained some form of legal permanent resident status.  The method based on Census data was used because HHSC Medicaid claims data do not conclusively identify an individual's residency status. Attached as Exhibit 1 is a document that explains the original methodology HHSC utilized to obtain estimates derived from the Census.

8.     In September of 2022, HHSC analysts identified a secondary data source that could be used in combination with claims data to better estimate the fraction of Emergency Medicaid services provided to undocumented immigrants. The updated method relies on enrollment data collected by the Texas Integrated Eligibility Redesign System (TIERS), which contains a variable related to documentation status. Using the percentage of Emergency Medicaid clients with 'UN' (for "undocumented") alien status among individuals that did not have a null/blank value for their Alien Type Code in TIERS, HHSC estimated the portion of Emergency Medicaid payments attributable to undocumented immigrants in Texas. The total estimated cost to the State for the provision of Emergency Medicaid services to undocumented immigrants residing in Texas was $116 million in CY 2019; $88.3 million in CY 2020; $95.6 million in CY 2021; and $72.2 million in

3

CY 2022.[1] Attached as Exhibit 2 is a report providing detailed information and data sources for these calculations.

9.      Texas CHIP Perinatal Coverage provides prenatal care to certain low-income women who do not otherwise qualify for Medicaid. To produce Rider 59 cost estimates for the portion of CHIP Perinate expenditures attributable to undocumented immigrants in Texas, HHSC relied on population estimates from the U.S. Census Bureau to estimate the percentage of non-U.S. citizen reproductive age females in Texas who have not attained some form of legal permanent resident status. The method based on Census data was used because there is no way to definitively report the number of undocumented immigrants served by CHIP Perinate as the program does not require citizenship documentation. Attached as Exhibit 1 is a document that explains the original methodology HHSC utilized to obtain estimates derived from the Census.

10.      The September 2022 estimate for the cost of CHIP Perinate benefits provided to undocumented immigrants used TIERS data in combination with capitation payments to better estimate the fraction of CHIP Perinate expenditures attributable to undocumented immigrants. The updated method uses the percentage of CHIP Perinate clients with 'UN' alien status among individuals that did not have a null/blank value for their Alien Type Code in TIERS to estimate the portion of CHIP Perinate capitation payments attributable to undocumented immigrants in Texas. The total estimated cost to the State for CHIP Perinatal Coverage to undocumented immigrants residing in Texas was $11.1 million in CY 2019; $16.9 million in CY2020; $25.8 million

---

[1] Administrative claims and MCO encounter data for CY 2022 were downloaded on January 11, 2023. Claims and encounter data are subject to an 8-month time lag for claims adjudication. Therefore, expenditures shown for client services in CY 2022 do not reflect complete expenditure data for the year.

in CY 2021; and $30.9 million in CY2022.   Attached as Exhibit 2 is a report providing detailed information and data sources for these calculations.

11.     For Emergency Medicaid and CHIP Perinate, the total estimated cost to the State each year is affected by both the volume and cost of services provided and annual changes in the percentage of expenditures matched by the federal government (i.e., Federal Medical Assistance Percentage (FMAP) and Enhanced Federal Medical Assistance Percentage (E-FMAP)), which determines the state share of overall Medicaid and CHIP expenditures. It is important to note that documentation status is missing or unknown for some individuals enrolled in these programs. Additionally, an Alien Type Code of 'UN' (undocumented) may result from a failure to provide proper documentation at the time an application is submitted. Although all of these cost estimates include some margin of uncertainty, it is clear that both of these programs have some positive cost to the State of Texas due to utilization by non-citizens, including undocumented immigrants.

12.     All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this 24th day of October 2023.

Susan
Bricker

Digitally signed by
Susan Bricker
Date: 2023.10.24
11:24:18 -05'00'

SUSAN BRICKER

5

Exhibit 1

# Population-based Method for Estimating the Percentage of Undocumented Clients in Texas

## Original Rider 59 Estimates

Previously, HHSC relied on different methods to estimate the percentage of non-U.S. citizens in Texas who are undocumented. The first method consisted of assuming that one-half of the estimated non-U.S. citizen population in the state was undocumented. Under this method, HHSC would obtain the estimate for total number of non-U.S. citizens in the state, as reported from the U.S. Census Bureau's American Community Survey (ACS)[1], and would divide that number by two in order to obtain an estimate of the undocumented population in the state.

HHSC relied on a method that used two different sources of official federal government data to develop its own in-house estimates of the percent of Texas residents that are undocumented immigrants:

- The Texas-specific sample of the U.S. Census Bureau's American Community Survey (ACS), and
- The Office of Immigration Statistics of the U.S. Department of Homeland Security (DHS).

The ACS was the source for estimates of the total non-U.S. citizen population in the state while DHS was the source for the estimated number of persons in the state who are undocumented.

