**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION**

**STATE OF TEXAS**,

*Plaintiff,*

**v.**

**U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.*,**

*Defendants.*

Case No. 2:23-cv-00055-AM

Hon. Alia Moses

**DEFENDANTS' OPPOSITION TO TEXAS'S MOTION
FOR PRELIMINARY INJUNCTION OR STAY OF AGENCY ACTION**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

I.     Statutory Background ........................................................................................ 2

II.    Factual Background .......................................................................................... 5

III.   Litigation History.............................................................................................. 8

LEGAL STANDARD ..................................................................................................... 9

ARGUMENT................................................................................................................. 10

I.     Texas Is Unlikely To Succeed On Its Claims............................................... 10

     A.    The Court lacks jurisdiction to grant Texas's requested relief. ................... 10

     B.    Texas may not assert its state-law claims against Defendants.................... 12

     C.    Judicial review is not available under the APA. .......................................... 15

           i.    Defendants' actions are committed to agency discretion by law. ........................................................................................................ 16

           ii.   The alleged "policy, practice, and pattern" is not final agency action.. ............................................................................. 19

     D.    Defendants' actions are consistent with their broad statutory authority......................................................................................... 23

     E.    Defendants' actions do not constitute a legislative rule............................. 25

     F.    Defendants' actions are not arbitrary or capricious.................................... 28

II.    Texas Has Not Demonstrated That It Will Suffer Irreparable Harm. .................... 29

III.   An Injunction Would Be Contrary To The Equities And The Public Interest........ 31

CONCLUSION .............................................................................................................33

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Al Otro Lado, Inc. v. Nielsen,*
   327 F. Supp. 3d 1284 (S.D. Cal. 2018) ................................................................................ 21

*All. for Hippocratic Med. v. FDA,*
   78 F.4th 210 (5th Cir. 2023) ................................................................................................ 9

*Anibowei v. Morgan,*
   70 F.4th 898 (5th Cir. 2023) ............................................................................................... 29

*Arizona v. Biden,*
   40 F.4th 375 (6th Cir. 2022) ............................................................................................... 22

*Arizona v. California,*
   283 U.S. 423 (1931) ............................................................................................................. 15

*Arizona v. United States,*
   567 U.S. 387 (2012) ............................................................................................................... 2

*Bark v. U.S. Forest Serv.,*
   37 F. Supp. 3d 41 (D.D.C. 2014) ....................................................................................... 20

*Biden v. Texas,*
   142 S. Ct. 2528 (2022) ......................................................................................................... 11

*CAE Integrated, LLC v. Moov Techs., Inc.,*
   44 F.4th 257 (5th Cir. 2022) ................................................................................................. 9

*City of New York v. Dep't of Def.*
   913 F.3d 423 (4th Cir. 2019) ............................................................................................... 20

*Dennis Melancon, Inc. v. City of New Orleans,*
   703 F.3d 262 (5th Cir. 2012) ............................................................................................... 29

*Dep't of Labor v. Kast Metals Corp.,*
   744 F.2d 1145 (5th Cir. 1984) ............................................................................................. 26

*Dickson v. United States,*
   11 F.4th 308 (5th Cir. 2021) ............................................................................................... 14

*DRG Funding Corp. v. Sec. of Hous. & Urban Dev.,*
   76 F.3d 1212 (D.C. Cir. 1996) ................................................................ 22

*El-Shifa Pharm. Indus. Co. v. United States,*
   607 F.3d 836 (D.C. Cir. 2010) ........................................................... 13, 15

*Fla. Wildlife Fed. v. Goldschmidt,*
   611 F.2d 547 (5th Cir. 1980) ................................................................. 16

*Garland v. Aleman Gonzalez,*
   142 S. Ct. 2057 (2022) ..................................................................... 10, 11

*Geo Grp., Inc. v. Newsom,*
   50 F.4th 745 (9th Cir. 2022) .................................................................. 15

*Haaland v. Brackeen,*
   143 S. Ct. 1609 (2023) .......................................................................... 31

*Hancock v. Train,*
   426 U.S. 167 (1976) .............................................................................. 15

*Heckler v. Chaney,*
   470 U.S. 821 (1985) ......................................................................... 16, 17

*Hernandez v. Mesa,*
   140 S. Ct. 735 (2020) ............................................................................ 18

*Hunsucker v. Phinney,*
   497 F.2d 29 (5th Cir. 1974) ................................................................... 12

*In re Supreme Beef Processors, Inc.,*
   468 F.3d 248 (5th Cir. 2006) (en banc) .............................................. 13, 14

*Johnson v. Maryland,*
   254 U.S. 51 (1920) ................................................................................ 15

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
   511 U.S. 375 (1994) .............................................................................. 12

*Lane v. Pena,*
   518 U.S. 187 (1996) .............................................................................. 13

*Leslie Miller, Inc. v. Arkansas,*
   352 U.S. 187 (1956) .............................................................................. 15

*Lincoln v. Vigil,*
   508 U.S. 182 (1993) ................................................................................ 17

*Lujan v. Nat'l Wildlife Fed.,*
   497 U.S. 871 (1990) ................................................................................ 20

*Mayo v. United States,*
   319 U.S. 441 (1943) ........................................................................... 14, 15

*McGuire v. Turnbo,*
   137 F.3d 321 (5th Cir. 1998) .................................................................. 14

*Michigan v. U.S. Army Corps. of Eng'rs,*
   667 F.3d 765 (7th Cir. 2011) .................................................................. 13

*Mock v. Garland,*
   75 F.4th 563 (5th Cir. 2023) .................................................................. 26

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) .................................................................................. 28

*Munaf v. Geren,*
   553 U.S. 674 (2008) ................................................................................ 11

*Nken v. Holder,*
   556 U.S. 418 (2009) ................................................................................ 32

*Norton v. S. Utah Wilderness All.,*
   542 U.S. 55 (2004) .................................................................................. 19

*Perez v. Mortg. Bankers Ass'n,*
   575 U.S. 92 (2015) .................................................................................. 26

*Pros.& Patients for Customized Care v. Shalala,*
   56 F.3d 592 (5th Cir. 1995) .................................................................... 26

*Sambrana v. United Airlines, Inc.,*
   2022 WL 486610 (5th Cir. Feb. 17, 2022) ............................................. 30

*Sierra Club v. Peterson,*
   228 F.3d 559 (5th Cir. 2000) ............................................................. 19, 20

*Sierra Club v. U.S. Dep't of Interior,*
   990 F.3d 909 (5th Cir. 2021) ................................................................. 28

*Soundboard Ass'n v. FTC,*
   888 F.3d 1261 (D.C. Cir. 2018) ............................................................ 22

*Steele v. City of Hous.,*
   603 S.W.2d 786 (Tex. 1980) ................................................................. 25

*Talbert v. United States,*
   932 F.2d 1064 (4th Cir. 1991) .............................................................. 14

*Texas v. EPA,*
   983 F.3d 826 (5th Cir. 2020) ................................................................ 18

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) ........................................................... 26, 27

*Towers Charter & Marine Corp. v. Cadillac Ins. Co.,*
   894 F.2d 516 (2d Cir. 1990) ................................................................. 30

*Trump v. Vance,*
   140 S. Ct. 2412 (2020) ......................................................................... 14

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
   578 U.S. 590 (2016) ........................................................................ 19, 22

*United States v. Delgado-Garcia,*
   374 F.3d 1337 (D.C. Cir. 2004) ............................................................ 18

*United States v. Mitchell,*
   463 U.S. 206 (1983) ....................................................................... 12, 13

*United States v. Texas,*
   143 S. Ct. 1964 (2023) ............................................................. 12, 18, 30

*United States v. Washington,*
   142 S. Ct. 1976 (2022) ......................................................................... 14

*United States v. Williams,*
   514 U.S. 527 (1995) ............................................................................. 13

