IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| THE STATE OF TEXAS,<br><br>    Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,<br><br>    Defendants. | Civil Action No. 2:23-cv-00055 |

### DECLARATION OF DAVID S. BEMILLER

I, David S. BeMiller, based upon my personal knowledge and information made known to me in the course of my official employment, hereby declare, to the best of my knowledge, information, and belief, as follows relating to the above-captioned matter:

1. I am the Chief of Law Enforcement Operations for the U.S. Border Patrol (USBP) in Washington, D.C. I have served in this position since November of 2022. Prior to taking this position, I served as the Chief Patrol Agent of Blaine Sector since March of 2021. In my more than 25 years of service, I have held several other leadership positions in Washington, D.C. as well as in other locations throughout the nation. From 2010 until 2014, within the San Diego Sector, I served as an Assistant Chief Patrol Agent, the Executive Officer of Operations for San Diego Sector, Deputy Patrol Agent in Charge (DPAIC) of the El Cajon Station, Patrol Agent in Charge (PAIC) of the San Clemente Station, and PAIC of the Campo Station. I was then promoted to Deputy Chief Patrol Agent of the Spokane Sector in December of 2016, where I directed and oversaw all law

enforcement and intelligence collection activities of seven Border Patrol Stations spanning the states of Washington, Idaho, and Montana.

2. In my position as Chief of Law Enforcement Operations, I am responsible for executing the missions of the U.S. Department of Homeland Security (DHS), U.S. Customs and Border Protection (CBP), and USBP. USBP is the primary federal law enforcement organization responsible for securing the U.S. borders between the ports of entry by preventing the entry of terrorists and their weapons and the illicit trafficking of people and contraband. USBP has a workforce of over 19,000 agents who patrol more than 6,000 miles of United States land borders. As Chief of Law Enforcement Operations, I am responsible for the oversight of day-to-day Border Patrol operations throughout the United States, among other duties. For instance, I also serve as the principal advisor to the Chief of the Border Patrol on enforcement operations, personnel, infrastructure, and technology requirements.

3. USBP is organized into twenty sectors. The Del Rio Sector is responsible for detecting and preventing the smuggling and unlawful entry of noncitizens into the United States along the 245 miles of the Rio Grande River and Lake Amistad that forms the border between the U.S. and Mexico. This area of responsibility covers 55,063 square miles of Texas and reaches 300 miles into Texas from the U.S.-Mexico border. The area in this Sector consists primarily of privately-owned farms and ranches.

4. Patrolling the border is integral to the way the USBP operates to fulfill its mission. Border patrol functions are conducted at or near international boundaries and coastlines to prevent the illegal entry and smuggling of noncitizens into the United States and to intercept those who do enter illegally before they can move to the interior of the United

States. The objective is to prevent and deter illegal entry into the United States; apprehend violators; remove noncitizens entering unlawfully; prosecute criminal violations; and gather and act on intelligence. Border Patrol's mission includes apprehension, processing (including inspection), and placing in removal proceedings inadmissible noncitizens.

5. Border Patrol guidance has addressed issues related to obstructions that may inhibit access to the area immediately adjacent to the border.

6. For instance, Border Patrol guidance dating back to the 1980s has advised Border Patrol Agents to work with private landowners where the agents encounter locked gates prohibiting access to the border. While Border Patrol guidance does require that agents take steps to work with the owner to gain access, it acknowledges that the agent may take steps to cut locks or fencing that prohibits access to the border. While agents are instructed to take steps to close gates, make available repairs to fencing, and take other steps to ameliorate any damage, Border Patrol guidance has recognized that agents may access the area immediately adjacent to the border even where there was fencing or other obstructions.

7. Each Sector has a designated liaison to communicate and remediate issues impacting the landowners as a result of USBP's operations and access to the area immediately adjacent to the border.

8. It is my understanding that the State of Texas is challenging USBP's cutting of concertina wire primarily in the Del Rio Sector. In that area, there is no wall infrastructure. Moreover, the border between the United States and Mexico is the center of the Rio Grande River.

9. By the time a noncitizen has crossed onto the bank of the Rio Grande River in the State of Texas, that noncitizen has already made entry into the United States and is subject to apprehension, processing (including inspection), and potential removal from the United States.

10. As part of overall USBP operations, life and safety is of the utmost importance. Among other functions, agents do, at times, rescue individuals who have crossed into the United States illegally and who are in distress near the banks of the Rio Grande River. These rescues, life-saving measures, and other such urgent care are a daily part of USBP operations.

11. At certain locations along the Rio Grande River, the State of Texas has installed concertina wire. In certain locations, the State of Texas has placed this same wire in the Rio Grande River itself on the U.S. side of the international boundary. I am also aware that there are locations where the State of Texas has placed concertina wire across gates that provide immediate access to the Rio Grande River.

