UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
DEL RIO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | CIVIL ACTION NO. 2:23-CV-00055-AM |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF HOMELAND | § | |
| SECURITY, *et al.,* | § | |
| | § | |
| *Defendants.* | § | |

---

**PLAINTIFF'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION OR STAY OF AGENCY ACTION**

---

# TABLE OF CONTENTS

Table of Contents ......................................................................................................................... ii

Table of Authorities .................................................................................................................... iii

Argument ....................................................................................................................................... 1

   I.    This Court has jurisdiction to award the requested relief .................................................. 1

   II.   Texas is likely to succeed on the merits of its claims. ....................................................... 2

      A.   Texas is likely to succeed on its conversion and trespass to chattel claims. .................... 2

      B.   Texas is likely to succeed on its claims that Defendants violated the APA ..................... 7

   III.  The State has pointed to an ongoing threat of irreparable harm. ...................................... 16

   IV.  The balance of the equities and public interest favor preliminary relief. ........................... 19

Conclusion .................................................................................................................................... 20

Certificate of Service .................................................................................................................... 21

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs v. Gardner*,
    387 U.S. 136 (1967)................................................................................................11

*All. for Hippocratic Med. v. FDA*,
    78 F.4th 210 (5th Cir. 2023) ....................................................................................2

*Am. Trucking Ass'ns v. City of Los Angeles*,
    569 U.S. 641 (2013)..................................................................................................6

*Apter v. HHS*,
    80 F.4th 579 (2023)................................................................................................15

*B.K. Instrument, Inc. v. United States*,
    715 F.2d 713 (2d Cir. 1983) (Friendly, J.)..........................................................3, 5

*Barrick Goldstrike Mines Inc. v. Browner*,
    215 F.3d 45 (D.C. Cir. 2000)..................................................................................11

*Beathard Joint Venture v. W. Houston Airport Corp.*,
    72 S.W.3d 426 (Tex. App. 2002)............................................................................16

*In re Beef Processors, Inc.*,
    468 F.3d 248 (5th Cir. 2006) (en banc) ..................................................................4

*Biden v. Texas*,
    142 S. Ct. 2528 (2022)................................................................................1, 2, 9, 12

*Boiles v. City of Abilene*,
    276 S.W.2d 922 (Tex. App. 1955)..........................................................................16

*Central Pines Land Co. v. United States*,
    274 F.3d 881 (5th Cir. 2001) ....................................................................................6

*Ciba–Geigy Corp. v. EPA*,
    801 F.2d 430 (D.C. Cir. 1986)................................................................................11

*Clean Water Action v. EPA*,
    936 F.3d 308 (5th Cir. 2019) ..................................................................................14

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
    710 F.3d 579 (5th Cir. 2013) ..................................................................................20

*Data Mktg. P'ship, LP v. DOL*,
    45 F.4th 846 (5th Cir. 2022) ............................................................................11, 12

*Dep't of Commerce v. New York*,
  139 S. Ct. 2551 (2019) .................................................................................8, 19

*Department of Army v. Blue Fox, Inc.*,
  525 U.S. 255 (1999) ............................................................................................4

*DHS v. Regents of Univ. of Cal.*,
  140 S. Ct. 1891 (2020) ....................................................................................8, 9

*DHS v. Thuraissigiam*,
  140 S. Ct. 1959 (2020) ..................................................................................10, 11

*United States ex rel. Drury v. Lewis*,
  200 U.S. 1 (1906) ................................................................................................5

*E.T. v. Paxton*,
  41 F.4th 709 (5th Cir. 2022) (Oldham, J.) .........................................................3

*Fort-Acre Spring Live Stock Co. v. W. Tex. Bank & Tr. Co.*,
  118 S.W. 790 (Tex. App. 1909) .......................................................................16

*Garland v. Aleman Gonzalez*,
  142 S. Ct. 2057 (2022) .......................................................................................2

*Graves v. New York ex rel. O'Keefe*,
  306 U.S. 466 (1939) ...........................................................................................5

*Her Majesty the Queen in Right of Ontario v. EPA*,
  912 F.2d 1525 (D.C. Cir. 1990) ......................................................................11

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010) ..............................................................................................20

*Hunsucker v. Phinney*,
  497 F.2d 29 (5th Cir. 1974) ...............................................................................7

*Irma Blas v. Rosen*,
  No. DR-18-CV-66-AM, 2019 WL 5199284 (W.D. Tex. July 16, 2019) .................6

*Itar-Tass Russian News Agency v. Russian Kurier Inc.*,
  886 F. Supp. 1120 (S.D.N.Y. 1995) ................................................................20

*Jean v. Nelson*,
  472 U.S. 846 (1985) .........................................................................................10

*Johnson v. Maryland*,
  254 U.S. 51 (1920) (Holmes, J.) ........................................................................5

*La. Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986) ........................................................................................... 14

*Lumbermens Mut. Cas. Co. v. United States,*
    654 F.3d 1305 (Fed. Cir. 2011) .......................................................................... 4

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
    567 U.S. 209 (2012) ............................................................................................. 5

*Mexican Gulf Fishing Co. v. U.S. Dep't of Com.,*
    60 F.4th 956 (5th Cir. 2023) ............................................................................. 13

*Michigan v. U.S. Army Corps of Eng'rs,*
    667 F.3d 765 (7th Cir. 2011) (Wood, J.) ....................................................... 3, 4

*Penn Dairies v. Milk Control Comm'n of Pennsylvania,*
    318 U.S. 261 (1943) ............................................................................................. 7

*Pennhurst State Sch. & Hosp. v. Halderman,*
    465 U.S. 89 (1984) ............................................................................................. 16

*Perry Capital LLC v. Mnuchin,*
    864 F.3d 591 (D.C. Cir. 2017) ........................................................................... 4

*Plyler v. Doe,*
    457 U.S. 202 (1982) ........................................................................................... 18

*Puerto Rico v. United States,*
    490 F.3d 50 (1st Cir. 2007) (Lipez, J.) ............................................................. 3

*Ramirez v. Immigr. & Customs Enf't,*
    310 F. Supp. 3d 7 (D.D.C. 2018) ..................................................................... 20

*Sackett v. EPA,*
    566 U.S. 120 (2012) ........................................................................................... 12

*Sierra Club v. Peterson,*
    228 F.3d 559 (5th Cir. 2000) ............................................................................ 13

*South Carolina v. Baker,*
    485 U.S. 505 (1988) ............................................................................................. 6

*Texas v. Biden,*
    646 F. Supp. 3d 753 (N.D. Tex. 2022) ............................................................. 2

*Texas v. Biden (MPP),*
    20 F.4th 928 (5th Cir. 2021) ........................................................... 9, 12, 18, 19

*Texas v. Brooks-LaSure*,
No. 6:21-cv-191, 2021 WL 5154219 (E.D. Tex. Aug. 20, 2021) (Barker, J.)..........................3

*Texas v. EEOC*,
933 F.3d 433 (5th Cir. 2019) ...............................................................................................11

*Texas v. Kleinert*,
855 F.3d 305 (5th Cir. 2017) .................................................................................................6

