**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**DEL RIO DIVISION**

|  |  |
|---|---|
| **STATE OF TEXAS**, | |
| *Plaintiff,* | Case No. 2:23-cv-00055-AM |
| **v.** | |
| | Hon. Alia Moses |
| **U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,** | |
| *Defendants.* | |

**DEFENDANTS' SUPPLEMENTAL BRIEF ON TEXAS'S APA CLAIMS**
**PURSUANT TO THE COURT'S NOVEMBER 9, 2023 ORDER**

# <u>TABLE OF CONTENTS</u>

INTRODUCTION .................................................................................................... 1

ARGUMENT............................................................................................................ 3

I.     Texas Is Unlikely To Succeed On Its APA Claims for Threshold Reasons.............. 3

    A.     Texas cannot rely on the APA to circumvent the statutory bar to its requested injunctive relief. ........................................................................ 4

    B.     Judicial review of Texas's APA claims is not available. ............................... 9

         1.     Decisions about whether and how to apprehend and inspect migrants are committed to agency discretion by law....................... 9

         2.     Texas's claims are not based on discrete, final agency action. ........ 11

II. Texas Is Unlikely to Succeed on the Merits of Its APA Claims ...................................... 14

    A.     Defendants' actions are consistent with their broad statutory authority. . 14

    B.     Defendants' actions are not a legislative rule. ............................................. 17

    C.     Defendants' actions are not arbitrary and capricious.................................. 18

CONCLUSION ...................................................................................................... 20

# TABLE OF AUTHORITIES

Cases

*Al Otro Lado, Inc. v. Nielsen*,
   327 F. Supp. 3d 1284 (S.D. Cal. 2018)........................................................................ 12

*Arizona v. Biden*,
   40 F.4th 375 (6th Cir. 2022) ........................................................................................ 7

*Barrick Goldstrike Mines, Inc. v. Browner*,
   215 F.3d 45 (D.C. Cir. 2000)....................................................................................... 14

*Bennett v. Spear*,
   520 U.S. 154 (1997).................................................................................................... 13

*Ciba-Geigy Corp. v. EPA*,
   801 F.2d 430 (D.C. Cir. 1986)..................................................................................... 14

*Data Mktg. P'ship v. Dep't of Labor*,
   45 F.4th 846 (5th Cir. 2022) ........................................................................................ 14

*Dep't of Comm. v. New York*,
   139 S. Ct. 2551 (2019)................................................................................................. 9

*Dep't of Labor v. Kast Metals Corp.*,
   744 F.2d 1145 (5th Cir. 1984) ..................................................................................... 19

*DHS v. Thuraissigiam*,
   140 S. Ct. 1959 (2020)................................................................................................. 17

*DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*,
   76 F.3d 1212 (D.C. Cir. 1996)..................................................................................... 14

*Garland v. Aleman Gonzalez*,
   596 U.S. 543 (2022)........................................................................................... 1, 5, 6, 7

*Holistic Candlers & Consumers Ass'n v. FDA*,
   664 F.3d 940 (D.C. Cir. 2012)..................................................................................... 14

*Indep. Equip. Dealers Ass'n v. EPA*,
   372 F.3d 420 (D.C. Cir. 2004)..................................................................................... 14

*Moher v. United States*,
   875 F. Supp. 2d 739 (W.D. Mich. 2012) .................................................................... 11

*Narenji v. Civiletti*,
    617 F.2d 745 (D.C. Cir. 1979) ................................................................ 16

*Nat'l Mining Ass'n v. McCarthy*,
    758 F.3d 243 (D.C. Cir. 2014) ................................................................ 18

*Northpoint Tech., Ltd. v. FCC*,
    414 F.3d 61 (D.C. Cir. 2005) ................................................................ 20

*Norton v. South. Utah Wilderness Alliance*,
    542 U.S. 55 (2004) ................................................................ 2, 13

*Sierra Club v. Peterson*,
    228 F.3d 559 (5th Cir. 2000) ................................................................ 2

*Sierra Club v. U.S. Dep't of Interior*,
    990 F.3d 909 (5th Cir. 2021) ................................................................ 20

*Texas v. Biden*,
    646 F. Supp. 3d 753 (N.D. Tex. 2022) ................................................................ 9

*Texas v. United States*,
    50 F.4th 498 (5th Cir. 2022) ................................................................ 9

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016) ................................................................ 14

*United States v. Texas*,
    599 U.S. 670 (2023) ................................................................ *passim*

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022) ................................................................ 16

