**APPENDIX**

The Court's November 9 order directs the parties to provide the legal definitions of 15 words. Defendants have made their best effort to define those words in the context that appears most relevant to the issues and arguments raised in Texas's motion for preliminary injunction in this case. When appropriate, Defendants have also explained how those terms would apply in the circumstances of this case. However, they respectfully note that many words "take[] on different meanings in different contexts." *Torres v. Lynch*, 578 U.S. 452, 459 (2016). "The same words may have different meanings in different parts of the same act, and of course words may be used in a statute in a different sense from that in which they are used in the Constitution." *Lamar v. United States*, 240 U.S. 60, 65 (1916). For that reason, the Supreme Court has cautioned against construing "[s]tatutory language … in a vacuum" and has stated that "words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012); *see Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 576 (2007) ("context counts").

\*   \*   \*

**Inspect**: Section 1225(a)(3) of Title 8 states: "Inspection. All aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers." The term is not further defined by statute. However, as noted above, an "inspection" ordinarily means an "[o]fficial examination or review," *American Heritage Dictionary*, https://perma.cc/QWK8-EVN4, "checking or testing an individual against

1

established standards," *Merriam-Webster Dictionary*, https://perma.cc/85XJ-7FK7, or "[a] careful examination of something," *Black's Law Dictionary* (9th ed. 2009). As a practical matter, the authority to inspect begins when a Border Patrol agent first observes the migrant; inspection includes questioning about citizenship and assessing security threats and medical needs; and it continues through to processing. Department regulations provide further guidance on inspections, including certain documentary requirements. *See* 8 C.F.R. §§ 235.1, 235.2.

**Interrogate:** Under 8 U.S.C. § 1357(a)(1), immigration officers—including Border Patrol agents, 8 C.F.R. § 1.2—have the authority to "interrogate any alien or person believed to an alien as to his right to be or remain in the United States." "Interrogate" is not further defined in Title 8. Agency regulation, 8 C.F.R. § 287.8(b)(1), explains that "[i]nterrogation is questioning designed to elicit specific information." In the context of this case, interrogation could include questioning of migrants in the river, on the banks, or at a staging area under Port of Entry #2, and "[i]nformation obtained from this questioning may provide the basis for a subsequent arrest," *id.* § 287.8(b)(3).

**Admit:** As relevant to this case, the INA defines "[t]he term[s] 'admission' and 'admitted' [to] mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A).

**Apprehend:** The INA does not define "apprehend" or "apprehension." However, CBP has defined the term as "the physical control or temporary detainment of a person who is not lawfully in the United States which may or may not result in an arrest." U.S.

2

Customs & Border Protection, *Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions Fiscal Year 2024*, https://perma.cc/YWE2-B6UZ. And in the context of this case, "apprehend" would include the control Border Patrol agents exert over migrants exiting the river and being directed to a staging area from which the migrants are then transported for further evaluation.

**Examine:** Section 1222 of Title 8 provides for the detention of noncitizens for purposes of a physical and mental examination. As noted above, inspection under § 1225 includes an examination. And 8 U.S.C. § 1357(a)(2) directs that officers arresting a noncitizen on suspicion of illegal entry shall take the noncitizen "without unnecessary delay for examination … as to their right to enter or remain in the United States." The INA does not specify what this examination includes, but agency regulations provide guidance on the scope of examination for certain types of individuals. *See* 8 C.F.R. § 235.1. The examining officers must otherwise exercise their judgment and discretion to determine whether the noncitizen is lawfully present or is removable, needs medical attention, or requires other assistance.

**Remove:** In the context of the INA, to "remove" a noncitizen is usually to cause him or her to depart the United States under an administrative or judicial order. *See* 8 U.S.C. § 1101(g) ("any alien ordered deported or removed … who has left the United States, shall be considered to have been deported or removed in pursuance to law"). Put another way, "removal" is understood as an execution of a final administrative or judicial order of removal, which results in a noncitizen being physically outside the United States, and can sometimes include noncitizens leaving the United States on their own accord

when they are under a final order of removal. *See* 8 C.F.R. § 241.7. Removal is a civil process, *Arizona v. United States*, 567 U.S. 387, 396 (2012), and Congress has set out the bases for removal, *see, e.g.*, 8 U.S.C. § 1227, and the exclusive procedures for effectuating removal, *see, e.g.*, *id.* §§ 1228, 1229, 1229a. Whether to initiate removal proceedings is wholly within the Executive Branch's discretion and is unreviewable. *See United States v. Texas*, 599 U.S. 670, 679 (2023) (citing *Arizona*, 567 U.S. at 396).

