## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## DEL RIO DIVISION

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | CIVIL ACTION NO. 2:23-CV-00055-AM |
| v. | § | |
| | § | |
| U.S. DEPARTMENT OF HOMELAND | § | |
| SECURITY, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

---

## PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION OR STAY OF AGENCY ACTION

---

## TABLE OF CONTENTS

Table of Contents ............................................................................................................ ii

Table of Authorities…………………………………………………………………………iii

Argument .......................................................................................................................... 1

    I.   This Court has jurisdiction to award the non-monetary relief that Texas seeks. ............... 1

    II.  The statutory terms this Court flagged show why immigration laws provide Defendants no basis to evade Texas's common-law claims. .................................................................. 3

    III. Record evidence supports Texas's APA claims challenging a federal policy that authorizes wanton destruction of state property. ............................................................. 13

Conclusion ...................................................................................................................... 20

Certificate of Service ....................................................................................................... 21

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Otro Lado, Inc. v. McAleenan,*
  394 F.Supp.3d 1168 (S.D. Cal. 2019) ...................................................................................16

*Am. Trucking Ass'ns v. City of Los Angeles,*
  569 U.S. 641 (2013) .........................................................................................................6

*Amadei v. Nielsen,*
  348 F. Supp.3d 145 (E.D.N.Y. 2018) ...............................................................................14

*Apter v. HHS,*
  80 F.4th 579 (5th Cir. 2023) ...........................................................................................13

*B.K. Instrument, Inc. v. United States,*
  715 F.2d 713 (2d Cir. 1983) ..............................................................................................3

*Barton v. Barr,*
  140 S. Ct. 1442 (2020) .....................................................................................................11

*Bhd. of Locomotive Eng'rs & Trainmen v. FRRA,*
  972 F.3d 83 (D.C. Cir. 2020) ...........................................................................................14

*Biden v. Texas,*
  142 S. Ct. 2528 (2022) ............................................................................................. 2, 3, 12

*Cargill v. Garland,*
  57 F.4th 447 (5th Cir. 2023) (en banc) .............................................................................3

*De La Mota v. U.S. Dep't of Educ.,*
  No. 02-cv-4276, 2003 WL 21919774 (S.D.N.Y. Aug. 12, 2003) .........................................14

*Dep't of Revenue v. Kentucky,*
  553 U.S. 328 (2008) .........................................................................................................6

*DHS v. Regents of Univ. of Cal.,*
  140 S. Ct. 1891 (2020) .....................................................................................................12

*DHS v. Thuraissigiam,*
  140 S. Ct. 1959 (2020) ...................................................................................................7, 8

*United States ex rel. Drury v. Lewis,*
  200 U.S. 1 (1906) .............................................................................................................4

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
    545 U.S. 546 (2005) ........................................................................................... 9

*Fort Leavenworth Ry. Co. v. Lowe*,
    114 U.S. 525 (1885) ........................................................................................... 6

*FTC v. Standard Oil Co. of Cal.*,
    449 U.S. 232 (1980) ......................................................................................... 15

*Garland v. Aleman Gonzalez*,
    142 S. Ct. 2057 (2022) .................................................................................. 1, 2

*Gomez v. Trump*,
    485 F.Supp.3d 145 (D.D.C. 2021) ................................................................ 14

*Grand Canyon Tr. v. Pub. Serv. Co. of N.M.*,
    283 F.Supp.2d 1249 (D.N.M. 2003) ............................................................. 15

*Hall v. Virginia*,
    105 S.E. 551 (Va. 1921) ................................................................................... 4

*Heinsohn v. Carabin & Shaw, P.C.*,
    832 F.3d 224 (5th Cir. 2016) ............................................................................ 9

*Her Majesty the Queen in Right of Ontario v. EPA*,
    912 F.2d 1525 (D.C. Cir. 1990) .................................................................... 15

*Hernandez v. Mesa*,
    140 S. Ct. 735 (2020) ..................................................................................... 11

*Holder v. Martinez Gutierrez*,
    566 U.S. 583 (2012) ....................................................................................... 10

*Johnson v. Arteaga-Martinez*,
    142 S. Ct. 1827 (2022) ................................................................................... 11

*Johnson v. Maryland*,
    254 U.S. 51 (1920) ........................................................................................... 4

*Leng May Ma v. Barber*,
    357 U.S. 185 (1958) ......................................................................................... 7

*Louisiana v. Biden*,
    45 F.4th 841 (5th Cir. 2022) .......................................................................... 12

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*,
    578 U.S. 374 (2016) ......................................................................................... 9

*Mexican Gulf Fishing Co. v. United States Dep't of Com.*,
   60 F.4th 956 (5th Cir. 2023) ................................................................. 20

*Michigan v. EPA*,
   135 S. Ct. 2699 (2015) ....................................................................... 20

*Michigan v. U.S. Army Corps of Eng'rs*,
   667 F.3d 765 (7th Cir. 2011) ................................................................. 3

*North Carolina v. Ivory*,
   906 F.2d 999 (4th Cir. 1990) ................................................................. 4

*OnPath Fed. Credit Union v. United States Dep't of Treasury, Cmty. Dev. Fin. Institutions Fund*,
   73 F.4th 291 (5th Cir. 2023) ................................................................. 19

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015) ........................................................................... 12

*Perry Capital LLC v. Mnuchin*,
   864 F.3d 591 (D.C. Cir. 2017) ............................................................... 3

*POET Biorefining, LLC v. EPA*,
   970 F.3d 392 (D.C. Cir. 2020) ............................................................... 17

*R.I.L-R v. Johnson*,
   80 F.Supp.3d 164 (D.D.C. 2015) ........................................................... 15

*Reid v. INS*,
   420 U.S. 619 (1975) ......................................................................... 10

*Rosa v. McAleenan*,
   583 F. Supp. 3d 850 (S.D. Tex. 2019) ...................................................... 11

*Rosa v. McAleenan*,
   No. 1:19-cv-00138, 2019 WL 5191095 (S.D. Tex. Oct. 15, 2019) ........................... 14

*Sale v. Haitian Centers Council, Inc.*,
   509 U.S. 155 (1993) .......................................................................... 8

*Sanchez v. Mayorkas*,
   141 S. Ct. 1809 (2021) ....................................................................... 10

*Sanchez v. United States*,
   803 F. Supp. 2d 1066 (C.D. Cal. 2011) ...................................................... 4

*Shaughnessy v. United States ex rel. Mezei,*
    345 U.S. 206 (1953) ............................................................................................7, 8

*Slocum v. Mayberry,*
    15 U.S. 1 (1817).....................................................................................................9

*South Carolina v. Baker,*
    485 U.S. 505 (1988)...............................................................................................6

*Sprint Nextel Corp. v. FCC,*
    508 F.3d 1129 (D.C. Cir. 2007) ......................................................................... 20

*Tamayo-Tamayo v. Holder,*
    725 F.3d 950 (9th Cir. 2013) ..............................................................................10

*Texas v. Biden (MPP),*
    20 F.4th 928 (5th Cir. 2021) ......................................................................... 2, 17

*Texas v. Kleinert,*
    855 F.3d 305 (5th Cir. 2017)................................................................................5

*Texas v. Nuclear Regul. Comm'n,*
    78 F.4th 827 (5th Cir. 2023) ..............................................................................18

*Texas v. United States,*
    40 F.4th 205 (5th Cir. 2022) ..............................................................................18

*Texas v. United States,*
    555 F. Supp. 3d 351 (S.D. Tex. 2021), *appeal dismissed,* No. 21-40618, 2022
    WL 517281 (5th Cir. Feb. 11, 2022) .................................................................19

