**FILED**

November 29, 2023

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ JAW

DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## DEL RIO DIVISION

| | |
|---|---|
| **THE STATE OF TEXAS,** § | |
| § | |
| *Plaintiff* § | |
| § | **Civil Action No.** |
| **v.** § | **DR-23-CV-00055-AM** |
| § | |
| **U.S. DEPARTMENT OF HOMELAND** § | |
| **SECURITY; ALEJANDRO** § | |
| **MAYORKAS, in his official capacity as** § | |
| **Secretary of the U.S. Department of** § | |
| **Homeland Security; U.S. CUSTOMS &** § | |
| **BORDER PROTECTION; U.S.** § | |
| **BORDER PATROL; TROY A.** § | |
| **MILLER, in his official capacity as** § | |
| **Acting Commissioner for U.S. Customs** § | |
| **& Border Protection; JASON OWENS,** § | |
| **in his official capacity as Chief of the** § | |
| **U.S. Border Patrol; and JUAN** § | |
| **BERNAL, in his official capacity as** § | |
| **Acting Chief Patrol Agent, Del Rio** § | |
| **Sector U.S. Border Patrol,** § | |
| § | |
| *Defendants.* § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is the State of Texas's (the "Plaintiff") Motion for a Preliminary Injunction or Stay of Agency Action (the "Motion") against the United States Department of Homeland Security ("DHS"); Alejandro Mayorkas, in his official capacity as Secretary of DHS ("Mayorkas"); United States Customs and Border Protection ("CBP"); United States Border Patrol ("BP"); Troy A. Miller, in his official capacity as Acting Commissioner for CBP ("Miller"); Jason Owens, in his official capacity as Chief of BP ("Owens"); and Juan Bernal, in his official capacity as Acting Chief Patrol Agent of the Del Rio Sector of BP ("Bernal") (collectively, the

"Defendants").  (ECF No. 3-1.)  Upon careful consideration of the record and relevant law, the Court **DENIES** the motion for preliminary injunctive relief.

## I. BACKGROUND

### A.  Procedural Background

On October 24, 2023, the Plaintiff commenced this civil action against the Defendants. (ECF No. 1.)  According to the Plaintiff, the Defendants are destroying its property by cutting the concertina wire ("c-wire" or "wire") fence the Plaintiff constructed near the U.S.-Mexico border. (*Id.* at 3-4.)  The Plaintiff claims that this property destruction is intended to allow migrants to enter the country illegally.  (*Id.* at 1-4.)  The Plaintiff raises numerous claims against the Defendants, including common law conversion, common law trespass to chattels, and several violations under the Administrative Procedure Act ("APA").  (*Id.* at 23-28.)  The Plaintiff seeks the following: preliminary and permanent injunctive relief to enjoin the Defendants from seizing or destroying the Plaintiff's property; a stay of agency action under 5 U.S.C. § 705; a declaration that the Defendants' actions are unlawful; and costs.  (*Id.* at 28-29.)  Together with the Complaint, the Plaintiff filed a motion for preliminary injunctive relief, which is presently before the Court. (ECF No. 3-1.)

Three days later, on October 27, 2023, the Plaintiff filed a Motion for a Temporary Restraining Order ("TRO").  (ECF No. 5.)  One day later, the Plaintiff filed a Notice of Escalating Property Damage in Support of its Emergency Motion for a TRO.  (ECF No. 8.)  The Plaintiff alleged that the Defendants, knowing a motion for a TRO had already been filed, used a forklift to seize concertina wire and smash it to the ground.  (*Id.*)  The Court, considering the motion for a TRO *ex parte* and on an expedited basis, granted the request on October 30, 2023, which forbade the Defendants from interfering with the Plaintiff's concertina wire except for medical

emergencies.  (ECF No. 9 at 4, 11.)  Following the TRO, the Defendants filed an opposition to the motion.  (ECF No. 23-1.)  Thereafter, the Plaintiff filed a reply in support of its request for a preliminary injunction.  (ECF No. 27-1.)

The parties appeared before the Court on November 7, 2023 for an initial hearing on the motion for preliminary injunction.  The Court heard testimony from the Plaintiff's witness, Michael Banks, Border Czar for the State of Texas, and from the Defendants' witnesses, Mario Trevino, Deputy Patrol Agent in Charge for the U.S. Border Patrol at the Eagle Pass South Station, and David S. BeMiller, Chief of Law Enforcement Operations at U.S. Border Patrol Headquarters. The Court also considered extensive arguments from the parties.  On November 9, 2023, the Court extended the TRO for an additional 14 days to fully consider the parties' arguments and evidence. (ECF No. 33.)  The Court then ordered that a second preliminary injunction hearing should be held, that the parties provide supplemental briefs on the APA claims, that the parties define various legal terms, and that the parties provide all documents and communications related to the cutting of the Plaintiff's c-wire and any other border barriers.  (*Id.*)

On November 14, 2023, the Defendants filed a Motion to Modify the Court's November 9, 2023 Order.  (ECF No. 38.)  The Defendants explained they would not be able to fully comply with the Court's order for production given the breadth of the order and the limited amount of time remaining before the next hearing, which the parties consented to have on mutually agreeable days between November 20 and November 29, 2023.  (ECF Nos. 36, 38.)  The Defendants proposed limiting the Court's discovery to seven custodians likely to have responsive documents to the Court's order.  (ECF Nos. 38 at 4; 38-1 at 4.)  These custodians included the Chief Patrol Agent and Deputy Patrol Agent of the Del Rio Sector, the Patrol Agents in Charge and Deputy Patrol Agents in Charge of the Eagle Pass North and Eagle Pass South Stations, and the Chief of Law

Enforcement Operations.  (ECF No. 38-1 at 4.)  According to the Defendants, a targeted search of these seven individuals yielded over 310,000 emails and documents.  (ECF No. 38 at 4.)  Thus, the Defendants also requested that they be permitted to produce only responsive documents from the search described in paragraphs 11, 12, and 15 of the Courey Declaration.  (*Id.* at 4-5.)

On November 15, 2023, the Court denied in part and granted in part the Defendants' motion to modify.  (ECF No. 39.)  Specifically, the Court ordered that its November 9, 2023 Order not be modified except to limit document production to the period between March 6, 2021, and November 9, 2023.  (*Id.*)  The parties had until November 21, 2023 to produce the documents as modified.   (*Id.*)   The Court also set the second preliminary injunction hearing for November 27, 2023.  In a separate order, the Court set a virtual conference for November 21, 2023 regarding document production, the TRO, and the second preliminary injunction hearing.  (ECF No. 41.)

Before the virtual conference, the Defendants reported that they reviewed more than 6,000 documents pulled from a search of the seven identified custodians' electronic records to include the modified period.  (ECF No. 43 at 6.)  From the pool, the Defendants produced approximately 1,182 documents and five videos, asserting they attempted to maintain appropriate controls to safeguard privileges and other necessary redactions and withholdings.  (*Id.*)  They stated these documents reflect that the c-wire "inhibits Border Patrol's ability to patrol the border and inspect, apprehend, and process migrants in this four-mile stretch of the border, and the ways in which Border Patrol has coordinated with Texas about the wire in this area."  (*Id.* at 7.)  They further stated that while Border Patrol and the Texas Department of Public Safety ("DPS") have coordinated concerning the c-wire, the documents reflect that the "relationship has deteriorated over time, driven at least in part by at least one instance in which Texas DPS personnel threatened

4

to criminally charge Border Patrol for cutting the wire and DPS efforts to impede Border Patrol access to certain areas." (*Id.* at 8.)

