**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**DEL RIO DIVISION**

FILED

MAR 26 2024

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No. |
| v. | § | DR-23-CV-00055-AM |
| | § | |
| U.S. DEPARTMENT OF HOMELAND | § | |
| SECURITY; ALEJANDRO | § | |
| MAYORKAS, in his official capacity as | § | |
| Secretary of the U.S. Department of | § | |
| Homeland Security; U.S. CUSTOMS & | § | |
| BORDER PROTECTION; U.S. | § | |
| BORDER PATROL; TROY A. | § | |
| MILLER, in his official capacity as | § | |
| Acting Commissioner for U.S. Customs | § | |
| & Border Protection; JASON OWENS, | § | |
| in his official capacity as Chief of the | § | |
| U.S. Border Patrol; and ROBERT | § | |
| DANLEY, in his official capacity as | § | |
| Chief Patrol Agent, Del Rio Sector, U.S. | § | |
| Border Patrol, | § | |
| | § | |
| *Defendants.* | § | |

## SUPPLEMENTAL FINDINGS OF FACT

Consistent with the limited remand order dated January 26, 2024 of the United States Court

of Appeals for the Fifth Circuit, this Court provides supplemental factual findings.  The Plaintiff

is the State of Texas (the "Plaintiff").  The Defendants are the United States Department of

Homeland Security ("DHS"); Alejandro Mayorkas, in his official capacity as Secretary of DHS

("Mayorkas"); United States Customs and Border Protection ("CBP"); United States Border Patrol

("BP"); Troy A. Miller, in his official capacity as Acting Commissioner for CBP ("Miller"); Jason

Owens, in his official capacity as Chief of BP ("Owens"); and Robert Danley, in his official

capacity as Chief Patrol Agent of BP's Del Rio Sector ("Danley") (collectively, the "Defendants").[1]

## I. PROCEDURAL BACKGROUND

On October 24, 2023, the Plaintiff commenced this lawsuit. (ECF No. 1.) According to the Plaintiff, the Defendants have damaged the Plaintiff's concertina wire barriers ("c-wire") to allow migrants to enter Texas by wading across the Rio Grande River between ports of entry. (*Id.*) The Plaintiffs asserted state law property claims, Administrative Procedure Act ("APA") claims, and an ultra vires claim. (*Id.*) On the same day that it commenced this lawsuit, the Plaintiff filed a motion for a preliminary injunction. (ECF No. 3.) Three days later, on October 27, 2023, the Plaintiff filed a motion for a temporary restraining order ("TRO"). (ECF No. 5.)

On October 30, 2023, the Court granted the Plaintiff's motion for a TRO. (ECF No. 9.) According to the TRO, the Defendants were barred from damaging or otherwise interfering with the Plaintiff's c-wire in the Eagle Pass, Texas area unless a medical emergency existed. (*Id.*) The TRO was set to expire on November 13, 2023, without an extension of the TRO or the entry of a preliminary injunction order. (ECF No. 9 at 11.)

The Court held a five-hour hearing on the Plaintiff's preliminary injunction motion on November 7, 2023. (ECF No. 32.) The Plaintiff and the Defendants raised arguments and submitted evidence. (ECF No. 37.) Three witnesses testified at the hearing: (1) Michael Banks, the Plaintiff's "border czar," (2) Mario Trevino, a Deputy Patrol Agent for BP in the Del Rio Sector, and (3) David BeMiller, then-Chief of Law Enforcement Operations at BP's headquarters. (*Id.* at 58-59, 117-18, 184.)

---

[1] On March 4, 2024, the Court granted the Plaintiff's unopposed motion to substitute Juan Bernal, then-Acting Chief Patrol Agent of BP's Del Rio Sector, with Robert Danley as Chief Patrol Agent of BP's Del Rio Sector. (ECF No. 89.)

On November 9, 2023, the Court extended the TRO to November 27, 2023 "to allow the Court more time to fully consider the parties' arguments and evidence." (ECF No. 33 at 1.) The Court also ordered that a second preliminary injunction hearing be held and that the parties produce certain documents. (*Id.*) The Court ordered document production because it did "not wish to presume one way or another about the evidence; because of testimony of one of the Defendants' witnesses at the November 7, 2023, preliminary injunction hearing; and because the Court" needed the documents to decide the preliminary injunction motion. (ECF No. 39 at 2.) On November 15, 2023, the Court clarified its document production order to cover the period of March 6, 2021, to November 9, 2023, inclusive. (*Id.*)

On November 21, 2023, the Court held a virtual hearing with the parties to address document production, the TRO, and the second preliminary injunction hearing. (ECF No. 44.) The Court then issued an order extending the TRO to November 29, 2023 "on the consent of the parties." (ECF No. 46 at 1.) On November 27, 2023, the Court held a second preliminary injunction hearing [ECF No. 52], at which the parties presented extensive arguments. (ECF No. 64.)

On November 29, 2023, the Court issued an order denying the Plaintiff's preliminary injunction motion, which is currently before the Fifth Circuit's merits panel. (ECF No. 57.) The Court found the Plaintiff's claims were not likely to succeed because the APA's sovereign immunity waiver did not allow state law claims against the federal government, the record was insufficient to establish final agency action for the APA claims, and the record was also insufficient to establish the ultra vires claim. (*Id.* at 19, 32-34.) The Plaintiff filed a notice of appeal of the order the next day. (ECF No. 58.)

