# THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## DEL RIO DIVISION

**STATE OF TEXAS**,

> *Plaintiff,*

**v.**

**U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,**

> *Defendants.*

Case No. 2:23-cv-00055-AM

Hon. Alia Moses

# DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND .................................................................................................... 1

I.    Statutory Background ................................................................................. 1

II.   Factual and Procedural Background ........................................................... 3

LEGAL STANDARD ............................................................................................ 4

ARGUMENT ......................................................................................................... 5

I.    This Court Lacks Jurisdiction Over Texas's State Tort-Law Claims, Which In Any Event Fail To State A Claim ............................................... 5

    A.   Sovereign immunity bars suits against the United States seeking equitable relief under state tort law ............................................................. 5

    B.   Under the Supremacy Clause, Texas cannot control or impede Border Patrol's execution of federal law ............................................................... 8

       1.   Border Patrol's challenged actions are authorized by federal law. ................... 8

       2.   Texas's reliance on state tort law to regulate federal law-enforcement activities violates the Supremacy Clause ................................. 11

       3.   Texas's state tort laws are conflict preempted. ................................. 12

II.   Texas's APA Claims Should Be Dismissed. ............................................ 13

    A.   Texas has not challenged a final agency action. ..................................... 13

    B.   Border Patrol's decisions regarding the concertina wire are committed to agency discretion by law ......................................................................... 16

    C.   Texas has failed to allege an APA violation ........................................... 17

III.  Texas's *Ultra Vires* Claim Fails. ............................................................. 19

IV.   At A Minimum, The Court Lacks Jurisdiction To Grant Injunctive Relief ............... 20

CONCLUSION .................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Cases**

*Ala.-Coushatta Tribe of Texas v. United States,*
757 F.3d 484 (5th Cir. 2014) ........................................................................... 6

*Al Otro Lado, Inc. v. Nielsen,*
327 F. Supp. 3d 1284 (S.D. Cal. 2018) ........................................................... 15

*Apter v. HHS,*
80 F.4th 579 (5th Cir. 2023) ........................................................................... 19

*Arizona v. Biden,*
40 F.4th 375 (6th Cir. 2022) ........................................................................... 20

*Arizona v. California,*
283 U.S. 423 (1931) ........................................................................................ 11

*Arizona v. United States,*
567 U.S. 387 (2012) ................................................................................... 1, 12

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .............................................................................. 4, 5, 15

*Biden v. Texas,*
597 U.S. 785 (2022) ................................................................................... 2, 20

*Boelens v. Redman Homes, Inc.,*
748 F.2d 1058 (5th Cir. 1984) .......................................................................... 5

*City of N.Y. v. Dep't of Def.,*
913 F.3d 423 (4th Cir. 2019) ........................................................................... 14

*Cunningham v. Neagle,*
135 U.S. 1 (1890) ..................................................................................... 11, 14

*Danos v. Jones,*
652 F.3d 577 (2011) ........................................................................................ 19

*DHS v. Texas,*
144 S. Ct. 715 (2024) ........................................................................................ 4

*DHS v. Thuraissigiam,*
140 S. Ct. 1959 (2020) ...................................................................................... 2

*DRG Funding Corp. v. Sec'y of HUD,*
    76 F.3d 1212 (D.C. Cir. 1996) ........................................................................ 16

*El-Shifa Pharm. Indus. Co. v. United States,*
    607 F.3d 836 (D.C. Cir. 2010) .......................................................................... 6

*Fla. Dep't of State v. Treasure Salvors, Inc.,*
    458 U.S. 670 (1982) ............................................................................................ 3

*Funk v. Stryker Corp.,*
    631 F.3d 777 (5th Cir. 2011) ........................................................................... 9

*Garland v. Aleman Gonzalez,*
    596 U.S. 543 (2022) ......................................................................................... 20

*Geier v. Am. Honda Motor Co.,*
    529 U.S. 861 (2000) ................................................................................... 12, 13

*Geo Grp., Inc. v. Newsom,*
    50 F.4th 745 (9th Cir. 2022) .......................................................................... 12

*Geyen v. Marsh,*
    775 F.2d 1303 (5th Cir. 1985) ......................................................................... 6

*Goodyear Atomic Corp. v. Miller,*
    486 U.S. 174 (1988) ......................................................................................... 11

*Halprin v. FDIC,*
    2016 WL 5718021 (W.D. Tex. Sept. 30, 2016) ............................................ 10

*Hancock v. Train,*
    426 U.S. 167 (1976) ......................................................................................... 12

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ................................................................................... 16, 17

*In re Supreme Beef Processors, Inc.,*
    468 F.3d 248 (5th Cir. 2006) ........................................................................ 5, 8

*INS v. Miranda,*
    459 U.S. 14 (1982) ........................................................................................... 10

*Jaffee v. United States,*
    592 F.2d 712 (3d Cir. 1979) ............................................................................. 7

iii

*Johnson v. Maryland*,
  254 U.S. 51 (1920) ................................................................................................... 11

*Lane v. Pena*,
  518 U.S. 187 (1996) ...................................................................................................... 5

*Larson v. Domestic & Foreign Commerce Corp.*,
  337 U.S. 682 (1949) ................................................................................................ 6, 19

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) .................................................................................................... 16

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) .................................................................................................... 14

*Mares v. Wood Grp. Mustang, Inc.*,
  2015 WL 75271 (S.D. Tex. Jan. 6, 2015) .................................................................. 10

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ...................................................................................................... 8

*Mayo v. United States*,
  319 U.S. 441 (1943) .................................................................................................... 11

*McCulloch v. Maryland*,
  17 U.S. (4 Wheat.) 316 (1819) ................................................................................... 11

*Molzof v. United States*,
  502 U.S. 301 (1992) ...................................................................................................... 8

*Moskovits v. Mercedes-Benz Fin. Servs. USA, LLC*,
  2022 WL 3969547 (S.D. Tex. July 18, 2022),
  *rec. & recommendation adopted*, 2022 WL 3998507 (S.D. Tex. Aug. 31, 2022),
  *aff'd*, 2023 WL 6972986 (5th Cir. Oct. 23, 2023) ................................................... 10

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ...................................................................................................... 18

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ...................................................................................................... 14

*Pennhurst State Sch. & Hosp. v. Halderman*,
  465 U.S. 89 (1984) ...................................................................................................... 19

*Perez v. Mortgage Bankers Ass'n*,
  575 U.S. 92 (2015) ...................................................................................................... 18

