**FILED**
April 16, 2024
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____  J.A. Ward
                              DEPUTY

# *United States Court of Appeals*
### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

TEL. 504-310-7700
600 S. MAESTRI PLACE,
Suite 115
NEW ORLEANS, LA 70130

April 11, 2024

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW:

    No. 23-50869   State of Texas v. DHS
                 USDC No. 2:23-CV-55

Enclosed is an order entered in this case.

The court has granted the motion to supplement the record in this
case.  Counsel is reminded that any citations to these documents
must cite to the supplemental electronic record.

Sincerely,

LYLE W. CAYCE, Clerk

By: _____
Lisa E. Ferrara, Deputy Clerk
504-310-7675

Mr. Monroe David Bryant Jr.
Mr. Matt A. Crapo
Mr. Philip Devlin
Mr. Robert D. Green
Mr. Conor Harvey
Mr. Robert E. Henneke
Mr. James Andrew Mackenzie
Mr. Steven Andrew Myers
Mr. Aaron Lloyd Nielson
Ms. Melissa Nicole Patterson
Ms. Lanora Christine Pettit
Mr. Ryan Daniel Walters

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

April 11, 2024

Lyle W. Cayce
Clerk

No. 23-50869

STATE OF TEXAS,

*Plaintiff—Appellant,*

*versus*

UNITED STATES DEPARTMENT OF HOMELAND SECURITY;
ALEJANDRO MAYORKAS, *Secretary, U.S. Department of Homeland
Security*; UNITED STATES CUSTOMS AND BORDER PROTECTION;
UNITED STATES BORDER PATROL; TROY MILLER, *Senior Official
Performing the Duties of the Commissioner, U.S. Customs and Border
Protection*; JASON OWENS, *in his official capacity as Chief of the U.S. Border
Patrol*; ROBERT DANLEY, *in his official capacity as Chief Patrol Agent, Del
Rio Sector, United States Border Patrol*,

*Defendants—Appellees.*

Appeal from the United States District Court
for the Western District of Texas
USDC No. 2:23-CV-55

ORDER:

IT IS ORDERED that Appellant's motion to supplement the
record is GRANTED. The clerk of the district court is instructed to
promptly supplement the record on appeal to include the district court's

findings of fact, the full transcripts of hearing proceedings, and any exhibits entered into evidence.

LYLE W. CAYCE, CLERK
United States Court of Appeals
for the Fifth Circuit
/s/ Lyle W. Cayce

ENTERED AT THE DIRECTION OF THE COURT

No. 23-50869

# In the United States Court of Appeals for the Fifth Circuit

STATE OF TEXAS,

*Plaintiff-Appellant,*

*v.*

UNITED STATES DEPARTMENT OF HOMELAND SECURITY;
ALEJANDRO MAYORKAS, SECRETARY, U.S. DEPARTMENT OF
HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER
PROTECTION; UNITED STATES BORDER PATROL; TROY MILLER,
SENIOR OFFICIAL PERFORMING THE DUTIES OF THE
COMMISSIONER, U.S. CUSTOMS AND BORDER PROTECTION;
JASON OWENS, IN HIS OFFICIAL CAPACITY AS CHIEF OF THE U.S.
BORDER PATROL; ROBERT DANLEY, IN HIS OFFICIAL CAPACITY AS
CHIEF PATROL AGENT, DEL RIO SECTOR, UNITED STATES
BORDER PATROL,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Texas, Del Rio Division

## APPELLANT'S MOTION TO SUPPLEMENT THE RECORD ON APPEAL

Pursuant to Federal Rule of Appellate Procedure 10(e)(2) and Fifth Circuit Rule 27.1.11, Appellant the State of Texas respectfully requests that the Court direct the clerk of the district court to prepare a supplemental record of proceedings arising from this Court's remand order dated January 26, 2024. ECF 117.

1.    On January 26, 2024, this Court held appellate proceedings in abeyance and remanded to the district court "for 60 days for the limited purpose of developing

the factual record." *Id.* at 2. The Court's order instructed the district court "to make additional fact findings concerning the matters contested by the parties and any other matters the district court deems relevant." *Id.* at 3. The order also noted that "[f]ollowing those proceedings, the panel may request supplemental briefing and will reschedule oral argument in an expeditious manner." *Id.*

2.    Texas notified the district court of this Court's limited remand order. *See Texas v. DHS*, No. 2:23-cv-55 (W.D. Tex. Jan. 28, 2024), ECF 77. The district court scheduled a two-day evidentiary hearing and ordered the parties to provide new document production for *ex parte* and *in camera* review. *See id.*, ECF 78 (Jan. 29, 2024); *id.* ECF 82 (Feb. 7, 2024). The parties submitted a joint brief, *id.* ECF 83 (Feb. 15, 2024), and the hearing was held on March 4–5, *id.* ECF 91-92. A final transcript is not yet available,[1] but eight witnesses testified at the hearing, and the parties entered numerous photographic, video, and documentary exhibits into evidence.

3.    Under examination, Defendants' representatives told a markedly different story from what they had previously suggested in public statements, court pleadings, and correspondence to Texas. *Id.*, ECF 77 at 3-4 (collecting Defendants' statements on January 13, 14, 15, and 18); Attachment A (additional statements admitted into evidence on remand). For example, Robert Danley, the Lead Field Coordinator for

---

[1] After the hearing concluded, both sides requested a copy of the hearing transcript. *See* ECF 90, 95. On April 3 and April 4, the court reporter provided preliminary drafts of a portion of the hearing transcript. The full and final transcript is forthcoming.

the U.S. Customs and Border Protection ("CBP") Del Rio Sector, had declared in the Supreme Court that he had some "personal knowledge" of the details of events happening at Shelby Park between January 10 and January 15, 2024. *E.g.*, Suppl. Mem. Regarding Emergency Appl. to Vacate the Inj. Pending Appeal, First Decl. of Robert Danley ¶5, *DHS v. Texas*, No. 23A607 (U.S. Jan. 12, 2024); Second Suppl. Mem. Regarding Emergency Appl. to Vacate the Inj. Pending Appeal, Second Decl. of Robert Danley ¶4, *DHS v. Texas*, No. 23A607 (U.S. Jan. 15, 2024). At the hearing, however, he admitted he was roughly 1,500 miles away in Detroit, Michigan, during that period. *See* Attachment B (excerpt from draft March 4 hearing transcript). Moreover, internal documents established that federal personnel knew by no later than 7:00 PM on January 13 that Texas had *not* "denied federal agents access to a stretch of border when they were trying to rescue three migrants who drowned" on January 12. *Compare* Associated Press, *US Says Texas Blocked Border Agents from Entering Park to Try to Save 3 Migrants Who Drowned*, POLITICO (Jan. 14, 2024, 10:20 AM), https://www.politico.com/news/2024/01/14/texas-border-agents-migrants-drowned-00135518, *with* Attachment C (excerpt from draft March 4 hearing transcript).

4.    On March 26, 2024, the district court issued the findings of fact requested by this Court. ECF 98. Among other things, the district court found that "[n]o CBP officer raised the issue" of boat-ramp access when Texas personnel took possession of Shelby Park and that Defendants have not identified any "emergency river operations that were unsuccessful because" of a lack of such access, which access, in all events, was restored within less than 48 hours. *Id.* at 11, 14. Further, not only

had any emergency on January 12 "concluded about one hour and a half before Border Patrol agents arrived" at Shelby Park, but federal officials "did not respond with the anticipated haste of an emergency" and were "not fully prepared to respond to an emergency." *Id.* at 17-18, 20. The district court further documented that Defendants had river access from "[t]wo other boat ramps [that] exist nearby," *id.* at 13, and that Defendants' complaints regarding visibility had been partially addressed "within hours or days," *id.* at 10 n.7, 13. Finally, despite insisting to the Supreme Court that they needed immediate and extraordinary relief to destroy Texas's property, "[s]ince this Court's initial TRO, the Defendants have not cut or attempted to cut any wire barriers in the Eagle Pass area." *Id.* at 25.

5.   On March 28, 2024, counsel for the State of Texas conferred with counsel for Defendants on this Motion pursuant to Fifth Circuit Rule 27.4. Counsel for Defendants indicated that they "take no position" on it.

## Conclusion

The Court should grant this Motion and instruct the clerk of the district court to promptly supplement the record on appeal to include the district court's findings of fact, the full transcripts of hearing proceedings, and any exhibits entered into evidence.

Date: April 5, 2024

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

/s/ AARON L. NIELSON
AARON L. NIELSON
Solicitor General
Aaron.Nielson@oag.texas.gov

BRENT WEBSTER
First Assistant Attorney General

LANORA C. PETTIT
Principal Deputy Solicitor General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

J. ANDREW MACKENZIE
Assistant Attorney General

Counsel for Plaintiff-Appellant

## CERTIFICATE OF CONFERENCE

On March 28, 2024, the parties conferred regarding this motion, and counsel for Appellees take no position on the relief requested.

/s/ Aaron L. Nielson
AARON L. NIELSON

## CERTIFICATE OF SERVICE

On April 5, 2024, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Aaron L. Nielson
AARON L. NIELSON

## CERTIFICATE OF COMPLIANCE

This motion complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 840 words, excluding exempted text; and (2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Aaron L. Nielson
AARON L. NIELSON

**Attachment A:**
January 2024 correspondence between
the Department of Homeland Security and
the Office of the Texas Attorney General



*Office of the General Counsel*
**U.S. Department of Homeland Security**
Washington, DC 20528

January 14, 2024

Ken Paxton, Esq.
Attorney General
State of Texas
300 West 15th Street
Austin, Texas 78711

Dear Attorney General Paxton:

On January 10, 2024, the State of Texas took action to block U.S. Border Patrol's access to the border over an approximately 2.5-mile stretch of the Rio Grande, inclusive of the area of Shelby Park and areas south of Shelby Park in Eagle Pass, Texas (hereinafter "Shelby Park area"). Although Texas recently indicated it allowed Border Patrol access to the boat ramp in this area it has done so only with restrictions such as requiring information about each Border Patrol individual agent entering the area and reiterated that this access is limited to use of the boat ramp. Even in light of this minor concession, Texas has continued to this day to deny full access to the area. The Department of Homeland Security (DHS) is committed to securing the border and ensuring the apprehension, inspection, and proper processing of noncitizens in accordance with the law, as well as to rendering emergency assistance to individuals in need. The recent actions by the State of Texas have impeded operations of the Border Patrol. Those actions conflict with the authority and duties of Border Patrol under federal law and are preempted under the Supremacy Clause of the Constitution. Texas's actions also improperly seek to regulate the federal government. I am writing to demand that Texas immediately cease and desist any actions taken by the State that block Border Patrol's full access to the U.S.-Mexico border in and around the Shelby Park area.

Beginning around 8:00 p.m., Central Time, on January 10, 2024, Texas National Guard (TNG) established fencing and concertina wire and began preventing access to Shelby Park and blocking entrances to the river and other areas proximate to the border using border barriers and armed soldiers. The combination of armed TNG soldiers and equipment, fencing, and concertina wire is blocking Border Patrol from a total of approximately 2.5 miles of the U.S.-Mexico border in the Shelby Park area. Some of the area to which Border Patrol has been denied access (e.g., the Park itself) is municipal land owned by the City of Eagle Pass. Pursuant to a Memorandum of Agreement with Eagle Pass signed by CBP on December 13, 2015, Border Patrol is entitled to have "continuous and uninterrupted access to all gate locations." In addition, the entire area to which Border Patrol has been denied access is well within 25 miles of the international border and thus within the zone to which Border Patrol has an express statutory right of access without a warrant. Finally, some of the barriers placed by Texas and the armed soldiers deployed by Texas are on federal land. Specifically, Texas National Guard is blocking entrances through federally owned and maintained border barriers

Ken Paxton, Esq.
January 14, 2024

with armed soldiers. While Texas has claimed that it has re-opened the use of Shelby Park to the public, it continues to prevent Border Patrol from entering, and from using the area under the adjacent port of entry where Border Patrol has certain property stored for use when migrants are apprehended. Border Patrol is being prevented from entering any portion of the 2.5 mile Shelby Park area, with the minor exception of regulated access to the boat ramp in Shelby Park, including being unable to place scope trucks as Border Patrol determines is operationally necessary.

The U.S. Constitution tasks the federal government with regulating immigration, *see Arizona v. United States*, 567 U.S. 387, 394 (2012) ("the Government of the United States has broad, undoubted power over the subject of immigration and the status of" noncitizens), and securing the Nation's borders. Among other things, federal law unambiguously grants Border Patrol agents the authority, without a warrant, to access private land within 25 miles of the international border, 8 U.S.C. § 1357(a)(3), as well as to "interrogate" and "arrest" anyone "who in [their] presence or view is entering or attempting to enter the United States in violation of any law" and is likely to abscond, 8 U.S.C. § 1357(a)(1)-(2). Federal law "deem[s]" those who are present in the United States without having been admitted or paroled "applicant[s] for admission" with certain statutory rights, 8 U.S.C. § 1225(a)(1). It provides for federal officials to "inspect[]" such applicants, 8 U.S.C. § 1225(a)(3); and authorizes federal agents to "arrest[] and detain[]" noncitizens "pending a [removal] decision," 8 U.S.C. § 1226(a). Texas's actions conflict with these statutory authorities and are an improper attempt to regulate the federal government. State law cannot be applied to restrain federal agents from carrying out these federally authorized activities.

