**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**DEL RIO DIVISION**

| | | |
|---|---|---|
| **THE STATE OF TEXAS,** | § | |
| ***Plaintiff*,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 2:23-CV-00055-AM** |
| | § | |
| **U. S. DEPARTMENT OF** | § | |
| **HOMELAND SECURITY, *et al.*,** | § | |
| ***Defendants*.** | § | |
| | § | |

**BRIEF OF GOVERNOR GREG ABBOTT**
**ON BEHALF OF THE STATE OF TEXAS**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... ii
INTRODUCTION ..... 1
BACKGROUND ..... 1
ARGUMENT ..... 3
  I. Under the Texas Constitution, the Governor Acts for the State in Negotiating and Consummating Sovereign-to-Sovereign Agreements. ..... 3
  II. Counsel for the State Is Not the State Itself and Cannot Override the Wishes of State Clients Concerning Settlement. ..... 5
  III. This Court May Retain Jurisdiction Over a Settlement Agreement Between the Two Sovereign Governments Concerned Here. ..... 9
CONCLUSION ..... 11
CERTIFICATE OF SERVICE ..... 13

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Adams v. Calvert*,
396 S.W.2d 948 (Tex. 1965) ........ 4

*Archer v. Warner*,
538 U.S. 314 (2003) ........ 10

*Bullock v. Tex. Skating Ass'n*,
583 S.W.2d 888 (Tex. App.—Austin 1979, writ ref'd n.r.e.) ........ 6

*Charles Scribner's Sons v. Marrs*,
114 Tex. 11 (1924) ........ 6

*Davis v. Mueller*,
528 S.W.3d 97 (Tex. 2017) ........ 3

*Day Land & Cattle Co. v. State*,
4 S.W. 865 (Tex. 1887) ........ 8

*Dickerson v. Texas*,
No. 4:21-cv-02729, 2021 WL 4192740 (S.D. Tex. Sept. 15, 2021) ........ 3

*Digital Equip. Corp. v. Desktop Direct, Inc.*,
511 U.S. 863 (1994) ........ 10

*Gust, Inc., v. Alphacap Ventures, LLC*,
905 F.3d 1321 (Fed. Cir. 2018) ........ 7

*Halliburton, Inc. v. Admin. Review Bd.*,
771 F.3d 254 (5th Cir. 2014) ........ 3

*Highway Comm'n of Tex. v. Vaughn*,
288 S.W. 875 (Tex. App.—Austin 1926, writ ref'd) ........ 3

*Jules v. Andre Balazs Properties*,
146 S. Ct. 1209 (2026) ........ 10, 11

*Kokkonen v. Guardian Life Ins. Co.*,
511 U.S. 375 (1994) ........ 10, 11

*LULAC v. Clements*,
999 F.2d 831 (5th Cir. 1993) (en banc) ........ 6, 7, 8

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ........ 9

*Paxton v. Am. Oversight*,
716 S.W.3d 535 (Tex. 2025) ........ 5, 9

*Richardson v. Famous Bourbon Mgmt. Grp.*,
857 F. App'x 182 (5th Cir. 2021) (per curiam) ........ 5, 10

*Ex parte Robinson*,
86 U.S. 505 (1873) ........ 9

*State v. Reagan County Purchasing Co.*,
186 S.W.2d 128 (Tex. Civ. App.—El Paso 1944, writ ref'd w.o.m.) ........ 8