Using these two sources, HHSC estimated the percent of non-U.S. citizens who are undocumented by taking DHS' estimate of the number of undocumented immigrants in Texas (the numerator) and dividing it by the ACS estimate for the number of non-U.S. citizens in the state (the denominator). This calculation resulted in HHSC's estimate of the proportion/percent of non-U.S. citizens in the state who are undocumented.

---

[1] The ACS is a large-scale demographic survey that provides annual estimates of the total population in Texas according to U.S. citizen status (citizen versus non-citizen). However, the estimate for the non-U.S. citizen population is not broken down any further according to documented/undocumented status because that type of information is not collected by the survey.

According to this method, during 2008-2014, an estimated two-thirds (62 to 66%) of non-citizens were considered undocumented on any given year within that period.

DHS temporarily suspended the publication of its estimates for the unauthorized/undocumented population after March 2013, when it published estimates for this population as of January 2012. It resumed publication of the estimates on April 19, 2021, when it released previously unpublished estimates for the years 2013-2018.  The new updates may be used to develop future versions of this report.

With the temporary suspension of DHS's estimates after March 2013, HHSC lost the official information source relied upon for data on the number of non-citizens who are undocumented, as none of the other Federal and Texas state agencies collected and published information about the legal status of non-U.S. citizens' residing in the state of Texas.

This situation resulted in the need to develop and alternative method for estimating the number and percent of non-U.S. citizens using HHSC services who are undocumented. The goal was to develop a method that does not rely on the simple assumptions previously used (that one-half of non-citizens are undocumented). The alternative method is explained below.

## Subsequent Estimates (2014 – 2022)

### Benchmark Program: Texas' Medicaid Type Program 30

Texas' Medicaid Type Program 30 (TP 30) plays an important role in paying for emergency medical services provided to non-U.S. citizens who do not meet the eligibility criteria for Medicaid. Given the high-profile role the program plays in compensating health care providers for services provided to non-eligible non-citizens, it was chosen as the benchmark program for developing an estimate of the percent of non-citizens provided HHSC services who are undocumented.

To a very significant degree, uninsured non-citizen reproductive-age (ages 15-44) females are the main caseload driver within TP 30. In SFY 2017, reproductive- age females accounted for 81% of the clients served. Given the highly disproportionate impact this group has on the program, it is by far the most important one to analyze to obtain the best and most accurate estimate possible of the percent of clients served under this program that are likely to be undocumented non-citizens.

**Appx. 041**

Data Analysis and Estimate

According to the U.S. Census Bureau's American Community Survey (ACS), in 2016 there were approximately 446,000 uninsured non-U.S. citizen reproductive-age females in Texas. Of those, 39 percent (176,000) had resided in the U.S. for 10 years or less and 61 percent (270,000) for more than 10 years.

It is reasonable to expect that the longer a non-citizen has resided in the U.S., the more likely he/she would have been able to attain some form of U.S. legal permanent resident status.

Assuming that the fraction of non-citizen reproductive-age females (ages 15-44) who have not attained some form of legal permanent resident status is 7 of every 10 (70%) among those who have lived in the U.S 10 years or less, and 4 of every 10 (40%) among those in the U.S. for more than 10 years, the estimated potential percentage for undocumented females of reproductive age in Texas is 52%.

**Calculation for Estimated Percent Undocumented**

**((0.7\*176,000 + 0.4\*270,000) / (446,000)) \* 100 = 51.8% ~ 52%**

Extending these assumptions derived from the ACS data to non-citizen reproductive-age females that received assistance under TP 30 – for whom year of entry into the U.S. information is not known -- it is then estimated that 52% of them are likely to be undocumented.

Taking into consideration that uninsured, non-citizen reproductive-age females represent a highly disproportionate share of the program's caseload, the estimated potential percentage for undocumented clients applicable to them, slightly adjusted downwards to 50%, is also applied to the entire TP 30 program. Due to the lack of sufficient demographic data on populations at-risk for other programs of interest, the same percentage was also applied to the Family Violence and CHIP-P programs in reports prior to 2023.

**Exhibit 2**

**Health and Human Services Commission Services and Benefits Provided to Undocumented Immigrants, Medicaid and CHIP-Perinate Programs, CY 2019 - 2022**

| | CY 2019 | CY 2020 | CY 2021 | CY 2022 |
|---|---|---|---|---|
| Texas Emergency Medicaid | $116,000,000 | $88,300,000 | $95,600,000 | $72,200,000* |
| Texas Children's Health Insurance Program (CHIP) Perinatal Coverage | $11,100,000 | $16,900,000 | $25,800,000 | $30,900,000 |
| **TOTAL TEXAS HEALTH AND HUMAN SERVICES COMMISSION** | **$127,100,000** | **$105,200,000** | **$121,400,000** | **$103,100,000** |

Notes:

*Administrative claims and MCO encounter data were downloaded on January 11, 2023. Claims and encounter data are subject to an 8 month time lag for claims adjudication. Therefore, expenditures shown for client services in CY 2022 do not reflect complete expenditure data for the year.