*Webster v. Doe,*
   486 U.S. 592 (1988) ............................................................................. 17

*Westbay Steel, Inc. v. United States,*
   970 F.2d 648 (9th Cir. 1992) ...................................................... 14

*Winter v. Nat. Res. Defense Council, Inc.,*
   555 U.S. 7 (2008) ............................................................... 29, 32

## **Statutes**

5 U.S.C. § 551 ................................................................... 19, 25

5 U.S.C. § 553 ................................................................... 25, 26

5 U.S.C. § 554 ....................................................................... 25

5 U.S.C. § 701 ............................................................... 16, 17, 19

5 U.S.C. § 702 ............................................................... 13, 14, 15

5 U.S.C. § 704 ................................................................... 16, 19

5 U.S.C. § 705 ..................................................................... 9, 11

5 U.S.C. § 706 ........................................................................ 8

6 U.S.C. § 202 ....................................................................... 17

6 U.S.C. § 211 .............................................................. 3, 17, 23

8 U.S.C. § 1103 ................................................................ *passim*

8 U.S.C. § 1158 ....................................................................... 5

8 U.S.C. § 1182 ....................................................................... 2

8 U.S.C. § 1225 ................................................................ *passim*

8 U.S.C. § 1226 ............................................................ 2, 4, 11, 23

8 U.S.C. § 1227 ....................................................................... 2

8 U.S.C. § 1252 ........................................................... 10, 11, 12, 16

8 U.S.C. § 1325 ....................................................................... 2

8 U.S.C. § 1326 ............................................................................................ 2

8 U.S.C. § 1328 ............................................................................................ 5

8 U.S.C. § 1357 ...................................................................................... *passim*

19 U.S.C. § 1630 .................................................................................... *passim*

28 U.S.C. § 1331 .......................................................................................... 12

28 U.S.C. § 1346 ............................................................................... 12, 14, 30

28 U.S.C. § 1356 .......................................................................................... 12

28 U.S.C. § 1367 .......................................................................................... 12

## **Regulations**

8 C.F.R. § 287.1 ............................................................................. 4, 16, 18, 23

## **Other Authorities**

CBP, *Southwest Land Border Encounters (By Component)* (last modified Oct. 21, 2023),
    https://perma.cc/7WKS-2GRF ............................................................... 5

Charles Alan Wright & Arthur R. Miller, 11A *Federal Practice & Procedure* § 2944
    (3d ed. Apr. 2023 update) ................................................................. 30

Government of Mexico, Information Note No. 04 (July 14, 2023),
    https://perma.cc/V72L-GTXE ............................................................. 32

Government of Mexico, Information Note No. 05 (July 26, 2023),
    https://perma.cc/F932-U9T9 .............................................................. 33

H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. 1358 ............................................ 3

Treaty of Peace, Friendship, Limits, and Settlement between the United States of America
    and the Mexican Republic, Feb. 2, 1848, 9 Stat. 922,
    1848 WL 6374 (July 4, 1848) .............................................................. 5

## INTRODUCTION

The Department of Homeland Security (DHS) and its officers and agents are charged with, among other things, protecting the Nation's borders and enforcing the immigration laws, including apprehending, inspecting, and processing noncitizens who have entered the United States unlawfully. No State or private party may obstruct the performance of those statutory duties. By deploying approximately 4 miles of concertina wire along the bank of the Rio Grande River without consultation with DHS, however, Texas has created such an obstruction—the wire impedes U.S. Border Patrol agents' access to noncitizens who have already crossed the international boundary in the middle of the Rio Grande into the United States. Border Patrol agents, therefore, properly have cut or moved that wire when necessary to carry out their statutory duties, including to apprehend, inspect, and process these noncitizens.

Raising state common law claims and a variety of Administrative Procedure Act (APA) claims, Texas seeks an injunction against further "disrupt[ion] [of] the State's border security efforts" by "cutting Texas's concertina wire." Mot. for Prelim. Inj. at 3, ECF No. 3-1 (PI Mot.). But Texas has things backwards. The Constitution assigns the responsibility over immigration and border security to the federal government, not to the States. That fundamental misunderstanding is fatal to Texas's claims and requests for injunctive relief. The Court should not accept Texas's invitation to impose the State's immigration policy preference on the federal government. Rather, it should deny Texas's motion for preliminary injunction because Texas cannot establish that it will likely

succeed on the merits, that it will suffer irreparable harm, or that the equities favor issuing the extraordinary relief sought.

For these reasons and those below—including significant jurisdictional bars to Texas's requested injunctive relief and the lack of any material factual disputes—the Government also respectively requests that the Court dissolve the October 30, 2023 Temporary Restraining Order (TRO) as soon as possible, before the TRO's current expiration date of November 13, 2023.

## BACKGROUND

### I. Statutory Background

The federal government "has broad, undoubted power over the subject of immigration and the status of [noncitizens]," which "rests, in part, on the National Government's constitutional power to 'establish an uniform Rule of Naturalization' and its inherent power as sovereign to control and conduct relations with foreign nations." *Arizona v. United States*, 567 U.S. 387, 394-95 (2012). To that end, Congress has specified who may be admitted to the United States, *see, e.g.*, 8 U.S.C. § 1182, criminalized unlawful entry and reentry, *see id.* §§ 1325, 1326, and determined who may be removed and under what conditions, *see id.* §§ 1182, 1225-1227. *See Arizona*, 567 U.S. at 395-96.

DHS has significant discretion to exercise its "power and duty to control and guard the boundaries and borders of the United States against the illegal entry of [noncitizens]." 8 U.S.C. § 1103(a)(5). The Secretary of Homeland Security may "establish such regulations" and "perform such other acts as he deems necessary for carrying out his authority under [8 U.S.C. §§ 1101-1537]." *Id.* § 1103(a)(3). That includes "authoriz[ing]

any employee . . . to perform or exercise any of the powers, privileges, or duties conferred [by the Immigration and Nationality Act (INA)]." *Id.* § 1103(a)(4). Those employees authorized by the Secretary to enforce the INA are known as immigration officers. 8 U.S.C. § 1101(a)(18).

U.S. Customs and Border Protection (CBP), in coordination with other federal agencies, is charged with "enforc[ing] and administer[ing] all immigration laws," including "the inspection . . . and admission of persons who seek to enter" the United States and "the detection, interdiction, removal . . . and transfer of persons unlawfully entering . . . the United States." 6 U.S.C. § 211(c)(8). U.S. Border Patrol is "the law enforcement office of [CBP] with primary responsibility for interdicting persons attempting to illegally enter . . . the United States" and for "deter[ring] and prevent[ing] the illegal entry of terrorists, . . . persons, and contraband." *Id.* § 211(e)(3)(A)-(B).

Individual immigration officers, including Border Patrol agents, also have express statutory authority "to interrogate any [noncitizen] or person believed to be [a noncitizen] as to his right to be or remain in the United States" and "to arrest any [noncitizen] who in his presence or view is entering or attempting to enter the United States in violation of any law." 8 U.S.C. § 1357(a)(1)-(2). Before Congress enacted § 1357(a)(3), Border Patrol's "activities . . . in certain areas [were] seriously impaired by the refusal of some property owners along the border to allow patrol officers access to extensive border areas in order to prevent such illegal entries." H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. 1358, 1360. Congress responded by codifying that agents may "access . . . private lands" without a warrant within 25 miles of an external border "for the purposes of patrolling the border

3

to prevent the illegal entry of [noncitizens] into the United States," 8 U.S.C. § 1357(a)(3). This means that Border Patrol agents may "conduct[ ] such activities as are customary, or reasonable and necessary, to prevent the illegal entry of aliens into the United States." 8 C.F.R. § 287.1(c); *see* H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. at 1360 (Section 1357(a)(3) "adequately authorize[s] immigration officers to continue their normal patrol activities, concerning which Congress has been well informed during the past 48 years, and which authority it unquestionably meant these officers to exercise.").