12. The State of Texas's concertina wire installation has reduced agents' visibility of the river and prevented their access to the river's shoreline and to individuals entering the United States. At times, if the level of the Rio Grande River rises, the concertina wire is submerged and not immediately visible to those crossing into the United States unlawfully or Border Patrol Agents. Submerged concertina wire, which is not readily visible, increases the risk of injury both to the Border Patrol Agents and noncitizens in the vicinity.

13. I am aware that, in some locations where the concertina wire is present the only method for those who have entered the United States to leave the immediate area of the Rio

Grande River shoreline is to traverse the river's shoreline. Traversing the shoreline, particularly over a great distance, increases the likelihood of noncitizen injury, dehydration, fatigue, and drowning.

14. I am aware, in my position, that USBP in the Del Rio Sector has received requests from the Texas Department of Public Safety Command Center to apprehend noncitizens who have been trapped between the concertina wire and the Rio Grande River.

15. The presence of concertina wire at these locations increases USBP response time because the concertina wire impedes the USBP agents' ability to apprehend the noncitizens trapped in the river. This can be particularly concerning when, as commonly occurs, the temperature reaches triple digits.

16. When seeking to apprehend individuals who have entered the United States, to prevent injury and/or the loss of life of noncitizens attempting to enter the United States, USBP personnel must, at times, cut the concertina wire. Indeed, in some locations, USBP personnel must cut through multiple layers of concertina wire with very sharp, razor-like protrusions.

17. I am not aware of any policy or procedure that has been issued from USBP headquarters regarding the cutting of concertina wire.

18. I am not aware of any policy, procedure, or practice within USBP that mandates the cutting of concertina wire. And I am certainly not aware of any policy, procedure or practice within USBP that directs the cutting of concertina wire either for the purpose of destroying the property of the State of Texas or for the purpose of encouraging the entry of noncitizens into the United States.

19. Prior to the Court's order of today, within the Eagle Pass area of responsibility, Border Patrol Agents could cut the concertina wire when necessary to carry out their duty to apprehend and process (including to inspect) individuals suspected of unlawful entry. I understand that they have been instructed that, where there is not an emergency, they should first contact a supervisor and have them come to cut the wire. The agents have also been instructed that, if a supervisor is not available or if anyone is in distress, they may take actions necessary to carry out their duties, including cutting the wire to allow apprehension and processing (including inspection) and to provide medical assistance. Agents have also been advised that they must report instances where the concertina wire is cut or lifted to their supervisors. I also understand that Border Patrol Agents have been instructed that they may use their discretion in deciding whether exigent circumstances exist requiring immediate action.

20. When a noncitizen or agent suffers an injury from contact with concertina wire, the Del Rio Sector notifies USBP headquarters telephonically and by email. Since the State of Texas installed the concertina wire in Eagle Pass, Texas, USBP has seen an increase in injuries sustained by noncitizens, which increases the risk of injury to Border Patrol Agents.

21. In July 2023, in just one week, the Del Rio Sector identified seven incidents where noncitizens required medical attention due to injuries caused by contact with the concertina wire in which they had lacerations to their hands, wrists, and lower extremities that required stitches and/or staples and a tetanus shot.

22. I am aware that, beginning on Thursday, October 26, 2023, in an effort to minimize damage to concertina wire, the Del Rio Sector began using a front-end loader in at least

    one location to move concertina wire. I understand the Sector has used the front-end loader when necessary to carry out their duty to apprehend and process (including to inspect) individuals suspected of unlawful entry and to rescue noncitizens in distress along the bank of the Rio Grande. I further understand that once the Sector has carried out its duties, it has withdrawn the front-end loader from the wire. As of today, I understand these efforts have been limited to the Heavenly Farms area in Eagle Pass, TX. There are approximately 4 miles in total of concertina wire at various sections along the Heavenly Farms area and upriver out of the approximately 242 miles of land border in Del Rio Sector.

23. One example in which a rescue was completed using the front-end loader, in an effort to avoid cutting the wire, is when a noncitizen was carrying a paralyzed noncitizen on his back to the shore because the paralyzed noncitizen was drowning and required immediate attention and assistance in order for USBP to save both noncitizens from drowning or injury caused by the concertina wire.

24. Because the concertina wire is multilayered and razor-sharp, there are individuals who have gotten tangled in it attempting to go past it, over it, or under it. Some of these individuals include small children and infants.

I hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge and information.

EXECUTED ON this 30th day of October 2023.

*[signature]*

David S. BeMiller
Chief of Law Enforcement Operations
U.S. Border Patrol