*Texas v. United States*,
40 F.4th 205 (5th Cir. 2022) (per curiam) ............................................................................2

*Texas v. United States*,
50 F.4th 498 (5th Cir. 2022) ................................................................................................17

*Trudeau v. FTC*,
456 F.3d 178 (D.C. Cir. 2006) (Garland, J.) .........................................................................3

*Trump v. Vance*,
140 S. Ct. 2412 (2020) ...........................................................................................................5

*United States v. Texas*,
143 S. Ct. 1964 (2023)............................................................................................................2

*United States v. Washington*,
142 S. Ct. 1976 (2022) .......................................................................................................5, 6

*Wages & White Lion Invs., LLC v. FDA*,
16 F.4th 1130 (5th Cir. 2021) .........................................................................................18, 19

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
139 S. Ct. 361 (2018) .............................................................................................................8

*Wilkie v. Robbins*,
551 U.S. 537 (2007).............................................................................................................5, 6

**Statutes**

5 U.S.C. § 551(4) .......................................................................................................................9

5 U.S.C. § 702 ...........................................................................................................3, 4, 5, 7

5 U.S.C. § 705 ...........................................................................................................................2

5 U.S.C. § 706(2)(C) ...............................................................................................................14

6 U.S.C. § 202(5) .....................................................................................................................14

6 U.S.C. § 211(c)(2), (5), (6), (8)............................................................................................14

8 U.S.C. § 701(a)(2) ...................................................................................7, 8

8 U.S.C. § 1103(a)(3) ......................................................................................1

8 U.S.C. § 1103(a)(5) ....................................................................................14

8 U.S.C. §§ 1221-1232 ...................................................................................1

8 U.S.C. § 1225(b)(2)(A) and § 1225(b)(1)(B)(ii) ..........................................2

8 U.S.C. § 1225 and § 1226 ............................................................................1

8 U.S.C. § 1226(c) and § 1231(a)(2) ..............................................................2

8 U.S.C. § 1252(f)(1) ..................................................................................1, 2

8 U.S.C. § 1324(a)(1)(A)(iv) ........................................................................16

8 U.S.C. § 1357(a)(3) .........................................................................1, 14, 15

28 U.S.C. § 1356 .............................................................................................7

28 U.S.C. § 1367 .............................................................................................7

90 Stat. 2721 (1976) ........................................................................................4

**Other Authorities**

42 C.F.R. § 440.225(c) ..................................................................................18

H.R. Rep. 94-1656 ...........................................................................................4

ARGUMENT[1]

## I.  This Court has jurisdiction to award the requested relief.

Defendants cannot justify their brazen destruction of another sovereign's property or their pattern of forcing line-level federal agents to violate their oaths to deter illegal entry and secure our Nation's border.[2] Perhaps that is why Defendants' lead argument asks this Court not to even look at these troubling actions. ECF 23-1 at 18–20.

Defendants claim that 8 U.S.C. § 1252(f)(1) "divests this Court of any jurisdiction." *Id.* at 18. But the Supreme Court recently made clear that, even where it applies, § 1252(f)(1) "does not deprive the lower courts of all subject matter jurisdiction." *Biden v. Texas*, 142 S. Ct. 2528, 2539 (2022). Instead, it limits their "power to issue a specific category of remedies," while "preserving th[e] [Supreme] Court's power to enter injunctive relief." *Id.*

More fundamentally, though, § 1252(f)(1) has no application to this case. That provision asks two things—whether the relief sought would "[1] enjoin or restrain the operation of [2] the provisions of part IV of this subchapter [8 U.S.C. §§ 1221-1232]." Most of the immigration-law provisions Defendants point to—including Defendants' vague authorization to take "other acts … deem[ed] necessary," 8 U.S.C. § 1103(a)(3), and their limited license to access private lands within 25 miles of the border, *id.* § 1357(a)(3)—simply do not fall within the specified provisions. ECF 23-1 at 10-14, 24-26, 31-33 (citing 6 U.S.C. §§ 202, 211; 8 U.S.C. §§ 1101, 1103, 1158, 1182, 1252, 1325, 1326, 1328, 1357); *see* ECF 23-1 at 18 (conceding "[t]he specified provisions [are codified at] 8 U.S.C. §§ 1221-1232").

The only provisions that matter, then, are 8 U.S.C. § 1225 and § 1226, which Defendants say require them to apprehend any alien that effects an illegal crossing into the United States. ECF 23-1 at 12, 19. The claim that these alien-processing provisions are mandatory is rich, coming from

---

[1] Plaintiff incorporates its briefing and exhibits in ECF Nos. 3-1, 3-2, 5, 5-1, 8, and 8-1. References to page numbers for filings are to the pagination stamped at the header by the ECF system.
[2] *See* Ali Bradley, *'Demoralizing': Border Patrol Agents Cut Razor Wire for Migrants*, NEWSNATION (Sept. 29, 2023), https://www.newsnationnow.com/us-news/immigration/video-border-patrol-agents-cut-razor-wire-for-migrants-in-texas/.

Defendants who previously grabbed for the power to ignore neighboring provisions mandating that various categories of aliens "shall" be detained. *See, e.g.*, *United States v. Texas*, 143 S. Ct. 1964, 1968–69 (2023) (disclaiming any need to comply with 8 U.S.C. § 1226(c) and § 1231(a)(2)); *Biden*, 142 S. Ct. at 2535–37 (disclaiming any need to comply with 8 U.S.C. § 1225(b)(2)(A) and § 1225(b)(1)(B)(ii)). But what matters here is that Texas does not seek an order from this Court barring Defendants from apprehending and processing aliens under "the specified statutory provisions." *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2065 (2022). Instead, the State asks only that federal agents be ordered not to wantonly destroy property that is not theirs, in violation of state tort law.

Defendants' reading of § 1252(f)(1) as prohibiting any order that somehow touches on their preferred method of going about their work cannot be squared with common sense or Supreme Court precedent. A disgruntled CBP officer might find it convenient to assault TMD soldiers based on his opinion that they make his job harder. But an order enjoining him from committing future batteries would not be an order restraining him from processing aliens. That is why the Supreme Court already rejected an argument like Defendants' when it recognized that a court *may* issue injunctive relief "even if [it] has some collateral effect on the operation of a covered provision." *Aleman Gonzalez*, 142 S. Ct. at 2067 n.4. At most, that is all Defendants point to here. But in any event, the evidence shows CBP agents freely moving along the river on the Mexico side of the fence. Texas's property thus does not inhibit Defendants from passing out water bottles, processing aliens along the river, or directing them to federal entry points. And Defendants' naked assertion that they simply "must" destroy Texas's fence to process aliens does not prove otherwise. ECF 23-2 at 5.[3]

## II.  Texas is likely to succeed on the merits of its claims.

### A.  Texas is likely to succeed on its conversion and trespass to chattel claims.

---

[3] Nor would Defendants' reading of § 1252(f)(1) bar a stay of agency action under the Administrative Procedure Act (APA), 5 U.S.C. § 705, for a stay is not an injunction. *Texas v. Biden*, 646 F. Supp. 3d 753, 769 (N.D. Tex. 2022). Recent Fifth Circuit precedent confirms this. *See All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 254 (5th Cir. 2023) ("In the same way that a preliminary injunction is the temporary form of a permanent injunction, a stay [under § 705] is the temporary form of vacatur."); *Texas v. United States (DACA)*, 50 F.4th 498, 528 (5th Cir. 2022) ("As an initial matter, § 1252(f)(1) does not apply to vacatur.").