<u>Statutes</u>

5 U.S.C. § 553 ................................................................ 18

5 U.S.C. § 701 ................................................................ 9

5 U.S.C. § 704 ................................................................ 9

5 U.S.C. § 705 ................................................................ 4, 8

8 U.S.C. § 1103 ................................................................ 15, 16

8 U.S.C. § 1158 ................................................................ 10

8 U.S.C. § 1225 ............................................................................................... *passim*

8 U.S.C. § 1226 ............................................................................................... 13

8 U.S.C. § 1228 ............................................................................................... 10

8 U.S.C. § 1229 ............................................................................................... 10

8 U.S.C. § 1229a ............................................................................................. 10

8 U.S.C. § 1252 ............................................................................................. 1, 4

8 U.S.C. § 1357 ........................................................................................... 15, 16

19 U.S.C. § 1630 ............................................................................................. 11

28 U.S.C. § 1346 ............................................................................................. 11

<u>Regulations</u>

8 C.F.R. § 287.5 ............................................................................................... 15

<u>Other Authorities</u>

Elizabeth Findell, *Texas Spent Billions on Border Security. It's Not Working.*,
   Wall Street Journal (July 22, 2023) ........................................................... 16

H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. 1358 (Feb. 19, 1952) ............................ 16

*Inspection*, American Heritage Dictionary, https://perma.cc/QWK8-EVN4 ................ 5

**INTRODUCTION**

Texas admits that the concertina wire it has placed along the banks of the Rio Grande near Eagle Pass impedes Border Patrol's—and indeed Texas's own—ability to access migrants on U.S. soil on the other side of the wire. The State nevertheless asserts various APA claims seeking to curtail Border Patrol's discretion to decide whether and when to remove that impediment so that Border Patrol may apprehend, inspect, and process the migrants under the Immigration and Nationality Act (INA). *See, e.g.*, 8 U.S.C. § 1225. These claims fail as a matter of law on multiple grounds.

Congress has withdrawn lower courts' authority to grant the relief Texas seeks, even if Texas's APA claims were meritorious, which they are not. Specifically, except in circumstances inapplicable here, Congress has specified that "[r]egardless of the nature of the action or claim or of the identity of the party or parties bringing the action," no lower federal courts "shall have jurisdiction or authority to enjoin or restrain the operation of [8 U.S.C. § 1225]," among other INA provisions. 8 U.S.C. § 1252(f)(1). The Supreme Court has held that this bar applies even when the challenged "operation" of the INA is alleged to be "illegal" or "improper," as long as "in the Government's view [the actions] are allowed by § [1225]." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 551 (2022) (parentheses omitted). Texas cannot rely on the APA to circumvent this express bar on the relief it seeks; were it otherwise, the bar would be rendered a nullity.

Beyond the § 1252(f)(1) bar, APA review is unavailable. For one thing, decisions about whether and how to apprehend, inspect, and process noncitizens are committed to agency discretion by law, just like decisions to arrest, prosecute, or remove a noncitizen

1

under the INA. *See United States v. Texas*, 599 U.S. 670, 678-79 (2023). For another, Texas's APA claims do not challenge a discrete, final agency action—which is "a prerequisite to suit" under the APA. *Sierra Club v. Peterson*, 228 F.3d 559, 564 (5th Cir. 2000). Not every act by individual agency employees or every agency policy constitutes a final agency action for purposes of the APA; indeed, most do not. Programmatic attacks on how an agency conducts its day-to-day operations are unreviewable under the APA. *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004). But that is precisely what Texas attempts to do here.

Even if Texas could overcome these threshold hurdles, its APA claims have no merit. First, its claims that Border Patrol exceeded its statutory authorities or acted *ultra vires* are unlikely to succeed because Border Patrol undoubtedly has the authority to remove impediments to its execution of federal immigration laws. Congress has charged the Department of Homeland Security, including its subagency U.S. Customs and Border Protection, with protecting the border and apprehending and inspecting unlawful entrants. Border Patrol has authority to interrogate and arrest noncitizens entering between ports of entry and to enter land near the border to carry out that mission. As Texas's own witness acknowledged, that authority includes the ability to break through barriers, such as gates or locks, when agents judge it necessary. Concertina wire belonging to Texas (or anyone else) is no different.

Second, the guidance that Border Patrol's Del Rio Sector provided to the line agents is not a legislative rule and, thus, it need not comply with APA's notice-and-comment rulemaking requirements. That guidance—the only "policy" shown to exist—

simply concerns which agents should decide whether to cut Texas's wire when exigent circumstances do *not* exist. It does not require the wire to be cut under any particular circumstances. Nor does it require Texas to do or refrain from doing anything. It is, at most, an interpretive rule, a general statement of policy, or a procedural rule, none of which requires notice and comment.

Third, Defendants' actions are reasonable—not arbitrary and capricious. Texas admits that Border Patrol agents have cut the wire to provide medical assistance or to facilitate apprehension of migrants, which wholly aligns with Border Patrol's mission. Doing so is necessary (as Texas's own conduct demonstrates) because there are no access points in the four-mile stretch of concertina wire at issue, unlike federal infrastructure at this location or elsewhere. In addition to the fact that Texas has admitted that migrants continue to unlawfully enter near Eagle Pass despite the wire's presence. Border Patrol reasonably could judge that the wire should be cut to carry out its statutory functions, even if it believed that concertina wire has beneficial uses.

For these reasons, and those stated in Defendants' preliminary-injunction opposition, the Court should deny Texas's motion for a preliminary injunction.[1]

## ARGUMENT

### I.    Texas Is Unlikely To Succeed On Its APA Claims for Threshold Reasons.

Texas is unlikely to overcome several threshold bars to the Court's review of its APA claims. *See* Opp. to Mot. for Prelim. Inj. at 10-12, 15-29, ECF No. 23-1.