**Transfer:** Section 211(c)(8)(B) of Title 6 charges CBP, alongside U.S. Immigration and Customs Enforcement and U.S. Citizenship and Immigration Services, with "enforc[ing] and administer[ing] all immigration laws," including "the detection, interdiction, removal, … and *transfer* of persons unlawfully entering … the United States." (emphasis added). The statute does not define "transfer," but as most relevant here, it refers to the process of Border Patrol releasing legal or physical custody of migrants to another agency after it has completed its inspection. That can include turning unaccompanied children over to the Department of Health and Human Services' Office of Refugee Resettlement; turning noncitizens over to ICE for further processing (including pending immigration proceedings) or removal; and turning noncitizens over to the U.S. Marshals or state and local law enforcement.

**Detain:** Sections 1225, 1226, and 1231 direct that certain noncitizens should be detained in certain circumstances. The Supreme Court has held that immigration officers have discretion in enforcing these provisions and that States may not challenge those discretionary decisions in federal court. *See United States v. Texas*, 599 U.S. 670, 679-80 (2023). While "detain" is not a defined term under the INA, CBP has defined "detention"

as "[r]estraint from freedom of movement." CBP, *National Standards on Transport, Escort, Detention, and Search* at 28 (October 2015), https://perma.cc/6KRP-2XTH. That restraint, however, does not necessarily have to be physical. *See id.* ("Physical restraint is not an essential element of detention.").

**Detect:** Section 211(c)(5) of Title 6 directs CBP to "detect, respond to, and interdict terrorists, drug smugglers and traffickers, human smugglers and traffickers, and other persons who may undermine the security of the United States, in cases in which such persons are entering, or have recently entered, the United States." Further, 6 U.S.C. § 211(c)(8)(B) provides that CBP "shall ... enforce and administer all immigration laws, … including ... the detection, interdiction, removal, departure from the United States, short-term detention, and transfer of persons unlawfully entering, or who have recently unlawfully entered, the United States." Neither Title 6 nor Title 8 defines "detect," but it ordinarily means "to discover or determine the existence, presence, or fact of," *Merriam-Webster's Dictionary*, https://perma.cc/YK7R-CAY2, or "to discern (something hidden or subtle)," *American Heritage Dictionary*, https://perma.cc/4VDP-392Y; *see also Black's Law Dictionary* (9th ed. 2009) (defining "detection" as "[t]he act of discovering or revealing something that is hidden"). In this case, it could include Border Patrol agents' efforts to discover the presence of migrants illegally entering the United States or weapons or contraband on their persons.

**Interdict:** Title 6 charges CBP with "ensur[ing] the interdiction of persons and goods illegally entering … the United States," *id.* § 211(c)(2), including "terrorists, drug smugglers," and human "traffickers," among others, *id.* § 211(c)(5). Title 6 further gives

Border Patrol "primary responsibility for interdicting persons attempting to illegally enter … the United States." *Id.* § 211(e)(3)(A). Neither Title 6 nor Title 8 defines "interdict." In this context, it primarily means "[t]o confront and halt the activities, advance, or entry of" something, *American Heritage Dictionary*, https://perma.cc/JRV6-TS8R, or "[t]o intercept and seize," *Black's Law Dictionary* (9th ed. 2009).