*Texas v. United States (DACA),*
    50 F.4th 498 (5th Cir. 2022) ..............................................................................19

*U.S. Gypsum Co. v. Muszynski,*
    161 F. Supp. 2d 289 (S.D.N.Y. 2001) ...............................................................16

*United States v. Benitez-Villafuerte,*
    186 F.3d 651 (5th Cir. 1999) ..............................................................................10

*United States v. Brignoni-Ponce,*
    422 U.S. 899 (1975)......................................................................................11, 13

*United States v. Martinez-Fuerte,*
    428 U.S. 543 (1976)............................................................................................10

*United States v. Olano,*
    507 U.S. 725 (1993) ........................................................................3

*United States v. Ortiz,*
    422 U.S. 891 (1975) ......................................................................13

*United States v. Texas,*
    599 U.S. 670 (2023) ..................................................................2, 17

*United States v. Valenzuela-Bernal,*
    458 U.S. 858 (1982) ......................................................................11

*United States v. Washington,*
    142 S. Ct. 1976 (2022) ....................................................................6

*Velesaca v. Decker,*
    458 F.Supp.3d 224 (S.D.N.Y. 2020) ............................................14

*Venetian Casino Resort, LLC v. EEOC,*
    530 F.3d 925 (D.C. Cir. 2008) ....................................................15

*Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.,*
    16 F.4th 1130 (5th Cir. 2021) ......................................................19

*Walji v. Gonzales,*
    500 F.3d 432 (5th Cir. 2007) ......................................................11

*West Virginia v. EPA,*
    142 S. Ct. 2587 (2022) ..................................................................18

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ......................................................................14

*Wilkie v. Robbins,*
    551 U.S. 537 (2007) ........................................................................4

**Statutes**

5 U.S.C. § 551(4)................................................................................12, 17

5 U.S.C. § 553(b), (c) ............................................................................12

5 U.S.C. § 701(a)(2) ..............................................................................17

5 U.S.C. § 702 ......................................................................................1, 3

6 U.S.C. § 202(1)–(3)............................................................................10

6 U.S.C. § 211 ........................................................................................ 10, 11, 12

6 U.S.C. § 251(2) ................................................................................................ 11

8 U.S.C. § 1103(a)(3) ........................................................................................... 1

8 U.S.C. § 1225 .................................................................................................... 1

8 U.S.C. § 1226 .................................................................................................. 10

8 U.S.C. § 1252(f)(1) .................................................................................. 1, 2, 3

8 U.S.C. § 1357(a)(1) ......................................................................................... 10

8 U.S.C. § 1357(a)(2) ....................................................................................11, 12

8 U.S.C. § 1357(a)(3) ........................................................................................... 5

28 U.S.C. § 1331 .................................................................................................. 9

28 U.S.C. § 1356 .................................................................................................. 9

28 U.S.C. § 1367(a) ............................................................................................. 9

**Other Authorities**

WEBSTER'S NEW COLLEGIATE DICTIONARY (1949) ........................................ 10, 11, 12

BLACK'S LAW DICTIONARY (11th ed. 2019) ...................................................... 11

**ARGUMENT**

## I. This Court has jurisdiction to award the non-monetary relief that Texas seeks.

In their supplemental brief, Defendants continue to insist that this Court lacks jurisdiction to award the non-monetary relief Texas seeks here. That is incorrect. The 8 U.S.C. § 1252(f)(1) proscription on restraining federal statutes is not implicated by a suit to enforce state tort law, and 5 U.S.C. § 702 waives Defendants' sovereign immunity from this suit for an injunction.

**1.** Section 1252(f)(1) does not bar the injunction Texas seeks. All Texas prays for here is an order "that [its] property not be destroyed"; it is "not trying to stop [Defendants] from doing [their] job." Tr.213. During the November 7th hearing, Defendants' counsel conceded that Texas's fence is "not … prohibiting or preventing" them from doing their job, Tr.43, even on their (mistaken) view that 8 U.S.C. § 1225 and § 1226 somehow require them to wave every illegal alien spotted on the threshold deeper into the United States, *infra* at 5-7. Instead, the most counsel could muster was that an injunction "would have an effect." Tr.41. That, of course, is the very thing the Supreme Court has said does *not* trigger § 1252(f)(1): A court may enjoin federal immigration officials "*even if that injunction has some collateral effect* on the operation of a covered provision." *Garland v. Aleman Gonzalez*, 142 S. Ct. 2057, 2067 n.4 (2022) (emphasis added). And ordering federal agents not to violate state criminal law ("thou shalt not murder") or state tort law ("thou shalt not steal") would, at most, have a collateral effect on the implementation of federal immigration statutes.

Now Defendants attempt to write their way out of that concession in their supplemental brief. They tacitly admit that most of the statutory provisions they previously cited—including 8 U.S.C. § 1103(a)(3) and § 1357(a)(3)—are outside § 1252(f)(1)'s cross-reference and thus irrelevant. *See* ECF 47 at 9.[1] Nevertheless, Defendants continue to claim that provision gives them the unreviewable power to do anything they want in the name of inspecting aliens, no matter how

---

[1] References to pagination for documents filed on this Court's electronic docket are to the stamped page numbers in the header of those filings.

needlessly destructive their misconduct. *Id.* at 9–13. Indeed, Defendants seem to *agree* that their reading of § 1252(f)(1) would "insulate" the "disgruntled CBP officer [who] might find it convenient to assault TMD soldiers based on his opinion that they make his job harder." *Compare* ECF 27-1 at 9, *with* ECF 47 at 12. To embrace Defendants' reading would be to permit unchecked federal power anytime a federal actor claims that his conduct somehow relates to his duties. Thankfully, the Supreme Court has preemptively warned against just that view. *See Aleman Gonzalez*, 142 S. Ct. at 2067 n.4. Section 1252(f)(1) does not elevate Defendants' mere "convenience" above the power of the federal courts. *E.g.*, Tr.51, 56, 209.

On whether a stay under § 705 of the APA—which is the temporary form of vacatur—is barred by § 1252(f)(1), Defendants avoid addressing the binding Fifth Circuit precedent on this issue, *see* ECF 27-1 at 9 n.3, instead relying on a three-Justice concurrence in *United States v. Texas*, 599 U.S. 670 (2023). ECF 47 at 13–14. A concurring Supreme Court opinion not in any way essential to the majority cannot override Fifth Circuit precedent. They attempt to distinguish this precedent by reasoning that staying their policy would have no effect because their agents could cut Texas's fence even without it. ECF 47 at 13–14. But that same argument was rejected in the case Defendants cite as different from this one—in the challenge to the termination of the Migrant Protection Protocols program (MPP), the Fifth Circuit noted that DHS said relief "would provide no redress because immigration officers under MPP would have discretion not to return any given immigrant to Mexico," but the court looked to past practice of how DHS personnel had exercised that discretion to reject this argument. *Texas v. Biden (MPP)*, 20 F.4th 928, 973–74 (5th Cir. 2021). Similarly, that Border Patrol agents do not cut Texas's fence in El Paso or the RGV to allow all awaiting migrants to enter, Tr.80, shows that absent the policy applied in Eagle Pass, agents will exercise their discretion in a way that reduces the harm to Texas.