Following the virtual conference, the Court ordered that the TRO be extended to November 29, 2023, at 11:59 p.m. on consent of the parties.  (ECF No. 46 at 1.)  The Court further ordered that the Defendants had until the morning of the second preliminary injunction hearing to produce the outstanding documents as previously ordered.  (*Id.* at 2.)  On November 26, 2023, the Defendants submitted additional documents to the Court for its review.  The Plaintiff also submitted documents to the Court on November 21 and November 27, 2023.  The Court held the second preliminary injunction hearing on November 27, 2023.

The Court now considers the Plaintiff's Motion for Preliminary Injunction.  (ECF No. 3-1.)  For purposes of clarifying the record, the Court makes its factual and legal determinations below based on the following: the Plaintiff's Complaint (ECF No. 1); the Plaintiff's Motion for Preliminary Injunction (and the appended declarations and exhibits) (ECF No. 5-1); the Plaintiff's Notice of Escalating Property Damage (and the appended declaration) (ECF No. 8); the Court's TRO entered on October 30, 2023 (ECF No. 9); the Plaintiff's video exhibits submitted on October 30, 2023 (ECF No. 10); the Defendants' Opposition to the Preliminary Injunction (and the appended declarations and exhibits) (ECF No. 23-1); the Plaintiff's Notice of Filing of Amended Declaration of Manuel Perez (ECF No. 26); the Plaintiff's Reply in Support of the Preliminary Injunction (and the appended declarations and exhibits) (ECF No. 27-1); the arguments, testimony, and evidence presented at hearings before the Court on November 7 and November 27, 2023; the Defendants' document production submitted to the Court *ex parte* and for *in camera* review on November 21, November 26, and November 29, 2023; and the Plaintiff's document production submitted to the Court *ex parte* and for *in camera* review on November 21 and

November 27, 2023.[1]   The Court also considers the Defendants' Supplemental Brief filed on November 21, 2023, and the Plaintiff's Supplemental Brief filed on November 27, 2023.  (ECF Nos. 47, 48.)

**B. <u>Factual Background</u>**

The U.S.-Mexico border presents a unique challenge that is equal parts puzzling to outsiders and frustrating to locals.  The immigration system at the heart of it all, dysfunctional and flawed as it is, would work if properly implemented.  Instead, the status quo is a harmful mixture of political rancor, ego, and economic and geopolitical realities that serves no one.  So destructive is its nature that the nation cannot help but be transfixed by, but simultaneously unable to correct, the present condition.  What follows here is but another chapter in this unfolding tragedy.  The law may be on the side of the Defendants and compel a resolution in their favor today, but it does not excuse their culpable and duplicitous conduct.

> ## i. *<u>The Border – A Brief Synopsis</u>*

Much of the 1,200-mile run of the Rio Grande River separating Texas and Mexico presents a bucolic setting, rolling from ranches to pecan orchards and back again.  Twenty-nine official ports of entry dot the landscape, but much of the focus in this matter, and the border debate more broadly, is the vast stretches of land between.  To guard this area, Congress created Border Patrol.  Its principal statutory objective, in the words of the Defendants, "is to deter illegal entry into the United States and to intercept individuals who are attempting to unlawfully enter the United States." (ECF No. 23-1 at 13.)   Border Patrol agents are empowered to apprehend noncitizens

---

[1] The Court is cognizant of the general nature of contents of the documents and is not relying on any particular document in this order.

unlawfully entering the country, process them, inspect them for asylum or related claims, and in appropriate circumstances, place them in removal proceedings. (*Id.* at 13–14.)

In recent years, the character of the situation facing Border Patrol agents has changed significantly. The number of Border Patrol encounters with migrants illegally entering the country has swelled from a comparatively paltry 458,000 in 2020 to 1.7 million in 2021 and 2.4 million in 2022. (ECF No. 3-1 at 9–10 (citing internal DHS figures).) Border Patrol is on track to meet or exceed those numbers in 2023. (*Id.* at 10.) As expected, organized criminal organizations take advantage of these large numbers. *The New York Times* reported that conveying all those people to the doorstep of the United States has become an incredibly lucrative enterprise for the major Mexican drug cartels. (*Id*. at 10–12.) However, the infrastructure built by the cartels for human cargo can also be used to ship illegal substances, namely fentanyl. (*Id.* at 11.) Lethal in small doses, fentanyl is a leading cause of death for young Americans and is frequently encountered in vast quantities at the border. (*Id.*)

Migrant numbers increased apparently in response to softened political rhetoric. To prepare those additional migrants for parole, Border Patrol devoted increasing portions of its manpower to processing. (ECF No. 37 at 63, 64.) For this purpose, the Defendants set up a temporary processing center on private land in Maverick County, Texas close to the Rio Grande River. (*Id.* at 143–45, 163–65, 200, 223 (discussing the processing center and its location).) As it became known that additional migrants were being allowed entry into the country, more appeared at the border, requiring still more agents to be pulled from deterrence and apprehension to processing. (ECF No. 37 at 63, 64.) This became a cycle in which the gaps in law enforcement at the border grew wider even as more illegal entries occurred. (*Id.*)

### ii.   *Operation Lone Star and the Concertina Wire*

The Plaintiff launched Operation Lone Star in 2021 to aid Border Patrol in its core functions.  (ECF No. 3-1 at 14.)  Through that initiative, the Plaintiff allocated resources in an attempt to stem the deteriorating conditions at the border.  (*Id.*; ECF No. 37 at 62–64.)  The activity subject to dispute here is the Plaintiff's laying of concertina wire along several sections of riverfront.  The wire serves as a deterrent—an effective one at that.  The Court heard testimony that in other border sectors, the wire was so successful that illegal border crossings dropped to less than a third of their previous levels.  (ECF No. 37 at 71–74.)  By all accounts, Border Patrol is grateful for the assistance of Texas law enforcement, and the evidence shows the parties work cooperatively across the state, including in El Paso and the Rio Grande Valley.  (*Id.* at 71–75.)  The Eagle Pass area, though, is another matter.

Eagle Pass, and Maverick County generally, is the epicenter of the present migrant influx: nearly a quarter of migrant entries into the United States happen there.  (ECF No. 3-1 at 18–19.)  Naturally, the Plaintiff's efforts under Operation Lone Star flowed there as well.  Just over 29 miles of concertina wire was installed in Maverick County by September 2023.  (ECF No. 37 at 76.)

Of course, the installed wire creates a barrier between crossing migrants and law enforcement personnel, meaning that it must be cut in the event of an emergency, such as a drowning or heat exhaustion.  The Plaintiff does not contest this.  In fact, the Plaintiff itself cuts the wire from time to time to provide first aid or render treatment.  (*Id.* at 79–80.)  The problem arises when Border Patrol agents cut the wire without prior notification to the Plaintiff for reasons other than emergencies.

Plaintiff's Exhibit 10 neatly displays this issue.[2]  In the video, Border Patrol agents are cutting a hole in the wire to allow a group of migrants to climb up from the riverbank.  However, another hole already exists in the wire, less than 15 feet away, through which migrants can be seen passing.  After completing the second hole and installing a climbing rope for migrants, agents then proceed to further damage the wire in that area and cut a third hole further down.  Meanwhile, in the background, a Border Patrol boat can be seen situated in the middle of the river, passively observing a stream of migrants as they make the hazardous journey from Mexico, across the river, and then up the bank on the American side.  At no point are the migrants interviewed, questioned as to citizenship, or in any way hindered in their progress into the United States.[3]

Border Patrol agents can be seen cutting multiple holes in the concertina wire for no apparent purpose other than to allow migrants easier entrance further inland.[4]  Any rational observer could not help but wonder why the Defendants do not just allow migrants to access the country at a port of entry.  If agents are going to allow migrants to enter the country, and indeed facilitate their doing so, why make them undertake the dangerous task of crossing the river?  Would it not be easier, and safer, to receive them at a port of entry?  In short, the very emergencies the Defendants assert make it necessary to cut the wire are of their own creation.