On December 4, 2023, a three-judge motions panel of the Fifth Circuit Court of Appeals granted the Plaintiff's opposed application for a temporary administrative stay. (ECF No. 68.) On December 19, 2023, the same Fifth Circuit panel granted the Plaintiff's opposed request for an injunction pending appeal. (ECF No. 69.) This Court denied the Defendants' opposed motion to stay district court proceedings pending appeal on December 22, 2023 but granted the unopposed motion to extend the deadline for the Defendants to respond to the complaint by granting a 90-day extension. (ECF No. 73.) On December 28, 2023, the Fifth Circuit panel granted the Defendants' opposed motion to expedite the appeal, stating that "[t]he merits panel will set a briefing schedule and argument date." (ECF No. 75.)

On January 2, 2024, the Defendants filed in the United States Supreme Court an application to vacate the Fifth Circuit's injunction pending appeal. *See* Application to Vacate the Injunction Pending Appeal Entered by the U.S. Court of Appeals for the Fifth Circuit, *Dep't of Homeland Sec. v. Texas*, 144 S. Ct. 715 (2024) (mem.) (No. 23A607), 2024 WL 51018. On January 9, 2024, the Plaintiff filed a response to the Defendants' application. *See* The State of Texas's Response in Opposition to the U.S.'s Application to Vacate Injunction Pending Appeal Issued by the U.S. Court of Appeals for the Fifth Circuit, *Dep't of Homeland Sec.*, 144 S. Ct. 715 (No. 23A607), 2024 WL 145107. On January 10, 2024, the Defendants filed a reply to the Plaintiff's response. *See* Reply in Support of Application to Vacate the Injunction Pending Appeal, *Dep't of Homeland Sec.*, 144 S. Ct. 715 (No. 23A607), 2024 WL 145108.

Two days later, on January 12, 2024, the Defendants filed a supplemental brief, contending that factual circumstances had changed since this Court denied the preliminary injunction motion. *See* Supplemental Memorandum Regarding Emergency Application to Vacate the Injunction Pending Appeal, *Dep't of Homeland Sec.*, 144 S. Ct. 715 (No. 23A607), 2024 WL 144445. On

January 13, 2024, the Plaintiff filed a response to the Defendants' supplemental brief, contesting the Defendants' factual allegations. *See* The State of Texas's Response to the U.S.'s Supplemental Memorandum Regarding Emergency Application to Vacate the Injunction Pending Appeal, *Dep't of Homeland Sec.*, 144 S. Ct. 715 (No. 23A607), 2024 WL 210067. On January 15, 2024, the Defendants filed a second supplemental brief, which included new factual contentions. *See* Second Supplemental Memorandum Regarding Emergency Application to Vacate the Injunction Pending Appeal, *Dep't of Homeland Sec.*, 144 S. Ct. 715 (No. 23A607), 2024 WL 210068. On January 17, 2024, the Plaintiff filed a response to the Defendants' second supplemental brief, again contesting the Defendants' factual allegations. *See* The State of Texas's Response to the U.S.'s Second Supplemental Memorandum Regarding Emergency Application to Vacate the Injunction Pending Appeal, *Dep't of Homeland Sec.*, 144 S. Ct. 715 (No. 23A607), 2024 WL 210069 (Westlaw incorrectly indicates the date as "January 18, 2024"). The United States Supreme Court granted the Defendants' application to vacate the injunction pending appeal on January 22, 2024. *Dep't of Homeland Sec.*, 144 S. Ct. 715. The Supreme Court did not issue an opinion on the merits. *Id.*

On January 26, 2024, the three-judge merits panel of the Fifth Circuit Court of Appeals issued an order holding the case in abeyance and remanding it to this Court for 60 days for "additional fact findings concerning the matters contested by the parties [before the United States Supreme Court] and any other matters the district court deems relevant." (ECF No. 80.) The Fifth Circuit did not order new legal findings or remand the case for a full consideration of the matters before this Court. (*Id.*)

On January 29, 2024, the Court scheduled a two-day evidentiary hearing for March 2024. (ECF No. 78.) The Court ordered the parties to provide new document production for *ex parte* and *in camera* review on February 7, 2024. (ECF No. 82.) On February 15, 2024, the parties

submitted briefs outlining the factual issues that needed further development. (ECF No. 83.) The next day, on February 16, 2024, the Court issued an order outlining the factual issues that the parties needed to address at the March 2024 hearings, including but not limited to:

A. The Defendants' use of and access to Shelby Park and surrounding areas;

B. The Plaintiff's control of municipal and non-municipal land in and around Eagle Pass, Texas since November 29, 2023;

C. The scope of the physical area that the Plaintiff has occupied in and near the Shelby Park area since November 29, 2023;

D. The Defendants' access to the Rio Grande in and near the Shelby Park area since November 29, 2023, including but not limited to boat ramp access;

E. The Defendants' ability to surveil the border, patrol the border, apprehend migrants, process migrants, and perform other duties in and near the Shelby Park area since November 29, 2023;

F. The Defendants' ability to respond to medical emergencies in and near Eagle Pass, Texas since November 29, 2023, including the Defendants' ability to access Shelby Park and surrounding areas on or about January 12, 2024;

G. Events in and near the Shelby Park area on or about January 12, 2024, including but not limited to migrant drownings; and

H. The frequency of migrant crossings in and near Eagle Pass, Texas since November 29, 2023.

(ECF No. 84.)

The Court conducted a two-day evidentiary hearing on March 4 and 5, 2024. (ECF Nos. 91, 92.) Over two days, eight witnesses testified: (1) Michael Banks ("Banks"), the Plaintiff's "border czar"; (2) Christopher Fletcher ("Fletcher"), Colonel in the Texas National Guard ("TXNG"); (3) Prince Anoj Pujitha Gunawardana ("Pujitha"), Sergeant in the TXNG; (4) Lindsey McKinney ("McKinney"), Staff Sergeant in the TXNG; (5) Robert Danley, Chief Patrol Agent of BP's Del Rio Sector; (6) David BeMiller ("BeMiller"), Deputy Chief of BP; (7) Michael Garcia ("Garcia"), BP agent; and (8) Mickey Donaldson ("Donaldson"), Acting Division Chief of BP's

Del Rio Sector. The parties also submitted exhibits, including photographs, videos, maps, letters, emails, reports, declarations, briefs, and court decisions. On March 19, 2024, the Court granted the Defendants' unopposed motion to extend the time to respond to the complaint and to enter a briefing schedule on the Defendants' anticipated motion to dismiss. (ECF No. 97.)