*Perry Capital LLC v. Mnuchin,*
  864 F.3d 591 (D.C. Cir. 2017) .................................................................. 7

*Public Util. Comm'n of Cal. v. United States,*
  355 U.S. 534 (1958) ................................................................................ 13

*Ramming v. United States,*
  281 F.3d 158 (5th Cir. 2001) ..................................................................... 4

*Sale v. Haitian Centers Council, Inc.,*
  509 U.S. 155, 158 (1993) ............................................................................ 2

*Sheehan v. Army & Air Force Exch. Serv.,*
  619 F.2d 1132 (5th Cir. 1980),
  *rev'd on other grounds*, 456 U.S. 728 (1982) ........................................... 6

*Sierra Club v. Peterson,*
  228 F.3d 559 (5th Cir. 2000) ................................................................... 14

*Sierra Club v. U.S. Dep't of Interior,*
  990 F.3d 909 (5th Cir. 2021) ................................................................... 18

*Steele v. City of Hous.,*
  603 S.W.2d 786 (Tex. 1980) ....................................................................... 9

*Texas v. DHS,*
  88 F.4th 1127 (5th Cir. 2023) .................................................................... 4

*Texas v. Kleinert,*
  855 F.3d 305 (5th Cir. 2017) ................................................................... 11

*Treasurer of N.J. v. Dep't of Treasury,*
  684 F.3d 382 (3d Cir. 2012) ...................................................................... 7

*Trudeau v. FTC,*
  456 F.3d 178 (D.C. Cir. 2006) .......................................................... 6, 7, 19

*U.S. Army Corps of Eng'rs v. Hawkes Co.,*
  578 U.S. 590 (2016) ................................................................................ 14

*United States v. Chem. Found.,*
  272 U.S. 1 (1926) .................................................................................... 10

*United States v. Delgado-Garcia,*
  374 F.3d 1337 (D.C. Cir. 2004) ............................................................... 17

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*,
  467 U.S. 797 (1984) ................................................................................................. 8

*United States v. Texas*,
  557 F. Supp. 3d 810 (W.D. Tex. 2021) .................................................................. 13

*United States v. Texas*,
  586 F. Supp. 3d 574 (W.D. Tex. 2022) .................................................................. 12

*United States v. Texas*,
  599 U.S. 670 (2023) ........................................................................................... 16, 17

*United States v. Washington*,
  596 U.S. 832 (2022) ........................................................................................... 11, 12

*USIA v. Krc*,
  989 F.2d 1211 (D.C. Cir. 1993) .............................................................................. 7

*Walker v. Beaumont Indep. Sch. Dist.*,
  938 F.3d 724 (5th Cir. 2019) ................................................................................... 5

**Statutes**

5 U.S.C. § 553 ....................................................................................................... 18

5 U.S.C. § 701 ....................................................................................................... 16

5 U.S.C. § 702 ..................................................................................................... 5, 6

5 U.S.C. § 704 ....................................................................................................... 14

5 U.S.C. § 706 ....................................................................................................... 17

6 U.S.C. § 211 ..................................................................................................... 1, 9

8 U.S.C. § 1103 .................................................................................................. 1, 17

8 U.S.C. § 1221 ...................................................................................................... 20

8 U.S.C. § 1225 ................................................................................................... 2, 8

8 U.S.C. § 1226 ............................................................................................. 2, 8, 20

8 U.S.C. § 1229 ........................................................................................................ 2

8 U.S.C. § 1229c ...................................................................................................... 2

8 U.S.C. § 1252 .................................................................................................. 20

8 U.S.C. § 1324 .................................................................................................... 2

8 U.S.C. § 1325 .................................................................................................... 2

8 U.S.C. § 1357 ........................................................................................... 2, 9, 17

28 U.S.C. § 1346 ................................................................................................ 7, 8

Pub. L. No. 94-574, 90 Stat. 2721 (1976) ......................................................... 6, 7

**The Constitution**

U.S. Const. art. VI, cl. 2 ...................................................................................... 11

**Rules**

Fed. R. Civ. P. 12................................................................................................ 1, 6

**Legislative Materials**

82 Cong. Rec. 1420 (1952) .................................................................................... 9

H.R. Rep. No. 82-1377 (1952) ............................................................................... 9

H.R. Rep. No. 94-1656 (1976) ........................................................................... 6, 7

S. Rep. No. 94-966 (1976) ................................................................................. 6, 7

**Regulations**

8 C.F.R. § 287.1(c) ........................................................................................... 2, 17

**Other Authorities**

Treaty of Peace, Friendship, Limits, and Settlement between the United States of
    America and the Mexican Republic, Feb. 2, 1848, 9 Stat. 922, 1848 WL 6374 ................. 9

**INTRODUCTION**

This Court correctly denied Texas's motion for a preliminary injunction because the State is not likely to succeed on its claims. Mem. Op. & Order, ECF No. 57 (Nov. 29, 2023) (PI Order). Consistent with that ruling, the Court should now dismiss the case for lack of jurisdiction and failure to state a claim. Fed. R. Civ. P. 12(b)(1), (6). Sovereign immunity bars Texas's state tort-law claims, its Administrative Procedure Act (APA) claims fail to challenge a final agency action, and the State has not cleared the high bar to proceed on an *ultra vires* claim. *See* PI Order at 19, 33, 34. Those defects—and others discussed below, including the federal government's immunity under the Supremacy Clause—are fatal to the State's case.

**BACKGROUND**

**I.      Statutory Background**

"The Government of the United States has broad, undoubted power over the subject of immigration." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Among other things, the Secretary of Homeland Security has "the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of [noncitizens]." 8 U.S.C. § 1103(a)(5). The Secretary may "establish such regulations" and "perform such other acts as he deems necessary for carrying out his authority" under the Immigration and Nationality Act (INA). *Id.* § 1103(a)(3).

U.S. Customs and Border Protection (CBP), an agency within the Department of Homeland Security (DHS), is charged with "enforc[ing] and administer[ing] all immigration laws," including "the inspection, processing, and admission of persons who seek to enter" the United States and "the detection, interdiction, [and] removal ... of persons unlawfully entering ... the United States." 6 U.S.C. § 211(c)(8). U.S. Border Patrol is CBP's "law enforcement office … with primary responsibility for interdicting persons attempting to illegally enter" the country between ports of entry. *Id.* § 211(e)(3)(A).