Texas's failure to provide access to the border persists even in instances of imminent danger to life and safety. On January 12, 2024, upon learning from Grupo Beta, a group affiliated with the National Institute of Migration of Mexico**,** that a group of migrants was attempting to cross the river, Border Patrol contacted Texas officials and requested access to the border. Texas refused. Later, a rescue team from Mexico was able to rescue two individuals from the group, both with signs of hypothermia. Three individuals drowned. Texas has demonstrated that even in the most exigent circumstances, it will not allow Border Patrol access to the border to conduct law enforcement and emergency response activities.

Texas's actions are clearly unconstitutional and are actively disrupting the federal government's operations. We demand that Texas cease and desist its efforts to block Border Patrol's access in and around the Shelby Park area and remove all barriers to access in the Shelby Park area. If you have not confirmed by the end of day on January 17, 2024, that Texas will cease and desist its efforts to block Border Patrol's access in and around the Shelby Park area and remove all barriers to access to the U.S.-Mexico border, we will refer the matter to the Department of Justice for appropriate action and consider all other options available to restore Border Patrol's access to the border.


Sincerely,



Jonathan E. Meyer
General Counsel

2

Ken Paxton, Esq.
January 14, 2024


**COPIES TO:**

Brian M. Boynton, Principal Deputy Assistant Attorney General
Civil Division, U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

Troy Miller, Commissioner
U.S. Customs and Border Protection
Office of the Commissioner
1300 Pennsylvania Ave. NW
Washington, D.C. 20229



# KEN PAXTON
ATTORNEY GENERAL OF TEXAS

January 17, 2024

Jonathan E. Meyer
General Counsel
U.S. Department of Homeland Security
2707 Martin Luther King Jr Ave SE
Washington, D.C.  20528-0525

Dear Mr. Meyer:

On behalf of the State of Texas, I write in response to your demand letter of January 14, 2024, in which you complain about how the Texas Military Department (TMD) recently seized and secured Shelby Park in the City of Eagle Pass, Texas.  Your letter misstates both the facts and the law in demanding that Texas surrender to President Biden's open-border policies.  Because the facts and law side with Texas, the State will continue utilizing its constitutional authority to defend her territory, and I will continue defending those lawful efforts in court.  The U.S. Department of Homeland Security (DHS) should stop wasting scarce time and resources suing Texas, and start enforcing the immigration laws Congress already has on the books.

Your letter betrays a lack of on-the-ground understanding of what is happening in Shelby Park. While I need not correct every mistaken assertion, a few of your false claims must be debunked:

- Texas allows prompt entry into Shelby Park by any U.S. Border Patrol personnel responding to a medical emergency, and this access is not "limited to use of the boat ramp," as you say.  TMD has ordered its Guardsmen not to impede lifesaving care for aliens who illegally cross the Rio Grande.  To that end, TMD has erected gates that allow for rapid admission when federal personnel communicate the existence of some medical exigency.

- Your supposed commitment "to rendering emergency assistance to individuals in need" is belied by the fact that U.S. Border Patrol withdrew from Shelby Park last year and advised the Texas Department of Public Safety that *federal personnel would not be present to administer aid unless Texas called for help*.  Moreover, the Del Rio Sector appears to be the only place along the Rio Grande where DHS does not keep boats on the water around the clock to provide water-rescue capabilities.

- Your attempt to blame Texas for three migrant deaths on January 12, 2024 is vile and, as you now should be aware, completely inaccurate.  "Three individuals drowned" that

night on the Mexican side of the Rio Grande, but that tragedy is *your* fault. Contrary to your letter, TMD did not prevent U.S. Border Patrol from entering Shelby Park to attempt a water rescue of migrants in distress. The federal agents at the gate did not even have a boat, and they did not request entry based on any medical exigency. Instead, ***the federal agents told TMD's staff sergeant that Mexican officials had already recovered dead bodies and that the situation was under control.*** Texas's Guardsmen nevertheless made a diligent search, only to confirm that Mexican officials had recovered the migrants' bodies, downriver from the Shelby Park boat ramp and on their side of the river.

- Texas has seen no evidence, and you cite none, showing that the migrants who drowned actually reached the Texas shore. And this despite TMD Guardsmen surveilling the waters of the Rio Grande near Shelby Park with spotlights, night-vision goggles, and thermal-imaging devices.

- As a federal court has already ruled, it is DHS and Biden Administration policies that are leading migrants to risk their lives, and sometimes lose them, trying to cross the Rio Grande. If you really care about migrants being put in "imminent danger to life and safety," your agency should stop driving them into the waters of the river. Nobody drowns on a bridge. A federal court recently rebuked the Biden Administration for creating this dangerous situation: "If [DHS] agents are going to allow migrants to enter the country, and indeed facilitate their doing so, why make them undertake the dangerous task of crossing the river? Would it not be easier, and safer, to receive them at a port of entry?" *Texas v. DHS*, 2023 WL 8285223, at *4 (W.D. Tex. Nov. 29, 2023). By "creat[ing] a perverse incentive for aliens to attempt to cross" the Rio Grande, the court found, you are "begetting life-threatening crises for aliens and agents both." *Id.* at *14.

- Although Shelby Park does sit on "municipal land owned by the City of Eagle Pass," as you say, TMD has now taken that land from the City for law-enforcement and disaster-relief purposes in accordance with Texas Government Code § 418.017(c). It is immaterial that U.S. Customs and Border Protection entered into a "Memorandum of Agreement with Eagle Pass . . . on December 13, 2015," because the State of Texas never approved that transaction as required by Article IV, § 10 of the Texas Constitution. Your federal agency cannot have something that was not the City's to give.

Quite apart from the Shelby Park specifics, your demand letter rests on a more fundamental misunderstanding of federal law and the role of sovereign States within our constitutional order. This much is clear from your invocation of a federal statute that gives U.S. Border Patrol warrantless access to land within 25 miles of the border, but only "for the purpose of patrolling the border to *prevent* the illegal entry of aliens into the United States." 8 U.S.C. § 1357(a)(3) (emphasis added). President Biden has ordered your agency to do the exact opposite, in keeping with his open-borders campaign promise. There is not even a pretense that you are trying to *prevent* the illegal entry of aliens.

As a federal court recently found, DHS's "utter failure . . . to deter, prevent and halt unlawful entry into the United States" has left your agency powerless to "claim the statutory duties [it is]

so obviously derelict in enforcing as excuses to puncture [Texas's] attempts to shore up the [Biden Administration's] failing system." *Texas v. DHS*, 2023 WL 8285223, at *14 (W.D. Tex. Nov. 29, 2023). Indeed, Secretary Mayorkas's refusal to enforce federal immigration laws enacted by Congress has now put him in danger of impeachment by the U.S. House of Representatives. *See also* U.S. CONST. art. I, § 8, cl. 4 (empowering Congress, not the President, "[t]o establish an uniform Rule of Naturalization").

According to your letter, "[t]he U.S. Constitution tasks the federal government with . . . securing the Nation's borders." When were you planning to start?

President Biden has been warned in a series of letters, one of them hand-delivered to him in El Paso, that his sustained dereliction of duty in securing the border is illegal. By instructing your agency and others to ignore federal immigration laws, he has breached the guarantee, found in Article IV, § 4 of the U.S. Constitution, that the federal government "shall protect each of [the States] against Invasion." Texas, in turn, has been forced to invoke the powers reserved in Article I, § 10, Clause 3, which represents "an acknowledgment of the States' sovereign interest in protecting their borders." *Arizona v. United States*, 567 U.S. 387, 419 (2012) (Scalia, J., concurring in part and dissenting in part). Although you invoke the majority opinion in that case, it never addressed these crucial constitutional guarantees because Arizona did not raise them. Having abandoned the field of immigration enforcement, in defiance of Congress's commands, your agency is in no position to claim preemption under *Arizona v. United States* and the Supremacy Clause.

Rather than addressing Texas's urgent requests for protection, President Biden has authorized DHS to send a threatening letter through its lawyers. But Texas has lawyers, too, and I will continue to stand up for this State's constitutional powers of self-defense. Instead of running to the U.S. Department of Justice in hopes of winning an injunction, you should advise your clients at DHS to do their job and follow the law.

Sincerely,

*Ken Paxton*

Ken Paxton
Attorney General of Texas


cc:     The Honorable Greg Abbott, Governor of Texas
        Major General Thomas M. Suelzer, Adjutant General, Texas Military Department
        The Honorable Merrick B. Garland, U.S. Attorney General



Office of the General Counsel
**U.S. Department of Homeland Security**
Washington, DC 20528

January 23, 2024

Ken Paxton, Esq.
Attorney General
State of Texas
300 West 15th Street
Austin, Texas 78711

Dear Attorney General Paxton:

I write to draw your attention to the U.S. Department of Homeland Security (DHS), U.S. Customs and Border Protection's (CBP, together the Department) property interest in the approximate 2.5-mile stretch of the Rio Grande in the area of Shelby Park and areas south of Shelby Park in Eagle Pass, Texas (hereinafter "Shelby Park area"), to address certain allegations made by the State which we believe are either inaccurate or require clarification or confirmation, and again to demand access to the Shelby Park area.

As you are aware, yesterday, the Supreme Court vacated the injunction prohibiting the Department from cutting or moving the concertina wire that Texas had placed along the border except in case of emergency, and restored the Department's right to cut and move the concertina wire placed by Texas in order to perform their statutory duties. The Department must also have the ability to access the border in the Shelby Park area that is currently obstructed by Texas.

The State has alleged that Shelby Park is open to the public, but we do not believe this statement is accurate. To our knowledge, Texas has only permitted access to Shelby Park by allowing public entry for a memorial, the media, and use of the golf course adjacent to Shelby Park, all while continuing to restrict U.S. Border Patrol's access to the park. Please clarify the scope of access Texas permits to the public.

Pursuant to federal law enabling the U.S. government to condemn property rights essential to control and guard the borders of the United States, 8 U.S.C § 1103(b), the Department acquired permanent real estate interests in and around Eagle Pass in 2008 to support the construction and maintenance of border barriers in and around the Shelby Park area. *See*, *e.g.*, Final Judgment, *United States v. 233 Acres of Land*, 2:08-cv-00003-AM (W.D. Tex. Feb. 16, 2016) (ECF No. 147) (J. Moses). For much of the property, including the property that runs north and south between Ryan Street and Shelby Park, the Department acquired fee simple interest from the City of Eagle Pass via condemnation as well as from private landowners. The attached map depicts the permanent interests administered by the Department in and around Eagle Pass. Because the Department owns property rights to the areas depicted on the attached map, we demand that

Ken Paxton, Esq.
January 22, 2024
Page 2

you immediately remove any and all obstructions on it, which include the access points into Shelby Park near the intersections of Ryan and Main Streets and Ryan and Rio Grande Streets, as well as the access points on Ford Street and the two access points on the end of Ryan Street.

In addition, in 2018, the Department acquired from the City of Eagle Pass a perpetual easement for the construction, operation, and maintenance of a road leading to and including the Shelby Park boat ramp and extending south along the river past Turtle Creek. Although Texas is now allowing Border Patrol to access the boat ramp with restrictions, we ask that Border Patrol be granted full access consistent with the perpetual easement.

Your letter of January 17, 2024 asserts that Texas will "allow[] prompt entry into Shelby Park by any U.S. Border Patrol personnel responding to a medical emergency." The State's Supreme Court filing of January 17, 2024, also seems to assert that the gate south of the Shelby Park Area –through which one Border Patrol agent was able to enter on January 15, 2024, to drive north – will remain open. Please confirm that both assertions will remain true.

In sum, we require full access to the Shelby Park area currently obstructed by Texas, including but not limited to the following locations to patrol the border and directly monitor the Rio Grande River consistent with U.S. Border Patrol's responsibility and statutory authorities:

- Access to Eagle Pass International Bridge Port of Entry II, also known as Camino Real International Bridge, from the Loop 480 access road, 24 hours a day. This is to include beneath the port of entry as well.
- Access through the federal border barrier entrances described above located on Ford Street, Main Street, near the intersection of Rio Grande Street and Ryan Street, and the two entrances on the end of Ryan Street, for Border Patrol to move through and conduct line watch duties and patrol within the Shelby Park area 24 hours a day.
- Full access to the boat ramp located at Shelby Park Main Street entrance, consistent with the perpetual easement.
- Unrestricted access to the entire Shelby Park area during emergency circumstances, including but not limited to, assistance to other agents and officers as well as medical and rescue operations.

By January 26, 2024, please confirm that the State will provide U.S. Border Patrol with the access described above. If the State refuses the requested access in part, but not in whole, please specify what access you intend to deny.