*State v. Volkswagen Aktiengesellschaft*,
692 S.W.3d 467 (Tex. 2022) .................... 3
*Terrazas v. Ramirez*,
829 S.W.2d 712 (Tex. 1991) .................... 6, 7
*Texas v. DHS*,
No. DR-23-CV-00055, 2023 WL 8285223 (W.D. Tex. Nov. 29, 2023) .................... 2, 11
*Texas v. DHS*,
123 F.4th 186 (5th Cir. 2024) .................... 2
*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) .................... 5
*United States v. Beebe*,
180 U.S. 343 (1901) .................... 7
*United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*,
986 F.2d 15 (2d Cir. 1993) .................... 7
*United States v. City of Miami*,
614 F.2d 1322 (5th Cir. 1980) .................... 10
*United States v. City of Miami*,
664 F.2d 435 (5th Cir. 1981) (en banc) .................... 10
*United States v. Texas*,
680 F.2d 356 (5th Cir. 1982) .................... 8
*Wallace v. City of Hampton*,
No. 2:15-cv-126, 2017 WL 11505959 (E.D. Va. Feb. 9, 2017) .................... 1
*Webster v. Comm'n for Lawyer Discipline*,
704 S.W.3d 478 (Tex. 2024) .................... 7
*Zivotofsky ex rel. Zivotofsky v. Kerry*,
576 U.S. 1 (2015) .................... 9

**Constitutional Provisions, Statutes, and Rules:**

U.S. CONST. art. III, § 1 .................... 9
FED. R. CIV. P.:
62 .................... 9
64 .................... 9
69 .................... 9
70 .................... 9
FED. R. CRIM. P. 42 .................... 9
TEX. CONST. art. IV:
§ 7 .................... 5
§ 10 .................... 3, 4, 11
§ 22 .................... 6
TEX. GOV'T CODE:
§ 402.003 .................... 6, 8
§ 402.004 .................... 8
§ 402.010 .................... 6

§ 402.021 .......... 6
§ 402.0212(a) .......... 8
§ 411.012 .......... 5
§ 437.002 .......... 5
TEX. DISCIPLINARY R. PROF'L CONDUCT 1.02(a)(2) .......... 7

**Other Authorities:**

Greg Abbott, Veto Proclamation, H.B. 2243, 89th Tex. Leg., R.S. (June 22, 2025), https://perma.cc/3SBL-L8SA .......... 5
William Baude, *The Judgment Power*, 96 GEO. L. J. 1807 (2008) .......... 9
Executive Order No. 14,165, 90 Fed. Reg. 8,467 (Jan. 30, 2025) .......... 11
Interim Settlement Agreement, *United States v. Texas*, ECF 180, No. 5:10-cv-01025 (W.D. Tex. Aug. 26, 2013) .......... 5
Office of the Texas Governor, Press Release (Jan. 29, 2025), https://perma.cc/PHS8-BLAZ .......... 11
Tex. Att'y Gen. Op. No. M-312 (1968), https://perma.cc/E37T-53Y6 .......... 4
Tex. Att'y Gen. Op. No. M-891 (1971), https://perma.cc/MXK4-V9UP .......... 4
13 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3523.2 (3d ed. 2026) .......... 9

## INTRODUCTION

At the July 14th hearing, this Court ordered briefs to be filed on an issue growing out of ongoing negotiations in this case—*i.e.*, whether this Court may retain jurisdiction to police compliance with a possible settlement between Texas and the United States. Governor Greg Abbott appears on behalf of the State of Texas as its Chief Executive Officer and the only official authorized to bind Texas in agreements with the United States. This brief explains why the Court may retain jurisdiction to enforce a settlement agreement's terms. But it also explains why absent the Governor's approval any resulting agreement would be unauthorized and unenforceable. This case has already consumed enough of the Court's scarce judicial resources. That is why any settlement agreement must be unimpeachable and fully comply with the Texas Constitution. The Governor is—and has been—prepared to enter a settlement containing terms the parties previously agreed to in principle and stands ready to work with the Court and the United States to bring this case to an immediate and permanent resolution.

## BACKGROUND

On April 23, 2026, this Court ordered the parties to engage in mediation before Magistrate Judge Watters. ECF No. 142. The substance of those settlement discussions is confidential. Accordingly, the Governor must refrain from divulging details of the terms being discussed. *See, e.g.*, *Wallace v. City of Hampton*, No. 2:15-cv-126, 2017 WL 11505959, at *1 (E.D. Va. Feb. 9, 2017) (discussing possibility of recusal where "some of the terms that were negotiated" in settlement negotiations were inadvertently disclosed to the court). The general course of negotiations, however, explains the need for this filing.