**Estimated cost to the State for the provision of Emergency Medicaid services to undocumented immigrants, CY 2019 - 2022**

| Texas Emergency Medicaid Expenditures[1] | CY 2019 | CY 2020 | CY 2021 | CY 2022[*] |
|---|---|---|---|---|
| Total | $379,408,384 | $357,752,477 | $379,965,247 | $257,913,172 |

| Texas' Share of TP 30 Expenditures | CY 2019 | CY 2020 | CY 2021 | CY 2022[*] |
|---|---|---|---|---|
| Texas' Share of Federal Medical Assistance Percentage (FMAP)[2] | 41.14% | 32.68% | 32.24% | 34.78% |
| Texas' Share of TP 30 Expenditures | $156,088,609 | $116,913,510 | $122,500,796 | $89,702,201 |

| Estimated Percentage of TP30 Services Provided to Undocumented Immigrants | CY 2019 | CY 2020 | CY 2021 | CY 2022[*] |
|---|---|---|---|---|
| TIERS estimate[3] | 74.3% | 75.5% | 78.0% | 80.5% |

| Estimated Cost of Services Provided to Undocumented Immigrants | CY 2019 | CY 2020 | CY 2021 | CY 2022[*] |
|---|---|---|---|---|
| Total | $115,973,837 | $88,269,700 | $95,550,621 | $72,210,272 |

Data Sources:

[1] TMHP, AHQP Medicaid Claims

[2] FFY 2019 rates are final as stated in Federal Register Vol. 82, No. 223, November 21, 2017.

  FFY 2020 rates are final as stated in Federal Register Vol. 83, No. 229, November 28, 2018.

  FFY 2021 rates are final as stated in Federal Register Vol. 84, No. 232, December 3, 2019.

  FFY 2022 rates are final as stated in Federal Register Vol. 85, No. 230, November 30, 2020.

[3] Texas Integrated Eligibility Redesign System (TIERS)

Notes:

Because HHSC Medicaid claims data do not conclusively identify the legal residency status of immigrants, the portion of Emergency Medicaid payments attributable to undocumented immigrants is estimated based on TIERS eligibility data. The TIERS estimate is the percentage of Emergency Medicaid clients with 'UN' alien status, among individuals that did not have a null/blank value for their Alien Type Code in TIERS.

*Administrative claims and MCO encounter data were downloaded on January 11, 2023. Claims and encounter data are subject to an 8 month time lag for claims adjudication. Therefore, expenditures shown for client services in CY 2022 do not reflect complete expenditure data for the year.

**Estimated cost to the State for CHIP Perinatal Coverage to undocumented immigrants residing in Texas, CY 2019 - 2022**

| Texas CHIP Perinatal Coverage expenditures[1] | CY 2019 | CY 2020 | CY 2021 | CY 2022 |
|---|---|---|---|---|
| Total | $175,103,677 | $154,717,301 | $150,341,871 | $161,628,934 |

| Texas' Share of CHIP Expenditures | CY 2019 | CY 2020 | CY 2021 | CY 2022 |
|---|---|---|---|---|
| Texas' Share of Enhanced Federal Medical Assistance Percentage (EFMAP)[2] | 8.67% | 14.25% | 22.57% | 24.35% |
| Texas' Share of CHIP-Perinate Expenditures | $15,181,489 | $22,047,215 | $33,932,160 | $39,356,645 |

| Estimated Percentage of CHIP-Pernate Services Provided to Undocumented Immigrants | CY 2019 | CY 2020 | CY 2021 | CY 2022 |
|---|---|---|---|---|
| TIERS estimate[3] | 73.3% | 76.6% | 76.1% | 78.4% |

| Estimated Cost of Services Provided to Undocumented Immigrants | CY 2019 | CY 2020 | CY 2021 | CY 2022 |
|---|---|---|---|---|
| **Total** | **$11,128,031** | **$16,888,167** | **$25,822,374** | **$30,855,610** |

Data Sources:
[1] HHSC, DAP SQL Server, CHIP_hx file
[2] FFY 2019 rates are final as stated in Federal Register Vol. 82, No. 223, November 21, 2017.
  FFY 2020 rates are final as stated in Federal Register Vol. 83, No. 229, November 28, 2018.
  FFY 2021 rates are final as stated in Federal Register Vol. 84, No. 232, December 3, 2019.
  FFY 2022 rates are final as stated in Federal Register Vol. 85, No. 230, November 30, 2020.
[3] Texas Integrated Eligibility Redesign System (TIERS)

Notes:
Because HHSC Medicaid claims data do not conclusively identify the legal residency status of immigrants, the portion of Emergency Medicaid payments attributable to undocumented immigrants must be estimated using TIERS eligibility data. The TIERS method is based on the percentage of CHIP-Perinate clients with 'UN' alien status, among individuals that did not have a null/blank value for their Alien Type Code in TIERS.