Noncitizens who have already crossed the international boundary into the United States stand on a different legal footing from those who have not. Under the INA, a noncitizen "present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival . . .)" is "deemed . . . an applicant for admission." 8 U.S.C. § 1225(a)(1). And the INA authorizes "immigration officers" to "inspect[]" all such applicants, as well as those "who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States." *Id.* § 1225(a)(3).

If an immigration officer determines that a noncitizen is inadmissible, the noncitizen may be removed or be permitted to depart from the United States only under the statutes' specified procedures, *see id.* §§ 1225(a)(4) (withdrawal); 1229a (removal proceedings); 1225(b)(1)(A) (expedited removal procedures). Inadmissible noncitizens may be detained pending removal. *Id.* §§ 1225(b)(1), 1226. With limited exceptions, Congress has specified that a noncitizen "who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ),

4

irrespective of such [noncitizen's] status, may apply for asylum." *Id*. § 1158(a). And certain noncitizens encountered by Border Patrol agents may be subject to criminal prosecution. *See id*. § 1328 ("Reentry of removed aliens").

No immigration statute that Congress has enacted authorizes Border Patrol agents to simply push noncitizens already present in the United States back to Mexico.

## II.    Factual Background

The United States and Mexico share a border nearly 2,000 miles long. From the Gulf of Mexico to the southern border of New Mexico, the middle of the Rio Grande serves as "[t]he boundary line between the two republics." Treaty of Peace, Friendship, Limits, and Settlement between the United States of America and the Mexican Republic, Feb. 2, 1848, 9 Stat. 922, 1848 WL 6374, at *3. In Fiscal Year 2023, Border Patrol agents had over 2 million encounters with noncitizens at the Southwest land border, including approximately 400,000 in the Del Rio Sector. *See* CBP, *Southwest Land Border Encounters (By Component)* (last modified Oct. 21, 2023), https://perma.cc/7WKS-2GRF. Border Patrol agents in the Del Rio Sector are responsible for patrolling 245 miles of the U.S.-Mexico border. Declaration of David S. BeMiller ¶ 3.

One of Border Patrol's main statutory objectives is to deter illegal entry into the United States and to intercept individuals who are attempting to unlawfully enter, including terrorists, criminals, and smugglers, before they can move to the interior of the country. *Id*. ¶ 4. As one exercise of this authority, agents patrol areas between ports of entry along the Rio Grande in the Del Rio Sector. *Id*. ¶¶ 3-4. Agents apprehend noncitizens unlawfully entering the country, inspect them, process them, and in

appropriate circumstances place them in removal proceedings. *Id.* ¶ 4. The land along the border in the Del Rio Sector consists primarily of farms and ranches. *Id.* ¶ 3. Agency guidance has long advised Border Patrol agents to coordinate with private landowners when encountering locks, fences, and other barriers preventing access to the border and to take steps to ameliorate any damage caused to such private property. *Id.* ¶ 6. However, Border Patrol agents are authorized to cut locks or remove barriers if necessary to access private lands and perform their duties. *See id.* ¶¶ 6, 19; *see also* 8 U.S.C. § 1357(a)(3).

In March 2021, Governor Abbott launched Operation Lone Star. Compl. ¶ 30, ECF No. 1. As part of that initiative, Texas has deployed concertina wire along the riverbank of the U.S. side of the Rio Grande "to deter" noncitizens from crossing into the United States. *Id.* ¶ 32.[1] Defendants have observed this wire on the U.S. side of the Rio Grande itself and across gates that provide access to the river. BeMiller Decl. ¶ 11. Texas alleges that the wire "is lawfully in place on state, municipal, or private land," Compl. ¶ 63,[2] and that it "has not placed concertina wire on any federal land near Eagle Pass," *id.* ¶ 59.[3] Because the concertina wire is on the U.S. side of the Rio Grande, any noncitizen

---

[1] In addition, Texas has installed a floating buoy barrier in the Rio Grande near Eagle Pass to stop migrants from crossing the river. That barrier structure is the subject of a suit by the United States. *See United States v. Abbott*, 1:23-cv-00853-DII (W.D. Tex.), *appeal of PI pending*, No. 23-50632 (5th Cir.).

[2] On page 23 of Texas's complaint, it restarts numbering paragraphs so that there are two paragraphs numbered 61, 62, 63, 64, and 65. Except where noted, Defendants' citations to these paragraphs in the complaint refer to second paragraphs numbered 61, 62, 63, 64, and 65.

[3] For purposes of these motions, Defendants accept this allegation as true. Any placement of concertina wire on federal land by Texas is presently beyond the scope of this case.

6

approaching this wire from the Rio Grande has already entered the United States. BeMiller Decl. ¶¶ 8-9.

Texas's installation of the concertina wire has reduced Border Patrol agents' view of the river and prevented them from apprehending or otherwise accessing noncitizens who have already unlawfully entered the United States. *Id.* ¶ 12. This has consequences for agents, migrants, and others. Most importantly, it makes it more difficult for Border Patrol to carry out its statutory responsibilities. *Id.* ¶¶ 12, 15. Migrants who are not apprehended and who cannot get through the wire travel down the shoreline, sometimes long distances in significant heat, until there is no wire blocking their egress. *Id.* ¶ 13. That increases the chances these migrants will evade apprehension as well as the migrants' risk of injury, dehydration, fatigue, and drowning. *Id.* When such circumstances arise, the wire can reduce Border Patrol's response time and pose a danger to Border Patrol agents' and migrants' safety. *See id.* ¶¶ 12, 15, 20-21. And when migrants have tried to traverse the wire, some have sustained injuries. *See id.* ¶¶ 21, 24.

Border Patrol agents have cut or moved the wire where the wire prevents them from performing their statutory duties to inspect, apprehend, and process noncitizens who have unlawfully entered the United States or from rendering aid to distressed individuals. *Id.* ¶ 16. Contrary to Texas's allegation, Compl. ¶ 8, Border Patrol does not have a policy or procedure requiring agents to cut this wire, let alone for the purpose of destroying Texas's property or of encouraging unlawful entry into the United States. BeMiller Decl. ¶¶ 17-18. Rather, agents have been advised to use their independent

7

judgment, subject to supervisory review in appropriate circumstances, in determining whether cutting the wire is required to fulfill their responsibilities. *Id.* ¶¶ 19-20.

## III. Litigation History

On October 24, 2023, Texas filed this lawsuit against DHS and its officials. *See* Compl. The State alleges that Defendants "have a policy, practice, or pattern of seizing, damaging, and destroying Texas's personal property by cutting, severing, and tearing its concertina wire fence to introduce breaches, gaps, or holes in the barrier." *Id.* ¶ 60. And it asserts that "[s]ince September 20, [2023], CBP has seized and damaged Texas's concertina wire to escort aliens into Texas more than 20 times." *Id.* ¶ 59.

Texas contends that these actions violate Texas common law and the APA. Counts 1 and 2 assert state common law claims for conversion and trespass to property. *Id.* ¶¶ 61-74. Counts 3 and 6 assert that Defendants have acted without or in excess of their statutory authority. *Id.* ¶¶ 75-89, 98-101. Count 4 asserts that "Defendants' policy, pattern, or practice" constitutes a "substantive rule" and that Defendants violated 5 U.S.C. § 706(2)(D) by not providing notice and an opportunity to comment beforehand. Compl. ¶¶ 90-92. And Count 5 asserts that Defendants' alleged destruction of Texas's concertina wire was arbitrary and capricious. *Id.* ¶ 93-97.