**1.** As Texas explained before, this Court may never see a simpler case for common-law conversion or trespass to chattels. ECF 3-1 at 17–18, 21–28, 31–32 n.55; ECF 5 at 5. Defendants apparently do not disagree. They explicitly accept, for purposes of this motion, that Texas's wire fence, which Defendants' agents routinely damage, destroy, or meddle with, is lawfully in place. ECF 23-1 at 14 n.3; Reply.Appx. 008–016 (maps of Texas's fence placement). Having conceded those dispositive facts, Defendants offer no argument that Texas's claims for conversion or trespass would fail on the merits. By offering no merits argument whatsoever, Defendants tacitly concede that Texas is likely to prevail on its common-law tort claims, as this Court already recognized in granting a temporary restraining order. ECF 9 at 4–7; *see also Texas v. Brooks-LaSure*, No. 6:21-cv-191, 2021 WL 5154219, at *14 (E.D. Tex. Aug. 20, 2021) (Barker, J.) (holding that federal government's preliminary-injunction papers forfeited "insufficiently briefed" arguments).

**2.** They nevertheless insist (again) that justiciability rules prevent this Court from taking cognizance of admitted, repeated, and ongoing torts. But 5 U.S.C. § 702's broad waiver of federal sovereign immunity for non-monetary relief means what it says, and intergovernmental immunity does not give federal actors a blank check to perpetrate intentional torts. As Texas explained in its Complaint, ECF 1 at 5, the APA waives Defendants' federal-law immunity from suit for a claim like this one: "An action in a court of the United States seeking relief other than money damages and stating a claim that an agency  or an officer or an employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States." 5 U.S.C. § 702. This plain text is clear—"[a]n action in" federal court "seeking relief other than money damages" means *any* action, whether under the APA, a different statute, or the common law.

Circuits across the country agree. *See, e.g.*, *Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006) (Garland, J.); *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 724–25 (2d Cir. 1983) (Friendly, J.); *Puerto Rico v. United States*, 490 F.3d 50, 57–58 (1st Cir. 2007) (Lipez, J.); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 776 (7th Cir. 2011) (Wood, J.). So does the go-to source on federal jurisdiction. The Fifth Circuit (among others) recognizes that *Hart & Wechsler* is "the leading treatise" on questions

like this one. *E.T. v. Paxton*, 41 F.4th 709, 717 (5th Cir. 2022) (Oldham, J.). And it could not be clearer: "Though codified in the APA, the waiver [in § 702] applies to *any suit*, whether or not brought under the APA." RICHARD FALLON ET AL., HART & WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 902 (7th ed. 2015) (emphasis added); *see also* 90 Stat. 2721 (1976) (amending § 702 to waive federal sovereign immunity).

It is unsurprising, then, that the court tasked most often with interpreting the APA rejects Defendants' suggestion that this waiver is not broad enough to cover state-law causes of action: The "argument that § 702 does not waive its immunity from suit for state law claims is foreclosed by our precedent. We have repeatedly and expressly held in the broadest terms that the APA's waiver of sovereign immunity applies to any suit whether under the APA or not." *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017) (cleaned up). That accords with the Supreme Court's decision in *Department of Army v. Blue Fox, Inc.*, 525 U.S. 255 (1999). There, a subcontractor sought to use § 702 to press an equitable lien against the Army, *id.* at 256-58, based on "rights created by state law," *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1315 (Fed. Cir. 2011). If Defendants were right that § 702 can *never* apply to state-law claims, the Court could have simply said that. Instead, it held the waiver did not apply because "the sort of equitable lien sought by respondent here constitutes a claim for 'money damages.'" *Blue Fox*, 525 U.S. at 263 (quoting § 702). Meanwhile, the Fifth Circuit case Defendants cite did not involve § 702's waiver for non-monetary relief at all. *See In re Beef Processors, Inc.*, 468 F.3d 248, 251 (5th Cir. 2006) (en banc) (describing claim "seeking damages").

With no support in § 702's text or precedent, Defendants ask this Court to imply a limit found nowhere in a *different statute*: The Federal Tort Claims Act, they say, waives the federal government's immunity for torts and authorizes monetary relief; it thus "impliedly precludes" non-monetary relief for torts. ECF 23-1 at 21–22. Other Courts have rejected this argument for good reason—it "reads too much into congressional silence." *Michigan*, 667 F.3d at 775. Section 702 "requires evidence, in the form of either express language or fair implication, that Congress meant to forbid the relief that is sought." *Id.* But the FTCA's silence on injunctive relief is unhelpful and unsurprising because it concerned only monetary liability. Historical context, too, shows that § 702 was designed to add to

4

and "strengthen th[e] accountability" already provided by the FTCA. H.R. Rep. 94-1656, 1976 WL 14066, at *4 (Sept. 22, 1976); *see also B.K. Instrument*, 715 F.2d at 727. Texas "is bringing a different claim, seeking different relief, from the kind the [FTCA] addresses." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 222 (2012). The fact that this suit and the FTCA may deal with a "similar subject matter" (*i.e.*, torts) "is not itself sufficient" to "trigger a remedial statute's preclusive effect." *Id.* at 223.

**3.** In two paragraphs, Defendants—perhaps accidentally acknowledging that § 702 *could* extend to state-law claims—suggest that Texas's tort claims are barred by intergovernmental immunity, making the breathtaking claim that state law can never interfere with operations of the federal government. ECF 23-1 at 22–23. Surely Defendants do not think a federal agent would be immune from a state criminal prosecution for murder simply because he was wearing a badge when he killed the victim. *See United States ex rel. Drury v. Lewis*, 200 U.S. 1, 3, 7–8 (1906) (no intergovernmental immunity for federal officer and enlisted soldier who murdered a civilian on municipal or private land in Pennsylvania). And while pointing to recent Supreme Court decisions as somehow supportive, Defendants neglect to mention that *Trump v. Vance*, 140 S. Ct. 2412, 2424–29 (2020), unanimously *approved* the issuance of state criminal subpoenas to a sitting President of the United States in the face of an argument that it would impair the performance of his duties, and that *United States v. Washington*, 142 S. Ct. 1976, 1984 (2022), prohibited only an effort to "singl[e] out the Federal Government for unfavorable treatment" under state law. The older cases Defendants cite are no more helpful: "Of course an employee of the United States does not secure a general immunity from state law"—including tort liability—"while acting in the course of his employment." *Johnson v. Maryland*, 254 U.S. 51, 56 (1920) (Holmes, J.); *see also Wilkie v. Robbins*, 551 U.S. 537, 560 (2007) ("the tort or torts by Governmental employees would be so clearly actionable under the general [common] law").