---

[1] In compliance with the Court's November 9 order, Defendants provide the "legal definitions" of the 15 identified terms—to the extent possible—in the attached appendix.

A.      **Texas cannot rely on the APA to circumvent the statutory bar to its requested injunctive relief.**

Texas seeks an injunction and a stay of agency action under the APA, 5 U.S.C. § 705, to block CBP's purported policy of cutting or moving Texas's concertina wire. But Congress has expressly withdrawn the Court's authority to restrain Defendants' enforcement discretion in the way that Texas's motion requests and the temporary restraining order does. 8 U.S.C. § 1252(f)(1).[2] Section 1252(f)(1) states that lower federal courts—"[r]egardless of the nature of the action or claim or of the identity of the party or parties bringing the action"—do not have "jurisdiction or authority to enjoin or restrain the operation" of certain provisions in Title 8 governing inspection, apprehension, and removal of noncitizens. *Id.* (referencing 8 U.S.C. §§ 1221-1231). Texas does not dispute that § 1225, which governs inspection and processing of applicants for admission, is among those identified provisions. *See* Pl.'s Reply in Supp. of Mot. for Prelim. Inj. at 1, ECF No. 27-1. But it contends that § 1252(f)(1) does not apply to its APA claims here. These arguments are meritless.

Contrary to Texas's suggestion, the requested injunction would have a direct impact on Border Patrol's enforcement of § 1225—not a mere "collateral effect," Reply at 2. Section 1225(a)(1) deems any noncitizen "present in the United States who has not been

---

[2] The TRO allows Defendants to cut the wire when necessary to render aid in a "medical emergency that mostly likely results in serious bodily injury or death to a person." TRO at 4, ECF No. 9. Texas has acknowledged that Defendants may cut through the wire when necessary to provide emergency medical treatment, Transcript of Prelim. Inj. Hr'g at 28 (argument of counsel for Texas), and that Texas officials have cut through the wire for the same reason, *see id.* at 109 (testimony of Special Advisor Michael Banks).

admitted" to be an "applicant for admission," and § 1225(a)(3) directs immigration officers—including Border Patrol agents—to "inspec[t]" all such "applicants for admission." The statute does not define "inspection," but it generally means an "[o]fficial examination or review," American Heritage Dictionary, https://perma.cc/QWK8-EVN4; *see also* Appendix at 1-2. In the context of § 1225, inspection includes a determination whether a noncitizen is inadmissible and whether the noncitizen presents a security risk. *See* 8 U.S.C. § 1225(b)(1)(A)(i), (b)(2)(A). After initial assessments, Border Patrol may conduct further inspection and processing to determine whether the noncitizen is seeking asylum or other humanitarian protection, and which immigration-law pathway (*e.g.*, removal, expedited removal, voluntary departure) is appropriate for the migrant, *see id.* § 1225(b). And in practical terms, for migrants who have entered the United States by crossing the river, Border Patrol's authority to inspect begins as soon as a Border Patrol agent observes the migrant, and once the migrant is apprehended, inspection covers initial intake and beyond, as the migrant is processed.

Texas's requested injunctive relief would directly interfere with Border Patrol's efforts to inspect migrants crossing the Rio Grande to enter the U.S. When approaching such migrants, Border Patrol agents are carrying out their responsibilities under § 1225, which "no one disputes … is among the provisions the 'operation' of which cannot be 'enjoined or restrained' under § 1252(f)(1)." *Aleman Gonzalez*, 596 U.S. at 551. The wire's presence, at a minimum, impedes law enforcement on one side of the wire from reaching migrants on the other; it could take anywhere from approximately 10 to 30 minutes to cut through the wire, depending on how many rolls of wire were deployed by Texas. *See* Tr.

at 132 (testimony of Deputy Patrol Agent in Charge Mario Trevino, Jr.). Indeed, Texas's "Border Czar," Mr. Banks, testified that Texas personnel themselves have had to cut through the wire to reach the migrants and provide medical assistance or make arrests. Tr. at 109 (Banks testimony). The same is necessarily true for Border Patrol. And preventing Border Patrol from cutting or otherwise moving the wire to gain access to migrants on the shoreline necessarily "inhibit[s]" or "stop[s]" the agents' efforts "to enforce, implement, or otherwise carry out" their responsibilities under § 1225. *Aleman Gonzalez*, 596 U.S. at 549-50. Just as district court orders requiring the government to provide certain hearings to noncitizens detained under 8 U.S.C. § 1231 "'enjoin[ed] or restrain[ed] the operation' of § 1231(a)(6) because they require officials to take actions that (in the Government's view) are not required by § 1231(a)(6) and to refrain from actions that (again in the Government's view) are allowed by § 1231(a)(6)," *id.*, the requested preliminary injunction would preclude Border Patrol officials from carrying out activities Border Patrol believe are authorized under § 1225. A preliminary injunction, and indeed the current TRO, "interfere with the Government's efforts to operate" § 1225 and are thus not permitted under § 1252(f)(1). *See id.* at 551.