**Arrest:** Border Patrol agents are immigration and customs officers with certain authorities under both Title 8 and Title 19. As most relevant here, Title 8 gives an agent authority to "arrest any [noncitizen]" without a warrant "who in [the agent's] presence or view is entering or attempting to enter the United States in violation of any law," 8 U.S.C. § 1357(a)(2), and to "make arrests" in certain circumstances for offenses "committed in the officer's … presence" or for felonies "under the laws of the United States," *id.* § 1357(a)(5); *see* 8 C.F.R. § 287.5 (defining who may exercise these powers). Agency regulations govern the conduct of arrests. *See* 8 C.F.R. § 287.8(c).

Title 8 does not define "arrest." Depending on the circumstances, it can refer to different levels or durations of restraint on an individual's movement, and different standards can apply. For instance, arrests for felonies unrelated to immigration law are analogous to ordinary criminal arrests and require probable cause. 8 U.S.C. § 1357(a)(5)(B); *see United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010) (equating "reason to believe" with "probable cause"). However, given that immigration violations are ordinarily civil in nature, other arrests are more administrative in nature and different standards apply. *See, e.g.*, *Quintana*, 623 F.3d at 1241; *see also Abel v. United States*, 362 U.S. 217, 233-34 (1960) (administrative arrests do not require judicial warrant); *United States v.*

6

*Wong Kim Bo*, 466 F.2d 1298, 1300 n.4 (5th Cir. 1972) (describing an arrest under § 1357(a)(2) as "simply a cautionary measure intended to prevent the escape of persons suspected of entering or being in this country illegally pending a determination of whether or not a show cause order should issue"). In each case, an arrest includes some restraint on the person's freedom of movement.

**Process:** Section 211(c)(8)(A) provides that CBP "shall ... enforce and administer all immigration laws, … including ... the inspection, processing, and admission of persons who seek to enter or depart the United States." Neither Title 6 nor Title 8 defines "processing." However, colloquially, Border Patrol uses this term to encompass both the inspection and examination of an individual, as outlined in 8 U.S.C. § 1225(a)(3) and 8 U.S.C. § 1357(a)(2), as well as other steps, some of which are legally required, like ensuring that the noncitizen does not have urgent medical needs, logging personal property, determining whether the noncitizen is traveling with children, and determining whether the noncitizen is an unaccompanied child under the Trafficking Victims Protection Reauthorization Act of 2005, 8 U.S.C. § 1232.

**Policy**: As a general matter, a "policy" is "[a] plan or course of action, as of a government, political party, or business, intended to influence and determine decisions, actions, and other matters." *American Heritage Dictionary*, https://perma.cc/V4CK-PUXL; *accord Merriam-Webster Dictionary*, https://perma.cc/955E-42M9 (defining "policy" as "a high-level overall plan embracing the general goals and acceptable procedures especially of a governmental body"); *Black's Law Dictionary* (9th ed. 2009) (defining "policy" as "[t]he general principles by which a government is guided in its

management of public affairs"). And depending on its content and how it was promulgated, a policy (as so defined) could qualify as a legislative rule, interpretative rule, general statement of policy, or a procedural rule. *See Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251-52 (D.C. Cir. 2014) (Kavanaugh, J.) (reviewing differences between many of these terms).

Under the APA, a "general statement of policy" is "[a]n agency action that merely explains how the agency will enforce a statute or regulation—in other words, how it will exercise its broad enforcement discretion or permitting discretion under some extant statute or rule." *Id.* at 252. Such statements are usually not considered "final agency actions" reviewable under the APA, and do not require notice and comment. *See id.* at 251-52 (explaining that "a general statement of policy ... is not subject to pre-enforcement review;" "[l]egislative rules generally require notice and comment, but interpretive rules and general statements of policy do not"); 5 U.S.C. § 704.

**Procedure**: Under the APA, "rules of agency, organization, procedure, or practice" are not subject to notice and comment. 5 U.S.C. § 553(b)(4)(A). The APA does not define "procedure." But case law defines "procedural rules" as rules that "cover[] agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." *McCarthy*, 758 F.3d at 250; *see also Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir. 1984) (discussing procedural rules).

**Notice**: In the context of the APA, notice (in notice and comment) is provided when the government publishes a notice of proposed rulemaking in the Federal Register

that includes "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b). Notice and comment is not required for interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice. *Id.* § 553(b)(4)(A).