More fundamentally, Defendants waived the applicability of § 1252(f)(1) when they agreed to extend the TRO. ECF 36 at 1; ECF 46. Because that provision does not go to un-waivable subject matter jurisdiction, *see Biden v. Texas*, 142 S. Ct. 2528, 2539–40 (2022), a party may waive its

applicability. And Defendants' affirmative conduct here constitutes a waiver, rather than mere forfeiture, of any argument under this statutory defense. *See United States v. Olano*, 507 U.S. 725, 733 (1993) ("Whereas forfeiture is the failure to make the timely assertion of a right waiver is the intentional relinquishment or abandonment of a known right.") (quotation omitted)); *Cargill v. Garland*, 57 F.4th 447, 465 (5th Cir. 2023) (en banc) (noting that, unlike a forfeited argument, courts generally cannot pursue a waived argument). At the very least, § 1252(f)(1) must be understood to authorize this Court to make findings that would support issuance of a preliminary injunction by the Supreme Court, which has unquestioned authority to enter injunctions even in scenarios covered by this provision. *See Biden*, 142 S. Ct. at 2539.

**2.** Section 702 waives the federal government's sovereign immunity here. This action is plainly "[a]n action in a court of the United States seeking relief other than money damages." 5 U.S.C. § 702. Congress has therefore waived the immunity that Defendants now contend shields them from this suit. At the hearing, Defendants suggested this Court should read into a different statute words that are not there and complained that Texas has pointed to just "one case" holding that § 702's waiver applies to state-law claims. Tr.44. But Defendants have pointed to *zero cases* saying the opposite. Instead, they ask this Court to become the first ever to ignore the statute's plain text—and, in the process, to create a split with the D.C. Circuit and at least two others. *See Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017) (rejecting Defendants' "argument that § 702 does not waive [their] immunity from suit for state law claims"); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011) (rejecting Defendants' argument that the FTCA impliedly precludes injunctive relief for torts); *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 727 (2d Cir. 1983) (same). The Court should decline that invitation.

## II. The statutory terms this Court flagged show why immigration laws provide Defendants no basis to evade Texas's common-law claims.

This case impacts states, municipalities, private individuals, corporations, organizations—*any* person or entity with property near the border. Defendants admit they have given their agents carte blanche to tamper with property that does not belong to them, whenever they deem it convenient

to do so, even if based on a bare desire to "release" the congestion of illegal aliens crowding Texas's riverbanks. Tr.49, 51–52. Defendants do not dispute that this amounts to an ongoing trespass to chattels or conversion of property under Texas common law. ECF 23-1 at 20–23 (making no merits argument at all); *see also* ECF 27-1 at 10. This Court was right, then, that "the bottom line" here is whether federal law authorizes federal agents to perpetrate ongoing, intentional torts. Tr.46. It does not, as is clear from the statutory terms this Court flagged.[2]

**1.** As a general matter, federal agents operating within the territorial confines of a state *are* subject to state law. That includes: state criminal law, *United States ex rel. Drury v. Lewis*, 200 U.S. 1, 3, 7–8 (1906) (U.S. Army officer and enlisted soldier prosecuted for murder); state tort law, *Johnson v. Maryland*, 254 U.S. 51, 56 (1920) (approving federal officer liability for negligence); state laws protecting private property interests, *Wilkie v. Robbins*, 551 U.S. 537, 560 (2007) (Bureau of Land Management employees could be sued for trespass); and yes, even state traffic laws, *Hall v. Virginia*, 105 S.E. 551, 552 (Va. 1921) (Postal Service worker could be fined for exceeding speed limit in mail truck); *North Carolina v. Ivory*, 906 F.2d 999, 1001–02 (4th Cir. 1990) (Marine driving truck in a military convoy "was subject to local traffic laws concerning rights of way, speed limits and the like"); *Sanchez v. United States*, 803 F. Supp. 2d 1066, 1070–71 (C.D. Cal. 2011) (FBI agent liable for not yielding to a pedestrian).

There may be exceptions to this general rule. To the extent Defendants believe an exception applies, though, it is their burden to show why. As this Court noted during the November 7th hearing, federal laws passed within the scope of Congress's enumerated powers may preempt state

---

[2] Defendants suggest Texas's common-law claims seek relief beyond what this Court ordered in its TRO. Tr.215. Not true. Because Defendants made no effort to engage on the common law, it is unsurprising that they misunderstand it. Texas has sued to prevent ongoing conversion and trespass to chattels. As the State has observed before, an acute medical emergency may afford a limited privilege to trespass at common law, consistent with this Court's TRO. *See* ECF 3-1 at 31. Far from Texas seeking "a per se bar" to any tampering with its fence, Tr.215, it is Defendants who seek an order authorizing them to damage the property of others "without restraint," Tr.207; *cf.* Tr.201, 216–17.

laws that conflict with federal mandates. Tr.55 (citing *Arizona v. United States*, 567 U.S. 387 (2012)). Understandably, however, Defendants have chosen *not* to argue conflict preemption. Tr.56. That's because no federal law actually says that the rights of each and every person with property in proximity to the southern border conflict with federal immigration laws. No statute declares that property rights vanish there or that they exist solely "at the discretion, the behest, and the choice, and the desires of" federal immigration officials. Tr.207. The only provision that is even arguably relevant on that score—8 U.S.C. § 1357(a)(3)—authorizes federal agents "within a distance of twenty-five miles from [the border] to have access to private lands, but not dwellings, for the purpose of patrolling the border *to prevent the illegal entry of aliens* into the United States." *See* Tr.149. The evidence adduced at the hearing showed the challenged policy is *not* designed to prevent illegal entry but rather is "encouraging [aliens] to come." Tr.204. Defendants and their agents have breached Texas's wire fence where there was no medical need. Tr.128. Instead, they have done so simply to "release" the congestion of aliens crowding Texas's riverbanks, Tr.52, and to prevent anything from "imped[ing]" the aliens from entering, Tr.122. While watching more than three thousand aliens cross the Rio Grande illegally, they have vowed to keep breaches open "[u]ntil they're all in." Tr.83. And they have permitted aliens, once past the fence, to "just walk[] off to the processing center on their own without a single question or even a hello from a Border Patrol agent." Tr.200.

Defendants had no answer when this Court asked: "Where is [the authority for] that in the statute?" Tr.208. So, instead of pressing conflict preemption, they rely solely on intergovernmental immunity. Tr.56. But Texas has already explained why that doctrine does not bar its tort claims. ECF 27-1 at 12–14. First, intergovernmental immunity applies in the Fifth Circuit "only when a federal officer is held *in the state court* to answer" for official actions. *Texas v. Kleinert*, 855 F.3d 305, 314 (5th Cir. 2017) (emphasis added). Second, Defendants' sweeping theory of intergovernmental immunity—*i.e.*, that it precludes the application of state law "without restraint," Tr.207, anytime federal actors deem compliance with state law inconvenient, Tr.51,

56–57, 209—"has been thoroughly repudiated by modern intergovernmental immunity caselaw." *South Carolina v. Baker*, 485 U.S. 505, 520 (1988). The Supreme Court made clear just last year that such immunity applies only where a state (1) "regulate[s] the United States directly" or (2) "discriminate[s] against the Federal Government or those with whom it deals." *United States v. Washington*, 142 S. Ct. 1976, 1984 (2022).