---

[2] Because the video is not yet publicly available, the Court includes herewith still images taken from the video as Appendix A. Those images provide a visual representation of key moments that factor heavily in the Court's analysis.
[3] It is important to note that the Court is aware of at least fourteen incidents of wire cutting. (ECF No. 3-2 at 10–13, 23–28; ECF No. 8-1.)  However, the Court will focus on the September 20 incident, as shown in Plaintiff's Exhibit 10, because it is most illustrative for analysis purposes.  The Court is aware of one additional wire cutting incident that took place after the TRO was issued, but the Court is satisfied that a sufficient emergency existed to justify the action.
[4] The evidence suggests that on the day Plaintiff's Exhibit 10 was filmed, several migrants attempting to cross the river had been swept away. (ECF No. 37 at 127–28.)  Accordingly, the wire was cut to rescue the individuals situated on the riverbank who had already entered the country, given the muddy and slippery conditions.  (*Id.* at 132–33.)  However, this assertion, made by Agent Mario Trevino, is totally uncorroborated by the condition of the migrants seen on the video.  Regardless, Agent Trevino's testimony is not lent great weight by the Court given his evasive answers and demeanor.

Making matters worse are the cynical arguments of the Defendants in this case.  During the second preliminary injunction hearing, counsel for the Defendants argued that although no Border Patrol agent can be seen making any sort of effort to physically restrain them, the migrants are in fact in custody because their path is bounded on both sides by wire and fence.  It is disingenuous to argue the wire hinders Border Patrol from performing its job, while also asserting the wire helps.  But regardless, the Court heard testimony that some 4,555 migrants entered during this incident, but only 2,680 presented themselves for processing that day at the Eagle Pass South Border Patrol Station.  (ECF No. 37 at 113, 147–48.)[5]  This information was provided to Banks by an unidentified Texas National Guardsman.  (*Id.* at 113.)  The Defendants do not contest the final processing number, only the number of entries on that day, though they do so without their own contrary evidence.  (*Id.* at 148.)

## II. STANDARD OF REVIEW

A preliminary injunction is an "extraordinary and drastic remedy," which is never awarded as a right.  *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008); *accord Pham v. Blaylock*, 712 F. App'x 360, 363 (5th Cir. 2017); *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).  Its purpose is to preserve the relative positions of the parties until a trial on the merits can be held.  *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Texas v. United States*, 809 F.3d 134, 187 n.205 (5th Cir. 2015).  A preliminary injunction is warranted only when a movant can show (1) a substantial likelihood of success on the merits; (2) substantial injury to the moving party if the injunction is not granted; (3) that the injury outweighs any harm that will result if the injunction is granted; and (4) that granting the injunction will not disserve the public interest.  *All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 242 (5th Cir. 2023); Fed. R. Civ. P. 65.

---

[5] Importantly, the Defendants raised concerns about the actions of the Plaintiff and its agents, suggesting the cooperative portrait the Plaintiff paints may not be entirely accurate.

When the United States is the opposing party to a preliminary injunction, the third and fourth requirements merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The party seeking the injunction must clearly carry the burden of persuasion on all four requirements. *Munaf*, 553 U.S. at 689-90; *Karaha Bodas Co. v. Negara*, 335 F.3d 357, 363 (5th Cir. 2003). Thus, "the decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Karaha Bodas Co.*, 335 F.3d at 363–64 (quoting *Miss. Power & Light Co.*, 760 F.2d at 621).

## III. JURISDICTIONAL ISSUES

### A. Standing

To establish standing, a plaintiff must show an injury in fact caused by a defendant and redressable by a court order. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The Plaintiff complains of three types of injuries caused by the Defendants' cutting or moving the fence: (1) harm to the fence; (2) harm from increased crime; and (3) increased state expenditures on healthcare, social services, public education, incarceration, and its driver's license program. (ECF No. 3-1 at 12-13, 40-41, 43; ECF No. 27 at 16-19.)

The Defendants do not challenge the Plaintiff's proprietary interest in the integrity of the fence. (*See* ECF No. 23-1 at 14 n.3.) They also admit that they did, in fact, cause the asserted harm to the fence. (*Id.* at 15.) Instead, the Defendants argue that states have "no cognizable interest in how the federal government exercises its enforcement discretion." (*Id.* at 38-39 (citing *United States v. Texas*, 143 S. Ct. 1964, 1970-71 (2023).) In that case, the Supreme Court held that states generally lack standing to assert "attenuated" injuries in the form of "indirect effects" of federal policies on "state revenues or state spending" derived from an alleged federal failure to make arrests or bring prosecutions. *Texas*, 143 S. Ct. at 1972 n.3, 1973-76.

In addition, citing *Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023), the Defendants argue that the Plaintiff cannot assert claims on behalf of its citizens.   (ECF No. 23-1 at 39.) *Haaland* found that states lacked standing to challenge a statute's rule governing child custody disputes based on a state's abstract "promise to its citizens" and indirect recordkeeping costs that were not "fairly traceable" to the federal policy.  *Haaland*, 143 S. Ct. at 1640-41.  The Defendants argue that the Plaintiff cannot claim standing based on an alleged rise in crime affecting the Plaintiff's citizens—such as drug smuggling, human trafficking, terrorist infiltration, and cartel activities (*see* ECF No. 3-1 at 7-8)—that the Defendants claim is similarly difficult to trace to their cutting or moving the fence.  (ECF No. 23-1 at 39.)

While *Texas* and *Haaland* cast significant doubt on whether the Plaintiff can claim indirect increased expenditures or a rise in crime as bases for standing, they do not address direct physical damage to a state's property by agents of the federal government.[6]  Here, the Plaintiff has direct proprietary interests in seeking to prevent or minimize damage to its fence caused by the Defendants' affirmative acts and to protect the Plaintiff's control and intended use thereof.  The asserted harm is particularized, concrete, and directly traceable to the Defendants' conduct.  *See Lujan*, 504 U.S. at 560.  It also satisfies the APA's additional "zone of interests" standing requirement.   *See Texas v. United State*s, 50 F.4th 498, 521 (5th Cir. 2022) (holding the requirement is satisfied if a claim is "arguably within the zone of interests to be protected or regulated by the statute" and the test is "not especially demanding.").  The APA expressly covers

---

[6] The Plaintiff suggests that this case could fall within one of the potential exceptions contemplated in *Texas*, *see* 143 S. Ct. at 1973-74, thereby establishing standing based on indirect state expenditures. (ECF No. 37 at 25.) The Plaintiff cited *Texas v. United States* as an example of adequate standing derived in this manner. Because the Court finds the injury-in-fact prong of standing analysis satisfied by direct harm to the Plaintiff's property, the Court need not further examine this argument at this time. 809 F.3d 134 (5th Cir. 2015).

"sanctions" affecting a plaintiff, defined as an agency's "destruction, taking, seizure, or withholding of property."  5 U.S.C. § 551.

The only question is whether the relief the Plaintiff seeks can redress such injuries.  That, of course, depends on whether such relief is available in the first place.  While an award of monetary damages under the Federal Tort Claims Act ("FTCA") could perhaps redress past property damage, as the Defendants suggest (*see* ECF No. 23 at 21-22, 38), the Plaintiff does not seek that remedy.  (*See* ECF No. 1.)[7]  Absent other jurisdictional issues, the Court must therefore review the availability of injunctive relief or a stay of agency action and potential barriers thereto.[8]

## B. Sovereign Immunity for Plaintiff's Common Law Claims

In Counts One and Two of this suit, the Plaintiff asserts common law claims for conversion and trespass to chattels.  (ECF No. 1 at 23-25.)  When the Court granted the Plaintiff's *ex parte* motion for a TRO, it did so under the trespass to chattels claim.  However, at the time, sovereign immunity was not considered.  (*See* ECF No. 9 at 4.)  For the reasons stated below, sovereign immunity presents a jurisdictional barrier to the Plaintiff's request for injunctive relief under its state law claims.  That said, the Plaintiff may have alternative state law relief for the damage the Defendants have previously caused to its concertina wire.