## II. SUPPLEMENTAL FACTUAL FINDINGS

The Court did not have the opportunity to make, *or even consider making*, any of the factual findings below when it issued its order in November because the events underlying these findings had not yet occurred.[2]

### December 2023

Eagle Pass, Texas, a city which sits on the banks of the Rio Grande River and well within 25 miles of the United States-Mexico border, has a public municipal park called Shelby Park. Shelby Park is located under two international bridges. It includes a municipal golf course and a boat ramp. The surrounding area includes a railroad bridge, private properties, two other boat ramps, and state and federal border barriers. The Plaintiff has installed c-wire in Shelby Park and parts of the surrounding area. The wire barrier runs from near the railroad bridge to near or beyond an area south of Shelby Park, known as "the 1430." This wire barrier has no access points and

---

[2] The Fifth Circuit's order remanding the case for additional factual findings without further reconsideration of any of the legal determinations of the November order places the case in a perplexing posture. In effect, the Court's legal determinations have been frozen to November 29, 2023, the date when this Court denied the Plaintiff's preliminary injunction motion. Yet the Court's factual determinations will now include factual updates which occurred after November 29, 2023. Thus, the Court's November decision may well be viewed in light of additional facts on which the Court could not have previously relied . The Court is not alone in noticing this unusual procedural development: attorneys for the Plaintiff and the Defendants at the hearing were left to speculate about the effect of the remand order.

runs for approximately four miles.  A previously built federal border wall sits near the entrance to the park.

Eagle Pass, like much of the southwest border, experienced a migrant surge in December 2023.  The Defendants established a staging area between an international bridge known as Port of Entry Bridge 2 ("POE 2") and the railroad bridge to manage the influx of migrants.  The migrants remained in the staging area pending further processing.[4]  On at least one day in December 2023, thousands of migrants waited for processing in the staging area.  The Defendants' agents were outnumbered.

The staging area included a place known as the "pit."  There, the Defendants separated migrants based on demographics, including single adult males, single adult females, and families. The Defendants prioritized processing vulnerable migrants there, including those with medical needs and unaccompanied children.  The Defendants did not consider the migrants, who were in the pit to be apprehended, in custody, or arrested, until the BP directed them from the pit to the area below POE 2.  Below POE 2, the Defendants determined alienage and prepared migrants for transportation by bus to an offsite processing center .

The migrants were free to leave the pit so long as they did not wander beyond the boundaries of the staging area.  The Defendants testified that they were unaware of any attempt to leave the staging area.

The parties disagreed about where most of the migrants entered the Eagle Pass area in December of 2023.  The Court finds that, while migrants crossed in various places in the Eagle

---

[4] The Defendants have established additional staging areas in areas outside Eagle Pass.

Pass area, the vast majority crossed at or very near Shelby Park where the Defendants maintained the staging area.

**Shelby Park Takeover**

On January 10, 2024, the Plaintiff launched what it called a "military operation."[5] The Plaintiff worried that CBP had insufficient resources to manage the several thousands of migrants whom CBP staged within the park during late December and early January and that the migrants' presence posed growing safety risks. The Plaintiff decided to seize Shelby Park to restore order and ensure the public could use its recreation facilities. The Plaintiff contends that the location of CBP's processing center in Shelby Park motivated migrants to unlawfully cross at that site rather than at a lawful port of entry or another section of the border.

Fletcher directed this effort. In the days or weeks leading up to January 10, his superiors instructed him to draw on his military experience to prepare and execute a plan to seize and secure Shelby Park. At approximately 6:00 p.m. on January 10, he received approval to initiate the "operation."

TXNG's actions unfolded in two stages on the of evening of January 10. First, shortly after 6:00 p.m., TXNG sent nine platoons of approximately 41 soldiers each, or approximately 369 soldiers total, to establish an outer area of control (or "outer cordon") that covered both the park and much of the surrounding land.[6] (*See* Defs.' Ex. 1 (yellow line indicates extent of this outer

---

[5] The Plaintiff believed it had authority do so under the Texas Disaster Act, *see* Tex. Gov't Code § 418.014, as made applicable under Governor Abbott's 2021 disaster declaration concerning "the surge of individuals unlawfully crossing the Texas-Mexico border" in Maverick County, among other areas. Gregory S. Davidson, Office of Gov. Greg Abbott, *Ltr. to Deputy Secretary of State David Nelson*, https://gov.texas.gov/uploads/files/press/DISASTER_border_security_renewal_IMAGE_03-17-24.pdf (last visited Mar. 25, 2024). Governor Abbott has regularly renewed that emergency declaration, including as recently as March 17, 2024. *See id.*

[6] Fletcher testified that TXNG entered the outer area at approximately 6:00 p.m. and that he spoke with CBP officers within Shelby Park between 7:00 p.m. and 7:30 p.m. However, Donaldson testified that TXNG soldiers did not enter Shelby Park until approximately 8:00 p.m., after nightfall.

area).)  This outer area stretched from POE 2 south of Shelby Park to some distance past the boat

ramp, and about a half-mile west of Shelby Park's boundaries.