Congress has provided that a noncitizen "present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival …)" is "deemed … an applicant for admission." 8 U.S.C. § 1225(a)(1). The INA authorizes immigration officers to "inspect[]" all such applicants. *Id.* § 1225(a)(3); *see also id.* § 1226 (authorizing apprehension and detention). Border Patrol agents have authority, without a warrant, "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States" and "to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law" where the individual is likely to abscond. *Id.* § 1357(a)(1)-(2). And Congress has further provided that "within a distance of twenty-five miles from any" external boundary to the United States, Border Patrol agents "shall have the power without warrant … to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States." *Id.* § 1357(a)(3).[1]

The INA has specified procedures for a noncitizen's removal or departure from the United States. *See, e.g., id.* §§ 1225(a)(4) (withdrawal), 1229a (removal proceedings), 1225(b)(1) (expedited removal), 1229c (voluntary departure). With limited exceptions, noncitizens may apply for asylum, regardless of whether they arrive at a designated port of entry. *Id.* §§ 1225(a)(1), (b)(1)(A)(ii), 1158(a). Inadmissible noncitizens may be detained, released subject to certain requirements, or prosecuted, *see, e.g., id.* §§ 1225(b)(1), 1226, 1229(a), 1325, 1326, but may not be immediately expelled back across the border, *see Biden v. Texas*, 597 U.S. 785, 806 (2022) ("The Executive … cannot unilaterally return … migrants to Mexico.").[2] Under Congress's design, even a noncitizen "who tries to enter the country

---

[1] "[P]atrolling the border to prevent the illegal entry of aliens into the United States … means conducting such activities as are customary, or reasonable and necessary, to prevent the illegal entry of aliens into the United States." 8 C.F.R. § 287.1(c).

[2] *Sale v. Haitian Centers Council, Inc.* involved migrants who had not "arrived at the border of the United States"; the Coast Guard encountered their vessels "beyond the territorial sea of the United States." 509 U.S. 155, 158, 160 (1993).

illegally is treated as an 'applicant for admission'" with certain statutory rights. *DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) (quoting 8 U.S.C. § 1225(a)(1)).

## II.    Factual and Procedural Background

This Court is familiar with the factual and procedural background of this case. *See* PI Order at 2–10. In summary, as part of Texas's Operation Lone Star, the State has deployed concertina wire allegedly on "state, municipal, or private land" along the riverbank of the U.S. side of the Rio Grande near Eagle Pass to deter noncitizens from crossing into the United States. Compl. ¶¶ 30, 32, 63, ECF No. 1.[3] This wire "creates a barrier between crossing migrants and law enforcement personnel." PI Order at 8. Border Patrol has cut or moved this wire on occasion to reach migrants. *See* Compl. ¶¶ 57-58.

On October 24, 2023, Texas sued to enjoin Border Patrol from cutting or moving the wire, raising state tort-law, APA, and *ultra vires* claims. *Id.* ¶¶ 61–101. Thereafter, it also sought emergency relief. *See* ECF Nos. 3-1, 5. On October 30, 2023, the Court entered a temporary restraining order, enjoining Defendants from, among other things, "removing the [wire] from its present location [in Eagle Pass, Texas] for any reason other than to provide or obtain emergency medical aid." Order at 6, ECF No. 9. The Court then heard arguments and took evidence on November 7 and 27. *See* ECF Nos. 32, 52.

On November 29, the Court denied Texas's motion for a preliminary injunction. *See* PI Order. Among other things, the Court found that Texas had failed to show a substantial likelihood of success on the merits of its claims because: first, the Court lacked subject-matter jurisdiction over Texas's state tort-law claims for equitable relief because Congress has not unambiguously waived the United States' sovereign immunity for such claims, *id.* at 19; second, Texas had failed to demonstrate the existence of a final agency action, *id.* at 32-33; and third, Texas had failed to show that Border Patrol had '"no

---

[3] The complaint has two paragraphs numbered 61, 62, 63, 64, and 65. Except where noted, Defendants' citations here refer to the second paragraphs with these numbers.

colorable basis' for the challenged actions" to support an *ultra vires* claim, *id.* at 33 (quoting *Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 682 (1982)). The Court also noted Texas's concession that Border Patrol at least has authority to cut or move the wire to respond to "an emergency, such as a drowning or heat exhaustion." *Id.* at 8.

Texas appealed this decision, and on December 4, 2023, it sought an injunction pending appeal from the Fifth Circuit. A motions panel granted that request on December 19, *see Texas v. DHS*, 88 F.4th 1127 (5th Cir. 2023), disagreeing with this Court's sovereign-immunity holding and finding that Texas was likely to succeed on its state tort-law claims, *id.* at 1134-35. The Supreme Court vacated that injunction pending appeal. *See DHS v. Texas*, 144 S. Ct. 715 (2024).

On January 26, 2024, the Fifth Circuit held Texas's appeal in abeyance for 60 days and remanded the case to this Court "to make additional fact findings concerning matters contested by the parties" in the Supreme Court. Order at 3, *Texas v. DHS*, No. 23-50869 (5th Cir. Jan. 26, 2024). This Court held the remand hearing on March 4 and 5, ECF No. 92, and issued supplemental findings of fact on March 26, *see* ECF No. 98. Supplemental briefing in the Fifth Circuit will be complete on May 20. *See* Order (5th Cir. Apr. 8, 2024).

## LEGAL STANDARD

Rule 12(b)(1) authorizes dismissal where the Court lacks subject-matter jurisdiction. "Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). The party asserting jurisdiction bears "[t]he burden of proof." *Id.*

Rule 12(b)(6) authorizes dismissal where a plaintiff "fail[s] to state a claim upon which relief can be granted." "To survive a [12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" meaning that there is enough "factual content" that "the court [can] draw

4

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A pleading that offers 'labels and conclusions' or 'a formulaic recitations of the elements of a cause of action will not do.'" *Id.* The Court may also consider "documents attached to the complaint" and "matters of which judicial notice may be taken." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019).

## ARGUMENT

## I.   This Court Lacks Jurisdiction Over Texas's State Tort-Law Claims, Which In Any Event Fail To State A Claim.

Counts 1 and 2 of the complaint asserting state tort-law claims for equitable relief should be dismissed for lack of jurisdiction because Congress has not waived sovereign immunity for such claims, *see* PI Order at 19, and for failure to state a claim because the claims are barred by the Supremacy Clause.