Sincerely,

Jonathan E. Meyer
General Counsel

Enclosure

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**DEL RIO DIVISION**

**FILED**

FEB **1 6** 2016

CLERK. U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY

UNITED STATES OF AMERICA,    §
   Plaintiff                 §
                             §
v.                           §    **Case No. DR-08-CV-003-AM**
                             §
233.0 ACRES OF LAND, MORE OR LESS  §
SITUATE IN MAVERICK COUNTY, STATE  §
OF TEXAS; AND CITY OF EAGLE PASS,  §
TEXAS, ET AL.,                §
   Defendants.            §
                             §

**FINAL JUDGMENT**

Pending before the Court is the parties' Joint Motion for Entry of Final Judgment and Final Order Establishing Just Compensation (ECF No. 146). Pursuant to the Joint Motion for Entry of Final Judgment and Final Order Establishing Just Compensation, signed and jointly filed herein by Plaintiff United States of America and Defendant City of Eagle Pass in full and final settlement of all claims (ECF No. 146), the Court hereby finds and orders as follows:

**I. FINDINGS**

**A. Case No. DR-08-CV-003**

1. On January 14, 2008, Plaintiff filed its Complaint in Condemnation with Declaration of Taking in Case No. DR-08-CV-003 condemning a temporary six month easement for survey and investigatory work over land identified therein as Tracts DRT-EGT-1006, 1007, 1008, 1009, and 1010, consisting of 233.90 acres of land. (ECF No. 2).

2. On January 14, 2008, the Court ordered that the $100 tendered by the United States as estimated just compensation for Tracts DRT-EGT-1006, 1007, 1008, 1009, and 1010 be deposited (ECF No. 7).

**B. Case No. DR-09-CV-001**

3. On January 20, 2009, Plaintiff filed its Complaint in Condemnation with Declaration of Taking in Civil Case No. DR-09-CV-001 condemning the following tracts of land: Tracts DRT-EGT-1006-2, 1006-3, 1006-4, 1006-5, 1006-6, 1006E, 1006E-2, 1006E-3, and 1006E-4 (ECF No. 1).

4. On January 22, 2009, this Court entered an Order to deposit Plaintiff's estimated just compensation in the amount of $280,900.00 for Tracts DRT-EGT-1006-2, 1006-3, 1006-4, 1006-5, 1006-6, 1006E, 1006E-2, 1006E-3, and 1006E-4 thereby vesting title in the United States by operation of law. (ECF No. 11). On March 4, 2009, the Court granted the United States possession of the property. (ECF No. 17).

5. On April 28, 2009, the Court granted Defendant City of Eagle Pass's Unopposed Petition for Partial Disbursement of Deposit, ordering that $250,900 be disbursed to the City as estimated just compensation for the City's ownership interests in the subject property. (ECF Nos. 19 and 23).

6. On February 18, 2010, the Court entered a partial judgment against Ft. Duncan Medical Center, owner of 0.41 acres in Tract DRT-EGT-1006-5 that revested portions of Tract Nos. DRT-EGT-1006E-3 and 1006E-4 and ordered disbursement of $35,364.10 to Ft. Duncan Medical Center as just compensation for 0.41 acres. (ECF No. 47).

**C. Case No. DR-10-CV-004**

7. On January 25, 2010, Plaintiff filed its Complaint in Condemnation with Declaration of Taking in Civil Case No. DR-10-CV-004 condemning the following tracts of land: DRT-EGT-1006-1, 1006-7, 1006-10, 1006E-5, 1006E-6, and 1006E-7.  (ECF No. 1).

8. On January 28, 2010, the Court entered an order to deposit Plaintiff's estimated just

2

compensation in the amount of $172,000.00 for Tracts DRT-EGT-1006-1, 1006-7, 1006-10, 1006E-5, 1006E-6, and 1006E-7, thereby vesting title in the United States by operation of law. (ECF No. 10).

### D. Consolidation of Three Cases

9. On June 16, 2010, the Court consolidated Civil Case Nos. DR-08-CV-003 (*U.S. v.233 Acres of Land, et al.*); DR-09-CV-001 (*U.S. v. 10.7664 Acres of Land, et al.*); and DR-10-CV-004 (*U.S. v. 11.682 Acres of Land, et al.*) under the lead case of 2:08-CV-003.

### E. Resolution of Title Issues

10. After a hearing to determine ownership of various tracts (ECF Nos. 67 and 110), the Court issued an order on September 30, 2012, finding that on the date of taking the city owned and should be justly compensated for Tracts DRT-EGT-1006-1; DRT-EGT-1006-2; DRT-EGT-1006-3, and DRT-EGT-1006E-5, and that the Government owned DRT-EGT-1006-10. (ECF No. 111).

### F. Stipulation as to Just Compensation by the Parties

11. On December 2, 2013, the United States and City of Eagle Pass stipulated and agreed that the full just compensation payable by Plaintiff, the United States of America, for the taking of the Subject Property, namely Tracts DRT-EGT-1006, 1007, 1008, 1009, and 1010 (Case No. DR-08-CV-003); DRT-EGT-1006-2, 1006-3, 1006-4, 1006-5, 1006-6, 1006E, 1006E-2, 1006E-3, and 1006E-4 (Case No. DR-09-CV-001); and DRT-EGT-1006-1, 1006-7, 1006-10, 1006E-5, 1006E-6, 1006E-7 (Case No. DR-10-CV-004), together with all improvements thereon

3

and appurtenances thereunto belonging, was $423,000.00[1] along with any interest earned thereon. (ECF No. 127).

12. In that Stipulation, the Parties informed the Court that a Third Amended Complaint and Declaration of Taking would be filed so that the legal descriptions conformed to final surveys. (ECF No. 127, ¶ 18).

13. On January 28, 2014, the Court granted the City of Eagle Pass's petition (ECF No. 128) to disburse the remaining $172,100.00, plus any accrued interest as just compensation for the taking of Tracts DRT-EGT-1006-1, 1006-7, 1006-10, 1006E-5, 1006E-6, and 1006E-7 as well as DRT-EGT-1006, 1007, 1008, 1009, and 1010 (ECF No. 129).

14. The case was inadvertently closed prior to entry of the final judgment as the Parties awaited the final surveys and amended declaration of taking. (ECF No. 130).

**G. Third Amended Complaint with Amended Declaration of Taking**

15. On January 29, 2016, the Court granted the motion to re-open the case. (ECF No. 144).

16. On February 2, 2016, the United States filed its Third Amended Complaint with Amendment to Declaration of Taking to clarify the legal descriptions for Tracts DRT-EGT-1006-1, 1006-2, 1006-3, 1006-4, 1006-5, 1006-6, 1006-7, 1006E-3, 1006E-4, 1006E-5, 1006E-6, and 1006E-7 in accordance with final surveys of the subject properties. (ECF No. 145). The square footage of some of the tracts changed slightly.

---

[1]The breakdown of that amount is as follows:
- $100.00 for Tracts DRT-EGT-1006, 1007, 1008, 1009, and 1010 (six month easement);
- $250,900 for DRT-EGT-1006-2, 1006-3, 1006-4, 1006-5, 1006-6, 1006-E, 1006E-2, 1006E-3, and 1006E-4 (the City was only a partial owner of Tracts 1006-5, 1006E-3, and 1006E-4; and
- $172,000 for DRT-EGT-1006-1, 1006-7, 1006-10, 1006E-5, 1006E-6, 1006E-7

## II. JUDGMENT

1. Accordingly, **IT IS HEREBY ORDERED AND ADJUDGED THAT** the full and just compensation payable by the United States to Defendant, City of Eagle Pass, for the taking of the interests in the property identified in the above-captioned consolidated cases as well as those in the Third Amended Complaint with Amendment to the Consolidated Declarations of Taking filed herein (ECF No. 145), together with all improvements thereon and appurtenances thereto belonging, shall be the sum of $423,000.00, along with any interest earned on the just compensation, which sum shall be all inclusive.

2. Judgment shall be and is hereby entered against the United States for Tracts DRT-EGT-1006, 1007, 1008, 1009, and 1010 (Case No. DR-08-CV-003); DRT-EGT-1006-2, 1006-3, 1006-4, 1006-5, 1006-6, 1006E, 1006E-2, 1006E-3, and 1006E-4 (Case No. DR-09-CV-001); and DRT-EGT-1006-1, 1006-7, 1006-10, 1006E-5, 1006E-6, 1006E-7 (Case No. DR-10-CV-004) in the amount of $423,000.00.

3. When the instant actions were filed, the Plaintiff deposited the total sum of $423,000.00 into the Registry of the Court as estimated compensation and upon deposit of said $423,000.00 into the Registry of the Court, title to the subject properties as more fully described in the complaints and amendments thereto, and to the extent set forth in the Declarations of Taking, vested in the name of the United States of America by operation of law. The United States was additionally found by this Court to be entitled to immediate possession of said land, and all persons in possession or control of the subject property were ordered by this Court to surrender possession of the subject property to the United States.

4. The said sum of $423,000.00, along with any interest earned on the just compensation, shall constitute full and just compensation as to the City of Eagle Pass, and shall be in full satisfaction of all claims by the City of Eagle Pass of whatever nature against the

United States by reason of the institution and prosecution of these actions and takings of the said lands and all appurtenances thereto belonging. The sum awarded to Defendant City of Eagle Pass has been paid to it, plus accrued interest and less any registry fee, pursuant to the Court's Orders dated April 28, 2009 (ECF No. 23) and January 28, 2014 (ECF No. 138).

5. The said sum of $423,000.00, along with any interest earned on the just compensation, shall be subject to all real estate taxes, liens, encumbrances, and charges of whatever nature existing against the said property at the time of vesting of title thereto in the United States of America, and all such real estate taxes, liens, encumbrances, and charges of whatsoever nature shall be payable and deductible from the said sum.

6. In the event that any other party is ultimately determined by a court of competent jurisdiction to have any right to receive compensation for the property taken in this case, the Defendant, City of Eagle Pass, shall refund to the United States of America, Department of Justice, U.S. Attorney's Office, Western District of Texas, Attn: AUSA Kristy K. Callahan, 601 N.W. Loop 410, Suite 600, San Antonio, TX 78216, the compensation distributed herein, or such part thereof as the Court may direct, with interest thereon at an annual rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, calculated in accordance with the provisions of Public Buildings Property and Works, 40 U.S.C. § 3116, from the date of receipt of the final order by the Defendants, City of Eagle Pass, to the date of repayment.

7. The parties shall be responsible for their own legal fees, costs, and expenses, including attorneys' fees, consultant's fees, and any other expenses or costs.

8. The signatory parties hereto shall take no appeal from any rulings or judgments made

6

by the Court in this action, and the parties consent to the entry of all orders and judgments necessary to effectuate this stipulated judgment.

9. This case shall be administratively **CLOSED**, but this Court shall retain jurisdiction over this matter, if necessary, to address any additional claims or issues that may arise.

SIGNED this 15th day of February , 2016.

**ALIA MOSES**
**UNITED STATES DISTRICT JUDGE**

7



# Eagle Pass Real Estate Acquisition Tracts

## Overview

### LEGEND

⬛ Ports of Entry

〰️ Existing Pedestrian Barrier

**Real Estate Acquisition Tracts**

🟩 Fee

🟨 Easement

*"If sheet measures less than 11x17" it is a reduced print.
Reduce scale accordingly.*

1:14,000          1:14,000

☐ AREA ENLARGED

NORTHWIND

**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO)**. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need to know" without prior approval of an authorized DHS official.

January 19, 2024

Map Request 927

# Eagle Pass Real Estate Acquisition Tracts

## LEGEND

Existing Pedestrian Barrier

**Real Estate Acquisition Tracts**

Fee

Easement

*Detail*

DRT-EGT-1001
DRT-EGT-1006-1
DRT-EGT-1005
DRT-EGT-1006-7
DRT-EGT-1005-5

N Ceylon St

*"If sheet measures less than 11x17" it is a reduced print. Reduce scale accordingly.*

1:3,000

1:3,000

Eagle Pass

Piedras Negras

AREA ENLARGED

NORTHWIND

**WARNING**: This document is **FOR OFFICIAL USE ONLY (FOUO)**. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need to know" without prior approval of an authorized DHS official.

January 19, 2024

Map Request 927

January 19, 2024



# Eagle Pass Real Estate Acquisition Tracts

*Detail*

## L E G E N D

Existing Pedestrian Barrier

**Real Estate Acquisition Tracts**

Fee

Easement

*If sheet measures less than 11x17" it is a reduced print. Reduce scale accordingly.*

1:3,000

1:3,000

Eagle Pass

Piedras Negras

AREA ENLARGED

**NORTHWIND**

**WARNING:** This document is FOR OFFICIAL USE ONLY (FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not to be released to the public or other personnel who do not have a valid "need to know" without prior approval of an authorized DHS official.

DRF-EGT-1001

DRF-EGT-1001S

DRF-EGT-1006E-7

DRF-EGT-1006E-1

DRF-EGT-1006-6

DRF-EGT-1006-1

DRF-EGT-1006E-5

DRF-EGT-1006-1

DRF-EGT-1021E-2

DRF-EGT-1021E-1

DRF-EGT-1021-8

DRF-EGT-1021-3

Map Request 927

January 19, 2024

# Eagle Pass Real Estate Acquisition Tracts

*Detail*



## LEGEND

〰 Existing Pedestrian Barrier

**Real Estate Acquisition Tracts**
- 🟩 Fee
- 🟨 Easement

*If sheet measures less than 17x17" it is a reduced print. Reduce scale accordingly.*

1:3,000        1:3,000

Piedras
Negras          Eagle Pass

□ AREA ENLARGED

**NORTHWIND**

**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO).** It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need to know" without prior approval of an authorized DHS official.