The Governor is eager to resolve this litigation and sought to fully participate in settlement discussions. He believes that destruction of state property is just as tortious

anywhere in Texas, whether it occurs in Eagle Pass or in El Paso. *Texas v. DHS*, 123 F.4th 186, 211 (5th Cir. 2024) (noting "Defendants do not contest the merits of these state law claims"). He likewise believes the State of Texas would derive the most benefit from the longest duration that can be secured for any settlement. Wanton destruction of state property absent an acute emergency would be unlawful in 5 years *and* in 50 years. *Ibid.*; *see Texas v. DHS*, No. DR-23-CV-00055, 2023 WL 8285223, at *4–5 (W.D. Tex. Nov. 29, 2023) (Moses, C.J.) (describing how Defendants were "seen cutting multiple holes in the concertina wire for no apparent purpose other than to allow migrants easier entrance further inland").

At the same time, the Governor recognizes that any settlement requires compromise and that negotiated resolution is more likely if the parties focus on terms capable of obtaining mutual assent—as opposed to maintaining maximalist positions. To that end, the Governor advised Magistrate Judge Watters and the United States of terms the State of Texas would be willing to accept. He has continually endeavored to resolve this dispute amicably.

On several occasions, counsel for the Governor also delivered proposed revisions to a draft settlement agreement to counsel for the Attorney General. For reasons that are unclear, counsel for the Attorney General repeatedly failed to provide that language to Defendants. After these failures forced counsel for the Governor and counsel for Defendants to engage directly, counsel for the Attorney General took the position that the Governor may not be involved in negotiating or consummating any settlement agreement.

This surprising position has prevented the parties from resolving a case on terms that both Texas and the United States have agreed to in principle. That position is also incorrect—not only because it transgresses the Attorney General's role as counsel, but also because under the Texas Constitution the Governor's approval is necessary to establish any binding

agreement between the State of Texas and the United States.

## ARGUMENT

### I. Under the Texas Constitution, the Governor Acts for the State in Negotiating and Consummating Sovereign-to-Sovereign Agreements.

Article IV, Section 10 of the Texas Constitution says that the Governor "shall conduct . . . all intercourse and business of the State . . . with the United States." Courts have applied this authority to encompass any "negotiations, agreements or contracts" with other sovereigns. *Highway Comm'n of Tex. v. Vaughn*, 288 S.W. 875, 879 (Tex. App.—Austin 1926, writ ref'd) (Governor's approval of agreement over interstate bridge with Oklahoma was required "to make the contracts the binding obligations of this state"); *see also Dickerson v. Texas*, No. 4:21-cv-02729, 2021 WL 4192740, at *2 (S.D. Tex. Sept. 15, 2021) (Governor entering and exiting funding "agreement" with U.S. Secretary of Labor).

That is not to say the Governor is "automatically implicated in every state action or even every executive-branch action." *State v. Volkswagen Aktiengesellschaft*, 692 S.W.3d 467, 470, 474 (Tex. 2022) (refusing to impute party status to Governor in a suit brought by Attorney General "acting on behalf of the Texas Commission on Environmental Quality"). "[A]ctors within the [Texas] executive branch . . . are not interchangeable and cannot be considered alter egos of one another." *Id.* at 474. That is why others cannot consummate an agreement for Texas with the United States—they are not the Governor's "alter ego."