**Appx. 046**

**United States District Court**
**Southern District of Texas**
**Victoria Division**

STATE OF TEXAS, *et al.*,
    *Plaintiffs,*

v.

U.S. DEPARTMENT OF HOMELAND SECURITY,
  *et al.*,
    *Defendants.*

Case 6:23-cv-00007

## DECLARATION OF SHERI GIPSON

My name is Sheri Gipson, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.      I am the Chief of the Texas Department of Public Safety ("DPS") Driver License Division. In this capacity, I oversee DPS's issuance of driver licenses and identification cards to residents of the State of Texas.

2.      I was appointed to my current position and confirmed by the Texas Public Safety Commission in February 2020. Prior to that, I served as Assistant Chief of the Driver License Division from March 2016 through February 2020.  I have worked for the Driver License Division of DPS for 40 years.

3.      Pursuant to Section 521.142(a) of the Texas Transportation Code, an individual applying for an original driver license "who is not a citizen of the United States must present to [DPS] documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States before the applicant may be issued a driver's license." Section 521.1425(d) of the Texas Transportation Code provides that DPS "may not deny a driver's license to an applicant who provides documentation described by Section 521.142(a) based on the duration of the person's authorized stay in the United States, as indicated by the documentation presented under Section 521.142(a)."

4.      Pursuant to Section 521.101(f-2) of the Texas Transportation Code, an individual applying for an original personal identification certificate "who is not a citizen of the United States must present to [DPS] documentation issued by the appropriate United States agency that authorizes the applicant to be in the United States." Section 521.101(f-4) of the Texas Transportation Code provides that DPS "may not deny a personal identification certificate to an application who complies with Subsection (f-2) based on the duration of the person's authorized stay in the United States, as indicated by the documentation presented under Subsection (f-2)."

5.      If an individual presents documentation issued by the federal government showing authorization to be in the United States (such as an Employment Authorization Document, parole, or grant of deferred action), and otherwise meets eligibility requirements, DPS will issue a limited term driver license or personal identification certificate to a non-citizen resident of Texas.[1] A license or identification certificate issued to such an applicant is limited to the term of the applicant's lawful presence, which is set by the federal government when it authorizes that individual's presence.  In fiscal year 2023 (September 2022 through April 2023), DPS issued 312,837 limited term licenses and identification certificates. In fiscal year 2022 (September 2021 through August 2022), DPS issued 414,567 limited term licenses and identification certificates.

6.      For each non-citizen resident of Texas who seeks a limited term driver license or personal identification certificate, DPS verifies the individual's lawful presence status with the United States government using the Systematic Alien Verification of Entitlements ("SAVE") system. The State of Texas currently pays $0.30 per customer for SAVE verification purposes. Approximately 18% of customers must complete additional SAVE verification at $0.50 per

---

[1] DPS maintains a list of documents acceptable for verifying lawful presence. *See* Tex. Dep't of Public Safety, Verifying Lawful Presence 4 (Rev. 7-13) (also attached to as Ex. A), https://www.dps.texas.gov/sites/default/files/documents/driverlicense/documents/verifyinglawful presence.pdf.

transaction.

7.     For each non-United States citizen resident of Texas who seeks a limited term driver license, DPS verifies the individual's social security number and that person's eligibility through Social Security Online Verification ("SSOLV") and the American Association of Motor Vehicle Administrators' ("AAMVA") Problem Drivers Pointer System ("PDPS") and, if applicable, the Commercial Driver License Information System ("CDLIS"). The State of Texas currently pays $0.05 per customer for SSOLV and PDPS verification purposes. There is a cost of $0.028 for CDLIS verification purposes, which is about 2% of all limited term licenses.

8.     Each additional customer seeking a limited term driver license or personal identification certificate imposes a cost on DPS that exceeds $33. Furthermore, DPS estimates that for an additional 10,000 driver license customers seeking a limited term license, DPS would incur a biennial cost of approximately $2,014,870.80. The table below outlines the estimated costs that DPS would incur based on the additional number of customers per year for employee hiring and training, office space, office equipment, verification services, and card production cost. For every 10,000 additional customers above the 10,000-customer threshold, DPS may have to open additional driver license offices or expand current facilities to meet that increase in customer demand.

| Customer Volume Scenario | Additional Employees Required | Additional Office Space Required (SqFt) (96 per employee) | Biennial Cost for Additional Employees, Leases, Facilities and Technology | Biennial Cost for Verification Services | Biennial Cost for Card Production | Total Cost to DPS |
|---|---|---|---|---|---|---|
| 10,000 | 9.4 | 902.4 | $1,978,859.60 | $9,011.20 | $27,000.00 | $2,014,870.80 |
| 20,000 | 18.8 | 1,804.8 | $3,957,719.20 | $18,022.40 | $54,000.00 | $4,029,741.60 |
| 30,000 | 28.2 | 2,707.2 | $5,936,578.80 | $27,033.60 | $81,000.00 | $6,044,612.40 |
| 40,000 | 37.6 | 3,609.6 | $7,915,438.40 | $36,044.80 | $108,000.00 | $8,059,483.20 |
| 50,000 | 46.9 | 4,502.4 | $9,894,298.00 | $45,056.00 | $135,000.00 | $10,074,354.00 |
| 100,000 | 93.9 | 9,014.4 | $19,788,596.01 | $90,112.00 | $270,000.00 | $20,148,708.01 |
| 150,000 | 140.8 | 13,516.8 | $29,682,894.01 | $135,168.00 | $405,000.00 | $30,223,062.01 |
| 200,000 | 187.8 | 18,028.8 | $39,577,192.01 | $180,224.00 | $540,000.00 | $40,297,416.01 |