On the same day that it filed the complaint, Texas moved for a preliminary injunction or, in the alternative, a stay of agency actions based on each of these claims. *See* PI Mot. at 39. On October 26, following the filing of Texas's suit, Defendants used a front-end loader to temporarily lift the wire, as opposed to cutting it, to minimize damage to the wire. BeMiller Decl. ¶ 23. In response, the State filed an emergency motion for a

TRO or stay of agency action. *See* Mot. for TRO, ECF No. 8. On October 28, when Defendants used a front-end loader to move the wire again, in another effort to minimize damage to the wire, Texas supplemented its filings with another declaration. Notice of Escalating Property Damage, ECF No. 8. On October 30, 2023, the Court entered a TRO, enjoining Defendants from, among other things, "removing the [wire] from its present location [in Eagle Pass, Texas] for any reason other than to provide or obtain emergency medical aid." ECF No. 9, Order at 6.

## LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" and "warranted only when the movant shows '(1) a substantial likelihood of success on the merits, (2) irreparable injury if the injunction is not granted, (3) that the injury outweighs any harm to the other party, and (4) that granting the injunction will not disserve the public interest.'" *CAE Integrated, LLC v. Moov Techs., Inc.*, 44 F.4th 257, 261 (5th Cir. 2022). These factors also govern a stay application under 5 U.S.C. § 705 "because a stay has the practical effect of an injunction." *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 242 (5th Cir. 2023). "The 'burden of persuasion on all of the four requirements . . . is at all times upon the plaintiff.'" *CAE Integrated*, 44 F.4th at 261.

<u>**ARGUMENT**</u>

**I.     Texas Is Unlikely To Succeed On Its Claims.**

      **A.     The Court lacks jurisdiction to grant Texas's requested relief.**

The INA divests this Court of any jurisdiction or authority to restrain Border Patrol agents from cutting Texas's concertina wire in the course of inspecting, processing, and apprehending noncitizens who have crossed the border into the United States. *See* 8 U.S.C. § 1252(f)(1). Section 1252(f)(1) provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [8 U.S.C. §§ 1221–1231], other than with respect to the application of such provisions to an individual alien against whom proceedings under [those provisions] have been initiated.

The specified provisions, 8 U.S.C. §§ 1221–1231, "charge the Federal Government with the implementation and enforcement of the immigration laws governing the inspection, apprehension, examination, and removal of [noncitizens]." *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2064 (2022). As the Supreme Court has explained, § 1252(f)(1)'s reference to "the 'operation' of the relevant statutes is best understood to refer to the Government's efforts to enforce or implement them." *Id*. That is, "the 'operation of the provisions' is a reference . . . to the way that [it is] being carried out." *Id*. Accordingly, with limited exceptions inapplicable here, § 1252(f)(1) "prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Id*. at 2065.

Here, Texas seeks to restrain Border Patrol agents from exercising their statutory functions under 8 U.S.C. § 1225 to inspect "applicants for admission," *id.* § 1225(a)(1), (3)—namely, as relevant here, those noncitizens who have already crossed the international boundary in the middle of the Rio Grande into the United States—and to inspect, process, apprehend or detain them pending removal proceedings or expedited removal, *id.* § 1225; *see also id.* § 1226 ("Apprehension and detention of aliens"). Indeed, there is no dispute that Border Patrol agents cut or lift the concertina wire in the course of performing such duties. *See* BeMiller Decl. ¶¶ 16, 22; Compl. ¶¶ 58, 61 (pages 19-22); Declaration of Michael Banks ¶¶ 15-20, Appx.020-025, ECF No. 3-2. In other words, Texas asks this Court to order Defendants to "refrain from actions that ( . . . in the Government's view) are allowed" by § 1225. *Aleman Gonzalez*, 142 S. Ct. at 2065. As such, the order would "interfere with the Government's efforts to operate" that provision, which is a provision specified in 1252(f)(1). *Id.* Accordingly, the requested relief is barred by § 1252(f)(1). *See Biden v. Texas*, 142 S. Ct. 2528, 2538 (2022) (district court's order enjoining DHS's Migrant Protection Protocols, which was implemented under 8 U.S.C. § 1225(b)(2)(C), "violated" § 1252(f)(1)). The Court thus lacks jurisdiction to issue the requested relief, and Texas is unlikely to succeed on the merits. *Cf. Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("difficult question as to jurisdiction" makes success on the merits "more unlikely due to potential impediments to even reaching the merits").

Texas cannot frame its request as one for a stay of agency action under 5 U.S.C. § 705, rather than an injunction, to avoid § 1252(f)(1)'s reach. Its requested relief would not just maintain the status quo, but also "restrain the operation" of §§ 1225 and 1226 by

restraining Defendants from performing their duties under those provisions, exactly what § 1252(f)(1) precludes. And if Texas's requested relief does not "require federal officials to change how they exercise th[eir] discretion," then it does not redress Texas's alleged injuries. *United States v. Texas*, 143 S. Ct. 1964, 1979 (2023) (Gorsuch, J., concurring). That lack of redressability would deprive them of standing to pursue the requested relief. *Id.* Either way, this Court lacks authority to grant the requested relief.

### B.    Texas may not assert its state-law claims against Defendants.

In Counts 1 and 2 of the complaint (at ¶¶ 61-74), Texas asserts state common law claims against Defendants: conversion and trespass to chattels. The Court concluded that Texas was likely to succeed on its trespass to chattels claim, Order at 6-7, but in addition to this Court's inability to afford Texas the relief it seeks, the Court lacks jurisdiction to review Texas's state-law claims. Congress has not waived the United States' sovereign immunity for such claims.[4]

It is well established that "the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v.*

---

[4] The complaint (at ¶ 20) cites three statutory bases—28 U.S.C. §§ 1331, 1346, and 1356—for the Court's subject matter jurisdiction, but none of them is applicable. The state common law claims do not "aris[e] under the Constitution, laws, or treaties of the United States,"28 U.S.C. § 1331; this is not a suit for "money damages" against the "United States," *id.* § 1346; and section 1356 does not cover state-law claims for tortious conversion of personal property, *see Hunsucker v. Phinney*, 497 F.2d 29, 35 (5th Cir. 1974); *see also* PI Mot. at 24 (noting functional similarity of conversion of and trespass to chattels). While the Court could potentially exercise supplemental jurisdiction over these state law claims, *see* 28 U.S.C. § 1367(a), Texas has made no attempt to show why the Court should do so, *see Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (burden is on the party invoking federal jurisdiction to establish jurisdiction).

*Mitchell*, 463 U.S. 206, 212 (1983). Moreover, "a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192 (1996); *see also United States v. Williams*, 514 U.S. 527, 531 (1995) (when confronted with a purported waiver of the Federal Government's sovereign immunity, the Court will "constru[e] ambiguities in favor of immunity"). Texas invokes 5 U.S.C. § 702's waiver of sovereign immunity for actions in federal court "seeking relief other than money damages." Compl. ¶ 22. But the State cites no binding precedent establishing that § 702 covers *state-law* claims. *Cf. Michigan v. U.S. Army Corps. of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011) ("The waiver [in § 702] applies when any *federal statute* authorizes review of agency action, as well as in cases involving constitutional challenges and other claims arising *under federal law*." (emphases added)); *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 854 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring) ("State tort law doesn't run against the United States, so it's not a federal law that can be pointed to as a substantive law which is being transgressed for an APA cause of action."). As the Fifth Circuit has explained, "[t]hat state law defines certain conduct as tortious . . . simply does not mean that a private person may sue the U.S. Government solely under the state's law," because "[t]he federal government enjoys complete sovereign immunity except as it has consented to be sued and consented to submit to liability." *In re Supreme Beef Processors, Inc.*, 468 F.3d 248, 255 (5th Cir. 2006) (en banc).