The idea that federal agents might be subject to state tort law on occasion—on equal terms with everyone else—does not "flip[] the Supremacy Clause on its head." ECF 23-1 at 23. It merely respects our system of federalism, in which agents of a federal government vested with limited and enumerated powers must often operate within state governments of unenumerated powers. *See, e.g.*, *Graves v. New*

*York ex rel. O'Keefe*, 306 U.S. 466, 486–87 (1939) (states may tax federal officials, employees, and property). Defendants' two-paragraph recitation of platitudes about federal power, without any explanation of the how the cases they cite support their claim, makes no serious effort to show why the immunity applies. It thus forfeits any argument on this affirmative defense. *Cf. Irma Blas v. Rosen*, No. DR-18-CV-66-AM, 2019 WL 5199284, at *4 (W.D. Tex. July 16, 2019).

In any event, the argument would fail. For one thing, under binding Fifth Circuit precedent intergovernmental immunity applies "only when a federal officer is held *in the state court* to answer" for official actions. *Texas v. Kleinert*, 855 F.3d 305, 314 (5th Cir. 2017) (emphasis added). Defendants do not—and cannot—complain that they will not receive a fair shake in federal court. And this Court may not ignore that precedent. *See Central Pines Land Co. v. United States*, 274 F.3d 881, 893 (5th Cir. 2001) (following rule of orderliness in intergovernmental-immunity case).

After ignoring Fifth Circuit precedent, Defendants run headfirst into Supreme Court precedent. The broad version of intergovernmental immunity that Defendants press here "has been thoroughly repudiated by modern intergovernmental immunity caselaw." *South Carolina v. Baker*, 485 U.S. 505, 520 (1988). Intergovernmental immunity applies only where a state (1) "regulate[s] the United States directly" or (2) "discriminates against the Federal Government or those with whom it deals." *Washington*, 142 S. Ct. at 1984. Texas's invocation of its own property rights under state tort law does not "regulate" anyone—much less the United States. Each government (whether federal or state) "deals with its neighbors as one [property] owner among the rest." *Wilkie*, 551 U.S. at 558. And Texas acts here as a property owner, not as a regulator. *Cf. Am. Trucking Ass'ns v. City of Los Angeles*, 569 U.S. 641, 649–50 (2013). Moreover, invoking generally applicable tort principles treats Defendants equally. Just like the federal government has authority "to enforce the trespass and land-use rules" in favor of its own property interests, so too do those whom it trespasses against. *Wilkie*, 551 U.S. at 558. (If anything, Texas has treated the federal government *more favorably* than other tortfeasors: By now, state officials would have arrested private individuals who engaged in the destructive campaign being carried out by the federal government.) To the extent restrictions on destroying someone else's property creates any burden at all, it is the *same* burden borne by everyone who operates in Texas; "state

regulation … inevitably imposes some burdens on the national government of the same kind as those imposed on citizens of the United States within the state's borders" without invading federal functions. *Penn Dairies v. Milk Control Comm'n of Pennsylvania*, 318 U.S. 261, 271 (1943).[4]

\*     \*     \*

Invocations of § 702 to press state-law claims may be rare. One might hope that is because most federal agents are not brazenly perpetrating ongoing torts. But it will not stay that way if this Court becomes the first ever to accept the argument that federal sovereign immunity precludes all state-law claims despite § 702, that intergovernmental immunity confers a blank check to violate local laws, and that federal agents are nowhere accountable for the intentional destruction of property.

### B.  Texas is likely to succeed on its claims that Defendants violated the APA.

Defendants do engage on the merits of Texas's APA claims. But their arguments largely hinge on ignoring uncontested facts: Defendants and their agents have damaged, destroyed, or otherwise interfered with Texas's concertina-wire fence on almost a daily basis since September 20, 2023. In public statements, officials have stated that DHS's policy allows agents to do so anytime an alien crosses the Rio Grande, even absent an acute medical exigency. And Defendants never subjected that policy to public notice and comment, explained how it is consistent with statutes that task Defendants with deterring illegal entry, or acknowledged the arbitrariness of destroying Texas's barriers to entry while building federal barriers designed to do the same thing.

**1.** At the outset, Defendants argue their challenged practice of declaring open season on someone else's property is "committed to agency discretion by law," 8 U.S.C. § 701(a)(2), and is therefore unreviewable under the APA. *See Heckler v. Chaney*, 470 U.S. 821 (1985). But it is simply not true that the policy Texas identifies rests on boundless discretion. Although Defendants repeatedly insist their

---

[4] Defendants briefly suggest that Texas may not rely on 28 U.S.C. § 1356 for subject-matter jurisdiction over its tort claims. ECF 23-1 at 20 n.4. But they cite only one case that declined jurisdiction based on a specific carveout from this general grant. *See Hunsucker v. Phinney*, 497 F.2d 29, 31 (5th Cir. 1974) (citing the Tax Anti-Injunction Act). Defendants point to no similar carveout covering Texas's tort claims. Nor do they dispute that—on the plain text—this action concerns the "seizure [of property] … on land," which Defendants claim is permitted "under a[] law of the United States." ECF 23-1 at 31–33.

policy builds in "discretion" or "independent judgment" in "fast-moving situations," ECF 23-1 at 24–27, elsewhere they argue that the *only* thing their agents and employees are empowered to do once an alien manages to get a toe across the international boundary is apprehend them, ECF 23-1 at 15, 19; ECF 23-2 at 4, and they *must* move or destroy Texas's fence in order to fulfill that statutory mandate, ECF 23-2 at 5. Tellingly, line-level agents have described feeling "demoralized" at being "compelled to" participate in the destruction of property, disserving their mission of deterring illegal entries in the process. *Supra* at 1 n.1. Meanwhile, undisputable video evidence shows agents are *not* apprehending the aliens they wave through Texas's fencing. ECF 3-2 at 31, 33. Defendants cannot have it both ways. It cannot be the case that agents *must* apprehend (rather than repel back across the border) any alien they see and *must* destroy property (rather than utilize federal resources on the Mexico side of the fence) to fulfill that statutory mandate, yet all of this somehow consists of "unbounded" discretion. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2568 (2019).

In any event, the fact that an agency's course of action includes some measure of discretion is not the litmus test for when a question is committed to the agency for purposes of § 701(a)(2). The Supreme Court has explained, time and again, that it "read[s] the exception in § 701(a)(2) quite narrowly, restricting it to 'those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370–372 (2018). In other words, the Court "ha[s] generally limited the exception to 'certain categories of decisions that courts traditionally have regarded as 'committed to agency discretion,'" where discretion really is "unbounded" and subject to "no meaningful standard" of review. *New York*, 139 S. Ct. at 2567–69. The destruction of private property "is not one of those areas traditionally committed to agency discretion." *Id.* at 2568. To the extent Defendants believe some common-law or statutory privilege justifies their ongoing trespass to someone else's property, the application of tort principles "involves the sort of routine dispute" that courts regularly decide. *Weyerhaeuser*, 139 S. Ct. at 370.