To the extent that Texas contends that Defendants' cutting or moving of the wire is not implementing *the proper* interpretation of § 1225, the argument is foreclosed by the Supreme Court's decision in *Aleman Gonzalez*. There, the Court rejected the argument that "the operation" of immigration provisions covered in § 1252(f)(1) means the operation of those provisions "as *properly* interpreted." *See id.* at 552. The Court reasoned that a natural reading of the term "operation" is not so limited; rather, "it is very common to refer to

the 'unlawful' or 'improper' operation of whatever it is that is being operated." *Id.*; *see also Arizona v. Biden*, 40 F.4th 375, 397 (6th Cir. 2022) (Sutton, C.J., concurring) ("§ 1252(f)(1) has the same force even when the National Government allegedly enforces the relevant statutes unlawfully. Else, it would not be much of a prohibition.").

Equally irrelevant is Texas's focus on whether § 1225 imposes "mandatory" duties on Border Patrol, *see* Reply at 1-2, or allows for the exercise of enforcement discretion. There is no dispute that Congress has tasked Border Patrol agents with apprehending, inspecting, and processing illegal entrants. It follows that § 1252(f)(1) insulates Border Patrol's performance of those law-enforcement functions from an injunction restraining how Border Patrol carries out these responsibilities.

Even if Texas were correct that "inspection" in certain instances did not actually begin until migrants reached the staging area under Port of Entry #2 in Eagle Pass, the § 1252(f)(1) bar still applies. A directive that agents cannot cut or move the wire to apprehend migrants or otherwise direct them to a place where agents can conduct a sufficient inspection prevents the inspection process from starting in the first place. Such an order, in other words, "restrains" "the Government's efforts to enforce or implement [§ 1225]" and "the way" officials "carry out" those statutory duties—exactly what § 1252(f)(1) prohibits. *Aleman Gonzalez*, 596 U.S. at 550.

Furthermore, it makes no difference whether a judicial order restricts particular actions Border Patrol agents take in performing their § 1225 duties or forbids the performance of those § 1225 duties under any circumstances. *See* Reply at 1. Barring Border Patrol agents from taking specific actions in enforcing § 1225 is still "restraining"

7

their discharge of their § 1225 duties. Texas's suggestions as to how Border Patrol could otherwise perform its duties under § 1225—such as by "passing out water bottles, processing aliens along the river, or directing them to federal entry points" from the Mexico side of the barrier, Reply at 2—underscore that Texas is trying to dictate how Border Patrol performs its duties under § 1225. And such a restraint on the operation or enforcement of § 1225 is not permitted.

Finally, reframing the injunction as a stay of agency action under 5 U.S.C. § 705 does not avoid § 1252(f)(1)'s reach. *See* Reply at 2 n.3. Staying the effective date of an agency action restrains the agency from carrying out that action and thus is precluded by § 1252(f)(1). But even if § 1252(f)(1) did not preclude a court from staying agency action implementing the provisions specified in 1252(f)(1) (here, a purported policy directing Border Patrol agents to cut Texas's wire to apprehend migrants), that alternative relief would not redress Texas's purported injuries in this case. *See Texas*, 599 U.S. at 691 (Gorsuch, J., concurring). The agents' authority to cut the wire when necessary to perform their § 1225 responsibilities comes from the INA—not an agency policy—and thus staying the effective date of the alleged policy would not "compel [Border Patrol agents] to change how they exercise their [enforcement] discretion." *Id.* That distinguishes this case from other cases concerning agency programs—such as the Migrant Protection Protocols, *see Texas v. Biden*, 646 F. Supp. 3d 753 (N.D. Tex. 2022), and Deferred Action for Childhood Arrivals, *see Texas v. United States*, 50 F.4th 498 (5th Cir. 2022)—where vacating (or staying) the agency program at issue nullified the challenged conduct. Here, in contrast, Border Patrol has the authority to cut the wire whether there is any purported

policy or not. Texas's attempt to frame its suit as a request for a stay is nothing more than "a clever workaround" that "doesn't succeed" here. *Texas*, 599 U.S. at 691 (Gorsuch, J., concurring) (rejecting argument that vacatur avoids the reach of § 1252(f)(1)).

> **B.** **Judicial review of Texas's APA claims is not available.**

Texas's claims under the APA are unreviewable for two threshold reasons: (1) decisions about whether and how to apprehend, inspect, and process migrants are committed to agency discretion by law, *see* Opp. at 16-19; 5 U.S.C. § 701(a)(2); and (2) Texas does not premise its claims for injunctive relief on a discrete, final agency action, *see* Opp. at 19-22; 5 U.S.C. § 704.