The State of Texas, just like the federal government itself, may hold "the rights of an ordinary proprietor." *Fort Leavenworth Ry. Co. v. Lowe*, 114 U.S. 525, 527 (1885). And by invoking that proprietary interest in the fence it owns, Texas is not "regulating" anyone. *Washington*, 142 S. Ct. at 1984. The hypothetical this Court posed at the November 7 hearing is a helpful one: Imagine a private "landowner that puts up a chain-link fence," Tr.46, perhaps to keep a pet in the yard or to keep coyotes out of the henhouse. Now imagine federal officials deliberately cut open, rip up, or tear down his fence on a daily basis. No one could seriously argue that, if this landowner sued to assert the right not to have his property continuously tampered with, he would be "directly regulating" the federal government. *See* Tr.211, 213. The same is true when the State, as a proprietor, presses the very same claim. In this case, Texas is not "acting in a regulatory rather than a proprietary mode"; instead, the State exercises its own property rights "just as a private party would." *Am. Trucking Ass'ns v. City of Los Angeles*, 569 U.S. 641, 649–50 (2013); *see also Dep't of Revenue v. Kentucky*, 553 U.S. 328, 339 (2008). And those rights apply against all tortfeasors equally. Generally applicable tort principles in no way "singl[e] out the Federal Government for unfavorable treatment." *Washington*, 142 S. Ct. at 1984. To the extent Texas tort law "indirectly increases costs for the Federal Government," it lawfully "imposes those costs in a neutral and nondiscriminatory way." *Id.*

**2.** Even assuming a freewheeling approach to intergovernmental immunity applied, the premise of the argument that Texas's property rights conflict with Defendants' statutory duties is mistaken. Defendants' policy of declaring open season on someone else's property rests on the idea that any alien who manages to get across the Rio Grande has "already crossed the international

boundary into the United States," ECF 23-1 at 12, and therefore *must* be brought further into this Country for processing "as soon as somebody crosses the international boundary," Tr.41. That is false. As Texas has already explained, ECF 27-1 at 17 n.6, "an alien who is detained shortly after unlawful entry cannot be said to have 'effected an entry.' Like an alien detained after arriving at a port of entry, an alien like respondent is 'on the threshold.'" *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982–83 (2020) (citations omitted); *see also Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 21 (1953); *Leng May Ma v. Barber*, 357 U.S. 185, 186–87 (1958). An alien on the threshold has *not* entered the country and federal officials *can* take steps to repel him.

Unsurprisingly, Defendants have a historical practice of turning migrants back across the border into Mexico. Mr. Banks testified that USBP itself assesses agents' performance based on the number of aliens repelled, and that thousands of migrants have, in fact, been turned back after crossing the Rio Grande. Tr.66, 104. This Court need not take Mr. Banks's word for it. Just this past summer, Defendants trumpeted their agents' authority to turn back aliens on the threshold of the international boundary.[3] Publicly available records show that Defendants regularly track incidents of successful "turn-backs" at the Border, including more than 5,000 "TBS"—*i.e.*, "Turn Back South"—between October 2018 and March 2020.[4] Unless Defendants are prepared

---

[3] *See* Press Release, U.S. Customs & Border Protection (June 1, 2023), https://www.cbp.gov/newsroom/local-media-release/us-border-patrol-urges-migrants-not-enda nger-their-lives-swimming (describing incident on May 25, 2023, where USBP agents were able to "turn [aliens] back south into Mexico" even *after* they "cross[ed] the maritime boundary line").

[4] *See* USBP FOIA Documents at 22, 25, 30, 128-29, 136-54, available at https://int.nyt.com/data/documenttools/border-patrol-fence-breach/b9addab9d72a6a2a/full.pdf (embedded in Zolan Kanno-Youngs, *Armed Mexicans Were Smuggled in to Guard Border Wall, Whistle-Blowers Say*, N.Y. TIMES (Dec. 7, 2020), https://www.nytimes.com/2020/12/07/us/politics/border-wall-mexico.html). In addition to documenting turnback authority, this collection of documents obtained by the *New York Times* shows that Defendants themselves use concertina-wire barriers along the southern border, record damage to their c-wire fencing, and repair such fencing when it is damaged because such breaches "enabl[e] illegal crossings." *See id.* at 6 ("C-Wire Damaged"); *id.* at 55 ("Agent saw two aliens either cutting the concertina wire or attempting to remove wire from the stakes that

to admit that all this documented activity of their own agents repelling aliens denies due process, violates federal statutes, or endangers migrants, they must concede that federal law does *not* leave them "duty"-bound to wave aliens into the United States and destroy Texas's property in the process, Tr.41. Now Defendants seem to recognize the error, based on efforts to walk back this duty-based argument in their supplemental brief. *See* ECF 47 at 12. But Defendants—not Texas— injected this "focus on whether § 1225 imposes 'mandatory' duties on Border Patrol." *Id.*; *see, e.g.*, Tr. 41 ("Border Patrol has a *duty*"); *see also* ECF 23-1 at 12–13, 36; ECF 23-2 at 4–6; Tr.33, 38–39, 127, 172, 186, 188.

And Defendants' view of immigration enforcement would "create a perverse incentive to enter at an unlawful rather than a lawful location," which is why the Supreme Court rejected it for a migrant who managed to "mak[e] it 25 yards into U.S. territory before he was caught." *Thuraissigiam*, 140 S. Ct. at 1982. Federal immigration officials have authority to repel aliens on the threshold of the border and to prevent them from making further entry into the United States. *See, e.g.*, *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 163 (1993) (aliens could be repatriated "without giving them any opportunity to establish their qualifications as refugees"); *Shaughnessy*, 345 U.S. at 207, 212 (alien could be "permanently excluded from the United States" and his "harborage at Ellis Island [for two years] is not an entry into the United States").

The Court was therefore correct that Defendants can do in the river the very same thing they do at international bridges or other ports of entry, Tr.34, and that merely waving migrants deeper into the United States without attempting to repel or apprehend them is not enforcing the

---

hold up the wire [and] the aliens then walked through the fence"); *id.* at 66 ("C-Wire removed"); *id.* at 88 ("Reinstalled Concertina Wire. Breach Repaired."); *id.* at 109 ("C-Wire cut and pushed down"); *id.* ("C-Wire cut at top and bottom and pushed aside"); *id.* ("C-Wire stake/pole bent backwards into Mexico"); *id.* ("Agent reported that the concertina wire … was cut up"); *id.* ("Agent reported another concertina wire breach"); *id.* ("C-wire has been compromised"); *id.* at 110 ("Top of C-Wire removed"); *id.* at 116 (after alien "appeared to be tampering/cutting the C-wire on top of International Boundary Fence" CBP "contacted Mexican officials about the incident" and "fence crew in the immediate areas was informed of the C-wire tampering").

immigration laws, Tr.199, 201, 209. Accordingly, Texas's state-law claims in no way impede federal agents from carrying out their statutory duties. ECF 27-1 at 8–9, 12–14.[5]

**3.** The terms this Court pointed to in its November 9th order further demonstrate why Texas's common-law claims do not impede Defendants' enforcement authority. Defendants are free to take the position (at Tr.199) that "Border Patrol's work" consists in: taking no steps to deter aliens attempting to cross into this country illegally, Tr.32; tearing down border infrastructure that Defendants simultaneously concede "can work as a deterrent," Tr.193; manufacturing emergencies by inviting aliens to cross (illegally) at "the deepest part of the river," Tr.84; classifying as "apprehensions" scenarios where aliens are "not in custody," Tr.198; and conducting "inspections" that entail asking them no questions at all, Tr.201.