The Supreme Court has long recognized that "[i]t is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983) (citing *United States v. Sherwood*, 312 U.S.

---

[7] The Court recognizes that compensation for past injury cannot adequately redress the prospect of continuing or future harm for which the only appropriate remedy would be injunctive relief.

[8] The Court pauses here to address the matter of jurisdiction. There is no dispute the Court holds jurisdiction over the Plaintiff's APA claims, but also asserted are various state law claims. The Court may maintain supplemental jurisdiction over the state law claim if it is so related to the other claim(s) that it forms part of the same case or controversy. 28 U.S.C. § 1367. Here, it is clear the state law claims are so bound up with the APA claims as to be part of the same case or controversy. Accordingly, the Court has the ability to, and does, exercise supplemental jurisdiction. Likewise, any issue not discussed in this order would not be outcome determinative at this stage of litigation.

584, 586 (1941)); *accord FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."); *Loeffler v. Frank*, 486 U.S. 549, 554 (1988); *Price v. United States*, 174 U.S. 373, 375-76 (1899) ("It is an axiom of our jurisprudence. The Government is not liable to suit unless it consents thereto, and its liability in suit cannot be extended beyond the plain language of the statute authorizing it."); *see also La. Dep't of Envtl. Quality v. United States EPA*, 730 F.3d 446, 448-49 (5th Cir. 2013). The exemption of the United States from being sued without its consent, known as "sovereign immunity," extends to a suit by a State. *California v. Arizona*, 440 U.S. 59, 61-62 (1979) (quoting *Kansas v. United States*, 204 U.S. 331, 342 (1907)) ("It does not follow that because a State may be sued by the United States without its consent, therefore the United States may be sued by a State without its consent. Public policy forbids that conclusion."); *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 781-82 (1991); *Minnesota v. United States*, 305 U.S. 382, 387 (1939).

Only Congress can establish how the United States and its governing agencies can consent to be sued. *Gonzalez v. Blue Cross Blue Shield Ass'n*, 62 F.4th 891, 899 (5th Cir. 2023); *La. Dep't of Envtl. Quality*, 730 F.3d at 449 (citing *Mitchell*, 463 U.S. at 215-16) ("An agency cannot waive the federal government's immunity when Congress hasn't."). Moreover, the terms of consent to be sued may not be inferred or implied and must be unequivocally expressed in statutory text to define a court's jurisdiction. *United States v. White Mt. Apache Tribe*, 537 U.S. 465, 472 (2003); *United States v. Bormes*, 568 U.S. 6, 9 (2012); *Gonzalez*, 62 F.4th at 899. Further, a waiver of sovereign immunity and the conditions therein "must be construed strictly in favor of the sovereign." *La. Dep't of Envtl. Quality*, 730 F.3d at 449.

Congress has enacted legislation to create several exceptions to sovereign immunity.  At issue in this preliminary injunction is the 1976 amendment to the Administrative and Procedures Act, passed under 5 U.S.C. § 702 ("Section 702"), which provides:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.  The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought. 5 U.S.C. § 702.

Section 702 has thus "waived sovereign immunity for suits seeking nonmonetary relief through nonstatutory judicial review of agency action." *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985).  "The intended effect of the amendment was to broaden the avenues for judicial review of agency action by eliminating the defense of sovereign immunity in cases covered by the amendment." *Doe v. United States*, 853 F.3d 792, 798-99 (5th Cir. 2017) (internal citations omitted).

Under Fifth Circuit precedent, Section 702 waives immunity for two distinct types of claims. *See Ala.-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 489 (5th Cir. 2014).  First, it waives immunity for claims where a "person suffer[s] legal wrong because of agency action." *Id.* (citing § 702).  "This type of waiver applies when judicial review is sought pursuant only to the general provisions of the APA." *Id.*  Second, Section 702 waives immunity for claims where a person is "adversely affected or aggrieved by agency action within the meaning of a relevant

statute." *Id.* (citing § 702). "This type of waiver applies when judicial review is sought pursuant to a statutory or non-statutory cause of action that arises completely apart from the general provisions of the APA." *Id.* (citing *Sheehan v. Army & Air Force Exch. Serv.*, 619 F.2d 1132, 1139 (5th Cir. 1980); *Trudeau v. FTC*, 456 F.3d 178, 187 (D.C. Cir. 2006)). Under this second type, there does not need to be final agency action; only "agency action" as defined by 5 U.S.C. § 551(13) is required. *Id.* (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990)). Because the Plaintiff's common law claims are separate and apart from those brought under the APA, they would not fall under the first type of waiver and could only be considered under the second type of waiver.

In the Motion for Preliminary Injunction, the Plaintiff asserts that Section 702 generally waives the United States's immunity from a suit "seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." (ECF No. 3-1 at 40.) They further assert, "[the] Defendants have waived sovereign immunity for *ultra vires* claims under the APA via the 1976 amendment to Section 702, which 'waived sovereign immunity for suits seeking nonmonetary relief through nonstatutory judicial review of agency action.'" (*Id.* (quoting *Geyen*, 775 F.2d at 1307).) The Motion for Preliminary Injunction did not, however, explicitly contend that Section 702's waiver of sovereign immunity applies to the state law claims of conversion and trespass to chattels. (*See generally* ECF Nos. 1, 3-1.)

In response to the Motion, the Defendants contend that the Plaintiff cannot assert its state law claims of conversion and trespass to chattels because Congress has not waived the United States's sovereign immunity for such claims. (ECF No. 23-1 at 20.) The Defendants note that the Plaintiff invokes Section 702's waiver of sovereign immunity for actions in federal court "seeking

relief other than money damages," but states no binding precedent that Section 702 covers its state law claims.  (*Id.* at 21.)

In reply, the Plaintiff again relies on the statutory text of Section 702 and asserts that the waiver of sovereign immunity applies to "any action seeking relief other than money damages." (ECF No. 27-1 at 10.)  In support of this theory, the Plaintiff asserts that the "plain text is clear— "[a]n action in" federal court "seeking relief other than money damages" means *any* action, whether under the APA, a different statute, or the common law."  (*Id.* citing § 702) (emphasis in original).)  The Plaintiff relies on the D.C. Circuit's review of Section 702 and supposes that the D.C. Circuit held the waiver extends to "any action" seeking non-monetary relief.  (*Id.* at 10-11 (citing *Trudeau*, 456 F.3d at 187).)  The Plaintiff also cites a Supreme Court decision where instead of establishing that Section 702 can never apply to state law claims the Supreme Court held the waiver did not apply because the equitable lien sought constituted a claim for money damages. (*Id.* at 11 (citing *Department of Army v. Blue Fox, Inc.* 525 U.S. 255, 263 (1999).)

In supplemental briefing, the Plaintiff asserts that the Defendants have not cited any case that finds the Plaintiff is barred from the state law injunctive relief they seek.  (ECF No. 48 at 11.) The Plaintiff also claims that a finding for the Defendants would create a circuit split with at least three other circuits.  (*Id.* (citing *Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017); *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 775 (7th Cir. 2011); and *B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 727 (2d Cir. 1983).)

After an extensive review of the relevant law, the Court has not identified any case or legal authority that finds Congress unequivocally consented to suit for injunctive relief under common law conversion or trespass to chattels causes of action.  The Fifth Circuit has also never recognized the availability of such a claim.  Nor has any other circuit court.  Absent binding precedent, the

Plaintiff instead relies on a D.C. Circuit case that held Section 702's waiver of sovereign immunity permits "nonstatutory" actions.[9] *Trudeau*, 456 F.3d at 187.