After TXNG soldiers flooded into that wider area, TXNG proceeded to establish a smaller

and more permanent inner area of control (or "inner cordon") within the limits of Shelby Park by

placing physical barriers along its boundaries and stationing soldiers at each park entrance.  TXNG

also positioned obstacles in federal border wall gaps immediately south of Shelby Park.[7]  Once

complete, a few hours into the operation, TXNG withdrew its soldiers from the outer cordon into

Shelby Park.  Fletcher explained at the hearing that this two-stage "cordoning" procedure is

standard for a military operation designed to secure control of a particular zone.

The Plaintiff did not notify CBP or any other federal officials in advance of its intent to

seize and occupy Shelby Park.  The designation of the seizure as a "military operation" was the

Plaintiff's justification for not providing any notice to anyone beyond DPS.[8]  DPS was needed to

protect and monitor Highway 480 while TXNG arranged physical barriers around Shelby Park.

At some time after 7:00 p.m., approximately 60 to 90 minutes after TXNG soldiers entered

the outer cordon, Fletcher finally alerted CBP of TXNG's actions.  After each of the TXNG

platoons reported that they had seized control of their assigned section of the outer cordon, Fletcher

traveled to CBP's command post underneath POE 2 and spoke with a number of CBP officers and

federal National Guardsmen assigned to CBP.  During that brief conversation, Fletcher requested

that CBP immediately cease conducting migrant processing, staging, transportation, or other

---

[7] Some obstacles in Shelby Park pre-existed those the Plaintiff set up in January 10, including several shipping containers (or "Connex containers").  (*See* Pl.'s Ex. 10 (map); Pl.'s Ex. 20 (photo).)  The Connex containers run along the riverbank from the Shelby Park boat ramp up to or just past the railroad bridge without any apparent gaps except near Bridge 1, at a creek called Turtle Creek.  (Pl.'s Ex. 10.)  Since January 10, the Plaintiff has installed anti-climbing barriers on the Connex containers.

[8] Evidence establishes that a Lieutenant Colonel Gilmore contacted Donaldson approximately 30 minutes before TXNG began its operation and warned of an impending action but refused to describe it.

immigration functions within Shelby Park.   One CBP officer raised concern regarding CBP's scope truck operations, especially at least one CBP scope truck then set up within the park that monitored the river and the surrounding area.   Fletcher suggested that CBP could place a scope truck 400 meters downriver on a recently cleared island called "Alcatraz Island."   No CBP officer raised the issue of CBP's use of the Shelby Park boat ramp during this conversation.

The CBP officers expressed frustration to Fletcher concerning TXNG's installation of obstacles and c-wire around the park, and requested time to contact other CBP officials regarding CBP's response.   Fletcher agreed.   Four hours later, the CBP officers contacted Fletcher and informed him that they intended to depart the park.   Fletcher did not speak with anyone higher in CBP's chain of command on the night of January 10.

Fletcher testified that he told the CBP agents they could remain in Shelby Park to manage their equipment.   However, Danley testified that CBP agents reported that TXNG soldiers gave them entrance into the park only to remove CBP equipment, but not to continue operating within it.   As noted above, of particular concern were CBP's scope trucks, which otherwise maintained continuous visual and radar surveillance of the area. It is not clear what TXNG told CBP agents that night.   It is clear, however, that the Plaintiff's unprecedented and unannounced conduct prompted CBP agents to discontinue operating their equipment in the park.

Migrants were not in Shelby Park or encountered entering the area that night, within CBP custody or otherwise.   CBP had detained or was otherwise aware of few or no migrants in Shelby Park on January 10.   When migrants crossed the river on the morning of January 11, TXNG refused to allow them under the POE 2 bridge and instead directed them toward CBP agents near the highway.   As highway traffic rendered that situation dangerous, TXNG and CBP coordinated for TXNG to direct migrants to another, safer location in the future.

11

After summoning TXNG soldiers from the outer cordon into Shelby Park around 11:00 p.m., TXNG blocked all entrances to the park. From that time on, TXNG admitted only emergency vehicles—specifically, ambulances, fire trucks, and state and local law enforcement—into Shelby Park. TXNG did not allow federal agents to employ the park for immigration or border security operations.

**Visibility**

The Plaintiff claims its seizure of Shelby Park did not reduce CBP's visibility of the border and the surrounding area. The Plaintiff's witnesses suggested that CBP could set up scope trucks equipped with cameras hoisted on 35-foot booms and radar capabilities on Alcatraz Island, on the international bridges, or on high grounds near Shelby Park. The Plaintiff claims that Shelby Park does not have effective observation locations at all because it is on low ground.

To the contrary, the Defendants' witnesses claim that the Plaintiff's actions meaningfully reduced their visibility of the river. Before January 10, CBP maintained five or six scope trucks in Shelby Park. On-the-ground CBP agents reported an estimated 90% temporary loss of visibility of the area immediately following the seizure of the park. The Defendants subsequently set up cameras on POE bridges, but permanently stationing scope trucks there was unfeasible due to the flow of traffic. The Defendants also moved their scope trucks to areas near Shelby Park. Danley testified that through these and other efforts, CBP has been able to regain up to half of their prior visibility, but that visual awareness remains at least somewhat reduced. The Defendants' witnesses also noted that their agents can lose sight of migrants who cross the border and become hidden from view by the Connex containers and obstacles the Plaintiff set up within the park and along the river.

The Court finds that CBP's visibility was reduced in the area of Shelby Park between January 10 and January 12 because of the Plaintiff's actions. The Court further finds that CBP's visibility remains somewhat reduced since the Plaintiff's seizure of Shelby Park. The Plaintiff's failure to provide prior notification of the seizure left CBP partially blind, albeit temporarily. The Court further finds, however, that the Defendant was able to regain partial visibility within hours or days of the Plaintiff's seizure of Shelby Park. The Court is unable to determine to what degree the Defendants' operations have been impaired.