### A.   Sovereign immunity bars suits against the United States seeking equitable relief under state tort law.

"The federal government enjoys complete sovereign immunity except as it has consented to be sued and consented to submit to liability." *In re Supreme Beef Processors, Inc.*, 468 F.3d 248, 255 (5th Cir. 2006) (en banc). A waiver of sovereign immunity must be "strictly construed, in terms of its scope, in favor of the sovereign." *Lane v. Pena*, 518 U.S. 187, 192 (1996). Contrary to Texas's assertion, *see* Compl. ¶ 22, 5 U.S.C. § 702 does not include "clear and unambiguous authorization" for state-law claims seeking equitable relief against the federal government. *See* PI Order at 19. Section 702 states:

> "[a]n action in [federal] court … seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States."

Especially when construing the provision in favor of the sovereign, the waiver of sovereign immunity properly is limited to suits arising under federal law and invoking federal-question jurisdiction under 28 U.S.C. § 1331. *Cf. Boelens v. Redman Homes, Inc.*, 748

F.2d 1058, 1067 (5th Cir. 1984) (strictly construing grant of jurisdiction because "there is a presumption against a statutory construction that would significantly affect the federal-state balance"). Indeed, the Fifth Circuit has long held that § 702 "waives immunity for two distinct types of claims": (1) those brought under "the general provisions of the APA"; and (2) "non-statutory" claims "against federal agencies *arising under 28 U.S.C. § 1331.*" *Ala.-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 488 (5th Cir. 2014) (emphasis added).[4] State-law claims do not fit in either category. *See El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 854 (D.C. Cir. 2010) (Kavanaugh, J., concurring) ("[T]he APA does not borrow state law or permit state law to be used as a basis for seeking injunctive or declaratory relief against the United States."). Thus, as this Court has already recognized, case law does not support interpreting § 702's waiver to include state-law claims. *See* PI Order at 17-19.

The statutory history is consistent with that interpretation. Congress added the waiver language in 1976, *see* Pub. L. No. 94-574, 90 Stat. 2721, 2721, to largely "do away with the *ultra vires* doctrine and other fictions surrounding sovereign immunity." *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985); *see* H.R. Rep. No. 94-1656 at 5 (1976); S. Rep. No. 94-966 at 5 (1976). Those legal fictions permitted suits based on federal—not state—law. *See Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 695 (1949) ("[I]f actions of [a federal] officer do not conflict with the terms of his valid statutory authority," they are barred by sovereign immunity and cannot support an *ultra vires* claim, "whether or not they are tortious under general law."); *Geyen*, 775 F.2d at 1307 (relying on *Larson*). Indeed, in 1976, Congress simultaneously eliminated the amount-in-controversy

---

[4] Federal appellate cases addressing the scope of § 702's waiver of sovereign immunity primarily focus on whether the waiver extended to "nonstatutory review of agency action under section 1331," *Sheehan v. Army & Air Force Exch. Serv.*, 619 F.2d 1132, 1139 (5th Cir. 1980), *rev'd on other grounds*, 456 U.S. 728 (1982), and how any waiver interacts with other APA provisions—not on whether § 702's waiver extended to state-law claims. *See, e.g.*, *Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006).

requirement for federal-question jurisdiction under 28 U.S.C. § 1331 so federal courts could hear all cases arising under federal law for which § 702 waives sovereign immunity. *See* 90 Stat. at 2721; H.R. Rep. No. 94-1656 at 3; S. Rep. No. 94-966 at 2; *Jaffee v. United States*, 592 F.2d 712, 718 (3d Cir. 1979) ("Congress amended section 702 with a specific purpose of waiving sovereign immunity in equitable actions brought under section 1331."). But Congress has never provided a jurisdictional grant for injunctive claims brought under state law, which further underscores that in 1976 Congress intended only to provide a "Federal forum for Federal claims," H.R. Rep. No. 94-1656 at 14; S. Rep. No. 94-966 at 13.

Texas's contrary authority—a total of four sentences in two cases—is not persuasive. In *Perry Capital LLC v. Mnuchin*, a panel observed that D.C. Circuit "precedent" "foreclosed" the "argument that § 702 does not waive [the federal government's] immunity from suit for state law claims." 864 F.3d 591, 620 (D.C. Cir. 2017). But the cited "precedent" did not clearly involve any state-law claims, let alone expressly decide whether § 702 waives sovereign immunity for state-law claims. *See Trudeau*, 456 F.3d at 186 (addressing non-statutory claims that arose under federal law); *USIA v. Krc*, 989 F.2d 1211, 1216 (D.C. Cir. 1993) (addressing tortious-interference claim in context of federal-employment dispute without specifying whether it arose under D.C. or federal common law). In *Treasurer of N.J. v. Dep't of Treasury*, 684 F.3d 382, 400 n.19 (3d Cir. 2012), the Third Circuit's footnote that § 702's text and history do not distinguish "between federal and state law" is likewise conclusory. In any event, its more considered holding is that applying state law to the federal government violates the Supremacy Clause. *See id.* at 406-12; *see also* pp. 11-12, *infra*.

Even if § 702 waives the federal government's sovereign immunity for some state-law claims, the waiver still does not extend to state *tort-law* claims. The last sentence of § 702 provides that "[n]othing herein … confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is

7

sought." The FTCA is such a statute. It waives sovereign immunity for money-damages claims "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of [a federal] employee" with important limitations. 28 U.S.C. § 1346(b)(1). Among other things, it permits only certain money damages—not prospective relief, *see id.* §§ 1346(b); *see also* 2674 (no punitive damages), and it does not permit claims challenging discretionary functions or actions authorized by statute, *see id.* § 2680(a). Congress thus "dealt in particularity with" state tort-law claims and "'intended a specified remedy'—including its exceptions—to be exclusive." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 216 (2012). Indeed, the FTCA's limitations and exceptions "are designed to protect certain important governmental functions and prerogatives from disruption," *Molzof v. United States*, 502 U.S. 301, 311 (1992), and "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort," *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984). Thus, "the APA does not undo the judgment" Congress exercised in enacting the FTCA, and Texas "cannot use the APA to end-run the [FTCA's] limitations." *Patchak*, 567 U.S. at 216; *see In re Supreme Beef*, 468 F.3d at 255 ("That state law defines certain conduct as tortious, however, simply does not mean that a private person may sue the U.S. Government solely under the state's law" because "[t]he federal government enjoys complete sovereign immunity except as it has consented to be sued.").