Tract labels:
- DRT-EGT-1006-5
- DRT-EGT-1023
- DRT-EGT-1008-6
- DRT-EGT-1002-4
- DRT-EGT-1020
- DRT-EGT-1017
- DRT-EGT-1006-2
- DRT-EGT-1006-3
- DRT-EGT-1022
- DRT-EGT-1006-9
- DRT-EGT-1009
- DRT-EGT-1018
- DRT-EGT-1011
- DRT-EGT-1006-8

Street labels: Madison St, Jefferson St, N Adams St, Washington St, E Main St, Commercial St, N Main St, Ryan St, Will Shore Paseo, San Juan Plaza Grazebo, Faxey St, Rasgora Dr, Ford St, Rio Bravo, Colon

Map Request 927



**Eagle Pass Real Estate Acquisition Tracts**

Detail

**L E G E N D**

Ports of Entry

Existing Pedestrian Barrier

**Real Estate Acquisition Tracts**

Fee

Easement

*If sheet measures less than 11x17" it is a reduced print. Reduce scale accordingly.*

1:3,000

1:3,000

Piedras Negras

Eagle Pass

AREA ENLARGED

NORTHWIND

**WARNING.** This document is **FOR OFFICIAL USE ONLY (FOUO).** It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need to know" without prior approval of an authorized DHS official.

January 19, 2024

Map Request 927

Eagle Pass Real Estate Acquisition Tracts

# Eagle Pass Real Estate Acquisition Tracts

*Detail*



WARNING. This document is FOR OFFICIAL USE ONLY (FOUO). It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid 'need to know' without prior approval of an authorized DHS official.

## LEGEND

🚗 Ports of Entry

〜 Existing Pedestrian Barrier

**Real Estate Acquisition Tracts**

◻ Fee

*"If sheet measures less than 17x17" it is a reduced print.
Reduce scale accordingly.*

1:4,000

1:4,000

Piedras
Negras

Eagle Pass

Eidson Road

◻ AREA ENLARGED

NORTHWIND

January 19, 2024

Map Request 927

Distribution Dr

Industrial Blvd

Industrial Blvd

Industrial Blvd

Ward St

Ward St

Ward St

Ward St

S Monroe St

Southern Pacific Railroad

Southern Pacific Railroad

Camino Real Brg

Eagle Pass Golf Club

Eagle Pass
Multi-Purpose
Center

Ward St

Eagle Pass
Camino Real
Ports Entry

DRTEG-10366

481

481



# KEN PAXTON
ATTORNEY GENERAL OF TEXAS

January 26, 2024

Jonathan E. Meyer
General Counsel
U.S. Department of Homeland Security
2707 Martin Luther King Jr Ave SE
Washington, D.C. 20528-0525

Dear Mr. Meyer:

I have received your second demand letter dated January 23, 2024, in which DHS continues to complain about how TMD secured Shelby Park in the City of Eagle Pass, Texas. In a previous response, I explained that your original letter "misstates both the facts and the law in demanding that Texas surrender to President Biden's open-border policies." Presumably because you have no meaningful response to our letter, your latest letter abandons earlier factual assertions, asserts new ones, and supplies even less of a legal basis for your demand. Once again, I respectfully suggest that any time you might spend suing Texas should be redirected toward enforcing the immigration laws Congress already has on the books.

Again, let's start with the facts. As I have already explained, U.S. Border Patrol withdrew from Shelby Park last year and deliberately reduced its ability to respond to medical emergencies in the vicinity. The tragic incident on January 12, 2024 that you once tried to pin on Texas had already occurred well before your agency's officers arrived at the Shelby Park gate—conspicuously lacking any equipment to perform an emergency rescue. And the supposed "Memorandum of Agreement" between U.S. Customs and Border Protection and the City of Eagle Pass from 2015 (2015 MOA) was never approved by Texas as required under the State's constitution.

Your latest letter disputes *none* of this. Instead, you now claim Texas has somehow restricted access to land owned by the federal government. Yet your first demand letter acknowledged that Shelby Park "is municipal land owned by the City of Eagle Pass," not the United States. Which is it?

If this newfound allegation of federal "property rights" were true, Texas would of course remove any obstructions to federal land pursuant to a lawful court order. This State will continue to respect another sovereign's property rights, even though the federal government refuses to do so. *See, e.g.*, *Texas v. DHS*, 2023 WL 7135677, at *3 (W.D. Tex. Oct. 30, 2023) (Moses, C.J.) (finding federal agents repeatedly trespassed to state chattels, and even "damaged more property a mere day after"

the State sought a temporary restraining order); *Texas v. DHS*, 88 F.4th 1127, 1136 (5th Cir. 2023) (observing that federal agents "have repeatedly 'damage[d], destroy[ed], and exercis[ed] dominion over state property'"), *vacated*, 2024 WL 222180 (U.S. Jan. 22, 2024) (mem.).

After conducting a diligent search in the arbitrarily short period you allotted for this rebuttal, it appears there are serious reasons to question both of your new claims of federal property rights.

First, you say the United States acquired fee-simple title to certain parcels in the Shelby Park area. But your own map shows that most of the tracts you reference fall outside the perimeter area secured by Texas at Shelby Park. With respect to parcels identified in your maps that are actually in the vicinity of the park, publicly available records suggest the United States does not even purport to own what your latest letter claims. For example, the home-cooked map attached to your letter insinuates that the United States has title to every parcel on the west side of Ryan Street bordering Shelby Park. Based on our necessarily cursory review, current records from Maverick County do not support that claim. **By February 15, 2024, Texas hereby demands that your agency supply the following documents and information to this office:**

- official plat maps and deeds demonstrating the precise parcels that you believe the United States owns; and
- your explanation of how exactly Texas officials are preventing access to those parcels by federal agents.

Second, you say the United States acquired a perpetual easement from the City of Eagle Pass in 2018. What I said last week about the 2015 MOA, I will say again about your latest claim: "Texas never approved that transaction as required by Article IV, § 10 of the Texas Constitution. Your federal agency cannot have something that was not the City's to give." You are invited to read that document at https://tlc.texas.gov/docs/legref/TxConst.pdf. But even if the 2015 MOA were somehow valid, you are not seeking "access consistent with" its terms. The "nonexclusive" easement from 2018 is attached for your convenience. Its express "purpose" was to allow "maintenance . . . of a road" along the river, including "the right to trim . . . trees" or other obstacles within the roadway. Elsewhere, the 2018 easement prohibits the United States from making any permanent improvements "other than a Roadway" without written City approval. If your federal agency wishes to help municipal officials with tree-trimming and road-maintenance chores, I suspect they would appreciate the help. The 2018 easement, however, nowhere contemplates allowing the federal government to deploy infrastructure that President Biden will use to wave thousands of illegal aliens into a park that will "continue to [be] use[d] and enjoy[ed]" for "recreation events." **By February 15, 2024, Texas hereby demands that your agency supply the following documents and information to this office:**

- any written approval from the City of Eagle Pass or the State of Texas consenting to allow your federal agents to erect the open-border infrastructure hinted at in your letter; and
- your explanation of where the Congress has empowered your federal agency to pursue this scheme, notwithstanding statutory provisions to the contrary.

Without clarifying both the metes and bounds of the federal government's alleged "property rights," and how its lawful access to such property has been in any way impeded, the State cannot meaningfully assess your demand. But to the extent your agency demands access in order to once again transform Shelby Park into "an unofficial and unlawful port of entry," *Texas v. DHS*, 2023 WL 8285223, at \*14 (W.D. Tex. Nov. 29, 2023) (Moses, C.J.), **your request is hereby denied**.

To be clear, your latest letter points to no law supporting the agency's right to do that. In an unexplained reference to "Border Patrol's responsibility and statutory authorities," you parrot statutory language about the need "to patrol the border." But you (unsurprisingly) omit the statutory language that your agency continues publicly to disregard: Border Patrol is tasked with "patrolling the border *to prevent the illegal entry* of aliens." 8 U.S.C. § 1357(a)(3) (emphasis added). Instead, you fixate on a recent order from the Supreme Court of the United States. As you know, that unsigned order supplied no rationale for vacating a Fifth Circuit injunction. It may be that the Supreme Court was misled by allegations levelled by your federal agency, and which you repeated in your January 14th letter to our office. In any event, the Court's order certainly said nothing about access to Shelby Park, which even the federal government's lawyers acknowledged is "not presented" in that ongoing litigation. *See* Second Supplemental Memorandum at 5, *DHS v. Texas*, No. 23A607 (Jan. 15, 2024).

As I said before, this office will continue to defend Texas's efforts to protect its southern border against every effort by the Biden Administration to undermine the State's constitutional right of self-defense. You should advise your clients to join us in those efforts by doing their job and following the law.

Sincerely,

Ken Paxton

Ken Paxton
Attorney General of Texas

cc:    The Honorable Greg Abbott, Governor of Texas
       Major General Thomas M. Suelzer, Adjutant General, Texas Military Department
       The Honorable Merrick B. Garland, U.S. Attorney General

Enclosure

DOC #205318

BOOK 1736    PAGE 263

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

Easement

THE STATE OF TEXAS          §

COUNTY OF MAVERICK        §

Date of this Instrument:          November 8, 2018

Effective Date:          November 8, 2018

Grantor:          City of Eagle Pass, Texas
                       A municipal corporation ("City")

Glantor's Mailing Address:     100 S. Monroe
                                           Eagle Pass, Texas 78852

Grantee:          UNITED STATES OF AMERICA and its assigns ("USA")

Grantee's Mailing Address:     Department of Homeland Security, Customs and Border Protectio
                                           OHS. CBP, Logistics Center-Dallas, Texas

                                           ICE Shared Services Provider Facilities and Engineering
                                           8th Floor 770 I. North Stemmons Freeway
                                           Dallas, Texas 75247

Consideration:          Thirty Six Thousand Dollars and no 100ths ($36,000.00) and other good
                              and valuable consideration including the rights, obligations, terms and
                              Conditions provided for herein.

Easement Area: An non-exclusive perpetual easement and right-of-way in, on, over and across the surface of the land described in Exhibit A for use by the United States, its representatives agents, and contractors for the location, construction, operation maintenance alteration replacement of a road and appurtenances thereto, together with the right to trim, cut, fell and remove therefrom all trees, underbrush obstructions and other vegetation, structures, or obstacles within the limits of the right-of-way; however, to the City and public all such rights and privileges as may be used without interfering with or abridging the rights and easement hereby acquired; subject, however, to existing easements for public roads (including the road leading to and including the boat ramp area) and highways public utilities (including the storm drainage system):.railroads and pipelines.

The Grantor retains, reserves, and shall continue to enjoy the use of the Easement Area described herein for any and all purposes that do not interfere with and prevent the Grantee's use of the Easement. The terms and conditions aforesaid are to apply to and bind the heirs, executors, administrators, successors, and assigns of the Grantor.

**Temporary Work Area Easement:** Grantor, for themselves and for their successors and assigns, hereby convey and grant to Grantee, its successors and assigns, a temporary, non-exclusive easement (the '"Temporary Work Area Easement") over, under, in, along, across and upon the property described on the attached and incorporated **Exhibit B**, Tract DRT-EGT-C I 006E-9 (the "Temporary Easement Area") for use in the initial construction and installation of the improvements and other construction purposes reasonably related to the initial construction of the Project described in the Easement Area. The Grantor retains, reserves, and shall continue to enjoy the use of the Temporary Easement Area described herein for any and all purposes that do not interfere with and prevent the Grantee's use of the easement. The terms and conditions aforesaid are to apply to and bind the heirs, executors, administrators, successors, and assigns of the Grantor.

**Easement Purposes**: The purpose of the Easement is for the location, construction, operation, maintenance, alteration replacement of a road and appurtenances thereto, together with the right to trim, cut, fell and remove therefrom all trees, underbrush, obstructions and other vegetation, structures, or obstacles within the limits of the right-of-way (sometimes, "Roadway") for pedestrian and vehicular access.

**Terms and Conditions for the Easement:** The following terms and conditions shall apply to the Easement:

1 . Character of Easement. The easement granted is in gross and shall run with the land whether or not such Easement is referenced in any conveyance. The Easement is for the benefit of Grantee and Grantee's successors and Grantee may use the Easement Prope ll y for the Easement Purpose. In addition, the Grantor and public may use the Easement Area described herein; however, such use may not interfere with the use of the Grantee its heirs and assigns.

2. Duration of Easement. The Easement shall be perpetual and shall run with the land and shall be binding on Grantor and on Grantor's successors and assigns unless and until Grantee abandons use of the Easement in writing at which time a l l rights granted to G lantee shall automatically and without further notice or demand, cease and revert to the Grantors, its heirs and assigns.

3. Duration of Temporary Work Area Easement. The Temporary Work Area Easement shall commence on the effective date of this Agreement and shall automatically te l minate and expire upon (i) the date construction of the improvements are completed, or (ii)twenty-four (24) months, whichever date shall first occur. Upon the expiration of the term of the Temporary Work Area Easement, all of the rights and benefits of Grantee in, to and under this Easement with respect to the Temporary Work Area Easement shall automatically terminate and be of no further force and effect.

4. Exclusiveness of Easement. The Easement is nonexclusive, and Grantor reserves for Grantor and Grantor's heirs, successors and assigns the right to convey the same or other rights and/or Easement to others, so long as such further conveyance is subject to this grant and does not interfere with the Easement Purposes.

5. Construction and Maintenance. Construction, operation, maintenance, alteration replacement of a mad and appurtenances of the Roadway shall be at the sole expense of Grantee and its assigns, subject to approval by the City, which shall not unreasonable be withheld.