When it comes to agreements "with the United States," unlike agreements with private litigants, the Governor is expressly vested with "all" constitutional authority to conduct the "intercourse and business of the State." TEX. CONST. art. IV, § 10; *see also Halliburton, Inc. v. Admin. Review Bd.*, 771 F.3d 254, 266 (5th Cir. 2014) ("'All means all.'"); *Davis v. Mueller*, 528 S.W.3d 97, 102 (Tex. 2017) ("All means all."). The Governor thus has primary authority to

"act[] in the name and on behalf of the State" when Texas is negotiating and entering into agreements with the federal government. *Adams v. Calvert*, 396 S.W.2d 948, 949–951 (Tex. 1965) (relying on Article IV, Section 10, to reject efforts to cabin Governor's discretion in cession of land to federal government).

The Office of the Attorney General has long recognized this constitutional requirement. In 1968, the Attorney General pointed to Article IV, Section 10, to conclude that a purported agreement between the Texas Highway Department and the State of Arkansas would become a binding contract only "upon approval by the Governor of Texas." Tex. Att'y Gen. Op. No. M-312 (1968), https://perma.cc/E37T-53Y6. A few years later, the office said the same thing, concluding that "[a]ny contract with the Federal Government by Texas Water Quality Board *must bear the approval of the Governor*." Tex. Att'y Gen. Op. No. M-891 (1971), https://perma.cc/MXK4-V9UP (emphasis added). Whether an agreement is between Texas and Arkansas, or between Texas and the United States, under the Texas Constitution the Governor alone speaks authoritatively for this State in dealings with another sovereign.

That principle is implicated here because the proposed settlement is more than an ordinary judgment or other kind of judicial decree resolving a legal dispute by judicial command. Instead, the possible resolution being contemplated here would involve a written agreement between Texas and the United States, that would later be incorporated into a separate judgment of the Court. *See infra* Part III. The sovereign-to-sovereign agreement under contemplation thus triggers the constitutional duty of the Governor.

The fact that the agreement grows out of a lawsuit, and that the parties envision this Court retaining jurisdiction to enforce its terms, does not change that outcome. A settlement

is "a binding agreement" and a "contract" just like any other, separate from any court "judgment" that may later incorporate it by reference. *Richardson v. Famous Bourbon Mgmt. Grp.*, 857 F. App'x 182, 184 (5th Cir. 2021) (per curiam). That is why, in this federal district, then-Governor Rick Perry co-signed with then-Attorney General Greg Abbott a settlement agreement between Texas and the United States. Attorney General Abbott signed as counsel for the State in ongoing litigation; Governor Perry signed as the State's chief diplomatic officer contracting with another sovereign government. *See* Interim Settlement Agreement, *United States v. Texas*, ECF 180, No. 5:10-cv-01025 (W.D. Tex. Aug. 26, 2013).

This arrangement makes especially good sense as a practical matter. Ultimately, it will be officers in the Governor's chain of command who will operationalize any agreement for Texas in the years to come. For example, should future disputes arise about cutting or repairing Texas's c-wire barrier, the Texas Military Department and Texas Department of Public Safety will be the ones responding and engaging with federal immigration agents. Under the Texas Constitution, which lodges all executive power in a department comprised of six officers and headed by the Governor, those agents necessarily exercise executive power delegated by the Chief Executive Officer. *See* Greg Abbott, Veto Proclamation, H.B. 2243, 89th Tex. Leg., R.S. (June 22, 2025), https://perma.cc/3SBL-L8SA; *Paxton v. Am. Oversight*, 716 S.W.3d 535, 567–568 (Tex. 2025) (Young, J., concurring); *cf. Trump v. Slaughter*, 146 S. Ct. 2283, 2293 (2026). It makes sense, therefore, that Texas's "Commander-in-Chief" has a seat at the table concerning the contractual duties owed by, and to, his delegees. *See* TEX. CONST. art. IV, § 7; TEX. GOV'T CODE §§ 411.012, 437.002.

## II. Counsel for the State Is Not the State Itself and Cannot Override the Wishes of State Clients Concerning Settlement.

Though the Attorney General has appeared here as counsel for the State, he is not

himself "the State." Accordingly, any effort to consummate this agreement without gubernatorial approval would be invalid, and any suggestion the Governor may be ignored is incorrect.