9.      Standard term licenses issued to most citizens are valid for a period of eight years with an allowance to renew online once after an office visit. Therefore, most license holders only have to visit a driver license office once every sixteen years. Because limited term licenses are limited to the term of the applicant's lawful presence, it is possible that an individual would have to renew their limited term license sixteen or more times during the same sixteen-year span. The frequency of renewing the license would depend on the length of time the appropriate United States agency authorizes the applicant to be in the United States. Every renewal for a limited term license requires an additional in-person visit to a DPS facility, and thus requires additional costs related to employee hiring and training, verification of lawful presence status through the SAVE system, office space, office equipment, and infrastructure. Thus, the estimated costs identified above that DPS would incur would only increase as more limited term licenses are issued.

10.     The added customer base that may be created by an increase in the number of individuals authorized to be in the United States who chose to reside in Texas will substantially burden driver license resources without additional funding and support.

11.     All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 20ᵗʰ day of July, 2023.

_____
SHERI GIPSON

# Declaration of Sheri Gipson
# Exhibit A:
# Verifying Lawful Presence



# Verifying Lawful Presence

An applicant for a driver license (DL) or identification card (ID) must present proof of lawful presence in the US.  The table on the following pages describes the acceptable documents for each type of applicant attempting to verify lawful presence.  All documentation must show the applicant's name and date of birth.  The applicant must validate a name change or other inconsistent information through additional documentation such as a marriage license, divorce decree or court order.

The department must verify applicable lawful presence documentation through the US Department of Homeland Security's (DHS) Systematic Alien Verification for Entitlements (SAVE) Program.  Verification through SAVE is often instantaneous, but when it is not, receipt of the DL/ID may be delayed for up to 30 days.  If SAVE cannot verify on the first attempt, SAVE will permit two additional stages of verification.  Each stage may require additional documentation from the applicant.  After each stage, the applicant will receive instructions either verbally or by mail on how to proceed with the transaction.  To avoid further delay, the applicant should comply with the instructions fully and as soon as possible.  If the applicant provides timely responses, the process timeline generally occurs as follows.

| Stage | DLD receives response from DHS | DLD response to applicant |
|---|---|---|
| First | Within a few seconds | If verified, card issued |
| Second | 3 to 5 business days | Instruction letter issued within 48 hours after DHS response received by DLD |
| Third | Up to 20 additional business days after second response received from DHS | Instruction letter issued within 48 hours after DHS response received by DLD |

*Temporary Visitor/Limited Term Issuance*

An applicant may be issued a limited term DL/ID if he or she is NOT:

- A US citizen;
- A US national;
- A lawful permanent resident;
- A refugee; or
- An asylee.

A limited term DL/ID will expire with the applicant's lawful presence as determined by DHS.

*Commercial Driver Licenses*

This guide does not apply to commercial driver licenses.  A person who is a US citizen, US national, lawful permanent resident, refugee or asylee may apply for a commercial driver license.  All others may apply for a nonresident commercial driver license, if eligible.  Refer to http://www.dps.texas.gov/DriverLicense/CommercialLicense.htm or Chapter 522 of the Transportation Code for application and eligibility requirements.