The Federal Tort Claims Act "waives the United States' sovereign immunity from tort suits" in certain circumstances, and is "the exclusive remedy for compensation for a federal employee's tortious acts committed in the scope of employment." *McGuire v.*

*Turnbo*, 137 F.3d 321, 324 (5th Cir. 1998); *Dickson v. United States*, 11 F.4th 308, 312 (5th Cir. 2021). But the FTCA's consent to suit for tort claims against the United States allows a plaintiff to seek only money damages. 28 U.S.C. § 1346(b). And by expressly permitting suit for money damages in certain circumstances, the FTCA impliedly precludes claims for the declaratory and equitable relief that Texas seeks. *See Talbert v. United States*, 932 F.2d 1064, 1065–66 (4th Cir. 1991) ("[t]he only relief provided for in the [FTCA] is "money damages," and thus, court "lack[s] jurisdiction under the FTCA" to grant "other relief"); *Westbay Steel, Inc. v. United States*, 970 F.2d 648, 651 (9th Cir. 1992) (same). The "FTCA's incorporation of state tort law" cannot be "divorced from that statute's express limits on liability." *In re Supreme Beef Processors, Inc.*, 468 F.3d at 255.

Even if § 702 could be read broadly to waive the United States' sovereign immunity for state common law claims "seeking relief other than money damages," intergovernmental immunity would preclude Texas from obtaining an injunction against the federal government based on state law. The doctrine of intergovernmental immunity recognizes that the Constitution "prohibit[s] States from interfering with or controlling the operations of the Federal Government." *United States v. Washington*, 142 S. Ct. 1976, 1984 (2022); *Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[A]ctivities of the Federal Government are free from regulation by any state."). Across two centuries, the Supreme Court has repeatedly affirmed that "the Constitution guarantees 'the entire independence of the General Government from any control by the respective States,'" so States can neither "control the operations of the constitutional laws enacted by Congress," nor impede the Executive Branch's "execution of those laws." *Trump v. Vance*, 140 S. Ct. 2412,

14

2425 (2020) (quoting *Farmers & Mechs. Sav. Bank of Minneapolis v. Minnesota*, 232 U.S. 516, 521 (1914); *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819)); *Arizona v. California*, 283 U.S. 423, 451 (1931) ("The United States may perform its functions without conforming to the police regulations of a state.").

Counts 1 and 2 in Texas's complaint seek to do indirectly—through an injunction from this Court—what it cannot do directly: use state tort law to regulate how federal officials conduct their law-enforcement function. But States cannot "control" federal agents' "performance of their duties." *Johnson v. Maryland*, 254 U.S. 51, 57 (1920); *see Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 755 (9th Cir. 2022). And no "specific congressional action" authorizes this "regulation by a subordinate sovereign." *Hancock v. Train*, 426 U.S. 167, 179 (1976); *see El-Shifa Pharm. Indus. Co.*, 607 F.3d at 854 (Kavanaugh, J., concurring) (noting that "the APA does not borrow state law or permit state law to be used as a basis for seeking injunctive or declaratory relief against the United States"). To hold otherwise would allow States to flip the Supremacy Clause on its head; States could regulate federal officials and then run to federal court for an injunction based on state law. It would undermine paramount interests enshrined in the Supremacy Clause that "uniformity [of] the laws of United States be dominant over those of any state." *Mayo*, 319 U.S. at 445. In sum, Texas would be unlikely to succeed on its state-law claims even if § 702 waived sovereign immunity.

### C.    Judicial review is not available under the APA.

In Counts 3, 4, and 5, Texas appears to challenge two separate purported agency actions: (a) Defendants' purported "policy, pattern, or practice of seizing and destroying

[Texas's] concertina wire fencing," Compl. ¶ 87; *see id.* ¶¶ 91, 96-97, and (b) Defendants' alleged destruction and seizure of the wire fencing itself, *see id.* ¶ 88. Texas is unlikely to succeed in stating a claim for prospective injunctive relief under the APA with respect to the alleged "policy, pattern, or practice" for threshold reasons. Actions taken pursuant to the purported "policy, pattern or practice" are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). And any "policy, pattern or practice" challenged here is neither discrete nor "final." *Id.* § 704. Moreover, any claim for injunctive relief based on past acts of wire-cutting is not only precluded by 8 U.S.C. § 1252(f)(1) but also moot, *see Fla. Wildlife Fed. v. Goldschmidt*, 611 F.2d 547, 549 (5th Cir. 1980) ("Where the activities sought to be enjoined have already substantially occurred and the appellate court can not undo what has already been done, the action is moot.").

### i.   Defendants' actions are committed to agency discretion by law.

Agency actions are not reviewable under the APA "to the extent" that they are "committed to agency discretion by law." 8 U.S.C. § 701(a)(2). Here, Congress has granted Defendants and their agents significant discretion to patrol the border and to use their judgment in inspecting and apprehending noncitizens they encounter at the border, which includes the authority to access private lands within 25 miles of the border. *See* 8 U.S.C. §§ 1103(a), 1225, 1357(a); *see also* 8 C.F.R. § 287.1(c). There are no "manageable standards . . . available for judging" *ex ante* "how and when" Border Patrol agents "should exercise [that] discretion"—as Texas's request for relief would have this Court do. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985).

Section 701(a)(2) precludes review "where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993). There are "certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion,'" *id.*, such as enforcement decisions, *see Chaney*, 470 U.S. at 831-32, and ones involving "interests in national security, an area of executive action 'in which courts have long been hesitant to intrude,'" *Lincoln*, 508 U.S. at 192 (citing *Webster v. Doe*, 486 U.S. 592, 599-600 (1988)). Each of them "requires 'a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise.'" *Id.* at 193 (quoting *Chaney*, 470 U.S. at 831). Those factors include "whether a violation has occurred," how agency resources are spent, and "whether the agency is likely to succeed if it acts." *Chaney*, 470 U.S. at 831.

Here, Texas seeks judicial review that goes to the heart of Defendants' exercise of quintessential enforcement discretion. As an initial matter, the relevant statutes grant Defendants broad discretion to carry out their law-enforcement duties and do not provide "meaningful standards for defining the limits of that discretion" in the abstract. *Id.* at 834. Texas acknowledges that Defendants have the '"power and duty to control and guard the boundaries and borders of the United States,'" PI Mot. at 27 (quoting 8 U.S.C. § 1103(a)(5)), and that Congress has specifically granted Defendants '"access to private lands . . . for the purpose of patrolling the border to prevent the illegal entry of [noncitizens] into the United States,"' *id.* (quoting 8 U.S.C. § 1357(a)(3)); *see also id.* (citing broad grants of authority under 6 U.S.C. §§ 202(5), 211(c), (e)). But Congress went further and authorized the Secretary to "perform such other acts as *he deems necessary* for carrying

17

out his authority," 8 U.S.C. § 1103(a)(3) (emphasis added), including authorizing employees to "exercise any of the powers, privileges, or duties" conferred on him by the INA, *id.* § 1103(a)(4); *see* H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. at 1360 (Section 1357(a)(3) "adequately authorize[s] immigration officers to continue their normal patrol activities" on private lands.). And the Secretary has, in fact, authorized Border Patrol agents to "conduct[] such activities as are customary, or reasonable and necessary, to prevent the illegal entry of [noncitizens] into the United States." 8 C.F.R. § 287.1(c). These provisions grant Defendants broad discretion, *cf. Texas v. EPA*, 983 F.3d 826, 834-35 (5th Cir. 2020) (finding permissive language as evidence "decision [wa]s 'committed to agency discretion by law'"), and provide no meaningful standard for this Court to judge *ex ante* which methods and actions are permissible in carrying out Defendants' law-enforcement responsibilities. *See Texas*, 143 S. Ct. at 1972 (The "complicated balancing process" involved in "devising arrest and prosecution policies" "leaves courts without meaningful standards for assessing those policies.").