Defendants' claim that their domain is especially exempt from judicial scrutiny because it implicates "national-security interests," ECF 23-1 at 26, is impossible to square with the Supreme

Court's application of these same standards to DHS. *See, e.g.*, *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1905–07 (2020) (DHS's discretionary enforcement decisions were amenable to judicial scrutiny because non-enforcement could affect the sorts of "interest[s] 'courts often are called upon to protect.'"). Just last year the Supreme Court stated that DHS's authority "is not unbounded" despite a statute granting the Secretary authority "in his discretion" to act "under such conditions as he may prescribe"; instead, "DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." *Biden*, 142 S. Ct. at 2543–44. Thus, even broad grants of discretion to an agency whose work touches on national security do not preclude review under the APA.

The fact that Defendants' policy is also a "rule" under the APA underscores its amenability to judicial review. A rule is "an agency statement of general ... applicability and future effect" that either "prescribe[s] law or policy" or "describe[s] [agency] organization, procedure, or practice requirements. 5 U.S.C. § 551(4). And § 701(a)(2)'s nonreviewability limit "does not apply to agency rules." *Texas v. Biden (MPP)*, 20 F.4th 928, 978 (5th Cir. 2021) (citing *Heckler*, 470 U.S. 821). That limit applies, "if at all, to one-off agency enforcement decisions rather than to agency rulemakings." *Id.* at 984. Defendants' ongoing policy does not fall within that category. The actions Texas challenges here are not mere "nonenforcement" or "a refus[al] to institute proceedings against a particular entity or even a particular class." *Regents*, 140 S. Ct. at 1906. Instead, Texas challenges an established policy, pattern, or practice of affirmatively damaging another sovereign's property. These actions "provide[] a focus for judicial review" under the APA. *Id*; *see also Texas v. United States (DAPA)*, 809 F.3d 134, 168 (5th Cir. 2015) ("where there is affirmative agency action ... the action at least can be reviewed to determine whether the agency exceeded its statutory powers.") (citations omitted). Where "an agency *does* act to enforce, that action itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner," and "[t]he action at least can be reviewed to determine whether the agency exceeded its statutory powers." *DAPA*, 809 F.3d at 166.

**2.** Defendants have an established policy, pattern, or practice that they never subjected to public notice and comment. ECF 3-1 at 34–37; ECF 5 at 5–6. The sheer volume of similar incidents, coupled with repeated public statements from DHS itself, demonstrates that. Defendants claim Texas has not

pointed to any statement. ECF 27-1 at 28. The APA, of course, does not require that given the possibility of unwritten policies. *See, e.g., Jean v. Nelson*, 472 U.S. 846, 851 (1985) (discussing "unwritten INS policy put into place in the first half of 1981"). But Texas *has* repeatedly pointed to such statements indicating a policy that concertina wire fencing must be cut or moved anytime aliens are present. On June 30, 2023, a spokesperson for CBP justified federal officials' cutting Texas's fence as "consistent w/ federal law" simply because "[t]he individuals had already crossed the Rio Grande from Mexico [and] were on U.S. soil." *See* ECF 3-1 at 22 (citing CBP statement). On October 24, 2023, in response to inquiries about this lawsuit concerning Defendant's destruction of state property, a DHS spokesperson said: "Border Patrol agents have a responsibility under federal law to take those who have crossed onto U.S. soil without authorization into custody for processing." *See* ECF 5 at 6 n.1 (citing DHS statement). And just this past week, Defendants reiterated the same policy in identical terms in statements to numerous news outlets after this Court granted a TRO.[5] Now, in a declaration submitted with their response, Defendants say no policy has been "issued" while at the same time admitting that DHS has instructed its employees on "issues related to obstructions" near the border for decades based on the idea that an alien "has already made entry into the United States" as soon as he crosses the Rio Grande. ECF 23-2 at 3–5.[6] An agency cannot turn an APA vice (*i.e.*, failing to issue a policy for public notice and comment) into a tool for avoiding the APA itself (*i.e.*, no policy thus "exists"). It would be hard to find evidence more clearly attesting to a policy that federal agencies chose not to share with the world.

   At this stage, the record more than amply demonstrates Texas's likelihood of success in showing

---

[5] *See, e.g.*, J. David Goodman, *Judge Orders Border Agents to Stop Cutting Texas' Barbed Wire Fence*, N.Y. TIMES (Oct. 30, 2023), https://www.nytimes.com/2023/10/30/us/texas-border-concertina-wire-judge-paxton.html (quoting DHS spokesman Luis Miranda); Ryan King, *Texas Scores Wire-Cutting Win in Border Battle with Biden Agents*, N.Y. POST (Oct. 30, 2023), https://nypost.com/2023/10/30/news/texas-scores-a-win-in-border-battle-with-biden-administration/ (same).
[6] The central premise of Defendants' policy—that any alien who manages to cross the border has already entered the United States—is not even correct: "[A]n alien who is detained shortly after unlawful entry cannot be said to have 'effected an entry.' Like an alien detained after arriving at a port of entry, an alien like respondent is 'on the threshold.'" *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982–83 (2020) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001), and *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953)).

the policy required public notice and comment. It is "final agency action" that "mark[s] the consummation of the agency's decisionmaking process." *Data Mktg. P'ship, LP v. DOL*, 45 F.4th 846, 853 (5th Cir. 2022). And Texas's "rights or obligations"—just like the rights of others with private property in close proximity to the Texas-Mexico border—have indisputably been impaired. *Id.* Texas need only show that it is "direct[ly] and immediate[ly]" impacted by Defendants' guidance in the form of "direct effect on [its] day-to-day business." *Abbott Labs v. Gardner*, 387 U.S. 136, 152 (1967). "The Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality requirement as 'flexible.'" *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019) (cleaned up). Because Defendants unlawfully direct the destruction of Texas's concertina-wire fence, directly impacting Texas's property rights, Texas must expend, and has expanded, substantial time and resources to repair its wires, affecting its day-to-day work.

"Final agency action may result from a series of agency pronouncements rather than a single edict." *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48–49 (D.C. Cir. 2000) (cleaned up). "Hence, a preamble plus a guidance plus an enforcement letter from [an agency] could crystallize an agency position into final agency action." *Id.*; *see also Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 n.8 (D.C. Cir. 1986) (final agency action consisted of a "series of steps taken by EPA" culminating in a letter from an EPA official clarifying the agency's position). This is consistent with the "flexible and pragmatic way" in which courts apply the finality requirement. *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990).

The declaration submitted by Defendants never disavows that USBP has a policy of sanctioning the destruction of private property anytime an agent sees an alien. Instead, it practically admits such a policy exists, albeit claiming that it contains certain limits that agents are not even following. ECF 23-2, BeMiller Decl. ¶6.[7] Nothing about it is merely "tentative or interlocutory [in] nature." ECF 23-1 at

---

[7] Defendants have not "work[ed] with [Texas] to gain access" to the river. *Id.* They have not taken steps to "close" or make "repairs" to the fences they destroy. *Id.* And they have not "ameliorate[d] any damage." *Id.* The notion that using hydraulic-powered tractors to tear fence posts out of the ground and to smash wire into a pulverized mass of tangled metal was an effort "to minimize damage to the wire" should not be taken seriously. ECF 23-1 at 16–17.