> **1.** **Decisions about whether and how to apprehend and inspect migrants are committed to agency discretion by law.**

Texas acknowledges that there are "certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion,'" in part, because that discretion is "subject to 'no meaningful standard' of review." Reply at 8 (quoting *Dep't of Comm. v. New York*, 139 S. Ct. 2551, 2568 (2019)). However, Texas ignores the Supreme Court's recent admonition that one of those categories is decisions about whether and how to arrest noncitizens. As the Court said, "[u]nder Article II, the Executive Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'" *Texas*, 599 U.S. at 678-79. And not only does immigration enforcement implicate "foreign-policy objectives," but also "courts generally lack meaningful standards for assessing the propriety of enforcement choices in this area." *Id.*; *see also id.* (noting that "the Executive Branch also

retains discretion over whether to remove a noncitizen from the United States" under the same principles). These principles apply to Defendants' decisions about whether and how to apprehend and inspect noncitizens crossing the International Boundary Line near Eagle Pass. Accordingly, they are similarly not reviewable under the APA, *see* Opp. at 16-19, and Texas's arguments to the contrary fail.

Texas's challenge confuses the duties Congress has imposed on Border Patrol and the decisions Congress left to agency discretion. *See* Reply at 7-8. Section 1225 directs agents to inspect applicants for admission, § 1226 authorizes DHS to arrest or detain certain noncitizens, and §§ 1228, 1229, and 1229a set out different procedures for removing noncitizens. None of those provisions allows an agent to force a noncitizen who has crossed the International Boundary Line to return to Mexico without going through the statutory procedures, unless the noncitizen chooses to return. *See id.* § 1225(a)(4) (allowing DHS to permit voluntary withdrawal of application for admission and immediate departure); *cf. id.* § 1158(a) (permitting any noncitizen "who arrives in the United States (whether or not at a designated port of arrival …)" to "apply for asylum"). Border Patrol agents nevertheless have enforcement discretion in deciding whether or how to apprehend, detain, and process a noncitizen consistent with those provisions. *See Texas*, 599 U.S. at 679; *see also* Tr. at 110–11 (Banks testimony). With respect to that enforcement discretion, Border Patrol agents are no different from other law-enforcement officers who have a responsibility to arrest someone suspected of committing a crime but must also use their judgment in determining whether and how to effectuate that arrest.

Texas cannot justify its request for injunctive relief merely by pointing to past instances of Border Patrol cutting Texas's wire. Whatever the circumstances in which those past instances occurred,[3] the decision whether and when to do so is within Border Patrol's discretionary authority, and the APA does not empower this Court to lay down a rule regulating how Border Patrol may exercise that authority in the future. Neither Texas nor a court could identify all the factors that go into deciding whether to cut the wire in a particular instance, let alone how to balance those hypothetical factors in advance. Decisions about apprehension, inspection, and processing, like those to arrest, require agents to "react and adjust to the ever-shifting public-safety and public-welfare needs," to respond to "inevitable resource constraints," and to engage in a "complicated balancing process" that "leaves courts without meaningful standards for assessing those policies," to the extent they exist. *Texas*, 599 U.S. at 679–80.

### 2.   Texas's claims are not based on discrete, final agency action.

Texas has asserted that Defendants have a "policy" "that concertina wire fencing must be cut or moved anytime [noncitizens] are present." Reply at 10; *see* Compl. ¶¶ 8, 60-61 (page 22), ECF No. 1; Pl.'s Mot. for Prelim. Inj. at 28-30, ECF No. 3-1; Reply at 9-13; Tr. at 15, 17-18. But Texas has not produced any evidence supporting that unfounded assertion, and even assuming the alleged policy's existence, it is not final agency action.

---

[3] Such actions could potentially be reviewed after the fact in a suit for damages, *see* 28 U.S.C. § 1346; *see, e.g.*, *Moher v. United States*, 875 F. Supp. 2d 739, 755-56 (W.D. Mich. 2012) (considering and rejecting trespass claim against Border Patrol agents under the Federal Tort Claims Act), when assessing claims for compensation under 19 U.S.C. § 1630, or when a Border Patrol agent is subject to personnel actions for violating agency conduct standards, *see* Tr. at 187 (testimony of Chief David BeMiller).

DHS's sworn declaration, and the evidence introduced at the first preliminary-injunction hearing, show that no such policy exists and that none was issued by DHS, CBP, or Border Patrol. *See* Declaration of Chief of Law Enforcement Operations David BeMiller ¶ 17, ECF No. 23-2; Tr. 186-87 (BeMiller testimony); *accord* Tr. at 138 (Trevino testimony stating same). Texas has not proven otherwise. In fact, Mr. Banks acknowledged that, by and large, Border Patrol has *not* cut the wire except when faced with exigent circumstances in the El Paso and Rio Grande Valley Sectors, disproving the notion that there is an agency-wide directive *requiring* agents to cut the wire. Tr. at 80, 96 (Banks testimony). The only other evidence that the State points to is Border Patrol's repeated confirmation that it has authority to cut the wire "to take those who have crossed onto U.S. soil without authorization into custody for processing." Reply at 9-10 (citing DHS statement). But that does not add up to a "policy of sanctioning the destruction of private property anytime an agent sees [a noncitizen]." *Id.* at 11; *see Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284, 1321 (S.D. Cal. 2018) (complaint failed to state discrete agency action where "there are no allegations connecting any of [CBP agents'] conduct" to the "unwritten policy" alleged by plaintiffs to have been issued by CBP). And so, what Texas is actually trying to do is to "inject[] [the Court] into day-to-day agency management," which "is not contemplated by the APA." *Utah Wilderness*, 542 U.S. at 67.