But federal laws task Defendants with actually securing our nation's borders, actually deterring illegal entries, actually apprehending aliens, and actually inspecting them. *See* ECF 3-1 at 20–21 (citing 6 U.S.C. § 202(1)–(3); *id.* § 211(c)(2), (5), (6), (8); *id.* § 211(e)(3)(A)–(B); *id.* § 251; *id.* § 255). Together, DHS, CBP, and USBP are duty-bound to: "deter and prevent the illegal entry

---

[5] Defendants' efforts to direct focus away from Texas tort law to federal immigration statutes shows why their halfhearted objection to subject-matter jurisdiction is a dead end. *See* ECF 23-1 at 20 n.4; Tr.45. Defendants cannot simultaneously argue that this case is all about federal statutory authority, *and* that it also does not implicate "a federal issue" that is "actually disputed" and "substantial" for purposes of 28 U.S.C. § 1331. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning*, 578 U.S. 374, 383-84 (2016). Likewise, they make no attempt to show how Texas's state-law claims—which concern Defendants' "seizure [of property] on land" ostensibly under "law[s] of the United States"—fall outside the plain text of 28 U.S.C. § 1356. The very case Defendants cite approves federal court jurisdiction over a suit (like this one) to take property "out of the possession of the [federal] officer." *Slocum v. Mayberry*, 15 U.S. 1, 10 (1817).

And this Court unquestionably may exercise supplemental jurisdiction under the "broad jurisdictional grant" in 28 U.S.C. § 1367(a), *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 558–59 (2005). This Court may do so even absent a citation to the supplemental jurisdiction statute in the complaint, for "the failure to expressly plead supplemental jurisdiction will not defeat it if the facts alleged in the complaint satisfy the jurisdictional requirements." *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 232 (5th Cir. 2016). Plaintiff's state-law claims are "part of the same case or controversy" as the federal claims, 28 U.S.C. § 1367(a), and none of the factors in favor of declining supplemental jurisdiction exist here, *see id.* at § 1367(c).

of terrorists, terrorist weapons, persons, and contraband," 6 U.S.C. § 211(e)(3)(B); "detect" and "ensure the interdiction of persons … illegally entering the United States," *id.* § 211(c)(2), (c)(5); administer "the inspection, processing, and admission of" aliens, *id.* § 211(c)(8)(A); and implement the "detention and removal program." *See* ECF 3-1 at 20–21; 6 U.S.C. § 202(1)–(3); *id.* § 211(c)(2), (5), (6), (8); *id.* § 211(e)(3)(A)–(B); *id.* § 251; *id.* § 255.

A brief review of some of these terms (and others this Court asked the parties to define) demonstrates how Defendants' position is out of step with federal law:

- Inspect: WEBSTER'S NEW COLLEGIATE DICTIONARY 435 (1949) ("To look upon; to view closely and critically; scrutinize" or "To view and examine officially, as troops, arms, etc."); 6 U.S.C. § 211(c)(8)(A) (CBP shall enforce immigration laws concerning inspection of aliens attempting to enter); *Reid v. INS*, 420 U.S. 619, 624-25 (1975) ("inspection" requires subjecting aliens to a "closer examination"—rather than a "perfunctory" process—including the completion of registration forms, submitting to fingerprinting, and collection of "information and a variety of records that enable [officials] to keep track of the alien after his entry"); *Sanchez v. Mayorkas*, 141 S. Ct. 1809, 1813 (2021) (inspection must occur *prior to admission* into the United States, citing 8 U.S.C. § 1101(a)(13)(A)). According to the Department of Homeland Security, United States Citizenship and Immigration Service ("USCIS"), "[i]nspection is the formal process of determining whether a noncitizen may lawfully enter the United States." USCIS Policy Manual, Vol. 7, Part B, Chapter 2, available at https://www.uscis.gov/policy-manual/volume-7-part-b-chapter-2#footnotelink-11 (accessed November 20, 2023).

- Interrogate: WEBSTER'S NEW COLLEGIATE DICTIONARY 440 (1949) ("To question; esp., to examine by asking questions; as, to *interrogate* a witness"); 8 U.S.C. § 1357(a)(1) (DHS and CBP authority "to interrogate any alien or person believed to be an alien"); *United States v. Martinez-Fuerte*, 428 U.S. 543, 552 & n.8 (1976) (describing Border Patrol agents' authority to stop and interrogate persons believed to be aliens as part of "an effort to minimize illegal immigration").

- Admit: WEBSTER'S NEW COLLEGIATE DICTIONARY 12 (1949) ("To suffer to enter; to grant entrance to, whether into a place, the mind, or consideration" and "To allow to enter on an office or to enjoy a privilege"); 6 U.S.C. § 211(c)(8)(A) (CBP shall enforce immigration laws concerning admission of aliens); *Holder v. Martinez Gutierrez*, 566 U.S. 583, 591 (2012) ("The terms 'admission' and 'admitted' mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." (quoting 8 U.S.C. § 1101(a)(13)(A))).

- Apprehend: WEBSTER'S NEW COLLEGIATE DICTIONARY 44 (1949) ("To seize" or "To arrest"); 8 U.S.C. § 1226 (statutory mandate that DHS and CBP "take into custody" criminal aliens in a provision titled "*Apprehension* and detention of aliens"); *United States v. Benitez-Villafuerte*, 186 F.3d 651, 654 (5th Cir. 1999) ("Benitez was apprehended by the local authorities and placed in the Dallas County jail."); *Tamayo-Tamayo v. Holder*, 725 F.3d 950, 952 (9th Cir. 2013) (alien was "apprehended" where federal government "sent Petitioner a letter advising him of an appointment" and when he "arrived for his appointment … the government arrested him").

- Examine: WEBSTER'S NEW COLLEGIATE DICTIONARY 286 (1949) ("To test by an appropriate method; to subject to inquiry or inspection; to investigate; scrutinize"); 8 U.S.C. § 1357(a)(2) (requiring that aliens be examined "without unnecessary delay" by an immigration officer); *United States v. Valenzuela-Bernal*, 458 U.S. 858, 864 (1982) ("Border Patrol agents … are directed to examine [aliens] without 'unnecessary delay' to determine whether 'there is prima facie evidence establishing' their attempted illegal entry."); *cf. Walji v. Gonzales*, 500 F.3d 432, 436–37 (5th Cir. 2007) (citing 8 U.S.C. § 1446).

- Remove: WEBSTER'S NEW COLLEGIATE DICTIONARY 716 (1949) ("To change the location of; to transfer"); 6 U.S.C. §§ 211(c)(8)(B), 251(2) (DHS and CBP shall enforce immigration laws concerning removal of illegal aliens); *Barton v. Barr*, 140 S. Ct. 1442, 1446 (2020) ("The umbrella statutory term for being inadmissible or deportable is 'removable.'); *Valenzuela-Bernal*, 458 U.S. at 864 ("Congress has determined that prompt deportation … constitutes the most effective method for curbing the enormous flow of illegal aliens across our southern border.").

- Transfer: WEBSTER'S NEW COLLEGIATE DICTIONARY 902 (1949) ("To convey from one place, person, or thing, to another; transport, remove, or cause to pass, to another"); 6 U.S.C. § 211(c)(8)(B) (DHS and CBP shall enforce immigration laws concerning the transfer of aliens unlawfully entering); *Rosa v. McAleenan*, 583 F. Supp. 3d 850, 860 (S.D. Tex. 2019) ("Once CBP transfers an alien to ICE custody, CBP's responsibility as to the care and custody of that alien ends.").

- Detain: WEBSTER'S NEW COLLEGIATE DICTIONARY 225 (1949) ("To hold or keep as in custody"); 6 U.S.C. § 251(2) (DHS shall implement detention program); *Johnson v. Arteaga-Martinez*, 142 S. Ct. 1827, 1830 (2022) (describing how federal agents "detained [alien] at the border, determined he was inadmissible, and removed him" on three different occasions); DHS Office of Homeland Security Statistics, Office of Immigration Statistics, Reporting Terminology and Definitions, https://www.dhs.gov/ohss/about-data/glossary (accessed November 21, 2023) (DHS defining "custody – CBP" as "[n]oncitizens apprehended by CBP and detained in CBP short-term custody facilities or processing centers").