This argument is unavailing for several reasons. The D.C. Circuit did not hold that Section 702 waives sovereign immunity for common law claims of conversion or trespass to chattels. *See id.* Instead, the plaintiff in *Trudeau* initially raised claims against the Federal Trade Commission ("FTC") for exceeding its statutory authority under 15 U.S.C. § 46(f) and violations of the First Amendment, but the non-statutory actions derived from the plaintiff's statutory and First Amendment claims. *Id.* at 190 ("[Plaintiff] contends that his § 46(f) claim falls within the core of the doctrine of non-statutory review because the issuance of a false and misleading press release exceeds the FTC's authority to disseminate information in the public interest.") (internal quotations omitted); *see also* Brief for Appellants at 33, *Trudeau*, 456 F.3d 178 (No. 05-5365) (asserting "it is well-established the First Amendment itself provides a means for plaintiffs to seek 'equitable relief to remedy agency violations' thereof.") Although not explicitly stated, the non-statutory claims the D.C. Circuit recognized seem to present as *ultra vires* claims, as opposed to separate or independent common law causes of action for conversion and trespass to chattels. *See Trudeau*, 456 F.3d at 190 (holding "[t]here certainly is no question that nonstatutory review 'is intended to be of extremely limited scope,' [*Griffith v. Fed. Lab. Rel. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988)], and hence represents a more difficult course for [plaintiff] than would review under the APA (assuming final agency action) for acts 'in excess of statutory . . . authority,' 5 U.S.C. § 706(2)(C)."). And notably, the *Trudeau* case was considered under a motion to dismiss posture, not a preliminary injunction posture as in this case. *See generally id.*

---

[9] To the extent that *Trudeau* supports the Plaintiff's position, the D.C. Circuit, as well as the Second and Seventh Circuits, are not binding on this Court.

The Plaintiff also contends that the absence of cited precedent barring their state law claims supports the waiver of sovereign immunity.  Notwithstanding that the burden is squarely on the Plaintiff, the fact that a court has not barred such claims does not then mean that Congress has authorized them.  It could imply the very opposite—that the sovereign immunity doctrine is so imposing that a plaintiff would not seek such equitable relief against the United States.  More likely, however, it indicates that a separate, appropriate remedy already exists.  *See, e.g.*, *Blue Fox, Inc.*, 525 U.S. at 263-64.  Indeed, in *Blue Fox*, cited by the Plaintiff, the Supreme Court denied the equitable lien sought because it constituted a claim for money damages.  *Id.*

In order to find that sovereign immunity is waived for the Plaintiff's common law claims, the Court would have to conclude that the language in Section 702 unequivocally expresses Congress's consent to *all* non-monetary actions arising outside the APA.  Statutory construction presumes Congress did not intend for Section 702's waiver to be so over-inclusive.  Had Congress intended to include common law claims for conversion or trespass to chattels or other state law claims under Section 702, it could have so stated.  To accept the Plaintiff's proposition would so broaden the scope of the APA that sovereign immunity would be effectively negated for state law causes of action seeking equitable relief.  To the extent there is any ambiguity in the application or statutory interpretation of Section 702, the Court is reminded that "a waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Peña*, 518 U.S. 187, 192 (1996).  Thus, the Court finds that the Plaintiff's common law claims do not overcome sovereign immunity.

Although the Plaintiff did not raise the issue, the Defendants recognized that the FTCA "'waives the United States' sovereign immunity from tort suits' in certain circumstances, and is 'the exclusive remedy for compensation for a federal employee's tortious acts committed in the

scope of employment.'"  (ECF No. 23-1 at 21-22 (quoting *McGuire v. Turnbo*, 137 F.3d 321, 324 (5th Cir. 1998); *Dickson v. United States*, 11 F.4th 308, 312 (5th Cir. 2021).)  The record here shows that Border Patrol has been known to cut the fences and locked gates of private ranch owners to perform immigration duties.  As most of the land near our southern border is privately owned, this relationship with Border Patrol has existed out of necessity for decades.  In instances where Border Patrol causes harm to private property, such as damaging fencing and allowing livestock to escape, they will often *ex post* restore a rancher by repairing the property or through financial compensation.  Such a cooperative relationship suggests that Border Patrol, and the federal government at large, acknowledge its duty to respect private property.  So, too, could such a relationship between the Plaintiff and the Defendants exist.  Thus, although the Plaintiff's common law claims seeking injunctive under conversion and trespass to chattels are unlikely to succeed, it is conceivable that the Plaintiff could pursue money damages for prior harm to its fence.  The Court is not ruling on what would be appropriate for future potential harm; it only references prior harm.

### IV. ANALYSIS

**A.  Likelihood of Success on the Merits**

**_i. The Defendants' Conduct_**

**a. The Defendants' Justifications**

While the Plaintiff bears the burden on a motion for preliminary injunctive relief, the Court will first consider the Defendants' own explanations for their conduct before turning to the Plaintiff's allegations.  The Defendants offer two justifications for their series of decisions to cut or move the Plaintiff's fence: (1) to discharge their statutory obligation to inspect, apprehend, and

detain individuals unlawfully entering the United States; and (2) to prevent or address medical emergencies.  (*See* ECF No. 23-1 at 15.)

### 1. Inspection, Apprehension, and Processing

The federal government "has broad, undoubted power over the subject of immigration and the status of [noncitizens]," which "rests, in part, on the National Government's constitutional power to 'establish an [sic] uniform Rule of Naturalization' and its inherent power as sovereign to control and conduct relations with foreign nations." *Arizona v. United States*, 567 U.S. 387, 394-95 (2012).  To that end, Congress has specified who may be admitted to the United States, *see, e.g.*, 8 U.S.C. § 1182, criminalized unlawful entry and reentry, *see id.* §§ 1325, 1326, and determined who may be removed and under what conditions, *see id.* §§ 1182, 1225-1227; *Arizona*, 567 U.S. at 395-96.

Congress entrusted DHS with the "power and duty to control and guard the boundaries and borders of the United States against the illegal entry of [noncitizens]."  8 U.S.C. § 1103(a)(5). Congress has charged the Secretary of Homeland Security to "establish such regulations" and "perform such other acts as he deems necessary for carrying out his authority under [8 U.S.C. §§ 1101-1537]."  *Id.* § 1103(a)(3).  That includes "authoriz[ing] any employee . . . to perform or exercise any of the powers, privileges, or duties conferred [by the Immigration and Nationality Act (INA)]."  *Id.* § 1103(a)(4).  Those employees authorized by the Secretary to enforce the INA are known as immigration officers. 8 U.S.C. § 1101(a)(18).

U.S. Customs and Border Protection ("CBP"), in coordination with other federal agencies, bears responsibility to "enforce and administer all immigration laws," including "the inspection . . . and admission of persons who seek to enter" the United States and "the detection, interdiction, removal . . . and transfer of persons unlawfully entering . . . the United States."  6 U.S.C. §

211(c)(8).  U.S. Border Patrol is "the law enforcement office of [CBP] with primary responsibility for interdicting persons attempting to illegally enter . . . the United States" and for "deter[ring] and prevent[ing] the illegal entry of terrorists, . . . persons, and contraband."  *Id.* § 211(e)(3)(A)-(B). Individual immigration officers, including Border Patrol agents, "interrogate any [noncitizen] or person believed to be [a noncitizen] as to his right to be or remain in the United States" and may "arrest any [noncitizen] who in his presence or view is entering or attempting to enter the United States in violation of any law."  8 U.S.C. § 1357(a)(1)-(2).