**Boat Ramp Access**

CBP regularly used the concrete, all-weather Shelby Park boat ramp for its river operations for at least two decades. (*See* Pl.'s Ex. 26; Defs.' Ex. 10 (photograph from before January 10, 2024).) Two other boat ramps exist nearby: a dirt ramp on private property approximately two miles north of Shelby Park that is not suitable for all types of weather (*see* Pl.'s Ex. 13 (photograph from TXNG soldiers taken on January 12, 2024));[9] and a boat ramp located near a casino approximately seven miles south of Shelby Park. CBP uses all three. The Shelby Park boat ramp is closest to the area that experienced a high traffic of migrant crossings. It allows CBP's marine unit to deploy boats quickly and remains usable in adverse weather conditions because it is a concrete boat ramp.

The parties' witnesses agree that for approximately 42 hours after the Plaintiff seized Shelby Park, TXNG denied CBP agents access to the Shelby Park boat ramp. TXNG prevented CBP from launching boat operations they likely would have otherwise undertaken during daylight

---

[9] This boat ramp also has electric gates that have damaged at least one CBP boat.

13

hours on January 11 and from sunrise to noon on January 12.[10]  TXNG suggested that CBP agents instead launch boats from the ramps up or downriver.  Donaldson testified that in addition to the longer distances to travel by boat, fluctuating water levels could slow boats launched from boat ramps elsewhere in reaching the Shelby Park area and could have hindered a river rescue. However, Donaldson was unaware of any CBP emergency river operations that were unsuccessful because the Plaintiff denied CBP access to the Shelby Park boat ramp during this interval.  By noon on January 12, the Plaintiff agreed to allow CBP agents to enter Shelby Park to launch riverine operations from the boat ramp.  CBP has done so regularly since that time.

**Gate Access**

The Plaintiff's and the Defendants' witnesses agree that for four or more hours on January 10, while the Plaintiff flooded the outer area with TXNG soldiers, the Plaintiff blocked the Defendants' access to gates in the federal border fence for approximately 2.5 miles, including Shelby Park.  (*See* Defs.' Ex. 1 (indicating length of border to which Plaintiff temporarily denied access).)  After the Plaintiff withdrew its soldiers to within the park around 11:00 p.m., CBP regained access to the federal border fence gates outside the park.  However, within Shelby Park, the Plaintiff created its own fences and gates along the border, locked them, and at times blocked them with TXNG soldiers and their vehicles.  Donaldson testified that between January 10 and January 12, the Plaintiff denied CBP access to Shelby Park and to the border through these gates.

**Drownings and Post-Drowning Boat Rescue**

On the night of January 12, 2024, two days after Texas had assumed control of Shelby Park, three Mexican nationals—a woman and two children ages 8 and 10—drowned in the Rio

---

[10] As noted above, CBP does not conduct boat operations between sundown and sunrise due to safety concerns with operating the air boats in the dark.  CBP conducted boat operations from the Shelby Park boat ramp on January 10 and withdrew its boats from the water before the Plaintiff began its effort to seize control of the park.

Grande.  Grupo Beta, a service of the National Institute of Migration of Mexico that specializes in providing orientation, rescue, and first aid to migrants, recovered the bodies of the victims on the Mexican side of the Rio Grande, across from the Eagle Pass Municipal Golf Course in Shelby Park.  How the events unfolded thereafter, and specifically who knew what information when, have been the subject of intense dispute.

The following is a chronology of the events relevant to this incident.[11]  At 7:45 p.m., Grupo Beta received an anonymous call indicating that six subjects were attempting to cross the Rio Grande into the United States.  At 7:47 p.m., Grupo Beta received another call about subjects yelling for help in the middle of the river near POE 1.  Grupo Beta responded, and between 8:05 p.m. and 8:15 p.m., they found the three deceased migrants.  Ten minutes later, at 8:25 p.m., Grupo Beta identified two male subjects on the U.S. riverbank who were attempting to make their way back to Mexico and appeared to be suffering from hypothermia and could be in distress.

The evidence is confusing as to what was known and when it was known.  Inconsistent timelines reveal the following: at 8:59 p.m., Grupo Beta telephonically advised someone at BP of two subjects flashing lights on the U.S. side of the river.  (Def's Ex. No. 22.)  Grupo Beta also stated they had previously rescued one subject and that they had three drowned victims across from the Pass Golf Course.  (*Id.*)  A different timeline indicates that around 9:15 p.m. Grupo Beta informed Border Patrol of three possible drowned migrants, one rescued migrant, and one migrant

---

[11] To create this timeline, the Court relies on witness testimony from both parties, declarations made to the Supreme Court, and differing timelines provided in Defendants' Exhibits 18, 20, and 22.  Defendants' Exhibit 18 (page 47 of 50) is a Bottom-Line Up Front (BLUF) for January 12, 2024.  Defendants' Exhibit 20 is an Evolving Situation Report (ESR) with entries from January 10 through January 15.  Given the use of past and present tense and the absence of an author, it is unclear whether the ESR entries reflect real-time updates or are compiled after the fact.  Defendants' Exhibit 22 is an email dated January 13 and addressed to Donaldson with a bulleted timeline of the events of January 12.  The email states "[b]elow is the most accurate timeline after clarifying with all parties involved."  The Plaintiff did not have any written reports or timelines for the events of January 12.  The Court finds that some of the misunderstandings can be attributed to the indirect way that line agents received and communicated information through the chain of command.  The misunderstandings can also be attributed to the difference between events happening in real time and those same events being communicated or recorded after the fact.

that made landfall.  (Def's Ex No. 20.)  Testimony failed to resolve the conflicting timelines.