**B.   Under the Supremacy Clause, Texas cannot control or impede Border Patrol's execution of federal law.**

Even if the Court were to conclude that it has jurisdiction over Texas's state tort-law claims, the Supremacy Clause stands as an independent barrier to those claims.

**1.   Border Patrol's challenged actions are authorized by federal law.**

As an initial matter, federal law authorizes Border Patrol agents to cut or move concertina wire to carry out their duties. The INA provides for the inspection,

apprehension, and detention of noncitizens present in the United States, 8 U.S.C. §§ 1225(a)(3), 1226, which, in this case, means noncitizens who have crossed the international boundary in the Rio Grande into the United States, *see* Treaty of Peace, Friendship, Limits, and Settlement between the United States of America and the Mexican Republic, Feb. 2, 1848, 9 Stat. 922, 1848 WL 6374, at *3. Congress has given that responsibility to Border Patrol. *See* 6 U.S.C. § 211(c)(8). Further, the INA authorizes Border Patrol, without a warrant, to "access … private lands" within 25 miles of the international border "for the purpose of patrolling the border to prevent the illegal entry of aliens," 8 U.S.C. § 1357(a)(3), as well as to interrogate and arrest certain noncitizens suspected of unlawfully crossing the border into the United States, *id.* § 1357(a)(1), (2).

Congress enacted § 1357(a)(3) because "the refusal of some property owners along the border to allow patrol officers access" to their land was "endanger[ing] the national security" and "affect[ing] the sovereign right of the United States to protect its own boundaries against the entry of [noncitizens], including those of the most dangerous classes." H.R. Rep. No. 82-1377, at 3 (1952); *see* 82 Cong. Rec. 1420 (1952) (statement of Rep. Fisher) (opposing legislation because it would authorize agents "to break down a gate or a fence or anything else in order to carry out their functions of patrolling the border"). Indeed, the authority to remove barriers precluding access to the border and to migrants within the United States inheres in Border Patrol's general authorities. *See* H.R. Rep. No. 82-1377 at 3 (recognizing that § 1357(a)(3) was a "positive legislative enactment authoriz[ing] specifically that which must always have been of necessity implied from the time the border patrol was first created"); *cf. Steele v. City of Hous.*, 603 S.W.2d 786, 792-93 (Tex. 1980) (government may defend its "destruction of … property as a means to apprehend escapees" based on "public necessity"). Under these authorities, Border Patrol agents have "cut locks on gates if they need to do so to apprehend a migrant" and "there's

an emergent need." Tr. at 111, ECF No. 37 (testimony of Texas's witness Mr. Banks)[5]; *accord* PI Order at 23 ("DHS has long made use of [§ 1357(a)(3)] to move or cut privately owned fencing within 25 miles of the international border when exigencies arise.").

These same authorities similarly permit Border Patrol to cut or move Texas's concertina wire. By design, the concertina wire seeks to impede migrants who have crossed the international boundary in the Rio Grande near Eagle Pass from moving further into the United States. Compl. ¶ 36. But the wire may also impede Border Patrol agents north of the wire from reaching migrants along the river—on U.S. soil—to apprehend them or to provide emergency assistance to them. *See* PI Order at 8; ECF No. 37 at 109 (Banks testimony). Border Patrol agents have accordingly cut or moved the wire to carry out their statutory duties. *See* PI Order at 28 ("The parties agree that medical emergencies justify cutting or moving the Plaintiff's fence." (citing ECF No. 37 at 28, 79)); Compl. ¶¶ 58-59 (identifying instances where agents have allegedly cut wire and allowed noncitizens to pass through the wire).[6] Given the "presumption of regularity" that "supports the official acts of public officers," courts must "presume that [public officers] have properly discharged their official duties" "in the absence of clear evidence to the contrary." *United States v. Chem. Found.*, 272 U.S. 1, 14-15 (1926); *see INS v. Miranda*, 459 U.S. 14, 18 (1982) (applying presumption to actions of INS agents). The facts alleged in the complaint, even if established, would not rebut the presumption. Indeed, the

---

[5] The Court may take judicial notice of Mr. Banks' testimony on behalf of Texas in deciding this motion. *See Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).

[6] Texas's repeated acknowledgement—through witness testimony (ECF No. 37 at 79), at oral argument (ECF No. 37 at 28), and in appellate briefing (Appellant Br. at 11, 41)— that Border Patrol may cut the wire to provide emergency assistance is a judicial admission that the Court may consider in deciding this motion. *See, e.g., Halprin v. FDIC*, 2016 WL 5718021, at *8 (W.D. Tex. Sept. 30, 2016) (dismissing claims under Rule 12(b)(6) based on judicial admission); *Mares v. Wood Grp. Mustang, Inc.*, 2015 WL 75271, at *2 (S.D. Tex. Jan. 6, 2015) (similar); *Moskovits v. Mercedes-Benz Fin. Servs. USA, LLC*, 2022 WL 3969547, at *12 (S.D. Tex. July 18, 2022) (similar), *rec. & recommendation adopted*, 2022 WL 3998507, at *1 (S.D. Tex. Aug. 31, 2022), *aff'd*, 2023 WL 6972986, at *1 (5th Cir. Oct. 23, 2023).

incidents described in the complaint are consistent with Border Patrol cutting the wire to access and appropriately process noncitizens who have crossed into the United States.

> ## 2. Texas's reliance on state tort law to regulate federal law-enforcement activities violates the Supremacy Clause.

Texas's attempt to regulate Border Patrol agents' performance of their duties violates the federal government's immunity under the Supremacy Clause (sometimes called "intergovernmental immunity"). Federal law is "the supreme Law of the Land," U.S. Const. art. VI, cl. 2, and it is firmly established that states have no power "to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government," *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819); *see also Mayo v. United States*, 319 U.S. 441, 445 (1943) (holding that "activities of the Federal Government are free from regulation by any state"). As the Supreme Court recently reiterated, the Supremacy Clause "prohibit[s] States from interfering with or controlling the operations of the Federal Government." *United States v. Washington*, 596 U.S. 832, 838 (2022). That prohibition extends to "even the most unquestionable and most universally applicable of state laws," which "will not be allowed to control the conduct of a[n] [official] of the United States acting under and in pursuance of the laws of the United States." *Johnson v. Maryland*, 254 U.S. 51, 56-57 (1920) (citing *Cunningham v. Neagle*, 135 U.S. 1, 60 (1890)); *see, e.g.*, *Arizona v. California*, 283 U.S. 423, 451 (1931) ("The United States may perform its functions without conforming to the police regulations of a State.").