6. Rights Reserved. Grantor reserves for the public, Grantor and Grantor's heirs, successors and assigns the right to continue to use and enjoy the Easement Area for all purposes which do not interfere with or interrupt the Grantee's use or enjoyment of the Easement Area, including but not limited to the annual events Fourth of July Festival, Neches Mexicanas and other routine park and recreation events. Grantee acknowledges that the routine park and recreation events, including July 4th Festival and Noches Mexicanas do not interfere with the Grantee's use. Neither party may erect buildings, fences, walls and

other permanent improvements on the Easement Area other than a Roadway without the written approval of the other party. In addition, the Grantor will continue to have the right to hold all public events at the land known as Shelby Park, as done in previous years and years to come, inclusive of said road easement (DRT-EGT-C 1006E-8) and easement (DRT-EGT-C 1006E-9) without restrictions or limitations.

7.    Drainage and Erosion. Grantee shall not permit the Easement Area, Roadway or other improvements in the Easement Area to obstruct the drainage of surface water across the Easement Area in a manner that causes flooding of any portion of Grantor's Property. Grantee shall also guard and protect against erosion of the Easement Area and the surrounding property

8.    Notice of Additional Construction. Grantee and Grantor agrees to notify the other in writing of its intention to commence construction of any improvements in the Easement Area, at least three (3) days prior to commencement of construction; unless an emergency exists, in which case, the Grantee and Grantor will provide notice as soon as practical.

9.    Binding Effect. This Agreement shall be binding upon and insure to the benefit of the patties hereto and their respective heirs, executors, representatives, successors and assigns where permitted by this Agreement.

10.    Counterparts. This Agreement may be executed in any number of counterparts with the same effect as if all signatory parties had signed the same document. All counterparts shall be construed together and shall constitute one and the same instrument

11.    Effect of Waiver or Consent. It is not a waiver of or consent to default if the non-defaulting party fails to declare immediately a default or delays in taking any action. Pursuit of any remedies set forth in this agreement does not preclude pursuit of other remedies in this agreement or provided by the law.

12.    Further Assurances. Each signatory party hereto agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions and conditions of this Agreement. Grantor further agrees to execute any additional documents necessary and required by the Grantee to correct any errors or omissions, as determined by the Grantee.

13.    Integration. This Agreement contains the complete agreement between the parties and cannot be varied except by the written agreement of the parties. The parties agree that there are no oral agreements, understandings, representations, or warranties that are not expressly set forth herein.

14.    Legal Construction. In case any one or more of the provisions contained in this Agreement shall for any reason be invalid, illegal or unenforceable in any respect, to, the extent such invalidity or unenforceability does not destroy the basis of the bargain among the patties, such invalidity, illegality or unenforceability shall not affect any other provision hereof, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. Whenever required by the context as used in this Agreement, the singular number shall include the plural and neuter shall include the masculine or feminine gender, and vice versa. Article and Section headings appeal'ing in this Agreement are for convenient reference only and are not intended, to any extent or for any purpose, to restrict or define the text of any Article or Section. This Agreement shall not be construed more or less favorably between the palties by leason of authorship or origin of language.

**BOOK 1736 PAGE 265**

3

15. Notices. Any notice or communication required or permitted hereunder shall be deemed to be delivered, whether actually received or not, when deposited in the United States mail, postage fully prepaid, registered or certified mail and addressed to the intended recipient at the address shown herein, and if such address is not known, then at the last known address according to the records of the party delivering the notice. Notice given in any other manner shall be effective if and when received by the addressee. Any address for notice may be changed by written notice delivered as provided herein.

16. Recitals. Any recitals in this Agreement are represented by the parties hereto to be accurate and constitute a part of the substantive agreement.

17. Equitable Rights of Enforcement. In the event of any interference or threatened interference with the Easement, such Easement may be enforced by restraining orders and injunctions (temporary or pemranent) prohibiting such interference and commanding compliance hereof, which restraining orders and injunctions shall be obtainable upon proof of the existence of such interference or threatened interference, and without the necessity of proof of inadequacy of legal remedies or irreparable harm, and shall be obtainable only by the parties hereto; provided, however nothing herein shall be deemed to be an election of remedies or a waiver of any other rights or remedies available at law or in equity.

18. Any Grantee liability under this easement may not exceed appropriations available for payment of any liability, and nothing contained herein may be considered as implying that Congress will at a later date appropriate funds sufficient to meet deficiencies. The provisions of this clause are without prejudice to any rights the Grantor may have to make a claim under applicable laws for any damages.

ACCEPTED AND AGREED TO BY:

GRANTOR:
THE CITY OF EAGLE PASS, TEXAS

By: _____
Signed

_____
Printed Name

_____
Title

## ACKNOWLEDGMENT

STATE OF TEXAS                                          §

COUNTY OF MAVERICK                              §


This instrument was acknowledged before me on this the 8th day of November 2018 by Ivan Morua (Name), City Manager (Title) of the City of Eagle Pass, Texas, a Municipal corporation, as the act and on behalf of said entity.


_Imelda B. Rodriguez_
**Notary Public, State of Texas**

IMELDA B. RODRIGUEZ
Notary Public, State of Texas
My Commission expires
September 21, 2021
ID # 12805645-9


**BOOK 1736 PAGE 267**

**GRANTEE:**
**UNITED STATES OF AMERICA**

By: _[signature]_

Loren Flossman
Acquisition Program Manager
Wall Program Management
Office
U.S. Border Patrol Program
Management Office Directorate
U.S. Border Patrol
U.S. Customs and Border
Protection Department of
Homeland Security

**ACKNOWLEDGMENT**

DISTRICT
STATE OF _Columbia_                  §

City
COUNTY OF _WASHINGTON_               §

This instrument was acknowledged before me on this the _26TH_ day of
_OCTOBER_                 2018 by Loren Flossman, Acquisition Program Manager, Wall Program
Management Office, U.S. Border Patrol Program, Managmeent Office Directorate, U.S. Border
Patrol, U.S. Customs and Border Protection, Department of Homeland Security, for the United
States of America.

_[notary seal]_

Notary Public, State of _DISTRICT OF COLUMBIA_

ARTHUR J. BURKET
NOTARY PUBLIC DISTRICT OF COLUMBIA
My Commission Expires September 14, 2021

**BOOK 1736 PAGE 268**

EXHIBIT A

LEGAL DESCRIPTION

Maverick County, Texas

Tract: DRT-EGT-FC1 006E-8

Owner: City of Eagle Pass

Acres: 5.6

Being a 5.6 acre access easement situated on a tract of land our of a 40.2797 acre remainder of a 44.42 acre tract of land in the Jose Maria Munos Survey No. 35, Abstract No. 743 as described in Award of Special Commissioners proceedings in Eminent Domain, the City of Eagle Pass versus unknown owners of 44.42 acres and recorded in Volume 40, Page 415 of the Deed Records of Maverick County, Texas and the 134.863 remainder from a 153.40 acre tract described in the Jose Maria Munoz Survey No. 34, Abstract No. 743 as described in a deed from the United States of America to the City of Eagle Pass and recorded i n Volume 32, Page 207 of the Deed Records of Maverick County, Texas, said 5.6 acres being more particular described by metes and bounds as follows:

COMMENCING at a brass cap marked Michael Baker Jr. LS 21 16 found at the northeasterly corner of a 4.163 acre tract described as Parcels A and B in a deed form the City of Eagle Pass to the United States of America and recorded in Volume 55, Page 95. of the Deed Records of Maverick County, said point being tin the existing southerly right-of.way (60 foot ROW) o9f Garrison Street. THENCE. as follows:

NORTH 54°16'33" WEST a distance of 1,459.23 feet to a 5/8 inch iron with a yellow plastic cap marked RODS SURVEYING INC found for the intersection of the existing southerly right-of-way line (60 foot ROW) of Main Street and the existing westerly right-of-way line (60 foot ROW) of Ryan Street and the northeasterly corner of Block 5 of the River Plan of the city of Eagle Pass and the southeast corner of BORDER FENCE PARCEL DRT-EGT-1006-2;

SOUTH 87°35'38,, WEST along said southerly line of Main Street, a distance of 298.30 feet to a point in the westerly line of said Block 5 and the Easterly line of said 40.2797 acre remainder of 44.42 acres;

NORTH 22°47'5 I" EAST. along the common line of the westerly line of said Block 5 and the easterly line of said 40.2797 acre remainder of 44.42 acres, a distance of 22.30 feet to a 5/8-inch i.-on rod with aluminum cap set for the POINT OF BEGINNING of the herein desctibed easement,. Said point having grid coordinates of N=13,444,527.50 and E= 1,484986.12, all bearings and coordinates are based on the Texas State Plane Coordinate System., South Central Zone (4204), North American Datum of 1983. CORS96 adjustment, all distance are grid and can be converted to surface by multiplying by a combined scale factor of 1.00007;

**BOOK 1736 PAGE 269**

1. THENCE, SOUTH 87°01'16" WEST a distance of 387.44 to a 5/8-inch iron rod with aluminum cap set for the beginning of a curve to the right;

2. THENCE, 42.26 feet along the arc of said curve having a radius of 50.00 feet, a central angel of 48°25'50" and a chord bearing and distance of NORTH 68°45'49" WEST 41.02 feet to a 5/8-inch iron rod with aluminum cap set for the end of said cut"ve;

3. THENCE, NORTH 44°32'54" WEST, a distance of 2.23 feet to a 5/8-inch iron rod with aluminum cap set for the beginning of a curve to the left;

4. THENCE, 23.56 feet along the arc of said culve havi.11-g a radius of 15.00 feet, a central angel of 90°00'00" and a chord bearing and distance of NORTH 89°32'54" WEST 21.21 feet to a 5/8-inch iron rod with aluminum cap set for the end of said curve;