The Texas Constitution grants the Attorney General power to "*represent* the State . . . in the Supreme Court of the State." TEX. CONST. art. IV, § 22 (emphasis added). State statutes have extended that authority by implication beyond proceedings in the Texas Supreme Court to include litigation elsewhere. *See, e.g.*, TEX. GOV'T CODE §§ 402.003 ("civil cases in which the state was a party"), 402.010 ("constitutional challenge[s]"), 402.021 (actions before "courts of appeals"). These litigation functions naturally assume the authority to resolve disputes in litigation, whether by declaratory relief, injunctions, agreed judgments, or other kinds of judicial decrees. They also include "authority to *propose* a settlement agreement." *Terrazas v. Ramirez*, 829 S.W.2d 712, 722 (Tex. 1991) (plurality op.) (emphasis added).

In carrying out these functions, however, courts have consistently recognized that the Attorney General "acts as *counsel*" for Texas, rather than as the client itself. *LULAC v. Clements*, 999 F.2d 831, 842 (5th Cir. 1993) (en banc) (emphasis added); *see, e.g.*, *Bullock v. Tex. Skating Ass'n*, 583 S.W.2d 888, 894 (Tex. App.—Austin 1979, writ ref'd n.r.e.) ("[T]he Attorney General . . . is authorized to perform the duties of the State's attorney."). In other words, the Attorney General does not become "the State" or "step[] into the[] shoes" of state actors whenever he litigates on the State's behalf. *LULAC*, 999 F.2d at 842; *see also id.* at 839, 846–847 (rejecting Attorney General's effort to force consent decree over the objection of state officials); *Charles Scribner's Sons v. Marrs*, 114 Tex. 11, 31 (1924) (clarifying on rehearing that, while the Attorney General "is charged with the duty to *represent* the state," it was the State

Board of Education, not the Attorney General, that "has the final authority" and "is empowered to" exercise the State's right to maintain or reject a voidable contract (emphasis added)); *Terrazas*, 829 S.W.2d at 753 (Hightower, J., dissenting) (recognizing Attorney General authority to settle with private individuals on behalf of the State where the Constitution did not authorize other officers to exercise power at issue and settlement thus would "not usurp the authority of" those officers).

As counsel, the Attorney General is bound by the rules that constrain other attorneys. The Supreme Court of Texas has explained that the State's Rules of Professional Conduct "apply to all Texas lawyers, including the attorney general and his staff." *Webster v. Comm'n for Lawyer Discipline*, 704 S.W.3d 478, 484 (Tex. 2024). Those Rules, in turn, provide that counsel "shall abide by a client[']s decisions . . . whether to accept an offer of settlement of a matter." TEX. DISCIPLINARY R. PROF'L CONDUCT 1.02(a)(2). "The decision to settle" is thus "wholly committed to clients, not their attorneys." *Gust, Inc., v. Alphacap Ventures, LLC*, 905 F.3d 1321, 1334 (Fed. Cir. 2018); *see United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., AFL-CIO*, 986 F.2d 15, 19 (2d Cir. 1993) ("[T]he decision to settle a case rests with the client alone."); *United States v. Beebe*, 180 U.S. 343, 350–353 (1901) ("[T]he power to compromise a suit in which the United States is a party does not exist with the district attorney any more than a power to compromise a private suit between individuals rests with the attorney of either party."). The Attorney General, as counsel, possesses no independent authority to reject settlement terms approved by, or to approve settlement terms rejected by, the only State official constitutionally empowered to enter Texas into agreements with the United States. In this case, that state official is the Governor.