| Category | Acceptable Documents |
|---|---|
| U.S. Citizen | ❖ Birth certificate issued by the appropriate vital statistics agency of a U.S. State, a U.S. territory, or the District of Columbia indicating birth in U.S.<br>❖ Department of State Certification of Birth issued to U.S. Citizens born abroad (FS-240, DS-1350, or FS-545) or Consular Report of Birth Abroad<br>❖ Certificate of U.S. Citizenship<br>❖ Certificate of Naturalization<br>❖ U.S. Dept. of Justice – INS U.S. Citizenship Identification Card (I-197 or I-179)<br>❖ Northern Mariana Card (I-873)<br>❖ U.S. passport book that **does not** indicate on the last page that "THE BEARER IS A UNITED STATES NATIONAL AND NOT A UNITED STATES CITIZEN"<br>❖ U.S. passport card |
| U.S. National | U.S. passport book that indicates on the last page that "THE BEARER IS A UNITED STATES NATIONAL AND NOT A UNITED STATES CITIZEN" |
| Kickapoo Traditional Tribe of Texas ("KIC") (U.S. citizen) | American Indian Card (form I-872) which indicates "KIC" |
| Kickapoo Traditional Tribe of Texas ("KIP") (non-U.S. citizen) | American Indian Card (form I-872) which indicates "KIP" |
| American Indian born in Canada (First Nations) | An applicant may refer to the Jay Treaty, 8 U.S.C. § 1359, or 8 C.F.R. § 289.2 and may present a variety of documents.  Issuance cannot occur without approval of the documents by Austin headquarters.  DLD Personnel:  make copies of documentation and seek approval through the chain of command. |
| Lawful Permanent Resident | ❖ Permanent Resident Card (I-551)<br>❖ Resident Alien Card (I-551) – card issued without expiration date<br>❖ Valid Immigrant Visa (with adit stamp) and unexpired foreign passport<br>❖ Unexpired foreign passport stamped with temporary I-551 language (adit stamp), "Approved I-551," or "Processed for I-551"<br>❖ I-94 stamped with temporary I-551 language (adit stamp), "Approved I-551," or "Processed for I-551"<br>❖  Re-entry Permit I-327<br><br>Note: I-151, the predecessor to I-551, is not acceptable as proof of permanent resident status. |
| Immigrant Visa with Temporary I-551 language | A valid Immigrant Visa within one year of endorsement (i.e. stamped by Customs and Border Protection – adit stamp) and an unexpired passport |
| Conditional entrants | Immigration documentation with an alien number or I-94 number indicating this status, which can include but is not limited to:<br>❖ I-94 or other document showing admission under Section 203(a)(7), "refugee conditional entry"<br>❖ I-688B coded 274a.12(a)(3)<br>❖ I-766 with category A3 or A03 |

**Appx. 053**

| Category | Acceptable Documents |
|---|---|
| Asylee | Immigration documentation with an alien number or I-94 number indicating this status, which can include but is not limited to:<br>❖ I-94 with annotation "Section 208" or "asylee"<br>❖ Unexpired foreign passport with annotation "Section 208" or "asylee"<br>❖ I-571 Refugee Travel Document<br>❖ I-688B coded 274a.12(a)(5)<br>❖ I-766 with category A5 or A05 |
| Refugee | Immigration documentation with an alien number or I-94 number indicating this status, which can include but is not limited to:<br>❖ I-94 with annotation "Section 207" or "refugee"<br>❖ Unexpired foreign passport with annotation "Section 207" or "refugee"<br>❖ I-571 Refugee Travel Document<br>❖ I-688B coded 274a.12(a)(3)<br>❖ I-766 with category A3 or A03 |
| Temporary Protected Status (TPS) | Immigration documentation with an alien number or I-94 number indicating this status or Employment Authorization Document (EAD) (I-766) with category A12 or C19 |
| Applicant with Employment Authorization Document | Employment Authorization Document (EAD)( I-766) |
| Applicants for adjustment of status<br><br>Note: These are individuals applying to become lawful permanent residents. | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to a form I-797 indicating pending I-485 or pending application for adjustment of status. |
| Applicants for extension of status, change of status, petition for non-immigrant worker, with a pending I-918 application, or other pending category. | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to a form I-797 indicating a pending application for an extension of status, change of status, petition for non-immigrant worker, or other pending category. |
| Citizens of the Republic of Palau | Unexpired foreign passport or I -94 with annotation "CFA/PAL" or other annotation indicating the Compact of Free Association/Palau<br><br>**OR**<br><br>Employment Authorization Document (EAD)(I-766) with category A8 or A08 |
| Citizens of the Republic of the Marshall Islands | Unexpired foreign passport or I -94 with annotation "CFA/RMI" or other annotation indicating the Compact of Free Association/Republic of Marshall Islands<br><br>**OR**<br><br>Employment Authorization Document (EAD)(I-766) with category A8 or A08 |

**Appx. 054**

| Category | Acceptable Documents |
|---|---|
| Citizens of the Federated States of Micronesia | Unexpired foreign passport or I -94 with annotation "CFA/FSM" or other annotation indicating the Compact of Free Association/Federated States of Micronesia<br><br>**OR**<br><br>Employment Authorization Document (EAD)(I-766) with category A8 or A08 |
| Cuban/Haitian entrants | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to an I-94 with annotation "Cuban/Haitian entrant" |
| Lawful temporary residents | Immigration documentation with an alien number or I-94 number |
| Self-petitioning abused spouses or children, parents of abused children, or children of abused spouses<br><br>(Applicants with Violence Against Women Act (**VAWA**) petitions) | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to I-797 indicating approved, pending, or prima facie determination of I-360 or an approved or pending I-360 or an I-766 with category C31. |
| Parolees | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to an I-94 with annotation "parole" or "paroled pursuant to Section 212(d)(5)." |
| Person granted **deferred action** | Immigration documentation with an alien number or I-94 number |
| Persons granted **deferred enforcement departure** (DED) | Immigration documentation with an alien number or I-94 number or Employment Authorization Document (EAD) (I-766) with category A11<br><br>Note: Individuals in this status may have been granted an extension to the period of authorized stay that is not reflected on the current EAD.  Notifications regarding any extensions to this category will be distributed by Austin headquarters. |
| Person granted **family unity** | Immigration documentation with an alien number or I-94 number |
| Persons under an **order of supervision** | Immigration documentation with an alien number or I-94 number |
| Persons granted **extended or voluntary departure** | Immigration documentation with an alien number or I-94 number |