These law-enforcement decisions, moreover, are of the type that courts have traditionally considered committed to agency discretion. Indeed, these decisions require individual officers to balance a variety of factors in fast-moving situations based on their training and expertise and the facts at hand. The exercise of enforcement discretion here also necessarily involves national-security interests in securing the border. *See id.* at 1970-72; *Hernandez v. Mesa*, 140 S. Ct. 735, 746 (2020) (noting that control of an international "border has a clear and strong connection to national security"); *United States v. Delgado-Garcia*, 374 F.3d 1337, 1345 (D.C. Cir. 2004) ("[T]his country's border-control policies are

18

of crucial importance to the national security and foreign policy of the United States."). And, of course, federal officials use their broad discretion in executing their statutory mission to enforce this Nation's immigration laws, which includes, as noted above, the inspection and processing of applicants for admission and the removal of inadmissible noncitizens. Because there is no standard to apply to judge law-enforcement tactics in the abstract, review under the APA is unavailable. *See* 5 U.S.C. § 701(a)(2).

      **ii.**    **The alleged "policy, practice, and pattern" is not final agency action.**

The APA permits review of only discrete and "final agency action." *Id.* § 704. A plaintiff must challenge "a specific" "agency action." *Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000); *see* 5 U.S.C. § 551(13) (defining "agency action"). General "programmatic" attacks on how an agency conducts its day-to-day operations are not cognizable. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990); *see Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004). Moreover, two conditions must be satisfied for an agency action to be deemed final. "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). "And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* Even apart from this Court's inability to grant Texas the injunctive relief it seeks, Texas's challenges to Defendants' actions do not satisfy these requirements.

*First*, Defendants' purported "patterns and practices" that Texas challenges in Counts 3, 4, and 5 do not constitute discrete agency action. The "pattern" and "practice" that Texas identifies are agents performing their day-to-day duties of apprehending, inspecting, and processing noncitizens who have already crossed the border unlawfully, which could require the cutting of Texas's concertina wire to access the noncitizens or to private lands along the border. *See* Compl ¶ 8. Texas is not challenging specific actions but the overall allowance of certain law enforcement methods; thus, the suit is a "programmatic" attack that is not cognizable under the APA. *See Nat'l Wildlife*, 497 U.S. at 891; *Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d 41, 50-51 (D.D.C. 2014). The fact that Texas pointed to "specific allegedly-improper" agency conduct "within that [alleged] program" makes no difference, *Peterson*, 228 F.3d at 567, because the State is effectively asking this Court to "supervise an agency's compliance with [its] broad statutory mandate" to patrol the border, *City of New York v. Dep't of Def.*, 913 F.3d 423, 433 (4th Cir. 2019), and to inspect noncitizens who have crossed the border. Yet "the obvious inability for a court to function in such a day-to-day managerial role over agency operations is precisely the reason why the APA limits judicial review to discrete agency actions." *Id.* at 434.

The Fifth Circuit's decision in *Sierra Club v. Peterson* is instructive. The plaintiffs in that case challenged "the [U.S.] Forest Service's program of timber management in the Texas forests," 228 F.3d at 566, on basis that the Forest Service's allowance of certain "timber harvesting techniques" contravened a federal statute, *id.* at 563. The Fifth Circuit held that the program—as opposed to particular individual sales—was not an "identifiable action or event" reviewable under the APA. *Id.* at 566. Allowing such a

challenge to proceed, the Court reasoned, would exceed the "institutional limits on courts" and "encroach[] on the other branches of government." *Id.* This problem with justiciability, the Court further held, was not resolved by the plaintiffs' ability to identify specific timber sales "as evidence" of the Forest Services' management program. *Id.* at 567. The same is true here: Texas is challenging DHS's day-to-day immigration enforcement at the border, and pointing to specific instances of wire cutting or lifting does not transform Texas' programmatic attack into a discrete agency action. Accordingly, Texas's "pattern and practice" claim is unlikely to succeed.

*Second*, there is no agency "policy" that either exists or is sufficiently final to be reviewable. Texas alleges that "[s]ince September 20, 2023, federal agents have developed and implemented a policy . . . of destroying Texas's concertina wire to encourage and assist thousands of aliens to illegally cross the Rio Grande and enter Texas." Compl. ¶ 8; *see id.* ¶¶ 60-61 (page 22). Texas cites a number of discrete actions and infers that "an overarching policy" must exist. But there is nothing to support the legal conclusion that such a purported policy exists. *See Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284, 1321 (S.D. Cal. 2018) (complaint failed to state discrete agency action where "there are no allegations connecting any of [CBP agents'] conduct" to the "unwritten policy" alleged by plaintiffs to have been issued by CBP). This is confirmed by the Chief of Law Enforcement Operations for the U.S. Border Patrol. BeMiller Decl. ¶¶ 17–18.

Although CBP has provided general guidance to individual officers concerning Texas's concertina wire, any such guidance does not satisfy either condition for final agency action. To start, the guidance does not represent the consummation of the

21

agency's decisionmaking process. By its nature, the informal guidance contemplates further decisions, *i.e.*, the agents' independent on-the-ground decisionmaking based on the facts presented in a particular circumstance. *Id*. ¶¶ 19-20; *cf. DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*, 76 F.3d 1212, 1215 (D.C. Cir. 1996) (contemplation of further agency action indicates that agency decisionmaking is not final). The guidance reinforces the agents' discretion to exercise their independent judgment, rather than direct a specific course of action. BeMiller Decl. ¶¶ 19-20; *cf. Hawkes*, 578 U.S. at 598 (a "definitive decision" after fact-finding is consummation of agency decisionmaking). And it lacks indicia of formality or finality, such as publication in the Federal Register. C*f. Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1268 (D.C. Cir. 2018) ("informal" letter issued by "subordinate official" not consummation of agency decisionmaking). These data points indicate that the guidance does not satisfy the first condition for final agency action, and little suggests otherwise.

Moreover, no legal consequences flow from the Board Patrol guidance, and the guidance does not determine any rights or obligations. *Hawkes*, 578 U.S. at 597. It does not "impose liability on a regulated party, create legal rights, or mandate, bind, or limit other government actors in the future." *Arizona v. Biden*, 40 F.4th 375, 387 (6th Cir. 2022) (Sutton, C.J.). Nor does it have any "direct effect on [Texas's] day-to-day business." *Id.* Instead, the guidance "maintains officials' independent decisionmaking" expressed in the statutes discussed above, allowing broad discretion for federal officials to conduct their immigration-enforcement operations. *Id.* Accordingly, the guidance "lacks legal effect," and is not reviewable under the APA. *Id.*

22

**D.      Defendants' actions are consistent with their broad statutory authority.**

In Counts 3 and 6, Texas claims that Defendants exceeded their statutory authority in cutting the concertina wire, at least in some circumstances, and that those actions are reviewable under the APA, Compl. ¶¶ 75-89, or under principles of nonstatutory review, *id.* ¶¶ 98-101. The State is incorrect and thus unlikely to succeed on either claim.

Congress has authorized Defendants to take necessary actions, which will include in some circumstances cutting Texas's (or any other party's) concertina wire, to carry out their statutory duties. As discussed above, Congress has charged Defendants with "detect[ing], interdict[ing], [and] remov[ing] . . . persons unlawfully entering . . . the United States," 6 U.S.C. § 211(c)(8)(B), and with "inspect[ing] . . . persons who seek to enter . . . the United States," *id.* § 211(c)(8)(A); *see also* 8 U.S.C. §§ 1225 (requiring immigration officials to inspect "applicants" for admission whether or not at a port of entry), 1226 (concerning the "[a]pprehension and detention" of noncitizens). It has granted Defendants "the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of [noncitizens]" and to "perform such other acts as . . . necessary for carrying out [t]his authority." *Id.* § 1103(a)(3), (5).