27. It strains credulity to suggest that the policy implemented by Defendants or their agents (who have damaged, destroyed, or otherwise interfered with Texas's concertina-wire fence on a near-daily basis since September 20, 2023) is "subject to further Agency review." *Sackett v. EPA*, 566 U.S. 120, 127 (2012) (citation omitted). "An action is either final or not, and the mere fact that the agency could— or actually does—reverse course in the future does not change that fact." *Data Marketing*, 45 F.4th at 854.

Defendants admit that CBP "has provided general guidance to individual officers concerning Texas's concertina wire," but insist that this guidance is subject to "agents' independent on-the-ground decisionmaking," and that requisite subsequent implementation makes the policy not final. ECF 23-1 at 29–30. As an initial matter, all rules are implemented down the line by orders to particular parties, and this does not serve to deprive the rules of finality. *See MPP*, 20 F.4th at 948 (rejecting argument that agency action was not "final until the agency applies it 'in a particular situation' to an affected person or entity"); *Biden*, 142 S. Ct. at 2545 n.7 ("The fact that the agency could not cease implementing MPP, as directed by the October 29 Memoranda" until the occurrence of a contingent event "did not make the October 29 Memoranda any less the agency's final determination of its employees' obligation to do so once such" an event would occur). And Defendants' own evidence reveals that agents have no such discretion in locations "where concertina wire is present" if the alternative would "force [aliens] who have entered the United States to leave the immediate area of the Rio Grande River" by "[t]ravers[ing] the river's shoreline." BeMiller Decl. ¶13.

In any case, the APA is routinely used to challenge policies that bake in discretion. ECF 23-1 at 27–30. That makes good sense—because every upstream policy requires downstream implementation by federal actors. For the same reason, the fact that this policy is implemented downstream does not mean it is committed to agency discretion. ECF 23-1 at 24–27. Because Defendants' policy applies anytime an alien is "present," it hardly requires "balanc[ing] a variety of factors in fast-moving situations."

To the extent Texas's modest request for an injunction against the destruction of its concertina-wire fencing may result in a change to some of DHS's policies and practices, that does not convert

Texas's claim into an impermissible "programmatic attack" on border policy, as Defendants suggest. ECF 23-1 at 29. Federal law differentiates between the subject of suit and the incidental effects of relief, clarifying that the APA permits challenges to "a specific 'final agency action' [which] has an actual or immediately threatened effect,' even when such a challenge has 'the effect of requiring a regulation, a series of regulations, or even a whole program to be revised by the agency.'" *Sierra Club v. Peterson*, 228 F.3d 559, 567 (5th Cir. 2000) (citation omitted).

**3.** Defendants' policy of declaring open season on property that belongs to someone else—indeed, property that serves as a barrier to illegal entry—is arbitrary and capricious. ECF 3-1 at 37–39; ECF 5 at 6. Defendants make no serious effort to reconcile their policy of destroying barriers with DHS's recent acknowledgment of an acute and immediate need for barriers.[8] Indeed, they do not even *discuss* that fact, which attests to a "fail[ure] to consider an important aspect of the problem." *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023) (quoting *Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Federal property—*i.e.*, fencing being constructed near Brownsville, Texas—gets to stand. Meanwhile, Texas property—*i.e.*, fencing being maintained near Eagle Pass, Texas—gets cut open, ripped up, or torn down on a daily basis. It would be hard to find a clearer picture of arbitrariness.

But even if Defendants had attempted to justify this unequal treatment, they have not "consider[ed] the costs and benefits" of cutting Texas's concertina-wire barriers. *Id.* at 971, 973. Defendants' own testimony reflects reliance on claimed benefits of reducing "injury and/or the loss of life of noncitizens attempting to enter the United States" without considering the impact on deterrence. BeMiller Decl. ¶16. All of that despite federal actors recognizing that concertina-wire

---

[8] DHS "says deterrence of illegal border activities is achieved *primarily* through border barriers." *GLO v. Biden*, 71 F.4th 264, 273 (5th Cir. 2023) (emphasis in original); *id.* ("DHS has affirmed that border barriers funnel illegal immigrants to areas where Customs and Border Protection is better prepared to intercept them, thus reducing illegal immigration," and "[i]n the absence of longer walls, at least some illegal aliens who otherwise would have been prevented from entering Texas will seek driver's licenses, education, and healthcare from Texas."); *see also* ECF 5 at 7 n.2 (recent DHS federal register notice stating that "[t]here is presently an acute and immediate need to construct physical barriers and roads in the vicinity of the border of the United States in order to prevent unlawful entries into the United States."

barriers have undisputed benefits that Defendants have previously recognized. *See* Storrud Decl. ¶¶3-4, 7–16, Reply.Appx.002, 003–006 (detailing how federal employees collaborated with and even requested help from TMD to deploy concertina-wire fencing near El Paso, Texas, to deter illegal migration, protect federal and state law enforcement officers, and route aliens to safe, legal ports of entry).

**4.** The APA prohibits agency action "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). As "mere creatures of statute," federal agencies are likewise subject to *ultra vires* actions when they exceed their statutory authority. *Cf. Clean Water Action v. EPA*, 936 F.3d 308, 313 (5th Cir. 2019); *see also La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act … unless and until Congress confers power upon it."). Defendants' policy and the actions taken pursuant to it plainly exceed any statutory authority or otherwise amount to *ultra vires* actions. ECF 3-1 at 32–34, 39–42; ECF 5 at 6.

Defendants' own recitation of the origins behind Congress's decision to enact 8 U.S.C. § 1357(a)(3) shows why: Defendants have the "duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5). "Before Congress enacted § 1357(a)(3)," however, USBP's operations were "seriously impaired by the refusal of some property owners along the border to allow patrol officers access to extensive border areas in order *to prevent such illegal entries*." ECF 23-1 at 11-12, 31–32 (emphasis added). Consistent with that focus on preventing illegal entries, federal law tasks Defendants with setting "national immigration enforcement policies and priorities," 6 U.S.C. § 202(5), in order to "ensure the interdiction of persons and goods illegally entering the United States," "detect, respond to, and interdict terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States," "safeguard the borders of the United States," and "enforce and administer all immigration laws." 6 U.S.C. § 211(c)(2), (5), (6), (8).

Here, Defendants have taken the position that they have no power to repel illegal entries as soon as an alien gets one inch past the border, that they must adopt an approach to apprehension that encourages illegal entry by routinely opening barriers to entry, and that, upon invoking that basis for

destroying Texas property, they need not actually apprehend aliens at all. Despite claiming their policy hinges on aliens effecting a crossing of the border and a need to apprehend, Defendants and their agents have created breaches in Texas's wire fencing *before* aliens even cross the border, ECF 3-2 at 23, and they have given migrants who pass through the fence freedom to move about the country, *id.* at 31, 33. Congress has not authorized Defendants to destroy State property for the purpose of facilitating unlawful entry into the United States. Not one of the provisions cited above authorizes Defendants to destroy and seize border infrastructure belonging to another sovereign to facilitate unlawful entry of aliens into the United States. The only statutory provision that even comes close authorizes Defendants to "have access to private lands, but not dwellings, for the purpose of patrolling the border *to prevent the illegal entry of aliens* into the United States." 8 U.S.C. § 1357(a)(3) (emphasis added). That provision provides no support whatsoever for a policy that is admittedly not about preventing illegal entry.