The guidance that supervisors in the Del Rio Sector have provided line agents regarding the wire likewise does not compel cutting the wire under any specific circumstances. Both Chief BeMiller and Deputy Patrol Agent in Charge Trevino explained that the advice supervisors in the Eagle Pass Stations provided to their line

agents was: (a) if there are no exigent circumstances, the agents should call a supervisor before any wire-cutting; and (b) if a supervisor is unavailable or exigent circumstances exist, the agents should use their judgment in determining how best to apprehend noncitizens or provide medical assistance. Tr. at 137-41 (Trevino testimony); BeMiller Decl. ¶ 19. In both cases, the line agents have discretion to assess the situation and exercise their judgment whether to cut the wire, *see, e.g.*, BeMiller Decl. ¶ 19, just as Mr. Banks testified Border Patrol agents do in other situations, Tr. at 110-11 (Banks testimony).

This guidance does not qualify as a final agency action, which requires that the action both "mark the consummation of the agency's decisionmaking process" and "determine[ ] rights or obligations … or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–178 (1997). As previously explained, this informal guidance does not represent the "consummation" of the agency's decisionmaking process about whether to cut any wire; rather, it expressly contemplates further agency action, specifically Border Patrol agents exercising their judgment in determining whether to cut the wire given the circumstances at the time. *See* Opp. at 21-22 (citing *DRG Funding Corp. v. Sec'y of Hous. & Urb. Dev.*, 76 F.3d 1212, 1215 (D.C. Cir. 1996)).

The cases that Texas cites illustrate the lack of a final agency action here. In those cases, the agency announced a definitive position that, by itself, would have real-world consequences. *See* Reply at 11 (citing *Barrick Goldstrike Mines, Inc. v. Browner*, 215 F.3d 45, 48-49 (D.C. Cir. 2000); *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 n.8 (D.C. Cir. 1986)). In *Barrick Goldstrike*, for example, the EPA made a firm determination (through a series of actions) that waste rock, like that moved by the petitioner, did not qualify for a de

minimis exception to statutory requirements. 215 F.3d at 47-48. And in *Ciba-Geigy*, the EPA "unequivocally stated [its] position on the question whether registrants were entitled to a cancellation hearing before labeling changes were required." 801 F.2d at 436.

Here, in contrast, Border Patrol's purely internal guidance in Eagle Pass makes no finding that any wire *should* or *would* be cut, only who should make that determination. *Cf. Holistic Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944 (D.C. Cir. 2012) (agency warning letters, advising that company may be in violation of law, "do not mark the consummation of [agency's] decisionmaking"). To the extent any wire is cut, that consequence flows not from the guidance but from the Border Patrol's statutory authority. That is, the guidance itself does not have "direct and appreciable legal consequences." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016); *contra* Reply at 12. It "[c]ompel[s] no one to do anything" and "ha[s] no binding effect whatsoever—not on the agency and not on the regulated community." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004) (Roberts, J.); *cf. Data Mktg. P'ship v. Dep't of Labor*, 45 F.4th 846, 854 (5th Cir. 2022) (advisory opinion bound the agency and thus "alter[ed] the legal regime"). It therefore is not a reviewable final agency action.

## II. Texas Is Unlikely to Succeed on the Merits of Its APA Claims

Even apart from any of the dispositive threshold grounds discussed above, Texas's APA claims fail on the merits.

### A.  Defendants' actions are consistent with their broad statutory authority.

Defendants previously demonstrated that Border Patrol agents have authority to cut through Texas's concertina wire when it obstructs the performance of their duties. *See*

14

Opp. at 23-25. Congress has given Border Patrol agents "the power and duty to control and guard the boundaries and borders of the United States," 8 U.S.C. § 1103(a)(5), to apprehend, inspect, and process noncitizens who have illegally entered the country, *id.* §§ 1225, 1226, and to make arrests and enter lands near the border without a warrant in pursuit of that mission, *id.* § 1357(a)(2), (3). And if those grants of authority on their own were not enough to permit Border Patrol agents to cut through Texas's concertina wire when it obstructs the performance of their duties (and they are enough), Congress also authorized Defendants to "perform such other acts as [they] deem[] necessary for carrying out" those provisions. *Id.* § 1103(a)(3); *see* 8 C.F.R. § 287.5 (addressing power and authority to patrol border, interrogate, and arrest noncitizens).