- Detect: WEBSTER'S NEW COLLEGIATE DICTIONARY 225 (1949) ("To discover the existence, presence, or fact of (something hidden or obscure)"); 6 U.S.C. § 211(c)(5) (CBP shall detect human smugglers and traffickers); *United States v. Brignoni-Ponce*, 422 U.S. 899, 907 (1975) (describing Border Patrol's "first line of defense … called the 'line watch'" which "consists of agents being placed *immediately upon the physical boundary* where experience has shown that large numbers of illegal aliens can be detected attempting entry").

- Interdict: WEBSTER'S NEW COLLEGIATE DICTIONARY 439 (1949) ("To prohibit; debar; esp., to lay under or prohibit by, an interdict"); BLACK'S LAW DICTIONARY (11th ed. 2019) ("To forbid or restrain" and "To intercept and seize (contraband, etc.)"); 6 U.S.C. § 211(c)(2), (c)(5) (CBP shall interdict aliens illegally entering and human smugglers and traffickers); *Hernandez v. Mesa*, 140 S. Ct. 735, 746 (2020) (interdiction "right at the border … *to prevent illegal entry*" is "one of [CBP's] main responsibilities").

- Arrest: WEBSTER'S NEW COLLEGIATE DICTIONARY 49 (1949) ("*Law.* To take or keep (a person or chattels) in custody by authority of law; to apprehend; attach"); BLACK'S LAW DICTIONARY (11th ed. 2019) ("A seizure or forcible restraint, esp. by legal authority" or "The taking or keeping of a person in custody by legal authority, esp. in response to a

11

criminal charge; specif., the apprehension of someone for the purpose of securing the administration of the law"); 8 U.S.C. § 1357(a)(2), (a)(5) (DHS and CBP authority "to arrest *any alien who in his presence or view is entering* or attempting to enter the United States in violation of any law" and to "make arrests" for offenses observed while "performing duties relating to the enforcement of the immigration laws"); DHS Office of Homeland Security Statistics, Office of Immigration Statistics, Reporting Terminology and Definitions, https://www.dhs.gov/ohss/about-data/glossary (accessed November 21, 2023) (DHS defining "arrest" as the [a]ct of detaining an individual by legal authority based on an alleged violation of the law").

- <u>Process</u>: WEBSTER'S NEW COLLEGIATE DICTIONARY 672–73 (1949) ("*Law*. To issue or take out process against, or to serve process upon."). 6 U.S.C. § 211(c)(8)(A) (CBP "shall ... enforce and administer all immigration laws, … including ... the inspection, processing, and admission of persons who seek to enter or depart the United States").

- <u>Policy</u>: WEBSTER'S NEW COLLEGIATE DICTIONARY 653 (1949) ("A settled course adopted and followed by a government, institution, body, or individual"); 5 U.S.C. § 551(4) (APA defining "rule" to mean "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or *policy* or describing the organization, procedure, or practice requirements of an agency"); *Biden*, 142 S. Ct. at 2545 (discrete agency memoranda "were themselves the operative agency actions … designed to implement, interpret, or prescribe law or policy"); *Louisiana v. Biden*, 45 F.4th 841, 846 (5th Cir. 2022) (APA can be used to police even "an unwritten agency policy").

- <u>Procedure</u>: WEBSTER'S NEW COLLEGIATE DICTIONARY 672 (1949) ("Manner or method of proceeding in a process or course of action; also, a particular way of proceeding."); 5 U.S.C. § 551(4) (APA defining "rule" to mean "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, *procedure*, or practice requirements of an agency").[6]

- <u>Notice</u>: WEBSTER'S NEW COLLEGIATE DICTIONARY 574 (1949) ("Information, esp. of a formal nature; announcement" or "An announcement or written mention"); 5 U.S.C. § 553(b), (c) (notice must provide substantive details on proposed agency rule and legal authority supporting it, along with meaningful opportunity to comment).

Congress, then, has directed Defendants to detect illegal entries and the human smugglers facilitating such entries as the first line of defense on our border, to interdict and deter entries right at the international boundary, to closely examine aliens before they are admitted into the United States, to apprehend, arrest, and detain aliens who manage to cross illegally, and to deport them from this Country promptly thereafter. The idea that "encouraging [aliens] to come" here illegally

---

[6] A "rule"—whether it prescribes a "policy" or describes a "procedure"—"constitutes 'agency action'" that may be subject to arbitrary and capricious review, *DHS v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1933 (2020), even if it would not *also* be subject to the APA's notice-and-comment requirements, *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 95-97 (2015). *See infra* at 17 n.10.

while "discouraging any type of action by anybody" else, Tr.204, "is part of enforcement," Tr.209, cannot be taken seriously. Once upon a time, the federal government "convinc[ed]" the Supreme Court "that the public interest demands effective measures to prevent the illegal entry of aliens at the Mexican border." *Brignoni-Ponce*, 422 U.S. at 878. Congress has provided such measures. It has not left our "society seemingly impotent to deal with massive lawlessness," and it certainly has not authorized Defendants to commit torts that can only encourage "the tide of illegal aliens—and dangerous drugs—that daily and freely crosses" the southern border. *United States v. Ortiz*, 422 U.S. 891, 899–914 (1975) (Burger, C.J., concurring in judgment).

## III. Record evidence supports Texas's APA claims challenging a federal policy that authorizes wanton destruction of state property.

In their supplemental brief, Defendants maintain that this Court cannot review their actions cutting Texas's fence because they are committed to agency discretion by law and there is no final agency action. On the merits, they claim that their actions are not contrary to law because they are consistent with their statutory authority; their policy is not a substantive (or "legislative") rule that required notice-and-comment procedures; and it is not arbitrary and capricious.

**1. Defendants' policy is final agency action.**[7] In their supplemental brief, they deny that it has "real-world consequences" because "[t]o the extent any wire is cut, that consequence flows not from the guidance but from Border Patrol's statutory authority." ECF 47 at 18–19.[8] But the ongoing destruction of Texas's fence is a "real-world consequence[]," and the evidence that the

---

[7] Even if the Court were to find that the policy did not satisfy the standards of final agency action, the Court could still reach Plaintiff's *ultra vires* claim. *See* ECF 3-1 at 24 (discussing *Apter v. HHS*, 80 F.4th 579, 589–90 (5th Cir. 2023), which held that when using the APA to bring an *ultra vires* claim, "[t]he [challenged] action need not be final").

[8] Defendants continue to press their argument that because their policy has to be implemented downstream, it is not final. ECF 47 at 18. To accept this would mean no "rules"—which by their nature must be implemented downstream in particular circumstances via "orders" or "sanctions," per the APA—could ever be subject to judicial review. As Plaintiff has explained, the Fifth Circuit and the Supreme Court have directly repudiated this argument. ECF 27-1 at 19 (quoting *MPP*, 20 F.4th at 948, and *Biden*, 142 S. Ct. at 2545 n.7).

El Paso and RGV Sectors do not follow this policy, Tr.80, shows that it does not flow from the same statutory authority that governs Border Patrol in all sectors—it is the specific policy applied in Eagle Pass that does the deed.

That an agency has not committed the Eagle Pass policy to writing does not insulate it from judicial review. *Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 479 (2001) ("Though the agency has not dressed its decision with the conventional procedural accoutrements of finality, its own behavior thus belies the claim that its interpretation is not final."); *see Gomez v. Trump,* 485 F.Supp.3d 145, 193 (D.D.C. 2021) ("cluster of guidance documents, cables, and directives, have ordered consular offices and embassies to cease processing and issuing visas for otherwise qualified applicants" constitutes final agency action). Rather, the final-agency-action inquiry is pragmatic and elevates substance over form. *See* ECF 27-1 at 17–19.