Before Congress enacted § 1357(a)(3), Border Patrol's "activities . . . in certain areas [were] seriously impaired by the refusal of some property owners along the border to allow patrol officers access to extensive border areas in order to prevent such illegal entries."  H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. 1358, 1360.  In response, Congress authorized agents to "access . . . private lands" without a warrant within 25 miles of an external border "for the purposes of patrolling the border to prevent the illegal entry of [noncitizens] into the United States."  8 U.S.C. § 1357(a)(3). Congress intended that Border Patrol agents should "conduct[ ] such activities as are customary, or reasonable and necessary, to prevent the illegal entry of aliens into the United States."  8 C.F.R. § 287.1(c);  *see* H.R. Rep. No. 82-1377, 1952 U.S.C.C.A.N. at 1360 (Section 1357(a)(3) "adequately authorize[s] immigration officers to continue their normal patrol activities, concerning which Congress has been well informed during the past 48 years, and which authority it unquestionably meant these officers to exercise.").

DHS has long made use of this provision to move or cut privately owned fencing within 25 miles of the international border when exigencies arise.  Border Patrol guidance dating back to the 1980s has advised Border Patrol Agents to work with private landowners where the agents encounter locked gates prohibiting access to the border.  (ECF No. 23-2 at 3.)  While Border Patrol

guidance requires that agents take steps to work with the owner to gain access, it acknowledges that the agent may cut locks or fencing that prohibits access to the border.  (*Id.*)  When they must do so, Border Patrol guidance instructs agents to take steps to close gates, make available repairs to fencing, and take other steps to ameliorate any damage.  (*See id.*)

Here, the Defendants claim that the appearance of any migrants at the Rio Grande qualifies as a situation requiring agents to cut the Plaintiff's fence.  The Defendants argue that "[n]oncitizens who have already crossed the international boundary into the United States stand on a different legal footing from those who have not."  (ECF No. 23-1 at 12.)  Disregarding that entering the United States by crossing the river other than at an official port of entry is a federal crime, *see* 8 U.S.C. § 1325, the Defendants note that a person "present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival . . .)" is "deemed . . . an applicant for admission." *Id.* § 1225(a)(1).[10] Claiming that "[n]o immigration statute that Congress has enacted authorizes Border Patrol agents to simply push noncitizens already present in the United States back to Mexico," (ECF No. 23-1 at 13), the Defendants maintain that they must assist anyone who has unlawfully crossed the border to advance further into the United States for immigration processing after this initial "inspection."

In short, the Defendants claim their hands are tied.  They have a statutory duty to "inspect," so they claim they must cut or move the Plaintiff's fence to get to the river.  Once at the river, they claim they have no authority to direct illegal entrants to return to Mexico, so they must cut or move

---

[10] The nation's immigration system is separate from its criminal justice system. An individual who enters the United States by unlawful means may freely apply for a change in his or her immigration status while serving time in federal prison. At the Rio Grande, Border Patrol agents can and should both process those they encounter as "applicants for admission" and arrest them for criminal conduct. As discussed below, Border Patrol agents may also simply direct such individuals to return to the far side of the river.

the Plaintiff's fence to help such individuals proceed further into the United States. These claims fail to recognize the dual civil and criminal nature of the immigration statutes.

The Defendants first argue that the mere act of laying eyes on migrants as they wade through the Rio Grande, as seen in Plaintiff's Exhibit 10, qualifies as the beginning of a drawn-out inspection process. As noted above, this inspection process involves: no warning against criminal violation of immigration law; no attempt to prevent the same; no direction to enter at a lawful port of entry; no questioning; no document requests; and no search for drugs or weapons. (*See* Plaintiff's Ex. 10; ECF No. 37 at 84–85.) According to the Defendants, pure visual observation justifies cutting or moving the Plaintiff's fence to access the river.

This rests on two false and misguided propositions. First, Border Patrol agents already possess access to both sides of the fence by which to accomplish this extraordinarily superficial, hands-off "inspection": to the river and bank by boat and to the further-inland side of the fence by road. (*See, e.g.*, Plaintiff's Ex. 10; ECF No. 37 at 82.) The fence may conceivably slow Border Patrol agents' ability to respond to medical emergencies, as discussed below, but the evidence and testimony presented so far has not conclusively established that any delay would materially impede inspection practices of the kind described above.

Second, "an alien who is detained shortly after unlawful entry cannot be said to have 'effected an entry.' Like an alien detained after arriving at a port of entry, an alien like respondent is 'on the threshold.'" *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982–83 (2020) (citations omitted); *see also Leng May Ma v. Barber*, 357 U.S. 185, 186–87 (1958). Federal officials can and historically do take steps to turn migrants on the threshold back across the border into Mexico. *See, e.g.*, *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 163 (1993) (finding that aliens could be repatriated "without giving them any opportunity to establish their qualifications as refugees").

The Defendants' view of immigration enforcement would "create a perverse incentive to enter at an unlawful rather than a lawful location," which is why the Supreme Court rejected it for a migrant who managed to "mak[e] it 25 yards into U.S. territory before he was caught." *Thuraissigiam*, 140 S. Ct. at 1982.[11]

Border Patrol itself assesses agents' performance based on the number of migrants repelled, and thousands of migrants have, in fact, been "turned back" after crossing the Rio Grande.  (ECF No. 37 at 66, 104.)  The Defendants recently boasted their agents' authority to "turn back" migrants on the threshold of the international boundary.  *See* Press Release, U.S. Customs & Border Protection (June 1, 2023), https://www.cbp.gov/newsroom/local-media-release/us-border-patrol-urges-migrants-not-endanger-their-lives-swimming (describing an incident on May 25, 2023, where Border Patrol agents were able to "turn [aliens] back south into Mexico" even after they "cross[ed] the maritime boundary line").  Publicly available records show that the Defendants regularly track incidents of successful "turn-backs" at the Border, including more than 5,000 "TBS"—*i.e.*, "Turn Back South"—between October 2018 and March 2020.  *See* USBP FOIA Documents at 22, 25, 30, 128-29, 136-54, available at https://int.nyt.com/data/documenttools/border-patrol-fence-breach/b9addab9d72a6a2a/full.pdf (embedded in Zolan Kanno-Youngs, *Armed Mexicans Were Smuggled in to Guard Border Wall,*

---

[11] The Defendants argue that *Thuraissigiam* is inapposite for the proposition that a noncitizen who manages to cross the border has not really effected entry into the United States. (*See* ECF No. 47 at 21 n.5.) The Ninth Circuit there had held that a noncitizen had a constitutional Due Process right to more process than what Congress set out in § 1225(b)(1)(B)(ii), (v). The Supreme Court rejected that conclusion, holding that "the procedure authorized by Congress" is sufficient for "due process as far as [a noncitizen] denied entry is concerned." 140 S. Ct. at 1982. The Supreme Court also noted that such a noncitizen "has . . . those rights regarding admission that Congress provided by statute," *Id.* at 1983 (cleaned up). Like the Ninth Circuit in *Thuraissigiam*, the Defendants here seek to add to the requirements of the immigration statutes. This Court refuses to ignore Supreme Court precedent and follow the Ninth Circuit's example of inventing a novel barrier to immigration enforcement where none exists. Doing so "would undermine the 'sovereign prerogative' of governing admission to this country and create a perverse incentive to enter at an unlawful rather than a lawful location." *Id.* Those who enter the United States unlawfully do possess certain due process rights; the right to continue into the United States rather be stopped at the border is not among them.

*Whistle-Blowers       Say*,      N.Y.      Times      (Dec.      7,      2020),
https://www.nytimes.com/2020/12/07/us/politics/border-wall-mexico.html).

The Defendants cannot justify cutting or moving the Plaintiff's fence whenever and wherever they find convenient based on a supposed need to access the river by both boat and foot so they may passively observe migrants crossing. Nor can they do so when the Defendants fail to direct migrants attempting to unlawfully enter the United States to return back across the border per longstanding, Supreme Court-sanctioned practice.