At 9:07 p.m., Border Patrol's Del Rio Sector Forward Operating Base ("DRT-FOB") was advised to contact the Eagle Pass North Station ("EGT"); however, it is unknown what information was relayed.   At 9:14 p.m., DRT-FOB relayed the unknown information to EGT station telephonically.  (Def's Ex. No. 22.)  At 9:23 p.m., EGT received an update that the situation was "an emergency."  (*Id.*)

Sergeant McKinney was on duty in Shelby Park the night of January 12 and, as the Sergeant of the Guard, was responsible for soldiers on the shift and events on-the-ground.  At some time between 8:00 p.m. and 8:40 p.m., McKinney observed emergency vehicle activity, such as firetrucks, police vehicles, and ambulances on the Mexican side of the Rio Grande.[12]  TXNG Sergeant Pujitha was on duty in Shelby Park and stationed with two TXNG specialists at the main fenced-in gate, near Ryan Street and Main Street.  Pujitha received orders to allow TXNG, DPS, and emergency medical services into the park, but not BP.  Pujitha, who immigrated to the United States and became a naturalized citizen, learned English as his third language.[13]

At some point after 9:23 p.m. and before 9:40 p.m., Garcia's duty supervisor, BP Agent Lancaster, contacted Garcia about a "situation" near the Shelby Park boat ramp.  At that time, Garcia and BP Agent Martinez were apprehending a group of ten migrants in the local north area near the army bridge, which is located north of Shelby Park.  According to Garcia, Lancaster communicated that there was "a situation going in Shelby Park with three individuals *possibly* drowning, and two individuals on the [U.S.] side of the riverbank."  Lancaster advised Garcia to

---

[12] Fletcher testified that he called the Battle Desk, which informed him that McKinney said he saw emergency lights on the Mexican side near 10:00 p.m.

[13] The Court notes this fact because Pujitha testified with a noticeable accent, which is relevant given the verbal communication (and lack of understanding) that transpired between he and McKinney, and he and Garcia.

visit Shelby Park and request TXNG for access to the area. Garcia understood his assignment was to go to the exact location of "the coordinates." Lancaster advised Garcia that "if granted access [to Shelby Park], [he was] to create an emergency rescue plan to locate those individuals and try and rescue them." The Court notes that by the time Eagle Pass Border Patrol received the information, Grupo Beta had already located the drowned victims and two other persons clinging to a bridge pillar on the Mexican side of the bridge.

At around 9:40 p.m., Garcia and Martinez arrived at the Shelby Park main gate. Between 9:41 p.m. and 9:43 p.m., Garcia requested to speak to a TXNG supervisor at the Shelby Park main gate. McKinney advised Garcia over the phone that he was denying access and would have someone investigate the situation. At 9:44 p.m., an unknown BP agent is advised that the two male subjects, later identified as Cuban nationals, crossed the river back to Mexico and were rescued by Grupo Beta with an airboat on the Mexican side. Sometime between 9:55 p.m. and 10:10 p.m., McKinney speaks to Garcia at the main gate and advises him that TXNG soldiers observed subjects on the U.S. side of the riverbank, but McKinney's chain of command ordered him to not interact with the subjects.

BP was not fully prepared to respond to an emergency. According to BP, the agents had various emergency equipment in the vehicle, including a flashlight, four standardized life vests, and a flotation ring. McKinney testified that he did not see any emergency equipment in the Border Patrol vehicle. It was dark out, and McKinney did not suggest that he circled the truck or saw the vehicle in its entirety—just that from where he was standing, he could not see emergency equipment. Garcia did not have night vision equipment or binoculars, which he testified are not standard issue for BP agents. Garcia also did not have a boat, as it is BP's policy to not deploy boats at night. In any event, Garcia believed he could assist migrants drowning in the river with

the rescue devices in his vehicle at the time.  He also testified that if he were to lay eyes on migrants drowning, he could contact the local fire department and Grupo Beta.  Garcia did not contact the local fire department or Grupo Beta.

Notably, BP did not respond with the anticipated haste of an emergency involving possible drownings.  BP agents first attempted to enter Shelby Park at a riverside gate on the north end of the park near the cable crossing area, but TXNG soldiers denied BP access because they did not have the ability to open the gates.  BP agents then drove towards the main gate of Shelby Park, less than half a mile away.  They did not activate their emergency lights and drove at the posted speed limit as they traveled through the city to the main gate.  According to Garcia, there was no need to speed or activate the emergency lights because it would not have made a material difference given the short distance between the two gates.  When the BP agents arrived at the Shelby Park main gate, they did not raise their voices or appear nervous.  They were instead professional and calm.

According to the Plaintiff, it is unclear whether there was an ongoing emergency.  McKinney testified that BP agents informed him that migrants had "*already* drowned" and that the Mexican authorities were handling the situation.  Moreover, according to McKinney, Garcia said that he was requesting access to the park to secure migrants that had crossed and were on the U.S. side of the river.  McKinney testified that at no point did Garcia reference an emergency or say that migrants were in distress in Shelby Park or in the river.  McKinney testified he did not sense urgency in Garcia's voice.  Instead, the conversation was like "two friends" speaking with each other.  Pujitha also testified that the BP agents made no mention of an emergency or of drownings and that the agents did not appear to act with urgency.  The Court would note Pujitha testified that he could not hear the phone conversation between McKinney and Garcia.  On the

other hand, Fletcher testified that after BP agents left the main gate, the Command Desk informed Fletcher that the BP agents were there due to an "emergency" that TXNG could not identify.