Here, in seeking injunctive relief based on its state tort-law claims, Texas seeks to limit Border Patrol agents' ability to cut or move Texas's concertina wire to access migrants in a manner that the agents deem necessary and appropriate to carry out their statutory functions. This limitation constitutes a direct regulation of federal officers carrying out their federal duties, *see Texas v. Kleinert*, 855 F.3d 305, 313-14 (5th Cir. 2017) ("Supremacy Clause immunity protects federal officers, acting within their federal

authority, from liability under state law," whether by "prosecution or private suit."), and, therefore, violates the Supremacy Clause unless Congress has "provided 'clear and unambiguous' authorization" to permit state law to regulate federal activities, *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988). But there is no "clear congressional mandate" authorizing "regulation by a subordinate sovereign" here. *Hancock v. Train*, 426 U.S. 167, 179 (1976). Accordingly, the Supremacy Clause precludes Texas's state tort-law claims. *See Washington*, 596 U.S. at 838; *see, e.g.*, *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 761 (9th Cir. 2022) (en banc) (California law that "prohibits ICE from exercising its discretion to arrange for immigration detention in the privately run facilities it has deemed appropriate" violated the Supremacy Clause); *United States v. Texas*, 586 F. Supp. 3d 574, 584 (W.D. Tex. 2022) (Texas law "dictating whether and how [federal actors] can transport certain groups of noncitizens … regulate[d] the United States directly" and violated the Supremacy Clause (cleaned up)). Indeed, if federal officials could not cut the wire to access and apprehend noncitizens, any jurisdiction opposed to federal immigration enforcement—or even any individual property owner—could enclose a large area and impede enforcement of federal law.

### 3. Texas's state tort laws are conflict preempted.

Texas's state-law claims also fail because "state laws are preempted when they conflict with federal law." *Arizona*, 567 U.S. at 399. The Supremacy Clause mandates such preemption where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id*. Put another way, the Supremacy Clause "nullifie[s]" state laws that, among other things, "prevent or frustrate the accomplishment of a federal objective." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000). It does not matter "whether that 'obstacle' goes by the name of 'conflicting; contrary to; … repugnance; difference; irreconcilability; inconsistency; violation; curtailment; … interference,' or the like." *Id.*

Here, applying Texas's state tort laws to prevent Border Patrol agents from carrying out their statutory duties constitutes an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Arizona*, 567 U.S. at 399, in violation of the Supremacy Clause. Courts have found preemption in similar circumstances. *See*, *e.g.*, *Public Util. Comm'n of Cal. v. United* States, 355 U.S. 534, 544 (1958) (California law restricting federal government's ability to negotiate rates preempted); *United States v. Texas*, 557 F. Supp. 3d 810, 818 (W.D. Tex. 2021) (disruption of "the United States' ability to transport noncitizens" preempted).

That Border Patrol may be able to create partial work-arounds in some circumstances, such as by apprehending migrants from the river side of the wire, does not lessen the constitutional injury. The Constitution prohibits state efforts "that prevent *or frustrate* the accomplishment of a federal objective." *Geier*, 529 U.S. at 873 (emphasis added). Indeed, in holding that ordinary preemption principles must apply when a state law could impose legal duties that would conflict directly with federal mandates, the Supreme Court has refused "to distinguish among types of federal-state conflict" because "[t]hat kind of analysis … would engender legal uncertainty with its inevitable systemwide costs." *Id.* at 874. Accordingly, Texas's state-law claims should be dismissed as inconsistent with the Constitution.

## II.     Texas's APA Claims Should Be Dismissed.

Counts 3, 4, and 5 of the complaint asserting various APA claims likewise should be dismissed because Texas has failed to identify a final agency action, because Border Patrol's decision to cut or move the concertina wire to access migrants is committed to agency discretion by law, and because Texas has failed to state an APA claim.

### A.     Texas has not challenged a final agency action.

In determining that Texas was unlikely to succeed on its APA claims, this Court properly recognized that courts must "take great care not to confuse final agency action with … broader programmatic decisions" and should "reject invitations to find final

agency action in an agency's 'continuing (and thus changing) operations.'" PI Order at 31. Applying this standard, the Court determined at the preliminary-injunction stage that Texas had not satisfied its burden of demonstrating "the existence of a final agency action." *Id.* at 33. The complaint likewise lacks sufficient allegations to carry this burden, and the APA claims should be dismissed.

The APA does not authorize programmatic attacks on "day-to-day agency management." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 67 (2004). It authorizes review only of discrete "final agency action." 5 U.S.C. § 704; *see Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000) (en banc) ("final action must be 'an identifiable action or event.'"). To be final, an action "must mark the consummation of the agency's decisionmaking process," must not be "tentative or interlocutory," and "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016). That is, under the APA, a plaintiff cannot "seek *wholesale* improvement of [government] program[s] by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). And "[a]bsent a specific and final agency action," this Court "lack[s] jurisdiction to consider a challenge to agency conduct." *Sierra Club*, 228 F.3d at 565.

Here, to the extent the complaint launches a "programmatic" attack against federal agents' performance of their day-to-day duties, it is not cognizable under the APA. *Lujan*, 497 U.S. at 891; *see Norton*, 542 U.S. at 64-67. It makes no difference even if Texas can point to "specific allegedly-improper" agency conduct "within [an alleged] program," *Sierra Club*, 228 F.3d at 567, because Texas's claims effectively ask this Court to "supervise an agency's compliance with [its] broad statutory mandate," *City of N.Y. v. Dep't of Def.*, 913 F.3d 423, 433 (4th Cir. 2019), by examining Border Patrol's reasons for cutting Texas's concertina wire in particular instances.