5. THENCE, SOUTH 45°27'06" WEST, a distance of 187.84 feet to a 5/8-inch iron rod with aluminum cap set for corner;

6. THENCE, NORTH 44°32'53" WEST, a distance of 188.95 feet to a PK nail set in curb set for corner;

7. THENCE, SOUTH *45°36'36"* WEST, a distance of 9.88 feet to a 5/8-inch iron rod with aluminum cap set.for come l;

8. THENCE, SOUTH 34°36'15" WEST, a distance of 94.82 feet to a 5/8-inch iron rod with aluminum cap set for cornet;

9. THENCE, SOUTH 31°00'08" WEST, a distance of 97.40 feet to a 5/8-inch iron md with aluminum cap set for corner;

10. THENCE, SOUTH 27°06'42" WEST, a distance of 97.81 teet to a 5/8-inch iron l'Od with aluminum cap set for cornet';

11. THENCE, SOUTH 23°35'22" WEST, a distance of 95.17 feet to a 5/8-inch iron rod with 'aluminum cap set for comer;

12. THENCE, SOUTH 22°10'40" WEST, a distance of 48.62 feet to a 5/8-inch iron rod with aluminum cap set for cornet;

13. THENCE, SOUTH 19°40'18" WEST, a distance of *49.45* feet to a 5/8-inch iron rod with aluminum cap set for corner;

14. THENCE, SOUTH 10°10'44" WEST, a distance of 95.91 feet to a 5/8-inch iron rod with aluminum cap set for comer;

**BOOK 1736 PAGE 270**

15. THENCE, SOUTH 02°51'29" WEST, a distance of 45.84 feet to a 5/8-inch iron rod with aluminum cap set for comer;

16. THENCE, SOUTH 01°30'58" EAST, a distance of 47.80 feet to a 5/8-inch iron rod with alumfnum cap set for comer;

17. THENCE, SOUTH 04°29'35" EAST, a distance of 46.92 feet to a 5/8-inch il'On rod with aluminum cap set for comer;

18. THENCE, SOUTH 06°42'54" EAST, a distance of 99.48 feet to a 5/8-inch iron rod with aluminum cap set for comer;

19. THENCE, SOUTH 12°52'06" EAST, a distance of 46.76 feet to a 5/8-inch iron rod with aluminum cap set for corner;

20. THENCE, SOUTH 19°42'50" EAST, a distance of 46.77 feet to a 5/8-inch iron rod with aluminum cap set for corner;

21. THENCE, SOUTH 18°05'25" EAST, a distance of 118.78 feet to a 5/8-inch iron rod with aluminum cap set for comer;

22. THENCE, SOUTH 15°04'24" EAST, a distance of 49.87 feet to a 5/8-inch iron rod with aluminum cap set for corner;

23. THENCE, SOUTH 10°42'24" EAST, a distance of 50.88 feet to a 5/8-inch iron rod with aluminum cap set for comer;

24. THENCE, SOUTH 08°45'52" EAST, a distance of 99.SS feet to a 5/8-inch iron rod with aluminum cap set for comer;

25. THENCE, SOUTH 04°2846" EAST, a distance of 99.08 feet to a point;

26. THENCE, SOUTH 05°11'27" EAST, a distance of 27.67 feet to a point;

27. THENCE, SOUTH 79°10'51" EAST, a distance of 175.61 feet to a point;

28. THENCE, SOUT_H 78°32'3Γ EAST, a distance of 330.28 feet to a point;

29. THENCE, SOUTH 06°09'27" WEST, a distance of 260.66 feet to a point;

30. THENCE, NORTH 67°34'27" WEST, a distance of 219.88 feet to a point;

**BOOK 1736 PAGE 271**

31. THENCE, NORTH 73°18'13" WEST, a distance of 44.91 feet to a point;

32. THENCE, NORTH 68°56'40" WEST, a distance of 245.45 feet to a point;

33. THENCE, NORTH 07°34'15" WEST, a distance of 171.41 feet to a 5/8-inch iron rod with aluminum cap set for corner;

34. THENCE, NORTH 05°11'27" WEST, a distance of 27.86 feet to a 5/8-inch iron rod with aluminum cap set for corner;

35. THENCE, NORTH 04°28'46" WEST, a distance of 98.14 feet to a 5/8-inch iron rod with aluminum cap set for corner;

36. THENCE, NORTH 08°45'52" WEST, a distance of 97.92 feet to a 5/8-inch iron rod with aluminum cap set for corner;

37. THENCE, NORTH 10°42'24" WEST, a distance of 48.23 feet to a 5/8-inch iron rod with aluminum cap set for corner;

38. THENCE, NORTH 15°04'24'WEST, a distance of 47.94 feet to a 5/8-inch iron rod with aluminum cap set for corner;

39. THENCE, NORTH 18°05'25" WEST, a distance of 117.56 feet to a 5/8-inch iron rod with aluminum cap set for corner;

40. THENCE, NORTH 19°42'50" WEST, a distance of 48.14 feet to a 5/8-inch iron rod with aluminum cap set for corner;

41. THENCE, NORTH 12°52'05" WEST, a distance of 50.17 feet to a 5/8-inch iron rod with aluminum cap set for corner;

42. THENCE, NORTH 06°42'54" WEST, a distance of 101.67 feet to a 5/8-inch iron rod with aluminum cap set for corner;

43. THENCE, NORTH 04°29'35" WEST, a distance of 48.28 feet to a 5/8-inch iron rod with aluminum cap set for cornet';

44. THENCE, NORTH 01°30'58" WEST, a distance of 49.73 feet to a 5/8-inch iron rod with aluminum cap set for corner;

45. THENCE, NORTH 02°51'29"EAST, a distance of 48.91 feet to a 5/8-inch iron rod with aluminum cap set for corner;

**BOOK 1736 PAGE 272**

46. THENCE, NORTH 10°10'44" EAST, a distance of 100.32 feet to a 5/8-inch iron rod with aluminum cap set for corner;

47. THENCE, NORTH 19°40'18,, EAST, a distance of 52.59 feet to a 5/8-inch iron rod with aluminum cap set for corner;

48. THENCE, NORTH 22°10'40" EAST, a distance of 49.65 feet to a 5/8-inch iron rod with aluminum cap set for corner;

49. THENCE, NORTH 23°35'22" EAST, a distance of 96.46 feet to a 5/8-inch iron rod with aluminum cap set for corner;

SO. THENCE, NORTH 27°06'42" EAST, a distance of 99.75 feet to a 5/8-inch iron rod with aluminum cap set for corner;

51. THENCE, NORTH 31°00'08" EAST, a distance of 99.36 feet to a 5/8-inch iron rod with aluminum cap set for corner;

52. THENCE, NORTH 34°36'15" EAST, a distance of 95.76 feet to a 5/8-inch iron rod with aluminum cap set for the beginning of a curve to the left;

53. THENCE, 61.24 feet along the arc of said curve having a radius of 56.72 feet, a central angle of 61°51'29" and a chord bearing and distance of NORTH 64°05'42" EAST, 58.31 feet to a 5/8-inch iron rod with aluminum cap set for the end of said curve;

54. THENCE, NORTH 45°27'41" EAST, a distance of 145.85 feet to a 5/8-inch iron rod with aluminum cap set for the beginning of a curve to the left;

55. THENCE, 23.41 feet along the arc of said curve having a iadius of 15.00 feet, a central angle of 89°26'13" and a chord bearing and distance of NORTH 00°44'35', EAST, 21.11 feet to a PK nail set in curb for the end of said curve;

56. THENCE, NORTH 43°58'32" WEST, a distance of 46.58 feet to a point for which a monument could not be set on the low bank of the Rio Grande River;

57. THENCE, NORTH 44°07'32" EAST, along the low bank of the Rio Grande River, a distance of 30.02 feet to a point for which a monument could not be set for corner;

58. THENCE, SOUTH 43°58'32" EAST, a distance of 46.99 feet to a 5/8-inch iron rod with aluminum cap set for the beginning of a curve to the left;

BOOK 1736 PAGE 273

59. THENCE, 23.71 feet along the arc of said curve having a radius of 15.00 feet, a central angle of 90°33'47" and a chord bearing and distance of SOUTH 89°J5'25" EAST, 21.32 feet to a 5/8-inch irnn rod with aluminum cap set fol' the end of said curve;

60. THENCE, NORTH 45°27'41" EAST, a distance of 125.60 feet to a 5/8-inch iron rod with aluminum cap set for corner;

61. THENCE, SOUTH 44°09 47" EAST, a distance of 199.75 feet to a 5/8-inch iron rod with aluminum cap set for corner;

62. THENCE, SOUTH 45°27'06" WEST, a distance of 1 12.02 feet to a PK nail in curb set for the beginning of a curve to the left;

63. THENCE, 23.58 feet along the arc of said cuave having a radius of 15.00 feet, a central angle of 90°00'00"and a chord bearing and distance of SOUTH 00°27'06' WEST, 21.21 feet to a 5/8-inch iron rod with aluminum cap set for the end of said curve;

64. THENCE, SOUTH 44°32'54" EAST, a distance of 2.23 feet to a 5/8-inch iron rod with aluminum cap set for the beginning of a cmve to the left;

65. THENCE, 8.45 feet along the arc of said curve having a radius of 10.00 feet, a central angle of 48°25'50" and a chord bearing and distance of SOUTH 68°45'49" EAST, 8.20 feet to a 5/8-inch iron rod with aluminum cap set for the end of said curve;

66. THENCE, NORTH 87°01'16"EAST, a distance of 406.75 feet to a 5/8-inch iron rod with aluminum cap set in the existing easterly line of said 40.2797 remainder of said 44.421 acre tract and the westerly line of Block 5 of the River Plan of the City of Eagle Pass;

67. THENCE, SOUTH 22°47'5 l" WEST, a distance of 44.42 feet along said common line to the POINT OF BEGINNING and containing 5.6 Acres more or less.

EXHIBIT 

LEGAL DESCRIPTION

Maverick County, Texas

Tract: DRT-EGT-FC1006E-9

Owner: City of Eagle Pass

Acres: 7.3 Acres more or less

Part of the J. M. Munoz Survey number 34, Abstract A-743, and part of the J. B. Roberts Survey Number 33, Abstract A-793, Maverick County, Texas, more particularly described as follows:

Commencing at the point where the gradient boundary on the left descending bank of the Rio Grande River intersects the South Right-of-Way of US Highway 57, East Garrison Street, in Eagle Pass, Maverick County, Texas;

Thence Easterly 1300 feet to the point where said South Right-of-Way intersects the border fence;

Thence Southerly along the meanders of the existing border fence to the point where the existing Border Fence intersects the North Right-of-Way of Ward Street;

Thence Westerly along said North Right-of-Way to the beginning of a curve to the left;

Thence along said curve to the left to the point where the formerly North Right-of-Way, now West Right-of-Way to a point 15 feet south of the centerline of a patrol road going west south west, for the Point of Beginning;

Thence along said south right-of-way, as occupied, westerly along path parallel to said patrol road, 700 feet more or less, to a point near the top bank of the Rio Grande River, where the patrol road turns northerly;

Thence northerly along the meanders of said patrol road right-of-way, now the west right-of-way to a point south of the top bank of a drainage ditch entering the Reo Grande River, and S 82° 48' 24" E from a point, with NAO 83 State Plane Coordinates of North=13,442,863.13 East = 1,484,163.20, U.S. Survey foot;

Thence leaving said west right-of-way N 82° 48' 24" W, to a point, with NAO 83 State Plane Coordinates of North=13,442,863.13 East = 1,484,163.20, U.S. Survey foot;

Thence N 06° 26' 16" W 417.58 feet to a point on the permanent easement for the bridge;

Thence leaving said permanent easement S 81° 28' 02" E 636.74 feet to a point;

Thence S 04° 15' 14" W 391.45 feet to a point;

Thence N 82° 48' 24" W 503 feet more or less to a point 15 feet East of the centerline of a patrol road traveling south and east to Ward Street, for the apparent East Right-of-Way of said patrol road:

**BOOK 1736 PAGE 275**

Thence Southerly along said East Right-of-Way of said patrol road to a point where the patrol road turns Easterly;

Thence Easterly along the North Right-of-Way of said patrol road 700 feet more or less to a point on the West Right-of-Way of Ward Street, 15 feet north of the point where the centerline of the patrol road intersects the West Right-of-Way of Ward Street;

Thence South along said West Right of Way of Ward Street 30 feet to the point of beginning and containing 7.3 Acres more or less.

Basis for bearings is Grid North based on GPS observations.



BOOK 1736 PAGE 277

Legend



BOOK 1736 PAGE 278

BOOK 1736 PAGE 279

**Doc #: 205318**
**Book: 1736**
**Pages: 263 - 279**

Filed & Recorded:
11/08/2018    11:05AM
SARA MONTEMAYOR
COUNTY CLERK
MAVERICK

| | |
|---|---|
| Recording Fee - Land Recs | $65.00 |
| Records Management | $10.00 |
| Records Preservation Fund | $10.00 |
| Courthouse Security Fee | $3.00 |

Irma Y Holguin, Deputy

STATE OF TEXAS,
COUNTY OF MAVERICK
I hereby certify that this instrument
was filed on the date and time stamped
thereon by me and was duly recorded in
the OFFICIAL PUBLIC RECORDS of
Maverick County, Texas.

Any provisions herein which restricts
the sale, rental, or use of the described
real property because of color or race
is invalid and unenforceable under
federal law.

SARA MONTEMAYOR
COUNTY CLERK MAVERICK COUNTY, TEXAS

**Attachment B:**
First Excerpt of March 4, 2024, Hearing
Testimony from Robert Danley

1   did you mention?

2   A    Or emergency reasons.

3   Q    Okay.  So you do recall specifically saying, You would be

4   admitted in the case of an emergency?

5   A    Yes, ma'am.

6   Q    Did you specify any terms or what those emergencies might

7   look like?

8   A    Negative.

9        MS. LOWRY:  Nothing further, Your Honor.

10       THE COURT:  Okay.  Any redirect?

11       MR. BRYANT:  Your Honor, no further questions.

12       THE COURT:  Okay.  May the witness be excused?

13       MS. LOWRY:  Yes, Your Honor.

14       THE COURT:  All right.  You may be excused.

15         Call your next witness.

16       MR. KERCHER:  Your Honor, the plaintiffs call

17   Robert Danley.

18

19                         **ROBERT DANLEY,**

20   having first been duly sworn, testified to the following:

21

22                       DIRECT EXAMINATION

23   BY MR. KERCHER

24   Q    Good afternoon, sir.  My name is Ryan Kercher.  I work for

25   the Office of the Attorney General for the State of Texas.

```
 1            Will you please state your name for the record.

 2   A    Robert Brian Danley.

 3   Q    Mr. Danley, you are the Del Rio sector chief for CBP; is

 4   that right?

 5   A    Sector chief for CBP, U.S. Border Patrol, Del Rio Sector.

 6   Q    And how long have you held that role?

 7   A    I've been the chief of Del Rio Sector since January 14th of

 8   this year.

 9   Q    And prior to January 14th, what role did you hold, or did

10   you fill for --

11   A    I was --

12   Q    -- for Border Patrol?

13   A    I was the chief patrol agent of Detroit Sector.

14   Q    When did you actually move into the Del Rio/Eagle Pass

15   area?

16   A    So I was -- I was put on a temporary duty assignment about

17   December 15th or so.  I -- I can't remember the exact date.

18   Q    Were you in the Del Rio Sector on January 10th, 11th, and

19   12th when TMB -- TMD moved into Shelby Park?

20   A    No, sir.

21   Q    You were not in the vicinity at all?

22   A    No, sir.

23   Q    What date did you arrive in -- in Eagle Pass following

24   TMD's move into Eagle Pass -- into Shelby Park?

25   A    It'd been about the 20th.
```

1    Q    So is it right to say you were not in Eagle Pass until ten

2    days after TMD moved into Shelby Park?

3    A    That's correct.

4    Q    You signed a pair of declarations filed in this case while

5    it was at the United States Supreme Court, right?

6    A    That's correct.

7    Q    One of them on January the 12th, right?

8    A    I believe that's correct.

9    Q    And the other on January the 15th; is that true?

10   A    Sounds right.

11   Q    Is it right to say that at the time that you signed either

12   of these declarations before the Supreme Court, you were not in

13   Eagle Pass?

14   A    That's correct.

15   Q    You had not been to Eagle Pass since Texas Military

16   Department moved into Shelby Park?

17   A    That's correct.

18   Q    You had no direct knowledge about Texas Military

19   Department's operations in Shelby Park on January 10th, 11th,

20   and 12th; is that true?

21   A    That's correct.

22   Q    You were relying on what other people were telling you; is

23   that right?

24   A    That's correct.

25   Q    Who did you talk to?

1  A    Talked to Acting Chief Patrol Agent Milton Moreno; Patrol

2  Agent In Charge of Eagle Pass, Micky Donaldson; and several

3  other members of my command staff.