The Fifth Circuit has noted these limits on the Attorney General's authority. In

*LULAC v. Clements*, 999 F.2d 831, 842 (5th Cir. 1993) (en banc), the Court explained:

> The Texas legislature has also recognized that the Attorney General represents the State but does not make its policies. "An admission, agreement, or waiver made by the attorney general in an action or suit to which the state is a party does not prejudice the rights of the state." TEX. GOV'T CODE ANN. § 402.004 (Vernon 1988); *see also State v. Reagan County Purchasing Co.*, 186 S.W.2d 128, 135 (Tex. Civ. App.—El Paso 1944, writ ref'd w.o.m.) ("acts beyond the scope of [the Attorney General's] delegated power are not binding on the State"). If the Texas Attorney General could make policy for the State, this provision would be superfluous, for he could never violate it. He would in effect be the State. When faced with this statute before, we appropriately noted that "Texas has been at particular pains to attempt to circumscribe the power of the attorney general to make admissions on its behalf." *United States v. Texas*, 680 F.2d 356, 368 n.17 (5th Cir. 1982).

There, the Attorney General claimed to be "sole arbiter of State policy when the State's interest is in litigation" by unilaterally negotiating a settlement that implicated the authority of other state officers. *Id.* at 840. The Fifth Circuit held the Attorney General "may not ignore" those officers whose authority was implicated by the proposal and even permitted them to appear separately in court to represent their own interests. *Id.* at 839 n.6, 842. That holding remains good law in this Circuit and is binding on this Court.

State law thus makes clear that, even in the realm of civil litigation, the Attorney General is not a law unto himself. The Supreme Court of Texas has indicated that the Governor could "require" the Attorney General to bring a lawsuit, even if the Attorney General otherwise lacked statutory authority to bring such an action. *Day Land & Cattle Co. v. State*, 4 S.W. 865, 867 (Tex. 1887). State statutes authorize any "agency established by the Texas Constitution" to obtain outside legal counsel without needing Attorney General approval. TEX. GOV'T CODE § 402.0212(a). And the Attorney General is obligated to report to the Governor—the Chief Executive Officer of the State—"on the first Monday of December of each even-numbered year" a summary of all "civil cases in which *the state* was a

party." TEX. GOV'T CODE § 402.003 (emphasis added).

The Attorney General's important—but limited—role as an "inferior officer[]" in the Executive Department generally tasked with representing the State cannot provide a basis to usurp the Chief Executive Officer's specific constitutional prerogative to speak exclusively for the State in sovereign-to-sovereign dealings. *Am. Oversight*, 716 S.W.3d at 553 (Young, J., concurring). The Governor's "specific" authority as "chief diplomat" under the Texas Constitution trumps the Attorney General's "general" authority as counsel implied by statute. *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 37–38 (2015) (Thomas, J., concurring in judgment in part and dissenting in part); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992) ("the specific governs the general"). No court has ever held otherwise.

## III. This Court May Retain Jurisdiction Over a Settlement Agreement Between the Two Sovereign Governments Concerned Here.

To understand why this Court may retain jurisdiction over a settlement, it is important to separate two instruments—a judgment on the one hand, and a settlement on the other.

A judgment of this Court is an exercise of the "judicial Power of the United States." U.S. CONST. art. III, § 1. When issuing such judgments, this Court exercises coercive power over litigants properly before it and binds them finally by decree. So, for example, this Court may require one party to pay another a sum of money; it may order a party to be confined to prison for a term of years; or it may direct a party to do (or refrain from doing) something. *See generally* William Baude, *The Judgment Power*, 96 GEO. L.J. 1807, 1814–1815 (2008). This Court, in turn, has inherent and express power to enforce such orders, from contempt to writs of execution to exercise of ancillary jurisdiction. *See, e.g.*, *Ex parte Robinson*, 86 U.S. 505, 510 (1873); FED. R. CIV. P. 62, 64, 69, 70; FED. R. CRIM. P. 42; 13 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3523.2 (3d ed. 2026).