Appx. 055

| Category | Acceptable Documents |
|---|---|
| Persons granted **withholding of deportation or removal** | Immigration documentation with an alien number or I-94 number<br><br>This can include but is not limited to an I-94 or passport with annotation "Section 243(h)" or a letter or order from USCIS or court granting withholding of deportation or removal. |
| Persons in **removal or deportation proceedings** | Immigration documentation with an alien number or I-94 number |
| Persons granted a **stay of deportation** | Immigration documentation with an alien number or I-94 number |
| Persons granted **voluntary departure** | Immigration documentation with an alien number or I-94 number |
| **A-1, A-2, and A-3** | Unexpired foreign passport or I -94<br><br>**Note:** Issuance **cannot occur unless** applicant presents a letter from U.S. Department of State with original signature <u>indicating ineligibility for Department of State issued driver license or requesting issuance of a state issued identification card.</u> |
| **B1/B2 Visa/BCC with I-94**<br><br>(Border Crosser Card , DSP-150, or "laser visa") | All of the following:<br>♦ Unexpired foreign passport,<br>♦ Visa (border crosser card), **and**<br>♦ **I -94**<br>Note:  Applicant must have an I-94 to be eligible because of the time and distance from the border restrictions for applicants who do not obtain an I-94. |
| **B-1, B-2, C-1, C-3, D-1, and D-2** | Unexpired foreign passport or I -94<br><br>Note: The applicant may not be able meet residency/domicile requirements. |
| **C-2**<br><br>Alien in transit to U.N. Headquarters district.  Travel limited to 25 miles radius of Columbus Circle in New York, NY | This status is restricted to New York, NY and not eligible for a Texas driver license under the domicile/residency requirements. |
| **E-1, E-2, and E-3** | Unexpired foreign passport or I -94 |
| **E-2 CNMI**<br><br>Treaty-investor and dependents in Commonwealth of the Northern Mariana Islands | This status is limited to persons entering the Commonwealth of the Northern Mariana Islands (CNMI) and is not eligible for a Texas driver license (8 CFR § 214.2(3)(23)). |
| **F-1**<br><br>Foreign academic student | Unexpired foreign passport or I -94 or I-20 |

5

**Appx. 056**

| Category | Acceptable Documents |
|---|---|
| **F-2**<br><br>Dependent on F-1 | Unexpired foreign passport or I -94 |
| **F-3**<br><br>Commuter Student from Canada or Mexico | This status is for commuters from Mexico or Canada and is not eligible for a Texas driver license under the domicile/residency requirements. |
| **G-1, G-2, G-3, G-4, and G-5** | Unexpired foreign passport or I -94<br><br>Note: Issuance cannot occur unless applicant presents a letter from US Department of State approving the issuance of a DL/ID. |
| **H-1B, H-1B1, H-1C, H-2A, H-2B, H-2R, H-3, H-4, and I** | Unexpired foreign passport or I -94 |
| **J-1**<br><br>Exchange visitor (may be student, trainee, work/travel, au pair, etc.) | Unexpired foreign passport or I -94 or DS-2019 |
| **J-2**<br><br>Dependent of J-1 exchange visitor | Unexpired foreign passport or I -94 |
| **K-1, K-2, K-3, K-4, L-1, L-1A, L-1B, and L-2,** | Unexpired foreign passport or I -94 |
| **M-1**<br><br>Non-academic student | Unexpired foreign passport or I -94 or I-20 |
| **M-2**<br><br>Dependents of non-academic students | Unexpired foreign passport or I -94 |
| **M-3**<br><br>Commuter Student from Canada or Mexico | This status is for commuters from Mexico or Canada and is not eligible for a Texas driver license under the domicile/residency requirements. |
| **N-1 through N-7 (NATO)**<br><br>North American Treaty Organization Representatives and dependents | Unexpired foreign passport or I -94 |
| **N-8, N-9, O-1, O-2, O-3, P-1, P-2, P-3, P-4, Q-1, Q-2, Q-3, R-1, R-2, S-5, S-6, S-7, T-1, T-2, T-3, T-4, T-5, TN-1, TN-2, TD, U-1, U-2, U-3, U-4, U-5, V-1, V-2, and V-3** | Unexpired foreign passport or I -94 |

**Appx. 057**

| Category | Acceptable Documents |
|---|---|
| **WB***<br><br>Visitor for business (visa waiver program) | Unexpired foreign passport with admission stamp annotated "WT/WB" or I -94<br><br>Note: The applicant may not be able meet residency/domicile requirements. |
| **WT***<br><br>Visitor for pleasure (tourist in visa waiver program) | Unexpired foreign passport with admission stamp annotated "WT/WB" or I -94<br><br>Note: The applicant may not be able meet residency/domicile requirements. |

*Visa waiver program countries: Andorra, Australia, Austria, Belgium, Brunei, Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Hungary, Iceland, Ireland, Italy, Japan, Latvia, Liechtenstein, Lithuania, Luxembourg, Malta, Monaco, the Netherlands, New Zealand, Norway, Portugal, San Marino, Singapore, Slovakia, Slovenia, South Korea, Spain, Sweden, Switzerland, and the United Kingdom.