Further, it has granted individual officers authority to "access . . . private lands . . . for the purpose of patrolling the border," *id.* § 1357(a)(3), which includes "activities . . . reasonable and necessary[] to prevent the illegal entry of [noncitizens] into the United States," 8 C.F.R. § 287.1(c). Congress specifically did so because "the refusal of some property owners along the border to allow patrol officers access" to their land "in order to prevent such illegal entries" was "endanger[ing] the national security" and "affect[ing]

the sovereign right of the United States to protect its own boundaries against the entry of [noncitizens], including those of the most dangerous classes." H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. at 1360. Contrary to the State's assertions, *see* PI Mot. at 25, Texas's concertina wire, as Mr. BeMiller's declaration shows, similarly obstructs Border Patrol agents from fulfilling their responsibilities, and in certain circumstances, it has been necessary for agents to cut or move the wire to interdict and inspect noncitizens crossing the Rio Grande into the United States, *see* BeMiller Decl. ¶ 16.

Congress "unquestionably meant these officers to exercise" their responsibilities to protect the national security and "adequately authorize[d] immigration officers to continue their normal patrol activities." H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. at 1360. Cutting, lifting, or otherwise moving the wire is therefore fully authorized by a straightforward application of the foregoing authorities.

Texas's contention otherwise ignores key statutory provisions and is inconsistent with background understandings of law-enforcement authority. PI Mot. 26-28. While the State recites a number of key provisions outlining Defendants' responsibilities, *see id.* at 26-27 (citing, among others, 8 U.S.C. § 1357(a)(3)), it ignores subsections (a)(3) and (a)(4) of 8 U.S.C. § 1103. Those subsections allow agents, acting on the Secretary's delegated authority, to "perform such other acts as [are] deem[ed] necessary for carrying out" their duties. 8 U.S.C. § 1103(a)(3). That can include cutting or lifting the wire. No additional authorization is required, as Texas suggests (PI Mot. at 27), because these subsections provide that authorization. And even if those subsections did not provide sufficient authorization on their own, the authority to take necessary supporting actions, such as

cutting or lifting the wire in certain circumstances, is included within the general grant of power to access private lands without a warrant and to interdict, inspect, and even arrest noncitizens. *Cf. Steele v. City of Hous.*, 603 S.W.2d 786, 792-93 (Tex. 1980) (recognizing government may defend its "destruction of … property as a means to apprehend escapees [a]s a classic instance of police power" by showing "public necessity"). Indeed, consistent with these authorities Border Patrol has long recognized that its agents may exercise their judgment to take steps to cut locks or fencing that prohibits access to areas immediately adjacent to the border where such access is needed if they cannot obtain cooperation from the private landowners. BeMiller Decl. ¶ 6; *see* H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. at 1360 (Section 1357(a)(3) is "positive legislative enactment authoriz[ing] specifically that which must always have been of necessity implied from the time the border patrol was first created.").

### E.    Defendants' actions do not constitute a legislative rule.

Texas wrongly contends that "Defendants' [purported] policy" of "destroying [its] concertina wire" is a legislative rule that "should have been subject to notice and comment." PI Mot. 28.[5] The "policy" as alleged by Texas does not constitute a legislative

---

[5] At points, Texas suggests that destroying the wire "is a sanction equivalent to a substantive rule" and "subject to notice and comment." PI Mot. 28, 30; *see id.* at 29 ("Defendants' sanction was also substantive."). These statements conflate two mutually exclusive concepts. *Compare* 5 U.S.C. § 551(4) (defining a "rule" as "an agency statement of general or particular applicability and future effect"), *with id.* § 551(10)(D) (defining a "sanction," in relevant part, as the past "destruction, taking, seizure, or withholding of property"). The notice-and-comment requirement applies only to certain rulemakings, *see id.* § 553(b)(A), and has no more relevance to sanctions than it does to adjudications, *see id.* § 554 (setting different procedures).

rule, and Border Patrol's actual guidance to its agents also is exempt from notice and comment because the guidance is at most a "general statement[] of policy," interpretative rule, or procedural rule. 5 U.S.C. § 553(b)(A).

The APA "does not define 'substantive rules,'" "statements of policy," or procedural rules. *Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995); *see also Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015). But at their essence, substantive rules or "[l]egislative rules are ones with the 'force and effect of law.'" *Mock v. Garland*, 75 F.4th 563, 578 (5th Cir. 2023). In contrast, statements of policy "leave[] the agency and its decisionmakers free to exercise discretion" and do "not impose any rights or obligations." *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015) (*DAPA*). Interpretive rules are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers," and "do not have the force and effect of law." *Perez*, 575 U.S. at 97. And procedural rules are directed at the agency's internal workings, do not create new law, and do not have "a substantial impact on the regulated industry." *Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir. 1984).

Texas has failed to allege facts establishing that Defendants' purported "policy" is a legislative rule. The State does not show that the "policy" has the force and effect of law, imposes any rights or obligations, or affects individual rights. *Mock*, 75 F.4th at 579 (cleaned up).[6] Further, Texas has not alleged that the "policy" bears any of the hallmarks

---

[6] Texas claim that "the destruction of concertina wire changes the substantive standards by which [noncitizens] are permitted to enter the United States." PI Mot. at 30. That relies on an incorrect premise because migrants who have crossed the middle of the Rio Grande are already in the United States. *See* pp. 6-7, *supra*.

of a legislative rule—*e.g.*, that "the agency intend[s] to speak with the force of law"; that the "policy is published in the Code of Federal Regulations, with the agency "explicitly invok[ing] its general legislative authority"; or that the agency has "claimed *Chevron* deference." *Id.* at 580. Indeed, Texas has not pointed to any "language actually used by the agency" or shown that the "policy," as opposed to the exercise of statutory authority, "w[ould] produce significant effects on private interests." *Id.* (cleaned up).

In fact, to the extent that a policy exists, it is embodied in the informal guidance provided to Border Patrol agents that reinforced those agents' independent, day-to-day decisionmaking authority; the guidance qualifies, at most, as a general statement of policy, interpretative rule, or procedural rule. The informal guidance does not deny or limit the agents' discretion in how they apprehend or inspect noncitizens. *See* BeMiller Decl. ¶¶ 19-20. It arguably interprets the authority that the various statutes provide to Border Patrol agents, potentially making it an interpretative rule. *See id.* And because it informs agents in the field of the internal procedure for ensuring that supervisors are notified when wire is cut and that noncitizens receive emergency medical treatment, it could be considered a procedural rule. *Id.* The impact of this guidance is merely "derivative," "incidental," or "mechanical," and thus, the notice and comment procedures are inapplicable. *DAPA*, 809 F.3d at 176.

Texas has not shown that cutting wire in certain circumstances has a causal relation to "the security of Texas residents" or "the interests of Texas taxpayers." PI Mot. 30-31. If anything, it is Border Patrol's enforcement of immigration laws and the

27

noncitizens' decision to enter the United States that affects those interests. *See* Appx.030-062. Texas's notice-and-comment claim in Count 4 is therefore unlikely to succeed.

**F.  Defendants' actions are not arbitrary or capricious.**

Even if Texas's claims were reviewable under the APA, the State is unlikely to succeed in showing that Defendants' actions were arbitrary and capricious. The arbitrary-and-capricious standard under the APA is "narrow and highly deferential." *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021). Under that standard, a court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *accord Sierra Club*, 990 F.3d at 913. "[A] court is not to substitute its judgment for that of the agency[.]" *State Farm, 463 U.S. at 43; accord Sierra Club*, 990 F.3d at 913.

In this case, the agents' decisions to cut the wire were reasonable in that they furthered the agents' execution of their statutory duties. Indeed, Border Patrol guidance since at least the 1980s has advised agents to exercise their judgment to cut any lock or fencing that impedes their access to the area immediately adjacent to the border if such access is necessary to carry out their statutory duties to patrol the area or to inspect or apprehend noncitizens. BeMiller ¶ 6. Texas's allegations show as much. For each instance of wire-cutting that Texas identifies, it acknowledges that Border Patrol agents did so to apprehend, inspect, and process noncitizens who have already entered the United States. *See* Compl. ¶ 58 (identifying over 20 instances). Moreover, some agents' decision to use a front-end loader to lift the wire near Shelby Park—rather than cutting it—was to

minimize damage to the wire while still allowing the agents to carry out their duties. BeMiller Decl. ¶ 22. These actions in direct furtherance of statutory duties are reasonable and reasoned decisionmaking, and easily pass arbitrary-and-capricious review.