Defendants also rely on their general "power and duty to control and guard the boundaries and borders of the United States against the illegal entry of [noncitizens]" and to "perform such other acts as … necessary for carrying out [t]his authority." ECF 23-1 at 31 (quoting 8 U.S.C. § 1103(a)(3), (5)). But such general provisions do not extend limitless discretion, particularly to authorize the destruction of another sovereign's property for convenience rather than necessity.[9] The FDA made a similar argument in a recent case, pointing to the purpose statement in its authorizing Act reflecting the FDA's "general mission to protect the public health." *Apter v. HHS*, 80 F.4th 579, 589 (2023). The Fifth Circuit was unpersuaded, reasoning that general "statements of purpose … cannot override a statute's operative language." *Id.* (quoting *Sturgeon v. Frost*, 139 S. Ct. 1066, 1086 (2019)). Because the FDA could not point to "plain text" that "authorize[d] FDA to issue medical advice or recommendations," its "argument from the Act's purpose statement … leads nowhere." *Id.*

---

[9] The Fifth Circuit has rejected similar attempts by Defendants: "the broad grants of authority in 6 U.S.C. § 202(5), 8 U.S.C. § 1103(a)(3), and 8 U.S.C. § 1103(g)(2) cannot reasonably be construed as assigning decisions of vast economic and political significance" to DHS. *DAPA,* 809 F.3d at 183.

Far from being authorized by statute, Defendants' conduct would subject individual actors to criminal prosecution. A person who "encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law" commits a felony offense. 8 U.S.C. § 1324(a)(1)(A)(iv). By creating gaps in Texas's concertina-wire fence, Defendants are rolling out the red carpet to illegal entry by aliens assembled across the Rio Grande. *See, e.g.*, Banks Decl. ¶¶15–20, Appx.020–025.

Congress has not granted Defendants authority to destroy Texas's property to facilitate unlawful migration. Texas is therefore likely to succeed on its claim that they have acted "without any authority whatever," *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984), or have acted *ultra vires*.

### III. The State has pointed to an ongoing threat of irreparable harm.

First, the ongoing tortious damage of private property *is* irreparable. That is precisely why Texas courts permit awarding injunctive relief rather than damages. ECF 3-1 at 32 (citing cases). Defendants have inflicted monetary harm on Texas in the past and Texas may well choose to vindicate its right to pursue those remedies under the FTCA later. But money damages for past invasions are not an adequate remedy for a party being subjected to "repeated or continuing" invasions of its property rights, which inflict "irreparable injury." *Beathard Joint Venture v. W. Houston Airport Corp.*, 72 S.W.3d 426, 432 (Tex. App. 2002). "Many authorities support the rule that injunction is a proper remedy to restrain repeated or continuing trespasses." *Boiles v. City of Abilene*, 276 S.W.2d 922, 925 (Tex. App. 1955) (collecting cites); *see also Fort-Acre Spring Live Stock Co. v. W. Tex. Bank & Tr. Co.*, 118 S.W. 790, 791 (Tex. App. 1909) (approving award of injunction for "continuing" trespass). Even if Texas could recover the costs for each time Defendants damage it in the future, that *still* would not fully compensate the State for its harms. The fence is not a mere decoration with a value equal to its material parts—it performs a function that reduces the flow of illegal aliens into the State and the resulting costs. There is no way to compensate Texas for the lost utility of the fence as a fence. That by itself suffices to show that Texas will likely suffer irreparable harm absent a preliminary injunction.

With respect to the consequences flowing from illegal entry, Defendants confusingly claim that Texas identified harm "in merely two paragraphs." ECF 23-1 at 37. Not so. Texas explained at length the litany of harms flowing directly from illegal entry into Texas. ECF 3-1 at 9–14. And it should be common sense that concertina wire deters unauthorized entries and the harms associated with them. If that were not enough, though, Texas also cited the widespread practice using concertina wire around sensitive locations and statements from Defendants themselves admitting that it helps deter illegal entry. ECF 3-1 at 15–17. In fact, after this Court granted the TRO, Texas discovered that federal agents have themselves proposed that Texas deploy concertina-wire fencing to help deter illegal entry. *See* Storrud Decl. ¶¶3–4, 7–16, Reply.Appx.002, 003–006. The notion that Texas's concertina-wire fencing has not completely prevented illegal migration is beside the point. Texas is entitled to take efforts to *reduce* the flow of illegal migration and associated harms. And in any event, outlets criticizing the fence's effectiveness describe in the same breath how *the federal government is routinely cutting the wire*.[10] A fence that everyone knows will be destroyed anytime someone stands opposite it cannot serve as an effective fence. Defendants cannot rely on their own tortious conduct of destroying fences to establish that fences do not deter illegal entry.

In addition to the costs of repairs to state property and increased crime and human suffering because of unchecked illegal migration, Texas will also incur uncompensated "expenditures in providing emergency medical services, social services and public education for illegal aliens." *Texas v. DACA*, 50 F.4th at 518. The record in this case describes how the City of Eagle Pass was overwhelmed by a one-week surge of migrants facilitated by the federal Defendants. Understandably, city leaders declared a state of emergency and requested funding from the State. ECF 3-1 at 19; ECF 3-2 at 21. That same dynamic is sure to ripple across the State: In just the past two years, the number of aliens who illegally crossed the southern border in Texas was 2.6 million—greater than the population of

---

[10] *See, e.g.*, Patrick J. McDonnell & Hamed Aleaziz, *Razor Wire and Soldiers Fail to Deter Migrants: They Say Its Easier to Get in with Kids*,' L.A. TIMES (Oct. 2, 2023), https://www.latimes.com/world-nation/story/2023-10-02/razor-wire-soldiers-fail-deter-migrants-border (explaining how "day and night in Eagle Pass" federal agents "use[] pliers to cut open a passage through the thickets of barbed wire" and destroy the fence "soon" after TMD soldiers "roll[] out fresh loops to patch [a] hole").

the City of Houston.[11] Future public welfare expenditures are sure to come and past payouts may be unrecoverable because of the federal government's sovereign immunity. *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). Damages would not be available to cover that. *See MPP*, 20 F.4th at 1002 (Texas satisfied irreparable injury prong because costs from aliens in the State could not be recovered from federal government). Consider just a few areas where the State's expenditures are impacted by illegal migration, which Defendants' policy facilitates.[12]

First, the State funds healthcare programs that cover illegal aliens. Federal law requires Texas to include illegal aliens in its Emergency Medicaid program. *See* 42 C.F.R. § 440.225(c). That costs the State tens of millions of dollars annually. *See* Bricker Decl. ¶8, Appx.036–037 (estimating costs between $72 million and $116 million for various years). And Texas's Children's Health Insurance Program spends tens of millions of dollars each year on perinatal coverage for illegal aliens. *Id.* ¶10 Appx.037–038 (estimating costs between $11 million and $31 million for various years).