Texas's efforts to show otherwise are unavailing. To start, Texas mischaracterizes § 1103 as a mere "statement of purpose," Reply at 15; that provision is far more. Section 1103 "confer[s]" "broad authority" on the Secretary of Homeland Security, *Narenji v. Civiletti*, 617 F.2d 745, 747 (D.C. Cir. 1979), and permits him to delegate that authority to subordinates, *see* 8 U.S.C. § 1103(a)(4).[4] As a result, Defendants can take actions specifically authorized and those "reasonably related to the duties imposed on [them]." *Narenji*, 617 F.2d at 747. And as explained above and before, *see* Opp. at 23-25, cutting

---

[4] Texas appears to invoke the major-questions doctrine. *See* Reply at 15 n.9. However, it offers no argument as to how wire damage that is not a significant amount in the Operation Lone Star budget, much less the national economy, qualifies as being of "vast economic and political significance." *Id.*; *compare* Elizabeth Findell, *Texas Spent Billions on Border Security. It's Not Working.*, Wall Street Journal (July 22, 2023) (Texas spent "$4.5 billion on Operation Lone Star in its first two years" and has "allocated another $5.1 billion for the next two years") *with* Tr. at 97-98 (Banks testimony) (estimated cost of repairing wire is $3,500 per incident).

wire in the course of apprehending, inspecting, or providing medical care to a migrant is "reasonably related" to Defendants' duties enumerated by Congress and was intended by Congress, *see* H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. 1358, 1360 (Feb. 19, 1952). Even Mr. Banks admitted that Border Patrol agents are authorized to cut locks to access private land to apprehend migrants in certain circumstances. Tr. at 111 (Banks testimony).

Texas is also incorrect to suggest that because Defendants have not "repel[led] illegal entries," their power to apprehend migrants who have unlawfully crossed the border is somehow diluted. *See* Reply at 14-15. It makes little sense to impede Border Patrol agents from apprehending someone before they reach further into the country just because agents had not apprehended the person sooner. And even if Congress had authorized Border Patrol to immediately expel migrants who have crossed the International Boundary Line in the Rio Grande but have not made landfall—which Congress has not done—that would have no impact on the powers Congress granted the Border Patrol in the provisions discussed above.[5]

Finally, Texas speculates that Border Patrol cut the wire "for the purpose of encouraging illegal entry," and thus, the conduct is outside of Defendants' statutory

---

[5] Texas's citation to *DHS v. Thuraissigiam*, 140 S. Ct. 1959 (2020), for the proposition that a noncitizen who manages to cross the border has not really effected entry into the United States, is inapposite. *See* Reply at 10 n.6. The Ninth Circuit there had held that a noncitizen had a constitutional Due Process right to more process than what Congress set out in § 1225(b)(1)(B)(ii), (v). The Court rejected that conclusion, holding that "the procedure authorized by Congress" is sufficient for "due process as far as [a noncitizen] denied entry is concerned." 140 S. Ct. at 1982. But the Court also emphasized that such a noncitizen "has … those rights regarding admission that Congress provided by statute." *Id.* at 1983 (cleaned up). Border Patrol cannot disregard the statutory regime any more than the Ninth Circuit could add to it.

authority. But the uncontradicted testimony of the Chief of Border Patrol's Law Enforcement Operations is that the wire is cut to facilitate apprehension, inspection, and processing of migrants or to provide medical assistance. *See* Tr. at 187 (BeMiller testimony); *see also* BeMiller Decl. ¶¶ 16, 18. Moreover, in every instance that Texas claims that Border Patrol improperly cut the wire, the agents apprehended noncitizens—rather than let them go free—and "escorted [migrants]" through. Compl. ¶ 59; *see also* BeMiller Decl. ¶¶ 16, 18. Indeed, with respect to the incident on which Texas places its primary focus, Mr. Banks acknowledges that Border Patrol took action and did not just wave migrants through into the interior of the country. *See* Tr. at 81, 113 (Banks testimony).

In sum, Congress has granted Border Patrol broad authority to patrol the border and apprehend and inspect illegal entrants, which includes—where necessary—the power to cut through Texas's wire when it is an impediment to carrying out their statutory functions. There is no evidence that Border Patrol authorizes its agents to cut the wire in other circumstances or that agents have done so. Accordingly, Texas has not shown that Defendants acted in excess of their statutory authorization or *ultra vires*.

## B.  Defendants' actions are not a legislative rule.

In its reply, Texas asserts that Defendants' policy or guidance qualifies as a legislative rule (requiring notice and comment), but it has not supported that assertion. That is understandable. To the extent a policy exists, it does not meet the definition of a legislative rule—and thus did not require notice and comment. *See* 5 U.S.C. § 553(b)-(d).

As Defendants previously explained, *see* Opp. at 26, a legislative or substantive rule is "[a]n agency action that purports to impose legally binding obligations or

17

prohibitions on regulated parties—and that would be the basis for an enforcement action for violations of those obligations or requirements," *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251 (D.C. Cir. 2014) (Kavanaugh, J.). An interpretive rule, on the other hand, "merely interprets a prior statute or regulation, and does not itself purport to impose new obligations or prohibitions or requirements on regulated parties." *Id.* at 252. And "a general statement of policy" "merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion … under some extant statute or rule." *Id.*

Neither the "policy" that Texas alleges exists nor the Border Patrol's informal guidance in the Del Rio Sector qualifies as a legislative rule. They do not require Texas to do anything or to stop doing anything, and they could not be the basis of an enforcement action. Rather, they are—at the very most—interpretive rules because they interpret the various statutory provisions governing agents' authority, or general statements of policy because they explain how agents may exercise their discretion. And to the extent they advise communication within Border Patrol, it is a procedural rule, even if it rose to the level of a rule. *See Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir. 1984). Notice and comment was thus not required, and Texas has failed to show otherwise.