Courts consistently find that unwritten policies constitute final agency action regardless of whether they are committed to a formal writing or published in the Federal Register. *Bhd. of Locomotive Eng'rs & Trainmen v. FRRA,* 972 F.3d 83, 100 (D.C. Cir. 2020) (collecting cases holding that "[a]gency action generally need not be committed to writing to be final and judicially reviewable"); *accord Rosa v. McAleenan,* No. 1:19-cv-00138, 2019 WL 5191095, at *19 (S.D. Tex. Oct. 15, 2019) (Rodriguez, J.) (same); *Velesaca v. Decker,* 458 F.Supp.3d 224, 237 n.7 (S.D.N.Y. 2020) ("[A] number of cases have involved courts inferring from a course of agency conduct that the agency has adopted a general policy, even in the face of agency denials of such policies existing."); *Amadei v. Nielsen*, 348 F. Supp.3d 145, 165 (E.D.N.Y. 2018) ("[N]umerous courts have found that a plaintiff can satisfy the [APA's] finality requirement without offering evidence of a formal or official statement regarding the agency's position."). *De La Mota v. U.S. Dep't of Educ.*, No. 02-cv-4276, 2003 WL 21919774, at *8 (S.D.N.Y. Aug. 12, 2003) ("[I]t is of no moment that the agency action here came in the form of an 'informal' email correspondence between a DOE employee and the law schools and plaintiffs. The practical effect of the DOE's action, not the informal packaging in which it was presented, is the determining factor in evaluating whether the

14

DOE's action was 'final.'"); *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990) (finding that "the absence of a formal statement of the agency's position, as here, is not dispositive"); *Venetian Casino Resort, LLC v. EEOC*, 530 F.3d 925, 929 (D.C. Cir. 2008) (concluding that "the record" as a whole "leaves no doubt" that a policy exists, even though "the details ... are still unclear"); *R.I.L-R v. Johnson*, 80 F.Supp.3d 164, 184 (D.D.C. 2015) ("Agency action, however, need not be in writing to be final and judicially reviewable."); *Grand Canyon Tr. v. Pub. Serv. Co. of N.M.*, 283 F.Supp.2d 1249, 1252 (D.N.M. 2003) (holding that "[b]oth law and logic" dictate that an unwritten agency policy is reviewable).

Here, Defendants have repeatedly articulated the contents of a policy specific to Eagle Pass. Defendants cannot, now, have their cake and eat it too: They responded to various media inquiries by saying that they were following a policy in Eagle Pass, *see* ECF 27-1 at 17, and testified to the same. Tr. 137–140, ECF 23-2 (BeMiller Decl. ¶¶ 5–6, 19), and the Court should take them at their word.[9] *See FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980) (finding that denying review of an agency action that is essentially conceded but ostensibly unwritten would fly in the face of the instruction that finality be interpreted "pragmatic[ally]"); *Grand Canyon Tr.*, 283 F.Supp.2d at 1252 (noting that an agency cannot be allowed "to shield its decisions from judicial review simply by refusing to put those decisions in writing").

Despite their belated efforts to suggest that this Eagle Pass policy of authorizing the destruction of property is limited to "non-exigent" circumstances, *compare* Tr.138-40, 215-17, *with* Tr.161, evidence adduced at the hearing demonstrated that the policy is keyed to prerequisites that will always be met in the "ordinary course," Tr.217; *see also* Tr.36 (after Defendants suggested that traversing the riverbank "is dangerous" this Court noted that migrants have "just crossed the river."). For example, Defendants' witness testified that the policy authorizes leadership to breach

---

[9] In their supplemental brief, Defendants appear to concede a separate policy limited to Eagle Pass. *See* ECF 47 at 17 (noting—without contesting—that "Mr. Banks acknowledged that, by and large, Border Patrol has not cut the wire except when faced with exigent circumstances in the El Paso and Rio Grande Valley Sectors," contrasted with Eagle Pass).

the fence anytime to remove an impediment. Why? Because any impediment creates a risk of "crowding" and "unruly" behavior. Tr.52, 122. But *any* c-wire fence creates an impediment. *See* Tr.133–34 (Q: "Why is that situation different from any other time…?" A: "It wouldn't be."). The policy, then, boils down to permission to destroy any fence operating as a fence. No wonder that, until this Court issued its TRO, Defendants were destroying Texas's property on almost a daily basis.

Given Defendants' numerous acknowledgements of the existence of a policy in Eagle Pass, and the facts that show Border Patrol in that area is acting differently than in El Paso and the RGV, Tr.80, Defendants' continued denials of a different policy in Eagle Pass are implausible.

Other courts have found a defendant agency's behavior relevant to inferring the existence of a policy. In *U.S. Gypsum Co. v. Muszynski*, 161 F. Supp. 2d 289 (S.D.N.Y. 2001) (Rakoff, J.), the plaintiff, a sediment disposal company, requested judicial review of an EPA policy that prevented the plaintiff from receiving a permit. The EPA moved to dismiss the action for lack of subject matter jurisdiction on the ground that, *inter alia*, no final agency action was taken. *See id.* at 290. In denying EPA's motion, the court held that despite the agency's disclaimer of its former policy, an agency's "'own behavior may belie the claim that its interpretation is not final.' … Ultimately, where an agency's decision is given practical effect, it will be sufficient to trigger judicial review." *Id.* at 291 (alterations adopted) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 479 (2001)). Here, the Eagle Pass policy is evidenced by the actions on the ground there.

Finality is a pragmatic test precisely so federal agencies cannot circumvent APA review this way. *BNSF Ry. Co.,* 385 F.Supp.3d at 523 ("An agency cannot skirt its obligations by acting illegally and then claiming it has not acted at all."); *Al Otro Lado, Inc. v. McAleenan,* 394 F.Supp.3d 1168, 1206-07 (S.D. Cal. 2019) ("[A] contrary rule 'would allow an agency to shield its decisions from judicial review simply by refusing to put those decisions in writing.'"). Holding that the Eagle Pass policy is not reviewable final agency action would provide the Executive Branch with a template to

evade judicial review.[10]

**2.** Defendants' policy is not an unreviewable lack of enforcement under 5 U.S.C. § 701(a)(2). In their supplemental brief, Defendants rely almost entirely on what they call "the Supreme Court's recent admonition that one of those [unreviewable] categories is decisions about whether and how to arrest noncitizens." ECF 47 at 9 (citing *Texas*, 599 U.S. 670). First, that case did not address APA unreviewability at all—it was solely about the injury-in-fact prong of Article III standing, unchallenged here. *Texas*, 599 U.S. at 676, 686. Second, that case involved seeking judicial relief to require DHS to arrest more aliens, after the agency had made nonenforcement decisions. *Id.* at 676–77, 680. That is not the case here, where the challenged agency action is not a refusal to enforce the law or arrest anyone, but the affirmative agency action authorizing the ongoing destruction of Texas's property. *See* ECF 27-1 at 16 (discussing distinction). Finally, Defendants never address the binding Fifth Circuit precedent that agency rules[11]—as opposed to "orders" or "one-off nonenforcement decisions"—do not ever fall within the APA's unreviewability provision. *MPP*, 20 F.4th at 983–84. That "does not apply to rules" at all. *Id.* at 978. And because the challenged rule here does not involve mere "nonenforcement decisions," but affirmative agency action destroying Texas's property, it does not involve "the executive's longstanding, common-law-based discretion *to do nothing* in a particular case." *Id.* at 982 (emphasis added).