The Defendants next claim that they must cut or move the Plaintiff's fence to allow migrants to proceed toward a further-inland processing center. (ECF No. 37 at 198.) Once they pass through the fence, Border Patrol agents orally direct persons whom they have just witnessed illegally entering the United States to walk as much as a mile or more—with vanishingly little if any further supervision or direction—and present themselves at the nearest immigration processing center. (ECF No. 37 at 83–85, 112–13, 115–16, 147–48, 169–170.) Notably, the Defendants concede that their hope that the aliens will flow in an orderly manner from the breach they created in the Plaintiff's fence to the nearest processing center relies on the Plaintiff's fence along the route.[12] The Defendants claim that easing migrants' path toward the processing center in this manner is necessary to "apprehend" and "detain" the migrants.

Border Patrol itself has defined "apprehension" as "the physical control or temporary detainment of a person who is not lawfully in the United States which may or may not result in an arrest." Customs & Border Protection, *Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions Fiscal Year 2024*, https://perma.cc/YWE2-B6UZ. It has defined "detention" as "[r]estraint from freedom of movement." CBP, *National Standards on Transport,*

---

[12] *See* forthcoming transcript of November 27, 2023 hearing. The Court has access to an audio recording of this hearing.

*Escort, Detention, and Search* at 28 (Oct. 2015), https://perma.cc/6KRP-2XTH.  No reasonable interpretation of these definitions can square with Border Patrol's conduct.  Visual observation is not physical control.  Opening fences does not restrain freedom of movement.  Blind trust that migrants who have just been seen criminally violating one boundary will respect barriers along the road toward a processing center constitutes neither "apprehension" nor "detention."  No unfair cynicism is required to suspect that some such migrants likely commit other crimes (*e.g.*, drug smuggling, human trafficking, etc.) during this process, providing ample incentive for the individuals posing the greatest public danger to flee rather than deliver themselves to the Defendants.[13]  To the extent migrants who fear no additional criminal or immigration consequence because of the Defendants' broader immigration policies, practices, and public statements elect to declare themselves at a processing center, their decision to do so can hardly be attributed to any acts to restrict their freedom of movement by the Defendants.

The Defendants cannot justify their wire-cutting based on purported "apprehension" and "detention" of migrants after they cross through the fence in the face of testimony of both parties strongly suggesting neither occurs without migrants' willing cooperation.  (ECF No. 37 at 112, 115–116, 169–170).  By ignoring the blatant criminal context of where, when, and how these "applicants for admission" enter the United States, the Defendants apparently seek to establish an unofficial and unlawful port of entry stretching from wherever they open a hole through the Plaintiff's fence to the makeshift processing center they established on private land a mile or more away.  The Defendants even appear to seek gates in the Plaintiff's fence that the Defendants can control to facilitate this initiative.  (*See id.* at 107-108, 114.)  Establishing such a system at a

---

[13] As noted above, the Plaintiff's fact witness claimed that during one incident, its personnel observed 4,555 migrants enter through holes the Defendants created while only 2,680 presented themselves for processing.  (ECF No. 37 at 113, 147-48.)

particularly dangerous stretch of the river creates a perverse incentive for aliens to attempt to cross at that location, begetting life-threatening crises for aliens and agents both.

The evidence presented amply demonstrates the utter failure of the Defendants to deter, prevent, and halt unlawful entry into the United States.  The Defendants cannot claim the statutory duties they are so obviously derelict in enforcing as excuses to puncture the Plaintiff's attempts to shore up the Defendants' failing system.  Nor may they seek judicial blessing of practices that both directly contravene those same statutory obligations and require the destruction of the Plaintiff's property.  Any justifications resting on the Defendants' illusory and life-threatening "inspection" and "apprehension" practices, or lack thereof, fail.

## 2. Medical Emergencies

At times, agents rescue individuals who have crossed into the United States illegally and who are in distress in or near the banks of the Rio Grande River.  (ECF No. 23-2 at 4–5).  These routine rescues, life-saving measures, and other such urgent care, often provided at grave risk to agents' safety, are a noble and legitimate part of Border Patrol operations.  Injury, drowning, dehydration, and fatigue are real and common perils in this area of the border, particularly in the context of changing water levels and regular triple-digit heat.  (*Id.*)  The parties agree that medical emergencies justify cutting or moving the Plaintiff's fence.  (ECF No. 37 at 28, 79; ECF No. 23-1 at 15).  The Court endorses this agreement.

However, evidence suggests that these exceptional circumstances can be used to swallow a rule against wire-cutting such as the one the Court entered in the TRO. (*See, e.g.*, ECF No. 37 at 81.)  While an ongoing medical emergency can justify opening the fence, the end of that exigency ends the justification.  As a hypothetical example, cutting the wire to address a single individual's display of distress does not justify leaving the fence open for a crowd of dozens or hundreds to

pass through.  In addition, an emergency that can be just as adequately addressed by less destructive means, such as by reaching one or more individuals by boat rather than on foot, does not justify opening the fence at all.  Moreover, given the greater potential for abuse, prevention of possible future exigencies rests on far more dubious grounds as a justification for destroying the use of private property than the need to address actual, ongoing crises.  Further, the question of whether a situation rises to the level of an emergency is an objective inquiry of a reasonable person's judgment, not the subjective determination of a particular agent.  With those qualifications, the Court accepts medical emergencies as a narrow, partial justification for the Defendants' conduct.

### b. Plaintiff's Allegation of a Policy, Practice, or Pattern

The Plaintiff alleges that the Defendants' series of acts interfering with its wire fence represent a "a policy, practice, or pattern of seizing, damaging, and destroying Texas's personal property by cutting, severing, and tearing its concertina wire fence to introduce breaches, gaps, or holes in the barrier."  (ECF No. 3-1 at 27.)  The Plaintiff alleges that the Defendants "have authorized their officials or agents to engage in this conduct anytime an alien has managed to illegally cross the international border in the Rio Grande to process that alien in the United States—even where migrants are in no apparent distress or when any legitimate exigency has dissipated." (*Id.*)  The Plaintiff suggests that orders to cut the Plaintiff's wire are largely implemented by Border Patrol supervisors, rather than lower-level agents, who allegedly often refuse to destroy or damage the Plaintiff's border infrastructure.  (*Id.*; *see also* ECF No. 37 at 139–140, 150.)

The Plaintiff argues that the sheer volume and regularity of similar incidents, together with repeated public statements from DHS itself, demonstrates an institutional policy, practice, or pattern of sanctioning Border Patrol agents' cutting or moving the fence even absent exigent

circumstances.  (ECF No. 27-1 at 16–17.)[14]  The Defendants deny that any such alleged pattern reflects an intentional policy handed down by DHS or Border Patrol leadership.  (ECF No. 47-1 at 16–18; *see* ECF No. 23-2 at 5; ECF No. 37 at 138, 186–87.)

The problem appears unique to the Del Rio sector.  The testimony and evidence of both parties suggest that, by and large, Border Patrol agents have not cut the Plaintiff's wire except when faced with exigent circumstances in the El Paso and Rio Grande Valley Sectors.  (ECF No. 47-1 at 16–18 (citing ECF No. 37 at 80, 96).)  The Defendants argue that this disproves the notion that there is an agency-wide directive requiring or authorizing agents to cut the wire when they observe any unlawful border crossing.  (*Id.* (citing ECF No. 37 at 80, 96).)  The Defendants admit that supervisors in the Del Rio Sector have provided "guidance" to agents along the following lines: "(a) if there are no exigent circumstances, the agents should call a supervisor before any wire-cutting; and (b) if a supervisor is unavailable or exigent circumstances exist, the agents should use their judgment in determining how best to apprehend noncitizens or provide medical assistance."  (*Id.* (citing ECF No. 37 at 137–41).)  The Defendants emphasize that in both cases, agents have discretion to assess the situation and exercise their judgment whether to cut the wire. (*Id.* (citing ECF No. 23-2 at 6; ECF No. 37 at 110-11).)