BP presented a different exchange. Garcia explained to McKinney that three migrants had "*possibly* drowned" and there were two migrants on the U.S. side of the river. Garcia said he needed access to Shelby Park to locate any migrants still in the water and to attempt to rescue them. According to Garcia, McKinney advised he was unable to allow access but that he would send soldiers to that area to look for those subjects. McKinney offered to retrieve at least two of the migrants. Martinez stood behind Garcia during this conversation and recorded names, information, and times. According to Garcia, he clearly communicated to McKinney that there was an urgent situation and that he was requesting access into Shelby Park, but that McKinney denied him access. Danley testified that his understanding that night was that BP was trying to rescue three people "who were believed to be drowning or potential drowning victims," and two additional people "who were believed to be hypothermic and needed assistance."

Garcia testified he learned the following day that the three migrants had drowned. Garcia testified he received a call from the Office of Professional Responsibility ("OPR"), which informed him that they received three deceased bodies. In response to a question from the Court, Garcia testified that OPR contacted him because there was a death involved and that he was the responding agent. Garcia testified that OPR asked about his response to the event. According to Garcia, it was his understanding that OPR contacted him for their own reporting purposes. Finally, Garcia testified that he did not speak with Danley or BeMiller about the events of January 12. Garcia testified that the only other person he spoke with about the situation was his Deputy Patrol Agent in Charge ("DPAIC"), George Cavazos.

Much is disputed about the events that transpired on the night of January 12, 2024, after three migrants tragically drowned in the Rio Grande. But what is clear from the evidence is this: whether the parties were aware of an emergency, or not, the emergency involving possible drownings had concluded about one hour and a half before Border Patrol agents arrived at the gates of Shelby Park. As to the two Cuban nationals, the only definitive information is that by 9:44 p.m., Grupo Beta rescued the two using airboats and had them on the Mexican side of the river.

**January 28, 2024**

On January 28, 2024, at approximately 12:06 p.m., BP rescued two migrants in the Rio Grande. The rescue occurred across from the 1430 area. The boat was headed up the river, and TXNG boats were nearby. After rescuing the migrants, BP's boat visited the Shelby Park boat ramp so that an ambulance could take one of the migrants to the hospital because he had ingested a dangerous amount of water. BP let DPS take the other migrant, who did not need medical attention, into custody from that boat ramp because the Plaintiff denied a BP agent's request to bring BP's transportation units into Shelby Park. After taking the migrant outside Shelby Park, DPS handed over the migrant to BP, who then took the migrant into custody. BP had no units inside Shelby Park. Although BP's airboat could have visited some other portion of the river to transfer the migrant who did not need medical care to another BP agent, BP visited Shelby Park first because emergency medical services were allowed inside the park by the Plaintiffs. BP trucks and/or boats usually, or likely, would have "throw bags" and orange flotation devices to use in the river. The Defendants suggested that BP had previously used "throw bags" to rescue migrants, but were unable to specify a distance.

**Broader Effects of Texas's Recent Activity**

At the remand hearing, the parties argued regarding several other topics.  The Court addresses these topics below.

The Plaintiff maintains that its takeover of Shelby Park does not impede BP from discharging its duties.  According to Banks, to his knowledge, the Plaintiff's operations in Shelby Park have not made it unreasonably difficult for BP to prevent illegal immigration.  He insisted that BP has always had access to the river since the Plaintiff took over the park.  The Defendants presented evidence to the contrary.  BeMiller testified that the Plaintiff's takeover of Shelby Park prevents BP from accomplishing its mission and has created a "conflict of authority" regarding which governmental entity oversees immigration enforcement operations at Shelby Park. According to BeMiller, BP welcomes any law enforcement agency's support in helping to mitigate and deter illegal border-crossing activity until such "support" becomes an impediment.  Here, he claimed, the Plaintiff's takeover of Shelby Park poses such an impediment.  Typically, BP agents respond to incidents at the river in Shelby Park by going directly to the riverbank, evaluating the situation, and determining how to respond.  But now, BeMiller testified, BP agents must first access the gate in the Plaintiff's fencing around Shelby Park before reaching the riverbank. According to BeMiller, this additional step puts BP agents at risk and slows down their process.

The Court pressed BeMiller to clarify who determines when an "impediment" exists. He responded that it is an agent-by-agent assessment that relies on each BP agent's determination on the ground.  He added that it is self-evident when an "impediment" exists.  BP does not have any policy, direction, or explanation for what qualifies as an "impediment," agents know when they are unable to accomplish their mission.

For the limited purposes of today's factual findings, the Court finds that definition too vague to make a concrete determination on whether the closure of Shelby Park operation constitutes an "impediment." Using BeMiller's explanation, some agents may find it an "impediment," while others do not. It is therefore an open question as to whether it constitutes an impediment, an inconvenience, or none of the above.

**Changes in Number of Crossings and Causation**

The evidence presented shows a considerable decrease in the number of illegal entries at Shelby Park and Eagle Pass since January 2024, when Texas expanded its operations in the area. Before the takeover, thousands of migrants were crossing the Rio Grande into Eagle Pass each day. After the takeover, between December 2023 and January 2024, migrant encounters in the Del Rio sector fell by 66%, and February saw another decrease by 12%. By March 3, 2024, the average daily number of migrants crossing at Shelby Park had fallen to eight migrants.

The parties acknowledge this trend but dispute its cause. The Plaintiff claims that its enforcement operations in Shelby Park are to thank for the decline in illegal crossings. By contrast, the Defendants argue that illegal crossings always tend to decrease in January. Danley testified that there is always a seasonal component to flows of people. Likewise, BeMiller stated that the recent decline in illegal crossings is consistent with historical trends and enhanced enforcement. Thus, according to the evidence the Defendants presented, the recent numbers have more to do with normal seasonal trends than the Plaintiff's enforcement actions.