14

In any event, the APA claims cannot survive because the complaint does not include sufficient factual allegations establishing that Texas is challenging a specific final agency action. Texas's bare allegations that "[s]ince September 20, 2023, federal agents have developed and implemented a policy, pattern, or practice of destroying Texas's concertina wire," *see* Compl. ¶¶ 8, 60, are either legal conclusions (to be ignored) or "mere conclusory statements" that do not "suffice" and are "not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 678-79. The allegations that Border Patrol has cut Texas's concertina wire in the past to reach migrants on the other side, *see* Compl. ¶¶ 52-53, 55, 57-59, by themselves do not suggest that a policy exists. At most, they hint at "a sheer possibility that a defendant has acted unlawfully" and do not satisfy the "plausibility standard" required to survive a motion to dismiss. *Iqbal*, 556 U.S. at 678. The complaint further alleges that Defendants have "authorized [their] officials or agents [to destroy the wire] anytime an alien has managed to illegally cross the international border in the Rio Grande [and] to process that alien in the United States." Compl. ¶ 60. But these "unadorned, the-defendant-unlawfully-harmed-me accusations" are "devoid of further factual enhancement" and therefore "will not do," *Iqbal*, 556 U.S. at 678. The same is true for the claim that the supposed Border Patrol "policies" "are largely implemented by higher level CBP leadership." Compl. ¶ 61. When these improper and unsupported allegations are cast aside, as they must be, no plausible allegations remain to show that any final agency action exists for which forward-looking equitable relief is available. *See Al Otro Lado, Inc. v. Nielsen*, 327 F. Supp. 3d 1284, 1321 (S.D. Cal. 2018) (complaint failed to state discrete agency action where "there are no allegations connecting any of [CBP agents'] conduct" to the "unwritten [CBP] policy" alleged by plaintiffs).

Moreover, the record developed in this case so far further demonstrates the lack of a final agency action. Border Patrol's then-Chief of Law Enforcement Operations, and now its second highest ranking official, David BeMiller, has denied the existence of the policy as alleged by Texas. *See* BeMiller Decl. ¶¶ 17-18, ECF No. 23-2; Tr. at 186-87, ECF

No. 37.[7] Texas, on the other hand, has not come forward with evidence to the contrary; indeed, Mr. Banks testified that Border Patrol agents in El Paso and the Rio Grande Valley do *not* cut the wire except when faced with exigent circumstances, ECF No. 37 at 80, 96, undercutting Texas's allegation that the alleged policy is "implemented by higher level CBP leadership," Compl. ¶ 61. Because Texas has not established the existence of the alleged policy—or the requisite final agency action—its APA claims must be dismissed.

### B.    Border Patrol's decisions regarding the concertina wire are committed to agency discretion by law.

Even if Texas has sufficiently alleged final agency action, its APA claims still must be dismissed because whether to cut concertina wire in any particular instance goes to the core of law-enforcement discretion that the APA places beyond judicial review.

The APA does not authorize judicial review where "agency action is committed to agency discretion by law," 5 U.S.C. § 701(a)(2), *i.e.*, where "a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993). There are "certain categories of administrative decisions that courts traditionally have regarded" as falling within this provision, such as law-enforcement decisions, *Lincoln*, 508 U.S. at 191; *see Heckler v. Chaney*, 470 U.S. 821, 831-32 (1985), and decisions involving "interests in national security," *Lincoln*, 508 U.S. at 192. As the Supreme Court has explained, "[u]nder Article II, the Executive Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law,'" whereas courts generally lack the capacity to "assess[] the propriety of enforcement choices" regarding whether and how to arrest

---

[7] The only Border Patrol guidance that exists concerning Texas's wire was issued within the Del Rio Sector. *See* ECF No. 53-1 at 14-15 (outlining various steps line agents should take before cutting wire where exigencies do not exist). Because that guidance limits agents' discretion to cut the wire—and therefore would not harm Texas—the State lacks standing to challenge it, and in any event, this guidance does not qualify as final agency action itself because it plainly contemplates further decisionmaking. *See DRG Funding Corp. v. Sec'y of HUD*, 76 F.3d 1212, 1215 (D.C. Cir. 1996).

noncitizens for immigration-law violations. *United States v. Texas*, 599 U.S. 670, 678-79 (2023).

Here, Congress has granted Border Patrol agents significant discretion to patrol the border and to use their judgment in inspecting and apprehending noncitizens who they encounter at the border, which includes the authority to access private lands within 25 miles of the border without a warrant. *See* 8 U.S.C. §§ 1103(a), 1225, 1357(a); *see also* 8 C.F.R. § 287.1(c). Texas acknowledges this authority. Compl. ¶¶ 78-79. But there are no "manageable standards ... available for judging" *ex ante* "how and when" Border Patrol agents "should exercise [that] discretion"—as Texas's request for relief would have this Court do. *Heckler*, 470 U.S. at 830; *cf. Texas*, 599 U.S. at 680. (The "complicated balancing process" involved in "devising arrest and prosecution policies" "leaves courts without meaningful standards for assessing those policies."). The exercise of enforcement discretion here also necessarily implicates "foreign-policy objectives." *Texas*, 599 U.S. at 679; *see United States v. Delgado-Garcia*, 374 F.3d 1337, 1345 (D.C. Cir. 2004) ("[T]his country's border-control policies are of crucial importance to the national security and foreign policy of the United States."). Just as law-enforcement officers' on-the-spot judgments regarding when to run a red light in pursuit of a subject are committed to their discretion, so are decisions regarding breaches of barriers to border-adjacent lands in order to access migrants unlawfully crossing into the United States. Texas's APA claims for equitable relief are accordingly unreviewable under § 701(a)(2).

### C.     Texas has failed to allege an APA violation.

Texas's APA claims in Counts 3 to 5, in any event, fail as a matter of law. Count 3, which asserts that Defendants have acted in excess of their statutory authority, *id.* ¶¶ 75-89, fails because, as explained above (at 8-11), federal law authorizes Border Patrol agents to take necessary actions to apprehend migrants or provide emergency medical assistance, and that includes cutting the wire. Because Texas's complaint does not include allegations establishing that Border Patrol agents acted in accordance with an unlawful

policy warranting prospective relief, *see* pp. 13-16, *supra*, the claim fails as a matter of law.

Similarly deficient is Count 4, which asserts that "Defendants' policy, pattern, or practice" constitutes a "substantive rule" and that Defendants violated 5 U.S.C. § 706(2)(D) by not providing notice and an opportunity to comment beforehand. Compl. ¶¶ 90-92. The notice-and-comment requirement applies only to certain rulemakings, *see* 5 U.S.C. § 553(b)(A), such as those for legislative rules. Beyond its conclusory allegation that such a rule exists, *see* Compl. ¶ 91, Texas has not alleged any facts establishing that Defendants have promulgated a legislative rule—one that has the "the force and effect of law," *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015)—concerning Border Patrol agents' interaction with Texas's wire. Because Texas has failed to allege such a rulemaking occurred, its claim of a procedural violation fails.