4  Q    The fact that you had not observed any of TMD's operations

5  in Shelby Park on January 10th, 11th, and 12th didn't make you

6  uncomfortable signing a sworn declaration before the United

7  States Supreme Court about the facts of that operation?

8  A    No, sir.

9  Q    Well, let's take a look at the first one.

10        MR. KERCHER:  Can we bring up Plaintiff's Exhibit

11  Number 19, please.

12            Is there a way to -- to erase the markings on the

13  screen the previous witness put on there?

14        THE COURT:  I'm -- I'm not seeing it on mine anymore.

15  Q    (By MR. KERCHER) All right, Mr. Danley, can you see your

16  first declaration on the screen in front of you?

17  A    I see a declaration on the screen.  I assume it's the first

18  one.

19  Q    Okay, let's scroll down to the bottom of page -- to the

20  last page, please.

21            You can see this one is dated January the 12th,

22  right?

23  A    Yes, sir.

24  Q    And so this is your first declaration, right?

25  A    Yes, sir.

1  Q    And you signed it electronically, true?

2  A    That's correct.

3  Q    And you signed it electronically on January the 12th, 2024,

4  right?

5  A    Yes, sir.

6  Q    And there's a timestamp at the bottom; is that right?

7  A    Yes, sir.

8  Q    What time does that indicate?

9  A    I believe it -- it's 12:37 a.m.

10  Q    That's between midnight and 1:00 a.m.; is that right?

11  A    That's correct.

12  Q    So at the time that you signed this declaration, where

13  physically were you?

14  A    Just outside of Detroit, Michigan.

15  Q    So at the time that you signed this declaration

16  electronically from just outside of Detroit, Michigan, TMD's

17  operation in Shelby Park was not yet 36 hours old; is that true?

18  A    That sounds about right.

19  Q    And you signed this declaration, of course, under penalty

20  of perjury, right?

21  A    That's correct.

22  Q    Just like you are today, right?

23  A    Yes, sir.

24       MR. KERCHER:  Let's go to Paragraph Six of Plaintiff's

25  Exhibit 19.  That's on Page Three.

```
 1   Q    (By MR. KERCHER) In Paragraph Six you state that in
 2   mid-December there were 6,000 migrants staged by CBP in Shelby
 3   Park; is that true?
 4   A    I think it's a little bit miss -- a little of a
 5   mischaracterization.  I said that there was just about 6,000
 6   migrants that were staged.
 7   Q    You didn't see the 6,000 migrants yourself, right?
 8   A    Oh, I -- I did see the -- those when I got there on --
 9   around the 15th of -- of December.
10   Q    Of December?
11   A    Yes, sir.
12   Q    Okay.  How many Border Patrol personnel were in the park at
13   that time?
14   A    When I arrived?
15   Q    In December, when you saw the 6,000 migrants.
16   A    I could -- best I could do is give you an estimate or a
17   guess.  It was probably at least 15 or 20.
18   Q    In Paragraph Seven -- if we could scroll down, please --
19   you state that beginning at 8 p.m. on January 10th, Border
20   Patrol was denied access to the park.
21             Is that true?
22   A    That is true.
23   Q    How did you find that out?
24   A    I believe my first notification came from Patrol Agent In
25   Charge Micky Donaldson via telephone.
```

1    Q    How is it possible that CBP was denied access to the park

2    if it already had numerous agents and migrants already inside

3    the park?

4    A    The way it was explained to me is that members of the Texas

5    National Guard were ordering our personnel out of the park, and

6    that they were putting up blockades to limit access in and out

7    of the park.

8    Q    Well, when you say, The way it was explained to you, that's

9    because you weren't there and you didn't see it.  Fair?

10   A    That's correct.

11   Q    You did not tell the Supreme Court when you signed a sworn

12   declaration to them about what happened the night that TMD moved

13   into Shelby Park that you were 2,000 miles away at the time, did

14   you?

15   A    No, sir.

16   Q    You did not disclose that you had to sign this declaration

17   electronically because you were just outside of Detroit,

18   Michigan, instead of just outside of Shelby Park, true?

19   A    That's not a -- a fair characterization.

20   Q    It's true that you were just outside of Detroit, Michigan,

21   right?

22   A    That's correct.

23   Q    There were not 6,000 migrants under CBP control or being

24   staged by CBP in Shelby Park on the night of January 10th, true?

25   A    That's correct.

1   Q   And I know that you weren't there that night, but do you

2   disagree that there were ten or fewer CBP agents in the park

3   that night?

4   A   I'm not sure how many were at the park the night that -- on

5   the 10th.

6   Q   Your testimony is you don't know how many CBP agents were

7   in Shelby Park when TMD moved in; is that right?

8   A   That's correct.

9   Q   You say that CBP was denied access to some 2.5 miles of the

10  border.  Who gave you that information?

11  A   Well, I received multiple lines of information from my

12  staff and also from -- I received a phone call from Regional

13  Director Escalon as well.

14  Q   You submitted photographs with your declaration to the

15  Supreme Court; did you not?

16  A   That's correct.

17  Q   You did not take those photographs, right?

18  A   No, sir.

19  Q   Who gave you those photographs?

20  A   My staff.

21  Q   Who, specifically, on your staff?

22  A   I would have received them from Micky Donaldson.

23  Q   Did Micky Donaldson take the photographs or did somebody

24  else take the photograph and give it to Micky Donaldson?

25  A   I'm not certain.

1    Q    You didn't ask that question?

2    A    No, but I -- I know that Micky Donaldson told me that he'd

3    gone to each of the gates that were being blocked and conveyed

4    that that information was in fact the photos that were taken at

5    the time.

6    Q    Are you familiar with Texas Military Department's habit of

7    parking vehicles in front of border gates during shift changes?

8    A    No, sir.

9    Q    That's just not a part of their standard operating

10   procedure with which you're familiar, true?

11   A    I was never made aware of that.

12   Q    So, if that's Texas Military Department's standard

13   operating procedure and you receive a photo in broad daylight of

14   a Humvee parked in front of a gate at -- in a border wall, you

15   don't know whether that Humvee is there because of a shift

16   change or because of TMD's assumption of responsibility for

17   Shelby Park, true?

18            That was a long question.  Let me see if I can ask

19   you a better question.

20   A    Okay.

21   Q    You get a picture of a TMD Humvee parked in front of a gate

22   at the border wall.  Okay?

23            Okay?  You need to answer out loud.

24   A    All right.

25   Q    You follow me so far?

```
 1  A     Yep.
 2  Q     Based on that picture, you don't know why that Humvee is
 3  there, do you?
 4  A     Just from the picture alone, no.
 5  Q     You told the Supreme Court that that picture showed TMD
 6  denying CBP access to Shelby Park and regions south, didn't you?
 7  A     Yes, sir.
 8  Q     Are you aware that TMD pulled back its gate-blocking
 9  personnel from outside Shelby Park within five hours of moving
10  into Shelby Park?
11  A     No, sir.
12  Q     Are you aware that at the gate that you gave a picture of
13  to the United States Supreme Court, if CBP or emergency services
14  needed to move through that gate, TMD would have moved their
15  Humvee happily?
16  A     I don't believe that's accurate.
17  Q     But you don't know, do you?
18  A     No.  I know what's conveyed to me from my staff and also
19  from Regional Director Escalon.
20  Q     Well, you told the -- you told the Supreme Court that you
21  had personal knowledge and that you were also --
22        MS. LOWRY:  Objection, Your Honor.  That is misstating
23  Paragraph Five of his declaration.
24        MR. KERCHER:  Let's take a look at Paragraph Five.
25        THE COURT:  I was going to say, we're not at Paragraph
```

1    Five, are we?

2            MS. LOWRY:  He -- he just --

3            THE COURT:  Let's get to Paragraph Five.

4            MR. KERCHER:  Let's take a look at Paragraph Five.

5    Q    (By MR. KERCHER) Mr. Danley, you say -- let me know if I

6    read this incorrectly.  You stated under -- under oath to the

7    United States Supreme Court, This declaration is based upon my

8    personal knowledge and information provided to me in the course

9    of my official duties.

10            Did I read that correctly?

11   A    Yes, sir.

12   Q    What we have heard so far is about information other people

13   gave you.  The fact of the matter is, you had no personal

14   knowledge about TMD operations in Shelby Park at the time that

15   you signed this declaration; isn't that true?

16   A    I believe that's a mischaracterization.

17   Q    What personal knowledge did you have?

18   A    I've been to the park before.  Information was relayed to

19   me by a number of sources directly to me.  I -- I believe that

20   that's what I'm saying here.

21   Q    Well, you said you'd been to the park before.  That

22   wouldn't help you tell the Supreme Court what was happening in

23   the park on January 12th, right?

24   A    No, I think it gives me a baseline of the information

25   that's provided to me.

1   Q    So the only information that you're providing to the

2   Texas -- to the United States Supreme Court is information that

3   somebody else gave to you?

4   A    That's correct.

5   Q    You did not tell the Supreme Court that CBP regained access

6   to -- or through the border wall south of Shelby Park within

7   hours of TMD moving in, fair?

8   A    I was not aware of any -- any access available to us at the

9   time.

10  Q    I'm not sure I understand that.  It seems like if you're

11  going to provide a sworn declaration to the United States

12  Supreme Court, you would want to get nailed down exactly what

13  access was granted and denied at the time that you gave the

14  sworn declaration.  And did you not ask a question when access

15  was regained?

16  A    I don't know that there was a -- a need to ask.  I was

17  being -- I was being informed throughout this process both from

18  my staff and conversations with Director Escalon, and nothing

19  had changed about our ability to access the -- the property in

20  question.

21  Q    Your testimony is the information that was being given to

22  you to rely -- to relay to the Supreme Court is that as of

23  January 12th, CBP still did not have access through the border

24  wall south of Shelby Park; is that right?

25  A    That was my understanding at the time.

1  Q    Nobody told you before you gave a sworn declaration to the

2  United States Supreme Court that as of 11 o'clock on January

3  10th CBP had access through the border wall south of Shelby

4  Park?

5  A    No, sir.

6  Q    Never got that information?

7  A    No, sir.

8  Q    Ever ask for it?

9  A    I don't know that I specifically asked if the gate south of

10  Shelby Park was open to us.

11          MR. KERCHER:  Let's go to Paragraph 13.

12              I'm sorry, let's go to Paragraph 11.

13  Q    (By MR. KERCHER) In the first sentence of Paragraph 11, can

14  you see where that is based on the scrolling?

15  A    Yes, sir.

16  Q    You say within the 2.5 miles blocked by TNG -- that's Texas

17  National Guard, right?

18  A    Yes, sir.

19  Q    -- there are multiple entry points, all of which are now

20  blocked.

21              Did I read that correctly?

22  A    That's correct.

23  Q    But your testimony today is you did not specifically ask

24  whether all of those were specifically blocked at the time that

25  you signed this declaration?

1  A   My staff informed me that all of those entry points were

2  blocked and nothing had changed up to the point that I signed

3  the declaration.

4  Q   You did not specifically ask whether those -- whether that

5  situation had changed before you signed the declaration, true?

6  A   No, that's not true.  We were in constant communication

7  throughout this process, and it was never relayed to me that we

8  had regained access, whether it was coming from my staff or from

9  Director Escalon.

10  Q   Is today the first day that you're learning that as of

11  January 12th there were not TMD Humvees blocking openings in the

12  border wall?

13       MS. LOWRY:  Objection, Your Honor.  That's not a

14  representation of counsel to Mr. Danley.

15       THE COURT:  Okay, there's a question.  There's a

16  question.  Let him answer the question.

17            Is today the first day?

18            I don't want speaking objections by either side.

19  Witnesses don't need to hear the answer from the attorneys.

20            Is today the first day that you've heard that?

21       THE WITNESS:  It's the first time that I was told that

22  a gate was open.

23       THE COURT:  Okay.

24       MR. KERCHER:  Let's go to Paragraph 13, please.

25  Q   (By MR. KERCHER) In Paragraph 13 of Plaintiff's Exhibit 19,

1  or arrested?

2        THE WITNESS:  We -- we move them from the pit area,

3  Chief Judge, up to the -- where our equipment is that's

4  underneath POE Two, and they -- we would determine alienage at

5  that point, place them on a manifest, and get them sorted out

6  for immediate transfer to a CBP facility.

7        THE COURT:  Okay.  So at which point were they

8  apprehended under your definition?

9        THE WITNESS:  Once they were no longer free to leave.

10        THE COURT:  And that was -- happened at what point?

11        THE WITNESS:  When we would escort them from the pit

12  to POE Two.

13        THE COURT:  Okay.

14        MR. KERCHER:  Let's scroll down to Page Nine of this

15  exhibit.

16  Q    (By MR. KERCHER)  This is your January 15th declaration.

17  I'll show you the date in a minute, but you can see this is one

18  of your declarations, right?

19  A    Yes, sir.

20  Q    All right.

21        MR. KERCHER:  And let's scroll down to the bottom of

22  the page, Mr. Przada.

23  Q    (By MR. KERCHER) And here you can see this is dated January

24  15th, and you have electronically signed it as well.

25  A    Yes, sir.

1   Q     It's right to say, isn't it, that you still had not arrived

2   in Stanley Park -- or excuse me, in Shelby Park or in Eagle Pass

3   when you signed this declaration?