A settlement agreement, by contrast, is different. Rather than originating with sovereign judicial power, a settlement is an arms-length agreement between two or more parties—just like any other "contract." *Richardson*, 857 F. App'x at 184; *see, e.g.*, *Archer v. Warner*, 538 U.S. 314, 321 (2003) (settlement was a "contractual release[]"). What the parties agree to, in other words, they agree to *by themselves* through a "private contractual agreement" and without involvement of, or coercion by, any court. *United States v. City of Miami*, 614 F.2d 1322, 1330 (5th Cir. 1980) ("[T]he trial court plays no role in overseeing or approving any settlement proposals."), *modified on rehearing en banc*, 664 F.2d 435 (5th Cir. 1981) (en banc). These products of private, mutual assent are ordinarily enforced "in the same way that other rights arising from private agreements are enforced, through an action for breach of contract." *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 882 (1994).

The Supreme Court, however, has recognized an exception: Parties may elect to make the "obligation to comply with the terms of the settlement agreement . . . part of [a court's] order of dismissal—either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order" itself. *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 381 (1994). Because a "court is authorized to embody the settlement contract in its dismissal order," the court can later enforce its terms by exercising judicial power to enforce its order in the same case, rather than by forcing the parties to bring a new action "for breach of contract." *Ibid*. The contract, in other words, becomes part of a court *judgment*, subject to ordinary judicial enforcement.

There should be nothing controversial or objectionable about this practice. Just two months ago, the Supreme Court reaffirmed these principles in *Jules v. Andre Balazs Properties*, 146 S. Ct. 1209 (2026), explaining that courts may "incorporate private settlements" and

"embody contracts" into court orders. *Id.* at 1219. For that reason, the Court unanimously approved a federal district court exercising continuing jurisdiction to enforce an arbitration award—*i.e.*, "a contractual resolution of the parties' dispute"—because it had been embodied "in a court order resolving the case." *Id.* at 1218–1219.

The contemplated settlement agreement is a "contract" between Texas and the United States. *Kokkonen*, 511 U.S. at 381–382. That is why it may be fully executed on Texas's behalf by the Governor alone. TEX. CONST. art. IV, § 10. It is also why this Court may then retain jurisdiction to enforce the agreement's terms by incorporating them in an order of dismissal.

## CONCLUSION

The conditions along the southern border have changed since 2023. As this Court observed, the federal government previously engaged in "culpable and duplicitous conduct" by destroying state property "for no apparent purpose other than to" facilitate illegal immigration. *Texas*, 2023 WL 8285223, at *3–4. Now, it has taken historic steps "to ensure complete operational control" of the border, including by deploying (rather than destroying) physical barriers. Executive Order No. 14,165, 90 Fed. Reg. 8,467 (Jan. 30, 2025). The Governor, meanwhile, has directed state agencies "to partner with the Trump Administration to enforce the rule of law and help secure the homeland." Office of the Texas Governor, Press Release (Jan. 29, 2025), https://perma.cc/PHS8-BLAZ. It is in the interest of both Texas and the United States to resolve this matter. Because the contemplated agreement is a "contract" between two sovereigns, *Kokkonen*, 511 U.S. at 381–382, it may be fully executed on Texas's behalf by the Governor alone, TEX. CONST. art. IV, § 10. This Court's recognition of that fact would allow Texas and the United States to resolve this case immediately.

DATE: August 14, 2026

Respectfully submitted,

/s/ Trevor W. Ezell
TREVOR W. EZELL
General Counsel
Texas Bar No. 24109849
Trevor.Ezell@gov.texas.gov

JASON T. BRAMOW
Deputy General Counsel
Texas Bar No. 24101545
Jason.Bramow@gov.texas.gov

Office of the Governor
P.O. Box 12428
Austin, Texas 78711

*Counsel for Greg Abbott, in his official capacity as Governor, on behalf of the State of Texas*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served on the 14th day of August, 2026, upon all parties who have entered an appearance, using the CM/ECF system.

/s/ Trevor W. Ezell
TREVOR W. EZELL
General Counsel
Office of Governor Greg Abbott