Appx. 058

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**DEL RIO DIVISION**

| | | |
|---|---|---|
| **THE STATE OF TEXAS,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | CIVIL ACTION NO. _____ |
| **v.** | § | |
| | § | |
| **U.S. DEPARTMENT OF HOMELAND** | § | |
| **SECURITY,** *et al.,* | § | |
| | § | |
| *Defendants.* | | |

<u>**DECLARATION OF MICHAEL MEYER**</u>

My name is Michael Meyer, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.      I am the Deputy Commissioner of Finance at the Texas Education Agency ("TEA"). I have worked for TEA in this capacity since June 2018. As a part of my role, I oversee TEA's school finance operations, including the administration of the Foundation School Program and analysis and processing of financial data. My responsibilities also include representing TEA in legislative hearings and school finance-related litigation.

2.      TEA estimates that the average funding entitlement from state and local sources for fiscal year 2023 will be $9,564 per student in attendance for an entire school year. If a student qualified for additional Bilingual and Compensatory Education weighted funding, it would cost the State $11,781 to educate each student in attendance for the entire school year. Most, if not all non-citizen (*i.e.*, "alien") children would likely qualify for both Bilingual and Compensatory Education weighted funding.

3.      TEA has not received any information directly from the federal government regarding the precise number of non-citizen children in Texas. However, I am aware that the U.S. Health and Human Services ("HHS") Office of Refugee Resettlement provides data for a subset of that population: unaccompanied children ("UAC") (available at https://www.acf.hhs.gov/orr/grant-funding/unaccompanied-children-released-sponsors-state, accessed on October 24, 2023 at 9:59 a.m. CST). It indicates that in Texas, 3,272 UAC were released to sponsors during the 12-month period covering October 2014 through September 2015; 6,550 UAC were released to sponsors during the 12-month period covering October 2015 through September 2016; 5,391 UAC were released to sponsors during the 12-month period covering October 2016 through September 2017; 4,136 UAC were released to sponsors during the 12-month period covering October 2017 through September 2018; 9,900 UAC were released to sponsors during the 12-month period covering October 2018 through September 2019; 2,336 UAC were released to sponsors during the 12-month period covering October 2019 through September 2020; 15,341 UAC were released during the 12-month period covering October 2020 through September 2021; and 19,071 UAC were released during the 12-month period covering October 2021 through September 2022.

4.      If each of the children described above enrolls in and achieves full attendance at a Texas public school during the school year following the period during which they are released to a sponsor, and qualifies for Bilingual and Compensatory Education weighted funding (such that the annual cost to educate each student from state and local sources for fiscal years 2016, 2017, 2018, 2019, 2020, 2021, 2022, and 2023 would be approximately $9,573, $9,639, $9,841, $10,330, $11,323, $11,536, $11,719, and $11,781, respectively), the annual costs to educate

2

**Appx. 060**

these groups of children for fiscal years 2016, 2017, 2018, 2019, 2020, 2021, 2022, and 2023 would be approximately $31.32 million, $63.13 million, $53.05 million, $42.73 million, $112.10 million, $26.95 million, $179.78 million, and $224.67 million, respectively. These estimates do not include any potential costs associated with UAC continuing in Texas public schools beyond one year.

5.      Texas public school formula funding is comprised of state and local funds. Funding entitlements are initially based on projections of student counts, attendance patterns, and other factors, and adjusted as actual data become available. Districts often experience changes in their student enrollment from year to year resulting from births and deaths, movement in and out of the district, and other factors. The State plans for a net increase of approximately 15,000-25,000 students in average daily attendance across Texas each year, based on available data.

6.      The Foundation School Program serves as the primary funding mechanism for providing state aid to public schools in Texas. Any additional UAC enrolled in and attending Texas public schools would increase the State's cost of the Foundation School Program over what it otherwise would have been.

7.      Based on my knowledge and expertise regarding school finance issues impacting the State of Texas, I anticipate that the total costs to the State of providing public education to UAC will rise in the future to the extent that the number of UAC enrolled in the State's public school system increases.

8.      All of the facts and information contained within this declaration are within my personal knowledge and are true and correct to the best of my knowledge.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

3

and correct.

Executed on this 24th day of October 2023.

_____
MICHAEL MEYER