## II.    Texas Has Not Demonstrated That It Will Suffer Irreparable Harm.

Texas must "demonstrate[] that irreparable injury is *likely* in the absence of an injunction" to obtain its requested relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). It identifies three alleged harms in merely two paragraphs: (1) the destruction of the concertina wire, (2) "expenditures in providing emergency medical services, social services and public education" due to "increased illegal entry into the State," and (3) frustration of "the State's ability to protect its residents from deadly fentanyl." PI Mot. at 37. None of these is sufficient to establish irreparable harm.

First, if the Court finds that Texas can assert state tort-law claims against the federal government, *see* Order at 7, any harm to the concertina wire itself is not irreparable. "Irreparable injury is 'harm for which there is no adequate remedy at law.'" *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023). "The *possibility* that adequate compensatory or other corrective relief will be available at a later date"—including in a subsequent, separate suit—weighs "heavily against a claim of irreparable harm." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (emphasis added); *id.* (noting a lack of irreparable harm where the plaintiffs "have recourse" in "the form of subsequent civil suits" to recover the amounts at issue). Monetary compensation would be an adequate remedy here, where the concertina wire is a mass-produced good, *see* Compl. ¶ 37, and damages "are the norm in actions involving personal property because

29

personal property is relatively fungible." *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 523 (2d Cir. 1990); *accord Sambrana v. United Airlines, Inc.*, 2022 WL 486610, at *16-17 (5th Cir. Feb. 17, 2022) (Smith, J., dissenting) ("[H]arms to real property, every plot of which is unique, often call for equitable remedies, while harms to personal property do not."); Wright & Miller, 11A *Federal Practice & Procedure* § 2944 (3d ed.).

In issuing the TRO, this Court found that Texas would be irreparably harmed because money damages are unavailable for Texas's property damage. *See* Order at 8 ("the only 'harm' before this Court at the moment is the cost of the destruction of the Plaintiff's property, which is the wire barrier"). But Texas could pursue whatever remedies are available under the Federal Tort Claims Act (FTCA), which as discussed above, waives the federal government's sovereign immunity for money damages in certain circumstances. *See* 28 U.S.C. § 1346; *see also* 28 C.F.R. §§ 14.1-14.11 (governing process for seeking compensation for property damage from DHS). And even if damages were unavailable under the FTCA, authority exists for the settlement of claims "for damage to, or loss of, privately owned property caused by an investigative or law enforcement officer (as defined in section 2680(h) of Title 28) who is employed by the Customs Service and acting within the scope of his or her employment." 19 U.S.C. § 1630(a).

Second, Texas's purported harm of increased expenditures in providing emergency medical services, social services, and public education is not cognizable, let alone a basis for establishing irreparable harm. As the Supreme Court just held, Texas has no cognizable interest in how the federal government exercises its enforcement

30

discretion, *Texas*, 143 S. Ct. at 1970–71, and reframing that interest as "indirect effects on state revenues or state spending" does not overcome this "fundamental" problem, *id.* at 1972 n.3. Moreover, there is no way to know whether individuals Defendants apprehended after cutting wire would have otherwise entered Texas anyway.

Third, any alleged impairment of Texas's interest to protect its citizens from fentanyl is not cognizable in a suit against the Federal Government, and still less does it constitute irreparable harm. *Cf. Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023) (Texas had no standing to assert claim on behalf of its citizens because "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government"). Moreover, even if such an asserted harm is cognizable here, there is no showing that Defendants' actions will have any impact on Texas's ability to protect its citizens from fentanyl. For example, it is unclear how the concertina wire would lead to Texas seizing or excluding fentanyl that it would not otherwise. And it is also unclear how obstructing Defendants' efforts to apprehend, inspect, and process noncitizens unlawfully entering the United States would lead to less fentanyl in circulation. Indeed, Texas notes that Defendants have made significant seizures of fentanyl, and it is difficult to see how frustrating those efforts would make Texans safer from illegal drugs. Compl. ¶ 3; *see* PI Mot. at 12 (noting CBP drug seizures increased in June and July 2023). As a result, Texas has failed to carry this essential part of its burden.

## III.  An Injunction Would Be Contrary To The Equities And The Public Interest.

In assessing whether to grant the "extraordinary remedy" of a temporary restraining order or preliminary injunction, courts "must consider the effect on each party

[and on the public] of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). And here, the balance of equities decidedly tips against the issuance of any emergency relief.

Texas's requested relief will indisputably interfere with Defendants' efforts to interdict and inspect noncitizens unlawfully entering the country, including efforts to secure the Nation's borders. *See* BeMiller Decl. ¶ 15. Not only would it impede Defendants' enforcement of immigration laws, but it also would have national-security implications. As Texas acknowledges, it is important to apprehend and inspect noncitizens who have illegally crossed the border into the United States because they could be—and have been—terrorists, criminals, and smugglers. *See* Compl. ¶ 3; TRO Mot. at 7. Yet the requested relief would prevent federal agents from doing just that.

Similarly, Texas's requested relief would harm the foreign relations of the United States. Mexico has repeatedly lodged official complaints about Texas's placement of concertina wire. The foreign ministry of Mexico reported on July 14, 2023 that Mexico had "sent a diplomatic note to the United States [on June 26] to express its concern over the installation of a spiral fence of razor wire" and other installations and actions. Government of Mexico, Information Note No. 04 (July 14, 2023), https://perma.cc/V72L-GTXE. Mexico specifically "expressed its concern" that the concertina wire would "obstruct[] and diver[t] runoff into Mexican territory" and requested its removal. *Id.* The Mexican foreign ministry further reported that Mexico sent a follow-up note several weeks later "express[ing] its concern" over "alleged human rights violations" caused by

Texas's actions, including the deployment of concertina wire. Government of Mexico, Information Note No. 05 (July 26, 2023), https://perma.cc/F932-U9T9. Mexico requested that the federal government investigate possible impact on "the integrity of migrants" and risks of "serious damage [to] people's well-being." *Id.* A court order preventing Defendants from freely traversing the wire to offer emergency assistance to individuals already in the United States would exacerbate Mexico's concerns, affecting U.S. foreign relations.

On the other side of the ledger, Texas cites generalized concerns without showing that keeping concertina wire in place will address them in any appreciable manner. *See* PI Mot. at 37-38. That is insufficient to tip the scale in favor of Texas's requested relief, particularly given the weighty federal sovereignty interests at stake on the other side. The motion for preliminary injunction should be denied.

## <u>CONCLUSION</u>

For these reasons, Texas's motion for a preliminary injunction should be denied.

33

Dated: October 30, 2023                     Respectfully submitted,

                                            BRIAN M. BOYNTON
                                            Principal Deputy Assistant Attorney General

                                            JAIME ESPARZA
                                            United States Attorney

                                            JEAN LIN
                                            Special Litigation Counsel

                                            /s/ *Christopher A. Eiswerth*
                                            Christopher A. Eiswerth (D.C. Bar 1029490)
                                            Stephen Ehrlich (NY Bar No. 5264171)
                                            Faith E. Lowry (TX Bar No. 24099560)
                                            Trial Attorneys
                                            U.S. Department of Justice
                                            Federal Programs Branch, Civil Division
                                            1100 L St., N.W.
                                            Washington, D.C. 20005
                                            Tel: (202) 305-0568 / Fax: (202) 616-8460
                                            christopher.a.eiswerth@usdoj.gov

                                            *Counsel for Defendants*