Second, the State also provides public education to illegal aliens, as the Supreme Court required in *Plyler v. Doe*, 457 U.S. 202, 230 (1982). The cost of educating unaccompanied alien children, which is only a subset of illegal aliens eligible for public education, is tens of millions of dollars per year. Meyer Decl. ¶4, Appx.060 (estimating annual costs between $27 million and $180 million).

Third, Texas also incarcerates many illegal aliens. Criminal activity that would not occur had an alien not been present imposes significant costs on Texans, not only in the form of victims' suffering but also in the significant financial cost of the criminal justice system. In one year alone, the Texas Department of Criminal Justice housed 7,058 illegal criminal aliens for a total of 1,984,597 days. Waltz

---

[11] Bob Price, *Migrants Apprehended in Texas-Based Border Sectors in Past Two Years Exceeds Houston Population*, Breitbart (Oct. 30, 2023), https://www.breitbart.com/border/2023/10/30/migrants-apprehended-in-texas-based-border-sectors-in-2-years-exceeds-houston-population/.

[12] Defendants argue that the Supreme Court's decision in *United States v. Texas*, 143 S. Ct. 1964 (2023), makes these injuries not judicially cognizable. ECF 23-1 at 38–39. But that case held those injuries non-cognizable solely because the States there were challenging a failure to take enforcement actions against aliens, which fell into nonreviewable executive discretion. *Texas*, 143 S. Ct. at 1973–76. That does not apply here—Plaintiff challenges affirmative actions of Defendants destroying its property. The destruction of private property "is not one of those areas traditionally committed to agency discretion." *New York*, 139 S. Ct. at 2568; *cf. Texas*, 143 S. Ct. at 1973–76 (using same analysis for APA reviewability under *Heckler v. Chaney* in determining whether there was a judicially cognizable injury in fact under Article III).

Decl. ¶8, Appx.032. That cost more than $150 million, but the federal government reimbursed the State less than $15 million. *Id.* ¶¶8–9, Appx.033. As one TDCJ official explained, "to the extent the number of aliens in TDCJ custody increases, TDCJ's unreimbursed expenses will increase as well." *Id.* ¶10, Appx.033.

Finally, consider the costs that additional illegal aliens impose on Texas's driver's license program. Texas provides driver's licenses to aliens so long as their presence in the United States is authorized by the federal government. Gipson Decl. ¶¶3–5, Appx.047–048. Texas loses money on each driver's license issued. *Id.* ¶8, Appx.049. The Chief of the Texas Department of Public Safety's Driver License Division has submitted a declaration estimating the costs of issuing additional licenses to aliens. *Id.* ¶8.

The destruction of Texas's concertina-wire fence facilitates the entry of more aliens into Texas. And the federal government is no longer subjecting newly arrived aliens to the Migrant Protection Protocols (MPP). That means aliens arriving at the border—to the extent they are even apprehended at all—are immediately granted parole and being released into the State to use healthcare services, obtain subsidized driver's licenses, and claim other costly public benefits. *MPP,* 20 F.4th at 966, 968. Some migrants crossing the southern border may ultimately make their way to other destinations, but it remains the case that Texas shoulders a "disproportionate share of [aliens]" and the costs detailed above do "not rest on mere speculation." *New York*, 139 S. Ct. at 2565-66.

## IV. The balance of the equities and public interest favor preliminary relief.

The harms Defendants assert do not outweigh these harms to Texas and its residents, which are immediate, irreparable, and continuing. A heightened risk of terrorist infiltration. A scourge of human trafficking. Illicit smuggling of the world's most dangerous opioid. Spikes in crime, violence, and property damage in border communities. And perils for migrants themselves making a dangerous journey. Defendants may choose not to admit it now, but on previous occasions they have recognized that concertina-wire fences, along with a variety of other tools, help ameliorate these harms. The benefits of awarding a preliminary injunction are clear.

Conversely, the Defendants face essentially no harm from maintaining the status quo ante. *See Wages & White Lion*, 16 F.4th at 1144 ("the *status quo* [is] the state of affairs before the" challenged

agency action). On the merits of Texas's common-law claims, Defendants "have no right to [damage] the [property] and assert none." *Itar-Tass Russian News Agency v. Russian Kurier Inc.*, 886 F. Supp. 1120, 1130–31 (S.D.N.Y. 1995). And evidence of federal and state cooperation—while using concertina-wire fencing in El Paso, Texas—shows there is absolutely no need for the broad policy of disrupting Texas's wire fencing to carry out Defendants' duties. *See* Storrud Decl. ¶17, Reply.Appx.006. Defendants have agents on both sides of Texas's fencing to apprehend aliens wherever they may be found. And the facts on the ground show Defendants are not all that interested in apprehending aliens anyway.

Instead, Defendants focus on foreign-policy concerns. ECF 23-1 at 40–41. "Our precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010). The idea that Defendants' approach to border enforcement would somehow do a better job of hampering "terrorists, criminals, and smugglers" is risible. And the fact that federal employees have received complaints from Mexico is irrelevant. Mexico could not dictate what kinds of fences property owners should maintain in Maverick County. To the extent foreign relations matter at all, then so should Congress's interests in that area. And Congress has expressed in statutory text that it expects Defendants to prevent, not invite, illegal entries. "[W]here the agency's discretion has been clearly constrained by Congress[,] [t]he public interest surely does not cut in favor of permitting an agency to fail to comply with a statutory mandate." *Ramirez v. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 33 (D.D.C. 2018).

Finally, "the public is served when the law is followed." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013). A preliminary injunction here will be a step toward promoting respect for America's system of laws.

## CONCLUSION

Plaintiff respectfully requests the Court preliminarily enjoin Defendants from damaging, destroying, or otherwise interfering with Texas's concertina-wire fence or, alternatively, enter a stay of Defendants' policy directing the same.

Dated: November 5, 2023.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

**ROBERT HENNEKE**
Texas Bar No. 24026058
Texas Public Policy Foundation
901 Congress Ave.
Austin, Texas 78701
(512) 472-2700
rhenneke@texaspolicy.com

*/s/ Ryan D. Walters*
**RYAN D. WALTERS**
Chief, Special Litigation Division
Texas Bar No. 24105085

**DAVID BRYANT**
Special Counsel
Texas Bar No. 03281500

**MUNERA AL-FUHAID**
Special Counsel
Texas Bar No. 24094501

**HEATHER L. DYER**
Special Counsel
Texas Bar No. 24123044

Office of the Attorney General
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1706
Ryan.Walters@oag.texas.gov
David.Bryant@oag.texas.gov
Munera.Al-Fuhaid@oag.texas.gov
Heather.Dyer@oag.texas.gov

**COUNSEL FOR PLAINTIFF**

### CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on November 5, 2023, which automatically serves all counsel of record who are registered to receive notices in this case.

*/s/ Ryan D. Walters*
RYAN D. WALTERS