### C.    Defendants' actions are not arbitrary and capricious.

Texas appears to claim that Defendants' cutting of Texas's wire is arbitrary and capricious, except in cases of emergency to save life or prevent serious bodily injury. *See* Compl. ¶ 96, Mot. at 31-32; Reply at 13; Tr. at 28 (Counsel for Texas: "we have no objection to someone destroying Texas' property if it is necessary to save someone's life or

[prevent] serious bodily injury."). Texas is unlikely to succeed on its arbitrary-and-capricious claim under the APA, the review of which is "narrow and highly deferential." *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021); *see also* Opp. at 28.

First, Texas contends that it is "arbitrar[y]" that federal fencing "gets to stand," while Texas's fencing near Eagle Pass "gets cut open, ripped up, or torn down on a daily basis." Reply at 13. But Texas's own witness explained why this may happen. There are no access points in Texas's wire in the four-mile stretch starting at Shelby Park and moving south. Tr. at 107-08 (Banks testimony). Federal border structure in the area, on the other hand, contains gates allowing law enforcement to pass through. *Id.* at 114. By Mr. Banks' own admission, Texas's wire near Eagle Pass, specifically, "hinder[s]" Border Patrol agents' and Texas employees' "ability to get down to the water" such that Texas personnel *themselves* cut the wire to provide medical assistance and make arrests. *Id.* at 109. There is no evidence in the record that federal infrastructure similarly impedes such efforts. That is, federal fencing and Texas's wire near Eagle Pass are differently placed and situated. Accordingly, the Border Patrol's different treatment of them is not arbitrary or capricious. *See Northpoint Tech., Ltd. v. FCC*, 414 F.3d 61, 75 (D.C. Cir. 2005) ("not arbitrary or capricious" to treat "differently situated" entities differently).

Second, Texas suggests that Defendants have failed to "consider[] the costs and benefits of cutting Texas's concertina-wire barriers" and specifically faults Defendants for prioritizing "reducing injury and/or the loss of life of noncitizens" over "the impact of deterrence." Reply at 13. Texas's witness, however, undermines this argument. Mr. Banks testified that "[p]rotection of life is first" and that, despite the cost, Texas employees will

cut the wire when there is a medical emergency. Tr. at 79 (Banks testimony); *see id.* at 28 (Counsel for Texas: "human life is paramount."). But if Border Patrol cannot act proactively to prevent a medical emergency from occurring, it may be too late by the time the wire needs to cut (which takes approximately 10 to 30 minutes depending on wire density) or an airboat needs to be deployed (which takes approximately 20 minutes roundtrip to travel one mile to one mile and a half, and that is without accounting for the accessibility of the city boat ramp at Shelby Park). Tr. at 130-132 (Trevino testimony). Mr. Banks acknowledged, moreover, that despite the wire's presence for several months, large numbers of migrants continued crossing the river where the wire was placed, raising significant questions about its deterrent value. Tr. at 112. Because the wire's deterrent effect is acknowledged to be dubious, Border Patrol's purported failure to prioritize that over its other law enforcement functions is not arbitrary or capricious.

Finally, Texas seems to claim that because Defendants have acknowledged the usefulness or benefits of concertina wire in some instances, it is per se unreasonable to cut through it in others. Reply at 13. This argument makes little sense. Locks on gates have beneficial uses. But Texas's witness Mr. Banks acknowledged that Border Patrol agents may cut them when, in their "judgment," "it is necessary" to apprehend a migrant. Tr. at 111 (Banks testimony). The same is true for concertina wire, as Texas's own actions to cut the wire to provide medical assistance and make arrests show.

<u>**CONCLUSION**</u>

This Court should deny Texas's motion for a preliminary injunction.

Dated: November 21, 2023        Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JAIME ESPARZA
United States Attorney

JEAN LIN
Special Litigation Counsel

/s/ *Christopher A. Eiswerth*
Christopher A. Eiswerth (D.C. Bar 1029490)
Stephen Ehrlich (NY Bar No. 5264171)
Faith E. Lowry (TX Bar No. 24099560)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St., N.W.
Washington, D.C. 20530
Tel: (202) 305-0568 / Fax: (202) 616-8460
christopher.a.eiswerth@usdoj.gov

Robert D. Green (TX Bar No. 24087626)
Assistant United States Attorney
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216
Tel: (210) 384-7362 / Fax: (210) 384-7312
robert.green3@usdoj.gov

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and accurate copy of the foregoing document to be filed electronically (via CM/ECF) on November 21, 2023, which automatically serves all counsel of record who are registered to receive notices in this case.


*/s/ Christopher A. Eiswerth*
Christopher A. Eiswerth