---

[10] Even if the Court were to find that the policy is not a substantive rule—and thus did not need to undergo notice-and-comment rulemaking—as final agency action, it would still be subject to Plaintiff's arbitrary-and-capricious and contrary-to-law claims. *See MPP*, 20 F.4th at 948–49 (policy statement exempt from notice and comment could still be found to be final agency action); *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 406 (D.C. Cir. 2020) (same regarding interpretive rules).

[11] The challenged policy is a "rule" because it is "an agency statement of general ... applicability and future effect" that either "prescribes law or policy" or at the very least "describes the organization, procedure, or practice requirements" of the agency." 5 U.S.C. § 551(4).

**3.** On whether Defendants' actions are contrary to law or *ultra vires*, as explained in Section II, *supra*, they point to general authority to detain or inspect aliens, ECF 47 at 20–22, but the record here shows that is not what they are doing. The Court need not address whether those powers or duties could justify cutting Texas's fence in particular circumstances because the record here does not plausibly involve such considerations—Defendants are allowing migrants to cross the river without performing those functions. *See* Tr.81–82, 84–85, 113, 115–16.  And Defendants can perform those duties without cutting Texas's fence. Tr.102–04, 108. Indeed, Defendants are cutting Texas's fence to allow migrants who are still in Mexico come through, Tr.83, 128, and justify it in a way that applies to all migrants, regardless of circumstance. Tr.122, 124–25, 133–34, 161, 168–69, 170. This Court has seen through this already. Tr.196–98, 200–01, 207, 209, 211. Defendants' policy simply cannot be justified under the APA as an implementation of their statutory mandates. ECF 27-1 at 21-23.[12]

**4.** Defendants' policy is a substantive rule that was required to undergo notice and comment. In its PI Motion, Plaintiff explained in detail why the challenged rule satisfies the test for a substantive rule, and thus could not fall within the exceptions for policy statements, interpretive rules, or procedural rules. ECF 3-1 at 34–37. This test is similar to that for final agency action. *See Texas v. United States*, 40 F.4th 205, 228–29 (5th Cir. 2022) ("For the same reasons articulated

---

[12] Defendants maintain that their general authorizing statutes grant them the authority to cut Texas's fence, and that the major questions doctrine does not preclude it because of the supposedly small cost of repairing the fence. ECF 47 at 20 n.4. But "[w]here the statute at issue is one that confers authority upon an administrative agency, that inquiry must be shaped, at least in some measure, by the nature of the question presented—whether Congress in fact meant to confer the power the agency has asserted" and whether there are "reason[s] to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 142 S. Ct. 2587, 2607–08 (2022) (quotations omitted). A federal agency being empowered to destroy the property of a sovereign State "is an issue of great "economic and political significance." *Id.* at 2608. "A decision of such magnitude and consequence rests with Congress itself, or an agency acting pursuant to *clear* delegation from that representative body." *Id.* at 2616 (emphasis added). And major questions are not limited to fiscal effects. *See Texas v. Nuclear Regul. Comm'n*, 78 F.4th 827, 844 (5th Cir. 2023).

[earlier in the opinion finding final agency action], the Final Memo is much more substantive than a general statement of policy and, as such, it had to undergo notice and comment procedures."); *Texas v. United States*, 555 F. Supp. 3d 351, 429 (S.D. Tex. 2021) (noting similarity between two tests), *appeal dismissed,* No. 21-40618, 2022 WL 517281 (5th Cir. Feb. 11, 2022).

"Substantive rules" produce "significant effects on private interests," *Texas v. United States (DACA)*, 50 F.4th 498, 522 (5th Cir. 2022)—aside from the effects on the aliens themselves, cutting Texas's wire fence obviously has significant effects on the State, including the costs to repair, the social service costs due to increased flow of aliens, and the conflict of a federal agency destroying another sovereign's property. The Eagle Pass policy was required to be published in the Federal Register as a substantive rule and subject to public inspection and comment.  Because it was not, it is unlawful.

Defendants also assert that the policy cannot be substantive because it "does not "require Texas to do anything or to stop doing anything" and "could not be the basis for an enforcement action" against the State. ECF 47 at 23. But rules do many different things. Courts find rules to be substantive even where they do not require the plaintiff to do anything or would be enforceable against it. The Fifth Circuit found the DACA policy to be a substantive rule even though it did not require Texas to do anything and did not threaten it with any sort of enforcement. *See DACA*, 50 F.4th at 522–24.

**5.** Finally, Defendants' policy is arbitrary and capricious. Their supplemental brief provides reasons why differential treatment of Texas's fences in Eagle Pass compared to those in other sectors could be justified, and how its policy properly balances the factors of reducing injury to migrants and providing deterrence. ECF 47 at 24–25. But such "*post hoc* rationalizations" cannot be used to defend against a claim of arbitrary-and-capricious agency action. *Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1136 (5th Cir. 2021). Instead, "[a]n agency must defend its actions based on the reasons it gave when it acted." *OnPath Fed. Credit Union v. United States Dep't of Treasury, Cmty. Dev. Fin. Institutions Fund*, 73 F.4th 291, 298

(5th Cir. 2023) (quoting *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020)). Courts "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 135 S. Ct. 2699, 2712 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)). Defendants point to no reasoned explanation on these points made when the agency acted. *See Sprint Nextel Corp. v. FCC*, 508 F.3d 1129, 1132 (D.C. Cir. 2007) ("We ... require more than a result; we need the agency's *reasoning* for that result." (emphasis added)). Defendants' counsel cannot clean up after the agencies' failure to adequately justify their policy when they made it.

Further, "a regulation is arbitrary and capricious if the agency failed to consider an important aspect of the problem," which "includes, of course, considering the costs and benefits associated with the regulation." *Mexican Gulf Fishing Co. v. United States Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023). Defendants' failure to consider the benefits of deterrence when they acted does not pass the test of reasoned decisionmaking, especially because they elsewhere emphasize these benefits of border barriers. *See* ECF 3-1 at 38–39; ECF 27-1 at 20–21.

## CONCLUSION

Plaintiff respectfully requests the Court preliminarily enjoin Defendants from damaging, destroying, or otherwise interfering with Texas's concertina wire fence or, alternatively, enter a stay of Defendants' policy directing the same.

Dated: November 27, 2023.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

*/s/ Ryan D. Walters*
**RYAN D. WALTERS**
Chief, Special Litigation Division
Texas Bar No. 24105085

**BRENT WEBSTER**
First Assistant Attorney General

**DAVID BRYANT**
Special Counsel
Texas Bar No. 03281500

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**RALPH MOLINA**
Deputy Attorney General for Legal Strategy

**MUNERA AL-FUHAID**
Special Counsel
Texas Bar No. 24094501

**ROBERT HENNEKE**
Texas Bar No. 24026058
Texas Public Policy Foundation
901 Congress Ave.
Austin, Texas 78701
(512) 472-2700
rhenneke@texaspolicy.com

**HEATHER L. DYER**
Special Counsel
Texas Bar No. 24123044

Office of the Attorney General
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1706
Ryan.Walters@oag.texas.gov
David.Bryant@oag.texas.gov
Munera.Al-Fuhaid@oag.texas.gov
Heather.Dyer@oag.texas.gov

**COUNSEL FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on November 27, 2023, which automatically serves all counsel of record who are registered to receive notices in this case.

*/s/Ryan D. Walters*
RYAN D. WALTERS