Regular and frequent occurrence of the incidents in question between September 20, 2023, and the entering of the TRO, regardless of exigency, and the fact of communications between lower- and higher-ranking DHS officers regarding wire-cutting in the Del Rio Sector raise the

---

[14] The Plaintiff provides the following examples of the Defendants' public statements, each of which is consistent with the Defendants' position in this litigation: On June 30, 2023, a spokesperson for CBP justified federal officials' cutting Texas's fence as "consistent w/ federal law" simply because "[t]he individuals had already crossed the Rio Grande from Mexico [and] were on U.S. soil." (*See* ECF No. 3-1 at 22 (citing CBP statement).) On October 24, 2023, in response to inquiries about this lawsuit concerning Defendants' destruction of state property, a DHS spokesperson said: "Border Patrol agents have a responsibility under federal law to take those who have crossed onto U.S. soil without authorization into custody for processing." (*See* ECF No. 5 at 6 n.1 (citing DHS statement).) The Defendants reiterated the same policy in identical terms in statements to numerous news outlets after this Court granted a TRO. (*See* ECF No. 27-1 at 16-17.)

possibility that an unwritten "policy, practice, or pattern" exists. However, the Court cannot find, on this procedural posture, that the evidence the Court has reviewed thus far conclusively establishes or disproves the existence of such an institutional "policy, practice, or pattern." Such a determination would require further review of evidence and likely additional investigation.

### ii. APA (Final Agency Action)

The Plaintiff asserts that the Defendants' interference with its c-wire is a final agency action and thus reviewable under the APA. (ECF No. 3-1 at 29.) The APA empowers courts to review only "final agency action." 5 U.S.C. § 704; *see also Lujan*, 497 U.S. at 885 ("When, as here, review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'"). Absent a final agency action, a court lacks subject matter jurisdiction to consider a claim brought under the APA. *See Peoples Nat'l Bank v. Off. of the Comptroller of the Currency of the U.S.*, 362 F.3d 333, 336 (5th Cir. 2004); *accord Sierra Club v. Peterson*, 228 F.3d 559, 562 (5th Cir. 2000) ("Absent a specific and final agency action, we lack jurisdiction to consider a challenge to agency conduct.").

An agency action is final when two conditions are satisfied. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). First, the action "must mark the 'consummation' of the agency's decisionmaking process." *Id.* Second, "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Id.* at 178 (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)). Although this analysis is "flexible" and "pragmatic," courts take great care not to confuse final agency action with tentative or interlocutory agency actions, or broader programmatic decisions. *Lujan*, 497 U.S. at 891; *see also Peterson*, 228 F.3d at 562. The APA does not authorize courts to

supervise "day-to-day agency management," *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 67 (2004), and thus, courts must reject invitations to find final agency action in an agency's "continuing (and thus constantly changing) operations." *Lujan*, 497 U.S. at 890.

As the party seeking preliminary injunctive relief, the Plaintiff bears the burden of showing a substantial likelihood that it will succeed on the merits of its APA claim, which requires final agency action. *Clark v. Pichard*, 812 F.2d 991, 993 (5th Cir. 1987) (discussing the standard for obtaining injunctive relief). Here, the Plaintiff alleges that the Defendants' interference with its concertina wire constitutes such a final action. (ECF No. 1 at 27.) Specifically, it asserts that "[s]ince September 20, 2023, federal agents have developed and implemented a policy, pattern, or practice of destroying Texas's concertina wire to encourage and assist thousands of aliens to illegally cross the Rio Grande and enter Texas." (*Id.* at 3.) The question, then, is whether the evidence presented thus far creates a substantial likelihood that the Plaintiff will ultimately establish the existence of final agency action.

At the November 7, 2023, hearing, the Court heard evidence from CBP officials involved in the decisions to cut or manipulate Texas's concertina wire. After the hearing, the Court took a step it rarely takes at this stage of injunction litigation and ordered the parties to produce additional documents regarding Texas's placement of the concertina wire and the Defendants' subsequent interference with it. (ECF No. 9.) The parties provided as much discovery as narrow time constraints allowed, and thereafter, the Court reviewed thousands of pages of emails, reports, and other documents. These documents shed further light on the events referenced at the November 7, 2023 hearing. But even viewed alongside the evidence presented at the hearing,[15] they fall short of demonstrating the existence of a final agency action.

---

[15] The Court continues to review the numerous documents provided by the parties and may supplement the factual findings in this Order in light of new information discovered through this review process.

Having considered the evidence presented at the November 7, 2023 hearing, the post-hearing document production, and the arguments of counsel, the Court finds that the Plaintiff has not, at this preliminary stage, shown a substantial likelihood that it will establish the existence of a final agency action. Of course, the Court does not suggest that the Plaintiff *cannot* establish final agency action when this case proceeds to be heard on the merits. As the Defendants note, the documents within the federal government's possession that mention the Plaintiff's concertina wire potentially number in the millions. (ECF No. 43 at 2.) Discovery may produce information that sheds new light on the nature of the directives to cut or otherwise interfere with the Plaintiff's concertina wire. But at this early stage of the case, the Court finds insufficient evidence of final agency action. Absent such final agency action, the Court need not address the Plaintiff's claims that the Defendants are engaging in arbitrary and capricious action or exceeding their statutory authority.

### iii. APA (Ultra Vires)

The Plaintiff correctly asserts that final agency action need not exist for the Court to address its non-statutory *ultra vires* claim. (ECF No. 48 at 13 n.7.) The Fifth Circuit recognizes that courts "may have jurisdiction to review an *ultra vires* agency decision under one of the exceptions to the final agency action rule." *Exxon Chemicals Am. v. Chao*, 298 F.3d 464, 467 n.2 (5th Cir. 2002); *see also Apter v. Dep't of Health & Hum. Servs.*, 80 F.4th 579, 589 (5th Cir. 2023) (noting that for *ultra vires* claims, agency action complained of "need not be final").

To prevail on its *ultra vires* claim, the Plaintiff must show that an agency had "no colorable basis" for the challenged actions. *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 682 (1982). This standard sets a high bar for plaintiffs bringing *ultra vires* claims. *See Trudeau*, 456 F.3d at 190. "[A] state officer may be said to act *ultra vires* only when he acts 'without any

33

authority whatever.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984). "There certainly is no question that nonstatutory review 'is intended to be of extremely limited scope.'" *Trudeau*, 456 F.3d at 190 (quoting *Griffith*, 842 F.2d at 493). Thus, plaintiffs bringing *ultra vires* claims face a higher burden than they do for traditional APA claims. *See id.* ("[*Ultra vires*] hence represents a more difficult course for Trudeau than would review under the APA (assuming final agency action) for acts 'in excess of statutory . . . authority.'") (quoting 5 U.S.C. § 706(2)(C)). Here, based on the evidence presented at the November 7, 2023 hearing and the documents submitted thereafter, the Court finds that there is insufficient evidence at this juncture to support a substantial likelihood of success on the Plaintiff's *ultra vires* claim.

## B.  Irreparable Harm and Public Interest

The possible harm suffered by the Plaintiff in the form of loss of control and use of its private property continues to satisfy the irreparable harm prong of preliminary-injunction analysis. (*See* ECF No. 9 at 7-8; *see also* above discussion of potential redressability for past violation of the Plaintiff's property under the FTCA.) The public interest calculation reflected in the Court's TRO decision stands. (*See id.* at 9-10.)

## V. CONCLUSION

Accordingly, it is **ORDERED** that the Plaintiff's Motion for a Preliminary Injunction Order or Stay of Agency Action (ECF No. 3-1) is **DENIED**.

SIGNED and ENTERED on this 29th day of November 2023.

_____

ALIA MOSES
Chief United States District Judge