In addition, the parties raised the question of how the decline in illegal crossings at Eagle Pass may affect the rate of crossings elsewhere along the U.S.-Mexico border. The parties questioned BeMiller about a declaration he signed that the federal government submitted in a filing

for *United States v. Abbott*, 1:24-cv-8, an ongoing case in this district involving a challenge to

Texas's recently enacted law, SB 4. In the declaration, BeMiller states:

> If Texas imposes criminal penalties for unlawful entry and reentry by migrants, I
> anticipate that migrants would instead seek to enter the United States through
> Arizona, New Mexico, and California. In the event of such a shift in migrant traffic,
> it would create additional operational stress to CBP personnel and resources in
> these areas, requiring CBP to significantly alter its operations to continue executing
> our responsibilities by shifting personnel to those States at great expense and strain
> on CBP's operations.

(*See* Pl.'s Ex. 32 at 2.) When questioned about this statement, BeMiller confirmed that this was

his opinion but then qualified his confidence in his conclusion. He stressed that BP is working

within an unprecedented situation and with limited data on the broader effects of policies that are

still playing out. He added that when BP heightens enforcement, there is typically an initial effect

on the patterns of illegal crossings. Yet, he said, the cartels invariably shift their strategies to

exploit loopholes and regain territory to continue moving their human cargo.

Ultimately, the Court will not speculate on how the Plaintiff's occupation of Shelby Park

may affect the rates of crossings elsewhere along the border. Likewise, myriad factors may

converge to explain the drop in migrant crossings in Eagle Pass—including the Plaintiff's border

barriers, changes in enforcement policies by Mexican authorities, regular seasonal trends, among

other forces. It remains unclear how large the Plaintiff's takeover of Shelby Park looms among

those factors. Consequently, on this factual record and procedural posture, the Court will not

opine. The Court does find that the number of migrant crossings in the Shelby Park area have

declined and have remained minimal, at best. The Court also finds that migrants and the groups

responsible for their entries in the United States do alter their operations to find the places of least

resistance and to continue making money, as BeMiller noted.

The dispute between CBP and the Plaintiff is an anomaly in an otherwise collaborative relationship. For years, state and federal officials on the ground have worked in close cooperation on border security in Eagle Pass. According to Fletcher, CBP and TXNG routinely work together in monitoring cameras, identifying surges in crossings, and conducting patrols and river operations. Donaldson testified that BP has worked with TXNG since at least 2022.

Even now, federal and state officials maintain regular communications. Donaldson testified that BP and TXNG are "routinely" in contact with each other. Donaldson testified that he communicates with a Lieutenant Colonel Gilmore at least weekly about events on the ground. As for DPS, Donaldson testified that he is in contact with a Lieutenant Gonzalez "frequently."

Several witnesses at the hearing stressed the importance of collaboration between state and federal law enforcement. BeMiller testified that BP's partnership with local, state, and international agencies is extremely important and noted that when there is no coordination among law enforcement entities, agents on the ground get conflicting messages from leadership. Fletcher noted that TXNG and CBP can work together to identify crossings and allocate their resources accordingly. Similarly, Donaldson explained how collaboration between state and federal partners translates to more effective resource allocation. It is clear to the Court that the local partners of the parties up to mid-level management want to continue to work together and remain in collegial relationships. It appears to be in the best interest of all agencies and the local citizenry to continue the constant communication and collaboration.

CBP may use the Shelby Park boat ramp but may not use other areas of the park for patrolling or other operations. Other than the night of January 10, 2024, the day of January 11, 2024, and the morning of January 12, 2024, CBP has had full use of the Shelby Park boat ramp to launch boat operations since TXNG took control of the park.

Migrants continue to cross in Eagle Pass and the entire Del Rio Sector. Most of the migrants are in the "Removal Process." Clarification of the term revealed that the "removal process" includes the asylum adjudication procedure. It is unclear from the testimony what percentage of the migrants crossing into the United States in the Del Rio Sector or the southwest border are actually deported or physically removed from the United States, and how many are allowed to remain in the "removal process" while awaiting an administrative asylum determination.

As of March 3, 2024, there are approximately 160 TXNG soldiers operating in various capacities at Shelby Park. The public can use portions of the park for recreation, from golfing to birthday parties. Protests are not allowed, but religious services are allowed. Fletcher also indicated that BP has not asked TXNG for permission to bring scope trucks into the park.

Since the takeover, Texas has classified its interactions with migrants into three categories: first, a migrant with a medical issue will be transported for medical care; second, a migrant whose conduct falls under the state criminal trespass statute will be arrested and charged; and third, a migrant who neither has a medical issue nor whose conduct falls under the criminal trespass statute will be handed over to BP. Today, according to Fletcher, migrants who illegally enter Shelby Park will be evaluated to determine if they have a medical condition requiring emergency services and EMS will be called. If they fall within the criminal trespass statute, DPS will arrest them. According to Fletcher, most migrants that cross fall into this category and lead to arrests. Families will be transported and handed off to BP personnel. After the January 2024 events, migrants continue to cross in Eagle Pass. Since this Court's initial TRO, the Defendants have not cut or attempted to cut any wire barriers in the Eagle Pass area.

## III. CONCLUSION

For years, the federal and Texas governments have cooperated with each other to protect the border.  Like in other parts of the Texas-Mexico border, federal and state agents in the Eagle Pass, Texas area usually work well together.  But the circumstances currently before the Court have been exceptional.  It pains the Court to know that the parties' relationship in ensuring border security has diminished.  Such a breakdown affects the parties' line agents, who are not responsible for the direction of their respective organizations. More importantly, that breakdown affects the public. The parties should never forget: they are bound to serve the public.

SIGNED and ENTERED on this 26th day of March, 2024.

ALIA MOSES
Chief United States District Judge