Finally, Count 5 asserting that Defendants' alleged destruction of Texas's concertina wire was arbitrary and capricious, Compl. ¶¶ 93-97, likewise fails because Texas has not alleged sufficient facts. The APA's arbitrary-and-capricious standard is "narrow and highly deferential." *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 909, 913 (5th Cir. 2021). Under that standard, a court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *accord Sierra Club*, 990 F.3d at 913. "[A] court is not to substitute its judgment for that of the agency[.]" *State Farm*, 463 U.S. at 43; *accord Sierra Club*, 990 F.3d at 913.

Texas's allegations fail to meet this highly deferential standard. Texas asserts that because the government supposedly "recogniz[es] the need … for such infrastructure [*i.e.*, concertina wire]" in some contexts, cutting Texas's wire is necessarily arbitrary and capricious. *See* Compl. ¶ 96. The allegations are deficient on their face. Locks on gates have beneficial uses. But Mr. Banks acknowledged that Border Patrol agents may cut them when, in their "judgment," "it is necessary" to apprehend a migrant. ECF No. 37 at 111. The same is true for concertina wire; even Texas cuts the wire to provide medical

18

assistance and to make arrests. Because the complaint does not include any other basis for finding Defendants' actions arbitrary and capricious, this count fails to state a claim.

## III.    Texas's *Ultra Vires* Claim Fails.

In refusing to grant a preliminary injunction, the Court concluded that Texas was unlikely to succeed on Count 6, its *ultra vires* claim, because the State had not shown Border Patrol's actions were taken "without any authority whatever." PI Order at 33-34 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984)). That claim should now be dismissed for the same reason.

A plaintiff asserting an *ultra vires* claim must clear a high bar because "non-statutory review is intended to be of 'extremely limited scope.'" *Trudeau*, 456 F.3d at 190. "To invoke this exception" to sovereign immunity, Texas "must 'do more than simply allege that the actions of the officer are illegal or unauthorized.'" *Danos v. Jones*, 652 F.3d 577, 583 (2011). "The complaint must allege facts sufficient to establish that the officer was acting 'without any authority whatever,' or without any 'colorable basis for the exercise of authority.'" *Id.* (quoting *Pennhurst*, 465 U.S. at 101 n.11); *see Larson*, 337 U.S. at 694 (an "agent's action" is not *ultra vires* just because it is "tortious").

Texas's allegations do not come close to meeting this standard. As explained above, *see* pp. 8-11, *supra*, federal law authorizes Border Patrol agents to remove physical barriers—including concertina wire—impeding their ability to carry out their statutory duties. Indeed, Texas's counsel and witnesses have acknowledged as much for at least certain circumstances. *See* ECF No. 37 at 28, 79; Appellant Br. at 11, 41. That fact defeats any *ultra vires* claim. It also renders inapposite cases like *Apter v. HHS*, 80 F.4th 579, 588-89 (5th Cir. 2023), where the Court concluded that the agency was not authorized to do what it did under any circumstances. At bottom, the dispute here is over whether Texas agrees with Border Patrol's decision to cut or move the wire in particular circumstances. While Texas may try to establish that the agents' actions were tortious in hindsight, its allegations fall far short of the onerous requirements for stating an *ultra vires* claim.

**IV.     At A Minimum, The Court Lacks Jurisdiction To Grant Injunctive Relief.**

Finally, this Court has no jurisdiction to grant the requested injunctive relief, *see* Compl. at 28-29. Congress has expressly withdrawn the Court's "jurisdiction or authority to enjoin or restrain the operation" of 8 U.S.C. §§ 1221-1231—the INA provisions "governing the inspection, apprehension, examination, and removal of aliens." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 549-50 (2022). That prohibition applies "[r]egardless of the nature of the action or claim or of the identity of the party or parties bringing the action." 8 U.S.C. § 1252(f)(1). The Supreme Court has further explained that so long as an order enjoins or restrains actions that "in the Government's view" serve to "enforce, implement, or otherwise carry out" the referenced INA sections, it is impermissible—regardless of whether the court considers the government to be carrying out those sections as "*properly* interpreted." *Aleman Gonzalez*, 596 U.S. at 550-52; *accord Arizona v. Biden*, 40 F.4th 375, 394 (6th Cir. 2022) (Sutton, C.J., concurring) (explaining that "§ 1252(f)(1) has the same force even when the National Government allegedly enforces the relevant statutes unlawfully," as it otherwise "would not be much of a prohibition.").

Here, because the requested relief would require the federal government to "refrain from actions that (… in the Government's view) are allowed" by §§ 1225 and 1226, granting Texas's request would "interfere with the Government's efforts to operate" those provisions, *Aleman Gonzalez*, 596 U.S. at 551, and is therefore barred by § 1252(f)(1), *see, e.g.*, *Biden*, 597 U.S. at 797 (order enjoining DHS's Migrant Protection Protocols "violated" § 1252(f)(1)).

## <u>CONCLUSION</u>

For these reasons, Texas's complaint should be dismissed.

Dated: April 11, 2024                    Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Principal Deputy Assistant Attorney General

                                         JAIME ESPARZA
                                         United States Attorney

                                         JEAN LIN
                                         Special Litigation Counsel

                                         /s/ *Christopher A. Eiswerth*
                                         Christopher A. Eiswerth (D.C. Bar No. 1029490)
                                         Stephen Ehrlich (NY Bar No. 5264171)
                                         Faith E. Lowry (TX Bar No. 24099560)
                                         Trial Attorneys
                                         U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L St., N.W.
                                         Washington, D.C. 20530
                                         Tel: (202) 305-0568 / Fax: (202) 616-8460
                                         christopher.a.eiswerth@usdoj.gov

                                         Robert D. Green (TX Bar No. 24087626)
                                         Assistant United States Attorney
                                         601 N.W. Loop 410, Suite 600
                                         San Antonio, Texas 78216
                                         Tel: (210) 384-7362 / Fax: (210) 384-7312
                                         robert.green3@usdoj.gov

                                         *Counsel for Defendants*

21

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and accurate copy of the foregoing document to be filed electronically (via CM/ECF) on April 11, 2024, which automatically serves all counsel of record who are registered to receive notices in this case.


*/s/ Christopher A. Eiswerth*
Christopher A. Eiswerth