4   A     That's correct.

5             MR. KERCHER:   Let's look at Paragraph Four, please.

6   Q     (By MR. KERCHER) This is just like the Paragraph Number

7   Five in your previous declaration.   You state, This declaration

8   is based upon my personal knowledge and information provided to

9   me in the course of my official duties.

10            Did I read that correctly?

11  A     Yes, sir.

12  Q     Is it right to say that the personal knowledge that you had

13  in this case was no different -- in the case of the second

14  declaration is no different from the personal knowledge you

15  claimed to have for the first declaration?

16  A     That's correct.

17  Q     You're still relying on what people in Eagle Pass are

18  telling you about what's happening on the 0ground in the park,

19  true?

20  A     That's true.

21  Q     Who provided you the information that is reflected in this

22  declaration?

23  A     I would have received it, again, from Patrol Agent In

24  Charge Micky Donaldson, and Acting Chief Patrol Agent Milton

25  Moreno.

1  Q    And in your second declaration, as with the first, you did

2  not tell the Supreme Court that you had not been to Shelby Park

3  in the time that TMD had assumed responsibility for it following

4  January 10th?

5  A    That's correct.

6  Q    At Paragraph Five, you state that the National Institute of

7  Migration contacted the Del Rio Sector; is that right?

8  A    That's correct.

9  Q    About migrants in distress near the Shelby Park boat ramp

10 and about a drowning that occurred earlier that evening around

11 8:00 p.m.; is that right?

12 A    That's correct.

13 Q    So by the time that CBP learned about some distress in the

14 Rio Grande next to Shelby Park on the night of January 12th, the

15 drownings had already occurred; is that true?

16 A    Can you -- can you say what the question is, sir?

17 Q    Sure.  So I'm trying to figure out the timeline --

18 A    Yes, sir.

19 Q    -- when CBP got information.  Your declaration reflects

20 that CBP got information from the National Institute of

21 Migration in Mexico, right?

22 A    That's correct.

23 Q    And that information was about migrants in distress near

24 the Shelby Park boat ramp and about drownings that had occurred

25 earlier that evening around 8:00 p.m., right?

**Attachment C:**
Second Excerpt of March 4, 2024, Hearing
Testimony from Robert Danley

1  did you mention?

2  A      Or emergency reasons.

3  Q      Okay.  So you do recall specifically saying, You would be

4  admitted in the case of an emergency?

5  A      Yes, ma'am.

6  Q      Did you specify any terms or what those emergencies might

7  look like?

8  A      Negative.

9              MS. LOWRY:  Nothing further, Your Honor.

10             THE COURT:  Okay.  Any redirect?

11             MR. BRYANT:  Your Honor, no further questions.

12             THE COURT:  Okay.  May the witness be excused?

13             MS. LOWRY:  Yes, Your Honor.

14             THE COURT:  All right.  You may be excused.

15               Call your next witness.

16             MR. KERCHER:  Your Honor, the plaintiffs call

17  Robert Danley.

18

19                      **ROBERT DANLEY,**

20  having first been duly sworn, testified to the following:

21

22                    DIRECT EXAMINATION

23  BY MR. KERCHER

24  Q    Good afternoon, sir.  My name is Ryan Kercher.  I work for

25  the Office of the Attorney General for the State of Texas.

```
 1   A    That's correct.

 2   Q    So the first information CBP gets from the Mexico side of

 3   the river on January 12th is after the drownings had occurred,

 4   true?

 5   A    That's correct.

 6        MR. KERCHER:  Let look Defendant's Exhibit 22, please.

 7   Q    (By MR. KERCHER) Mr. Danley, this is an email chain that

 8   was produced and has been made an exhibit to this hearing by the

 9   DOJ that involves Mr. Donaldson and another correspondence --

10   correspondent, we know not whom.  Have you ever see this before?

11   A    I believe I have.

12   Q    You see that a -- the bottom email here on the first page

13   is dated January the 13th, right?

14   A    That's correct.

15   Q    So this email is two days before the declaration -- the

16   second declaration you submitted to the United States Supreme

17   Court, right?

18   A    I believe so.

19   Q    It says, Below is the most accurate timeline after

20   clarifying with all parties involved.

21        MR. KERCHER:  And, Jacob, can you scroll down, please.

22   Q    (By MR. KERCHER) In the 8:05 p.m. entry, it says that

23   Grupo Beta recovered drowning victims.  Do you see that?

24   A    Yes, sir.

25   Q    And this is before CBP had been notified by Mexican
```

1  officials about drownings in the river, true?

2  A    That's true.

3  Q    And so necessarily, this is before CBP sent any personnel

4  to Shelby Park to investigate, true?

5  A    The -- we did have this information at that time.  You're

6  saying that the people had drowned prior to us responding?

7  Q    Yes, sir.

8  A    That's correct.

9  Q    The 8:15 entry indicates that Grupo Beta also rescued a

10  female and small child stranded underneath POE Number One.  Is

11  that true?

12  A    I believe so.

13  Q    Did you review this email before or after you submitted

14  your second declaration to the Supreme Court?

15  A    I -- I'm not certain.

16  Q    At the 8:25 entry it says that Grupo Beta encountered two

17  additional males trying to get back to the Mexican side of the

18  river.  Is that right?

19  A    That's correct.

20  Q    Why would they be trying to get back to the Mexican side of

21  the river; do you know?

22  A    It was my understanding that they were hypothermic, had

23  been wet, and on the shoreline for a number of hours without

24  being able to successfully cross the -- the c-wire.

25        My screen just went black.

```
 1    Q      So your assessment, based on the information you received,
 2    is that the barriers erected by Texas to keep illegal migrants
 3    out had successfully kept these migrants from -- from making it
 4    onto the bank; is that right?
 5    A      It kept them from making a further entry into the country.
 6    Q      And so they turned around and wanted to go back to Mexico;
 7    is that right?
 8    A      That's my understanding.
 9    Q      And your understanding is that Grupo Beta used boats, then,
10    to help get these illegal immigrants -- or would-be illegal
11    immigrants back to the Mexican side of the river, right?
12    A      I'd say that they were illegal -- are illegal migrants that
13    made landfall and had broke our laws.  But, yes, they did get
14    back on a boat with [INM/Anomi]*** and went back to Mexico.
15    Q      So if this is happening at 8:25 on January 12th, it's dark,
16    right?
17    A      Yes, sir.
18    Q      And the -- so, CBP boats could not have taken these
19    gentlemen back across the river to Mexico, right?
20    A      We don't make it a habit of taking anybody back to Mexico
21    in the river, especially after they make landfall.  It'd be
22    illegal for us to return an arriving alien back without taking
23    them back through the port of entry with legal, civil
24    immigration authorities.
25    Q      And you also don't make it a habit of putting boats in the
```

1   river at night, true?

2   A    That's correct.

3        MR. KERCHER:  Let's look at the 9:23 entry, please.

4   Q    (By MR. KERCHER) Here there's a name that's been redacted,

5   so someone, we know not whom, updates EGT that the situation is

6   an emergency.  Did I read that correctly?

7   A    Yes, sir.

8   Q    And then if we go -- if we look at the 9:55 entry, again,

9   the name is redacted.  Someone, we know not whom, clarified the

10  situation to Eagle Pass Station and provides an update of the

11  situation.  At the time it was believed all subjects were

12  traveling together, but communication on 1/13/24 with GOM --

13  that's Government of Mexico, correct?

14  A    That's correct.

15  Q    -- clarified that the Cubans -- these are the gentlemen who

16  wanted to go back, right?

17  A    I believe so.

18  Q    -- were not part of the group of five that included the

19  drowning or rescued subjects.  Did I read that correctly?

20  A    I believe so.

21  Q    And then it says in the first bullet point, Michael Garcia

22  arrives to Shelby Park, advises TNG of situation and is denied

23  access at the gate by TNG soldiers.  Right?

24  A    That's correct.

25  Q    So 9:55, that would be almost two hours after the original

1   drownings occur, right?

2   A    That's correct.

3   Q    That would be 22 minutes after someone at CBP determined

4   that this was an emergency, right?

5   A    What -- what are you comparing?

6   Q    9:23 determines that the situation is an emergency --

7   A    Yeah.

8   Q    -- at 9:55, Michael Garcia arrives at Shelby Park, right?

9   A    That's correct.

10  Q    When Mr. Garcia and the other CBP agent who was with him

11  arrived at Shelby Park, they did not have a boat, right?

12  A    That's correct.

13  Q    Even if they had had a boat, they would not have put the

14  boat in the water because it was nighttime, right?

15  A    Most likely.  That's correct.

16  Q    Would they have had night vision in their truck?

17  A    It'd be likely that our agents at night would have night

18  vision.

19  Q    Do you know whether they had night vision in their truck?

20  A    No.  Agents take out personal equipment as they see fit for

21  their shift and their assignment.

22  Q    And do you know whether or not those agents have flotation

23  devices, ropes, or other land-based help they could have

24  provided to someone in distress in the river?

25  A    It'd be highly probable, but I can't say for certain.

1   Q     And we agree, don't we, that when the CBP agents arrived at

2   the gate of Shelby Park on the night of January 12th, CBP

3   already had access to the boat ramp for use and riverine

4   operations from TMD?

5   A     I believe so.

6   Q     According to Defense Exhibit Number 22, CBP had all of the

7   information we've been talking about by January 13th, 2024,

8   right?

9   A     I believe that's correct.

10         MR. KERCHER:  Let's go back to the 1/15, I believe

11   Paragraph Number Seven.

12   Q     (By MR. KERCHER) In Paragraph Number Seven of your

13   January 15th declaration, some two days after CBP put all this

14   information together, there are no times describing when the

15   drownings occurred versus when CBP arrived at Shelby Park, are

16   there?

17   A     No, sir.

18   Q     There is nothing in this declaration to indicate that by

19   the time CBP arrived at Shelby Park, it could not have helped

20   anyone who was distressed in the river based on the reports it

21   had received from the Mexican side of the river?

22   A     I believe that's accurate.  The only thing that I would say

23   is at the time that we were responding, we weren't certain what

24   had occurred.  Generally we receive calls for assistance that

25   there's an emergency situation and we have to put eyes on it.  I

1    think as you saw in the previous email, it talked about how we

2    received an anonymous call.  We take all those calls seriously

3    and we respond to try to determine what -- what had occurred.

4           And it is also not uncommon that if, say, a portion

5    of a group had succumbed to a drowning, that there's not other

6    people that are involved that we find a long period of time

7    later that are still holding onto the cane, still in the water

8    that -- that still need to be rescued.  That's why we -- when we

9    respond to these situations, we take them seriously, and we do

10   our best to resolve the situation.

11   Q   Well, I understand that situational awareness can be

12   evolving over time, but I'm asking you what you communicated to

13   the Supreme Court two days after you figured out the precise

14   timeline.  Two days after you figured out the precise timeline,

15   you did not tell the Supreme Court what that precise timeline

16   was, did you?

17   A   We communicated to the Supreme Court the challenge that we

18   had responding in this situation.

19   Q   My question is different, sir.  Listen closely, please.

20           You did not communicate to the Supreme Court the

21   precise timeline of events that occurred on the night of

22   January the 12th when you provided them with your second

23   declaration.

24   A   I believe that's accurate.

25   Q   What statements did you make to media outlets about what

1    happened in the river next to Shelby Park on the night of

2    January the 12th?

3    A    I did not make any media statements.

4    Q    What statements were you consulted on by CBP that were made

5    by CBP to the media regarding the events of the night of January

6    the 12th?

7    A    I wasn't consulted, nor was I aware of any statements being

8    made at the time that this event was occurring.

9    Q    You read none of the news coverage?

10    A    No, at some point -- and I don't know if -- at what point,

11    but at some point I -- I read a CBS, I believe, article --

12    Q    I'm sorry, what's a CBS?

13    A    CBS?

14    Q    Oh, okay.  CBS, the news station?

15    A    Yes, sir.  National news.  And I know that -- if I remember

16    right, they attributed whatever they had to an unnamed CBP

17    official.  But I'm not aware of who that official was.  I'm not

18    aware of us, as an agency, providing any authorized statements

19    to be made.

20    Q    When you learned that someone in CBP had given an

21    unauthorized statement to the media about the events alleged --

22    that are -- that are alleged to have occurred on the night of

23    January 12th, what -- what action did you take?

24    A    I'm not aware that -- that whoever made that statement made

25    that within my purview, anybody that I have command and control

1    over.

2    Q    Did you ask the people you do have command and control over

3    whether or not they had made a statement to the media?

4             MS. LOWRY:  Objection.  Outside the scope.

5             THE COURT:  I'll allow it.

6             THE WITNESS:  I don't remember asking.  I know that we

7    had a discussion about it because it is troubling when things do

8    get leaked out.  However, we -- for a very long time in a lot of

9    high-profile situations like this, it's nearly impossible to

10   determine who the leak was.

11   Q    (By MR. KERCHER) Well, it's particularly impossible if you

12   make no effort to determine who the leak is, right?  You're

13   never going to learn the answer to the question you don't ask.

14   Fair?

15   A    I guess so.

16   Q    You asked none of your subordinates whether or not they

17   were leaking information to the media?

18   A    No, sir.

19   Q    Are you aware of official statements that came out from

20   your office to the media about the events on the night of

21   January 12th?

22   A    I'm not aware of anything the Del Rio Sector CBP office

23   of -- OPA, they may have made a statement, but I'm not aware of

24   my office making any statements.

25   Q    So if somebody further up the chain or outside of the